**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**AIKEN DIVISION**

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA, | ) | |
| | ) | |
| SOUTH CAROLINA DEPARTMENT OF | ) | |
| HEALTH AND ENVIRONMENTAL CONTROL, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SAVANNAH RIVER MARITIME | ) | |
| COMMISSION, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C/A No. __1:19-cv-3132-RMG__ |
| | ) | |
| UNITED STATES ARMY CORPS OF | ) | |
| ENGINEERS; | ) | |
| | ) | |
| UNITED STATES ARMY CORPS OF | ) | |
| ENGINEERS, SAVANNAH DISTRICT; | ) | |
| | ) | |
| RYAN MCCARTHY, in his official capacity as | ) | |
| Secretary of the Army; | ) | |
| | ) | |
| LT. GENERAL TODD T. SEMONITE, in his | ) | |
| official capacity as Commanding General and | ) | |
| Chief of Engineers, U.S. Army Corps of Engineers; | ) | |
| | ) | |
| MAJOR GENERAL DIANA M. HOLLAND, in | ) | |
| her official capacity as Commanding General, | ) | |
| South Atlantic Division, U.S. Army Corps of | ) | |
| Engineers; | ) | |
| | ) | |
| and | ) | |
| | ) | |
| COLONEL DANIEL H. HIBNER, in his | ) | |
| official capacity as District Engineer, U.S. | ) | |
| Army Corps of Engineers, Savannah District, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

The State of South Carolina, the South Carolina Department of Health and Environmental Control, and the South Carolina Savannah River Maritime Commission jointly set forth and complain as follows:

## PARTIES

1.    Plaintiff State of South Carolina (State) is a sovereign state of the United States which borders the Savannah River. South Carolina also is the owner of property and other various property rights located in, nearby, and adjacent to the Savannah River.

2.    Plaintiff South Carolina Department of Health and Environmental Control (DHEC) is an agency and instrumentality of the State of South Carolina with general jurisdiction over, *inter alia*, the quality of and construction in the waters of the State under S.C. Code Ann. §§ 44-1-20 *et seq.*, 48-1-10 *et seq.* and 49-1-10 *et seq.*, and S.C. Code Ann. Regs. 19-450 *et seq.* and 61-101 *et seq.*

3.    Plaintiff Savannah River Maritime Commission (Commission) is an agency and instrumentality of the State of South Carolina and was created by Act No. 56 of 2007, which established the Commission to represent the State "in all matters pertaining to the navigability, depth, dredging, wastewater and sludge disposal, and related collateral issues in regard to the use of the Savannah River as a waterway for ocean-going container or commerce vessels." S.C. Code Ann. § 54-6-10. The Commission is further "empowered to negotiate on behalf of the State of South Carolina and enter into agreements with the State of Georgia [and] U.S. Army Corps of Engineers," and its responsibilities in that regard "supersede any other concurrent responsibilities of a particular state agency or department." *Id.*

4.    Collectively, all plaintiffs are referred to as "South Carolina."

5.      Defendant United States Army Corps of Engineers (Corps) is a federal agency responsible for compliance with federal and state law for its civil works projects.

6.      Defendant United States Army Corps of Engineers, Savannah District is a unit of Defendant United States Army Corps of Engineers and is the lead federal agency responsible for compliance with federal and state law for the project at issue in this case.

7.      Defendant Ryan McCarthy is the Secretary of the Army and is sued in his official capacity. Secretary McCarthy has decision-making authority and is responsible for ensuring compliance with federal and state law related to the project at issue in this case.

8.      Defendant Lieutenant General Todd T. Semonite is the Commanding General and Chief of Engineers of the U.S. Army Corps of Engineers and is sued in his official capacity. General Semonite has decision-making authority and is responsible for ensuring compliance with federal and state law related to the project at issue in this case.

9.      Defendant Major General Diana M. Holland is the Commanding General of the South Atlantic Division of the United States Army Corps of Engineers and is sued in her official capacity. General Holland has decision-making authority and is responsible for ensuring compliance with federal and state law related to the project at issue in this case.

10.      Defendant Colonel Daniel H. Hibner is the District Commander for the U.S. Army Corps of Engineers, Savannah District and is sued in his official capacity. Colonel Hibner has decision-making authority and is responsible for ensuring compliance with federal and state law related to the project at issue in this case.

11.      Collectively, all defendants are referred to as the "Federal Defendants."

## JURISDICTION

12.     This Court has jurisdiction pursuant to 28 U.S.C.A. § 1331 (federal question), 28 U.S.C.A. §§ 2201 and 2202 (declaratory judgment and injunction), the Federal Administrative Procedures Act, 5 U.S.C.A. §§ 701 *et seq.*, and the continuing jurisdiction of the Court under this Court's Order dated May 29, 2013, in the related case bearing C.A. No. 9:12-cv-00610-RMG, dkt.#99 (Settlement Order), as this case implicates interstate commerce, interstate waters, federal statutes, federal regulations, compliance with the Settlement Order, and the conduct of federal agencies and federal officers.

## VENUE

13.     Venue is proper in this court pursuant to 28 U.S.C.A. § 1391(b) and Local Civil Rule 3.01(A)(1), as a substantial portion of the property and land that is the subject of this action is within the boundaries of the State of South Carolina and Aiken County.

## GOVERNING LAW

**Declaratory Judgment Act**

14.     The Declaratory Judgment Act provides that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C.A. § 2201(a).

15.     The Declaratory Judgment Act further provides that "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." 28 U.S.C.A. § 2202.

**Administrative Procedure Act**

16.    The Administrative Procedures Act (APA) entitles a party suffering a legal wrong because of agency action, or adversely affected by agency action, the right to judicial review. 5 U.S.C.A. § 702.

17.    The APA provides judicial review of final agency actions for which there is no other adequate remedy in court. 5. U.S.C.A. § 704.

18.    A reviewing court shall (1) compel agency action unlawfully withheld or unreasonably delayed; and (2) hold unlawful and set aside agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, or in excess of statutory jurisdiction or authority, or without observance of procedure required by law. 5 U.S.C.A. § 706.

**The National Environmental Policy Act**

19.    The National Environmental Policy Act (NEPA) directs all federal agencies to assess the environmental impact of proposed actions that significantly affect the quality of the environment. 42 U.S.C.A. § 4332(2)(C). NEPA was enacted to ensure that federal agencies carefully and fully contemplate the environmental impact of their actions and to ensure that sufficient information on the environmental impact is made available to the public before actions are taken.

20.    The Council on Environmental Quality (CEQ) has promulgated uniform regulations to implement NEPA that are binding on all federal agencies. 42 U.S.C.A. § 4342; 40 C.F.R. §§ 1500-1508. The Corps has also promulgated its own NEPA regulations to supplement the uniform CEQ regulations. 33 C.F.R. §§ 230 *et seq*.

21.     NEPA requires federal agencies to prepare a review of any major federal action that may significantly affect the quality of the environment. 42 U.S.C.A. § 4332(2)(C); 40 C.F.R. § 1501.4(a)(1); 33 C.F.R. § 230.6.

22.     Environmental review under NEPA can take the form of three levels of review: (1) a categorical exclusion; (2) an environmental assessment (EA) and subsequent finding of no significant impact (FONSI); or (3) an EA and/or environmental impact statement (EIS). *E.g.* 40 C.F.R. §§ 1508.1 *et seq.*

23.     If the proposed action does not meet the criteria for a categorical exclusion, then the action is to be evaluated to determine whether an EIS is required. Typically that evaluation takes the form of an EA, which is meant to be a concise public document that looks at and provides sufficient evidence and analysis for determinting whether an EIS is required. 40 C.F.R. § 1508.9. If, at the end of the EA process, the agency determines that no EIS is necessary, the agency is authorized to produce a draft EA for public review and, thereafter, issue a FONSI. 40 C.F.R. § 1508.9, -13. If, at the end of the EA process, the agency determines that an EIS is required, the agency will build upon the analysis developed in the EA process and thereafter publish a draft EIS. 40 C.F.R. § 1508.11.

24.     The NEPA regulations state that during the NEPA process "[a]gencies shall not commit resources prejudicing selection of alternatives before making a final decision." 40 C.F.R. § 1502.2(f).

25.     "Until an agency issues a record of decision …, no action concerning the proposal shall be taken which would: (1) Have an adverse environmental impact; or (2) Limit the choice of reasonable alternatives." 40 C.F.R. § 1506.1(a); *see* 33 C.F.R. § 230.22 ("Limitations on actions during the NEPA process.").

26.     Following the publication of any draft or final environmental document under NEPA, an agency is required to supplement its analysis if the agency makes substantial changes to the proposed action that are relevant to environmental concerns, or if there are significant new circumstances or information relevant to the environmental effects that have bearing on the proposed action or its impacts. 40 C.F.R. §§ 1500-1508.

**The National Historic Preservation Act**

27.     The National Historic Preservation Act (NHPA) was enacted to remedy the serious problem of "historic properties significant to the Nation's heritage [] being lost or substantially altered, often inadvertently, with increasing frequency." 16 U.S.C.A. § 470(b)(3). NHPA Section 106 thus requires that federal agencies having authority to license any undertaking shall, prior to the issuance of any license, "take into account the effect of the undertaking" on any historic district or property. *Id.* § 470f. Furthermore, the agency "shall afford the Advisory Council on Historic Preservation ... a reasonable opportunity to comment with regard to such undertaking." *Id.* The goal of this consultation is "to identify historic properties potentially affected by the undertaking, assess its effects and seek ways to avoid, minimize or mitigate any adverse effects on historic properties." 36 C.F.R. § 800.1(a).

28.     The Advisory Council on Historic Preservation is charged with promulgating binding regulations that federal agencies must follow to implement NHPA Section 106. *See* 36 C.F.R. Part 800. To identify historic properties in an undertaking's Area of Potential Effects, the Corps shall "[s]eek information, as appropriate, from consulting parties, and other individuals and organizations likely to have knowledge of, or concerns with, historic properties in the area, and identify issues relating to the undertaking's potential effects on historic properties" and must consult with the State Historic Preservation Office (SHPO) as well as local governments, the

public, and "other parties entitled to be consulting parties." *Id.* § 800.4. Before concluding its analysis of potential adverse effects, the Corps "shall make a reasonable and good faith effort to carry out appropriate identification efforts, which may include background research, consultation, oral history interviews, sample field investigation, and field survey." *Id.*

29.     An undertaking's "Area of Potential Effect" is defined as the area "within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties" given the undertaking's "scale and nature." 36 C.F.R. § 800.16(d). "[A]n adverse effect is found when any undertaking may alter, directly or indirectly, any of the characteristics of a historic property in a manner that would diminish the integrity of its location, design, setting, materials, workmanship, feeling, or association," and includes indirect and cumulative effects. *Id.* § 800.5(a)(1); *see id.* § 800.5(a)(2)(iv) (adverse effects include "change of the character of the property's use or of physical features within the property's setting that contribute to its historic significance"); *id.* § 800.5(a)(2)(v) ("introduction of visual, atmospheric or audible elements that diminish the integrity of the property's significant historic features").

30.     The Corps' regulations require the agency, when authorizing work within the Corps' regulatory jurisdiction, to consider "the effects of undertakings on any known historic properties that may occur outside the permit area," 33 C.F.R. Part 325, Appendix C, ¶5(f), and direct it to "comply with the current procedures for addressing the requirements of Section 106 of the National Historic Preservation Act" in authorizing an activity. If the Corps determines an undertaking will have no effects, it must provide documentation of its determination to the SHPO, notify all consulting parties, and make the documentation available for public inspection. 36 C.F.R. §§ 800.4(d)(1), 800.5(b). Where a consulting party or the ACHP objects to the no-adverse-effect determination, the Corps must consult with the objecting parties. 36 C.F.R. § 800.5(c)(2)(i).

**The Clean Water Act**

31.    The Clean Water Act (CWA) was enacted with the objective to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C.A. § 1251(a).

32.    Further, "[i]t is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution[.]" 33 U.S.C.A. § 1251(b).

33.    Section 313 of the CWA, 33 U.S.C.A. § 1323, provides:

> (a)    Compliance with pollution control requirements of Federal entities
>
> Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any property or facility, or (2) **engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants**, and each officer, agent, or employee thereof in the performance of his official duties, **shall be subject to, and comply with, all** Federal, **State**, interstate, and local requirements, **administrative authority**, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity including the payment of reasonable service charges. The preceding sentence shall apply (A) to any requirement whether substantive or procedural (including any recordkeeping or reporting requirement, **any requirement respecting permits** and any other requirement whatsoever), (B) **to the exercise of any** Federal, **State**, or local **administrative authority**, and (C) to any process and sanction, whether enforced in Federal, State, or local courts or in any manner. This subsection shall apply **notwithstanding any immunity** of such agencies, officers, agents, or employees under any law or rule of law.

33 U.S.C.A. § 1323(a) (emphasis added).

34.    Section 401 of the CWA, 33 U.S.C.A. § 1341, "Certification", provides:

> (a)(1) Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation

of facilities, which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate … that any such discharge will comply with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title. … No license or permit shall be granted until the certification required by this section has been obtained or has been waived as provided in the preceding sentence. **No license or permit shall be granted if certification has been denied by the State**, the interstate agency, or the Administrator, as the case may be.

33 U.S.C.A § 1341(a)(1) (emphasis added).

## South Carolina Water Quality Certification

35.     S.C. Code Ann. Regs. 61-101 *et seq.* establishes DHEC's procedures and policies for implementing the South Carolina's water quality certification requirements consistent with Section 401 of the CWA.

36.     Under Regulation 61-101, DHEC is responsible for evaluating any project requiring a federal license or permit which may result in a discharge into navigable waters in order to determine whether the proposed discharge is in compliance with Section 401 of the Clean Water Act.  In its analysis, DHEC is required to, among other things, assess the water quality impacts of the project and make conclusions concerning compliance with water quality standards, protection of classified uses, and related water quality impacts.  Based on its evaluation, DHEC must either issue, deny, or waive certification (through inaction) for the proposed discharge and may set forth limitations, conditions, or monitoring requirements for the project in order to assure continued compliance with South Carolina's environmental regulations.

37.     Activity, either during construction or operation, which results in any discharge to navigable waters requires certification from DHEC that such activity will not violate applicable water quality standards of the State.

38.    In assessing the water quality impacts of the project, DHEC addresses and considers the following factors:

    a.    whether the activity is water dependent and the intended purpose of the activity;

    b.    whether there are feasible alternatives to the activity; and

    c.    all potential water quality impacts of the project, both direct and indirect, over the life of the project including:

        i.    impact on existing and classified water uses;

        ii.    physical, chemical, and biological impacts, including cumulative impacts;

        iii.    the effect on circulation patterns and water movement; and

        iv.    the cumulative impacts of the proposed activity and reasonably foreseeable similar activities of the applicant and others.

S.C. Code Ann. Regs. 61-101(F)(3).

39.    Among other reasons, a 401 Certification may be denied by DHEC if, *inter alia*:

    a.    the proposed activity permanently alters the aquatic ecosystem in the vicinity of the project such that its functions and values are eliminated or impaired;

    b.    there is a feasible alternative to the activity, which reduces adverse consequences on water quality and classified uses;

    c.    the proposed activity adversely impacts waters containing State or Federally recognized rare, threatened, or endangered species; or

    d.    the proposed activity adversely impacts special or unique habitats, such as National Wild and Scenic Rivers, National Estuarine Research Reserves, or National Ecological Preserves, or designated State Scenic Rivers.

S.C. Code Ann. Regs. 61-101(F)(5).

**South Carolina Construction in Navigable Waters Permit**

40.    South Carolina law provides that a permit issued by DHEC is required for any dredging, filling, or construction or alteration activity in, on, or over a navigable water; or in or on the bed under navigable waters; or in or on lands or waters subject to a public navigational servitude under Article 14 Section 4 of the South Carolina Constitution and S.C. Code Ann. §§ 49-1-10 *et seq.* S.C. Code Ann. Regs. 19-450 *et seq.* (Navigable Waters Permit).

41.    Under Regulation 19-450, DHEC is responsible for assessing the total impact of the projected activity on the navigable waters and lands subject to the jurisdiction of South Carolina, as well as the impact on the economy and natural resources of the State. DHEC is required by regulation to evaluate the utilization and protection of important State resources and balance the extent and permanence of reasonably foreseeable benefits and detriments of the projected activity including its impact on conservation, economics, aesthetics, general environmental concerns, cultural values, fish and wildlife, navigation, erosion and accretion, recreation, water quality, water supply and conservation, and is tasked with determining whether the projected activity is consistent with the needs and welfare of the public.  In particular DHEC must consider the extent to which, among other things:

a.  the activity requires construction in, on, or over a navigable waterway, and the economic benefits to the state and public from such location;

b.  the activity would impact fish and wildlife, water quality and other natural resource values or could affect the habitats or rare and endangered species of wildlife and irreplaceable historic and archaeological sites associated with public lands and waters;

12

  c. the economic benefits to the state and public from the authorized use of lands and waters meets or exceeds the benefits from preservation of the area in its unaltered state;

  d. there is any adverse environmental impact which cannot be avoided by reasonable safeguards;

  e. all feasible alternatives are taken to avoid adverse environmental impact resulting from the project; and,

  f. the long range, cumulative effects of the project, including the cumulative effects of similar projects, may affect navigable waters.

S.C. Code Ann. Regs. 19-450.

  42. In particular, any activity "that is intended to restore a water control structure involving impoundment that has not been continually maintained and is not currently serviceable and intact and is now in disrepair and disuse, shall require a permit." S.C. Code Ann. Regs. 19-450.3(H)(1).

  43. Through a Navigable Waters Permit, DHEC has the authority to ensure that "permitted activities shall not block or obstruct navigation or the flow of any waters unless specifically authorized [by the permit]; no attempt shall be made by the permittee to prevent the full and free use by the public of all navigable waters at or adjacent to the work authorized by the permits; and that no spoil, dredged material, or any other fill material be placed below the mean high water or ordinary high water elevation, unless specifically authorized [by the permit]." S.C. Code Ann. Regs. 19-450.4(A)(7).

  44. Further, Regulation 19-450.12 provides:

  Unpermitted Activity; Review of Previously Permitted Activity. A. **Any activity undertaken after the commencement of the**

13

> **Construction in Navigable Waters permitting program** under regulation 19-450 promulgated on December 31, 1976 **for which a permit is required but was not obtained is in violation of these regulations**. Such activity may be permitted providing that it is consistent with these regulations, and the applicant promptly complies with the permitting process. **Unless specifically authorized by the Department, an applicant may not complete any structure or continue any activity until the permit is issued**.

S.C. Code Ann. Regs. 19-450.12 (emphasis added).

45.    Federal law requires the Corps to comply with South Carolina law and obtain a 401 Certification and Navigable Waters Permit from the State of South Carolina. 33 U.S.C.A. §§ 1323(a) (all federal agencies "shall be subject to, and comply with, all Federal, State, interstate, and local requirements … respecting the control and abatement of water pollution."), 1370 (Clean Water Act does not preclude a State from adopting or enforcing standards or limitations or pollution control requirements or impair any rights of the States); 33 C.F.R. § 336.1(a)(1), (b)(8) (requiring the Corps to acquire a 401 Certification); *see* Executive Order 12088, *Federal Compliance With Pollution Control Standards*, dated Oct. 13, 1978 (requiring compliance of federal activities with applicable pollution control standards in the same manner as any non-federal entity).

46.    Policy guiding the Corps' conduct also requires the Corps to obtain a 401 Certification and Navigable Waters Permit from the State of South Carolina.

> State water quality certification requires the District Commander to accomplish the following three tasks:
>
> (1) Complete an evaluation of the effects of the proposed discharge consistent with the Section 404(b)(1) Guidelines;
>
> (2) Issue a public notice, with opportunity for public hearings for the proposed discharge, including or referencing the preliminary Section 404(b)(1) evaluation; and
>
> (3) **Obtain certification, including any required conditions, from the State or interstate water pollution control agency that the proposed action is in compliance with established**

14

> **effluent limitations and water quality standards.** If the State in question has assumed responsibilities for the 404 regulatory program, a State 404 permit shall be obtained, if applicable, which will serve as the certification of compliance. District commanders shall provide the State with necessary detailed information it may need to issue the water quality certification.

U.S. Army Corps of Eng'rs, *Planning and Guidance* Appx. C, ER 1105-2-100 at C-42 (emphasis added); U.S. Army Corps of Eng'rs, *Water Quality and Envtl. Management For Corps Civil Works Projects*, ER 1110-2-8154 at 1-3 (federal activities must comply with all Federal, state, interstate, and local requirements in the same manner and extent as other entities, and the "environment will be addressed as equal in value and importance to other project purposes when developing or carrying out management strategies. **The Corps will, at least, manage its projects in accordance with all applicable** Federal and **state environmental laws, criteria, and standards**.") (emphasis added).

47.    On October 29, 2019, the Corps publicly announced and released the Integrated Post Authorization Analysis Report and Supplemental Environmental Assessment, dated August 30, 2019 (SEA). *See* Exhibit A, SEA.

48.    On October 29, 2019, the Corps announced that Alternative 2-6d from the SEA, which calls for the removal of the NSBLD and the construction of a river-wide fixed weir structure and dry floodplain bench, was the preferred and approved option for the NSBLD. *See* Exhibit B, U.S. Army Corps of Eng'rs Mem., Maj. General Holland, Approval of Final Report, Savannah Harbor Expansion Project (SHEP), Georgia and South Carolina: Fish Passage at New Savannah Bluff Lock and Dam (NSBLD) Integrated Post Authorization Analysis Report and Supplemental Environmental Assessment (EA), dated Oct. 29, 2019 (Approval Memo); *See* Exhibit C, Finding of No Significant Impact, Savannah Harbor Expansion Project Fish Passage at New Savannah

Bluff Lock and Dam Richmond County, Georgia and Aiken County, South Carolina, dated Oct. 29, 2019 (FONSI).

49.    The preferred plan (Alternative 2-6d) is expected to lower the existing pool level by approximately 5.5 feet (from approximately 114.5 NGVD29 to 109.0 NGVD29) during normal operating conditions.

## FACTS

**Background**

50.    The New Savannah Bluff Lock and Dam (NSBLD) is located at the New Savannah Bluff, Savannah River, along the border of South Carolina and Georgia in Aiken County, South Carolina.

51.    The NSBLD was constructed on the Savannah River approximately 13 miles below the City of North Augusta, South Carolina (and Augusta, Georgia) in 1937 as part of a federal project on the Savannah River below Augusta/North Augusta.



Source:    https://www.theoutbound.com/georgia/photography/explore-and-fish-at-the-savannah-river-lock-and-dam

52.    The purpose of the federal project was to assist in commercial navigation of the Savannah River from Savannah Harbor to Augusta via steamship and commercial barge. The project authorized maintenance of a channel through the Savannah River to a depth of nine feet and 90 feet wide. The nine-foot authorized depth of the Savannah River channel would support only the operation of commercial freight barges, not ocean-going container ships.[1]

53.    In 1932, the South Carolina General Assembly created the Savannah River Navigation Commission (Navigation Commission) for the purpose of aiding in the construction and future maintenance of the proposed channel or channels by the United States in the Savannah River below Augusta, Georgia. 1932 S.C. Acts 1190.

54.    The Navigation Commission was empowered to represent local interests insofar as the State of South Carolina was concerned, and deal with the United States, on matters pertaining to the development of and maintenances of navigation facilities in the Savannah River, from the upper limits of Savannah Harbor, Georgia, to the upper limits of navigation in the vicinity of Augusta, Georgia. *Id.*

55.    The Navigation Commission was also empowered to secure through purchase such land or lands, or any part thereof, flowage rights, easements, and/or other facilities as may be required by the United States as part of the project. *Id.*

---

[1] In contrast, the typical draft for a Panamax ship carrying between 3,001 and 5,100 Twenty-foot Equivalent Unit (TEU) containers, which is on the small-end of modern oceangoing container ships, is 39.5 feet. Even smaller seagoing container vessels, like feeder ships, which carry around 300 TEU containers, have a minimum draft of approximately 20 feet.

56.    The Navigation Commission exercised this power by obtaining easements upon properties adjacent to the Savannah River and the proposed project site, said easements being recorded in Aiken County, South Carolina.

57.    The easements obtained by the Navigation Commission conveyed the perpetual right or easement to flood as may be necessary, "by the erection and operation of a dam across the Savannah River near New Savannah Bluff, Georgia, with crest control gates so operated as to maintain a pool elevation at said dam of 114.5 feet mean sea level (11.9 feet above the point of zero on the gauge located on this date at the 5th Street Bridge leading from the State of South Carolina to the City of Augusta, Georgia), except when the natural discharge of the river exceeds that elevation at that point." *See* Exhibit D, Easements.

58.    The Navigation Commission thereafter conveyed these easements to the United States via deeds recorded in Aiken County, South Carolina.

59.    Thus, the flowage easements obtained by the Navigation Commission and transferred to the United States for the purpose of constructing and operating the NSBLD required as an express condition that the pool be maintained at 114.5 feet mean sea level.[2]

60.    The Navigation Commission was extinguished in 1972. The State of South Carolina is the successor-in-interest to all rights, duties, privileges, and obligations of the Navigation Commission.

61.    As presently constructed, the NSBLD creates a pool that currently serves water supply users.

---

[2] At the time of the conveyance, "mean sea level," for all intents and purposes, was NGVD29. *See infra* note 5(discussing and defining NGVD).

62.    As presently constructed, the NSBLD creates a pool that currently serves water-related recreation activities such as boating, fishing, and rowing events, as well as tourism activities.

63.    Even at the authorized depth, this Savannah River channel did not serve its intended commercial navigational purpose even for barges. In 1978, commercial traffic ceased on the Savannah River around Augusta and the Corps of Engineers has not maintained the NSBLD or the nine-foot channel since that time.

64.    The Corps of Engineers states that commercial navigation through the lock ceased in 1979 and that the lock is no longer operated for fish passage or recreational boating. https://www.sas.usace.army.mil/Missions/Civil-Works/Savannah-Harbor-Expansion/SHEP-Fish-Passage/.

65.    The Corps has failed to provide routine maintenance and repair to the NSBLD for decades, accounting for its current state of disrepair.

66.    As a result of non-use and lack of funding for maintenance, the NSBLD has fallen into disrepair over the years. *See* Exhibit A, SEA at 14 ("According to the most recent Periodic Inspection (2014), the current condition of the project is poor. That inspection revealed substantial deterioration of the lock and dam, including numerous structural issues….").

67.    The 2001 Consolidated Appropriations Act added a fish passage to the rehabilitation project. Since its construction in 1937, the NSBLD has prevented fish from migrating to the Augusta Shoals located on the Savannah River near the I-20 overpass, which served as historic spawning grounds for sturgeon, American shad, striped bass, and other fish species. Construction of a fish passage at the NSBLD was designed for the dual purpose of allowing fish access to the Augusta Shoals while also serving as mitigation for adverse impacts to

sturgeon and other fish from the construction activities in the Savannah River. However, the 2001 Consolidated Appropriations Act removed the estimated cost of the rehabilitation from the available appropriations. As a result, no substantive steps were taken by the Corps to rehabilitate the NSBLD.

68.    As part of the development and approval of the Savannah Harbor Expansion Project (SHEP), on November 4, 2011, the National Oceanic and Atmospheric Administration's (NOAA) National Marine Fisheries Service (NMFS) provided a biological opinion (Biological Opinion) on species listed under the Endangered Species Act (ESA) of 1973. *See* Exhibit E, Biological Opinion.

69.    The Biological Opinion included non-discretionary terms and conditions that were required to be implemented in order for the SHEP to be exempt from the prohibitions of Section 9 of the ESA.

70.    The Biological Opinion concluded that certain mitigation measures must be fulfilled to address the potential environmental impacts of the SHEP.

71.    One such mitigation measure requires construction of a fish passage around the NSBLD, some 180 miles upstream from the SHEP, to mitigate for adverse impacts to shortnose and Atlantic sturgeon caused by the inner harbor dredging of the SHEP.

72.    The Biological Opinion included as a term and condition of NOAA/NMFS' approval of the SHEP that construction of the fish passage must commence prior to or concurrently with initiation of inner harbor dredging in the Savannah harbor and be completed within two years. *See* Exhibit E, Biological Opinion, p. 190.

73.    This term and condition was designed to provide simultaneous mitigation and minimization of the adverse impacts to the sturgeon habitat caused by the inner harbor dredging.

74.     On or about April 11, 2012, the Corps issued a Final Environmental Impact Statement and Final General Reevaluation Report (FEIS) for the SHEP.

75.     The FEIS adopted the mitigation measures and conditions set forth in the Biological Opinion, incorporating the Biological Opinion as Appendix Z.

76.     The FEIS recognized that compliance with the relevant environmental laws, as required by WRDA, obligated the Corps to adopt the mitigation measures set forth in the Biological Opinion, including timely construction of the fish bypass, for any alternative selected.

77.     Thereafter, DHEC and the Commission filed suits challenging the adequacy of the FEIS, as well as the Corps' failure to obtain a 401 Certification and a Construction in Navigable Waters permit.

78.     On or about August 17, 2012, the Corps provided the Report of the Chief of Engineers (Chief's Report) for the SHEP. *See* Exhibit F, 2012 Chief's Report.

79.     The Chief's Report provided that the mitigation plan for the SHEP included construction of the fish bypass around the NSBLD to compensate for the adverse impacts to shortnose and Atlantic sturgeon attributable to the inner harbor dredging of the SHEP.

80.     On or about October 26, 2012, the Corps issued a Record of Decision providing that compensatory mitigation for the SHEP includes timely construction of a fish bypass around the NSBLD.

81.     On or about December 12, 2011, state litigation was commenced by the Commission related to the SHEP.

82.     On or about July 11, 2012, federal litigation was commenced by the Commission related to the SHEP.

83.     On or about May 17, 2013, the Corps, DHEC, the Commission, and the Georgia Ports Authority executed a Settlement Agreement of all claims related to the permitting of the SHEP. *See* Exhibit G, Settlement Agreement.

84.     As part of the Settlement Agreement, DHEC and the Commission agreed to issue the requisite 401 Certificate and the Construction in Navigable Waters permit for the SHEP, conditioned on compliance with certain express terms and conditions.

85.     Specifically, the Settlement Agreement provides that "[t]he Corps will comply with the terms and conditions of the Final Biological Opinion issued by the National Marine Fisheries Service on or about November 4, 2011." Exhibit G, Settlement Agreement, § I.A.13. Among the terms and conditions set forth in the Biological Opinion is a requirement that construction of the fish passage commence prior to or concurrent with inner harbor dredging.

86.     The Settlement Agreement was expressly adopted and incorporated into the order of U.S. District Judge Richard Gergel issued on May 29, 2013, which dismissed the lawsuit with prejudice but expressly retained jurisdiction to enforce the terms of the Settlement Agreement.  *See* Exhibit H, Settlement Order, *Savannah River Keeper v. United States Army Corps of Engineers*, No. 9:12-610-RMG (D.S.C.), Dkt.#99.

87.     On or about September 23, 2013, the NMFS issued an Amended Biological Opinion (First Amended Biological Opinion) for the SHEP.[3]

88.     On or about June 10, 2014, Congress enacted the Water Resources Reform and Development Act of 2014 (2014 WRDA), Public Law 113-121.

---

[3] The First Amended Biological Opinion did not involve sturgeon or the fish passage mitigation feature of the SHEP; therefore, it is not directly relevant to the issues involved in the instant complaint.

89.     Section 7002(1) of the 2014 WRDA reauthorized the SHEP "to be carried out by the Secretary substantially in accordance with the plan, and subject to the conditions" described in the Chief's Report.

90.     The plan and conditions described in the Chief's Report provide for construction of a fish passage around the NSBLD. *See* Exhibit F, Chief's Report.

91.     The fish passage proposed and approved as a part of the mitigation plan for the SHEP was limited to the construction of a passageway structure around the South Carolina side of the lock and dam that would allow migrating fish to pass and thereby provide access to historic upriver spawning areas at the Augusta Shoals. Under the SHEP plan, lock and dam components of the NSBLD remained in place and were not removed. While the off-channel fish passage recommended by the SHEP EIS included deposition of rock required to construct the structure, and other alternatives looked at variations of such a structure, the Corps did not analyze the complete removal of the NSBLD or the impacts related to the construction of a river-wide weir structure. Instead, the Corps determined at the initial stage that complete removal of the NSBLD was not feasible due to the concerns of water supply users. In short, the current proposal advanced by the Corps was neither evaluated as a part of the SHEP mitigation nor received consideration or approval by South Carolina.

**2016 WIIN Act**

92.     On or about December 16, 2016, Congress enacted the Water Infrastructure Improvements for the Nation Act (WIIN Act), Public Law 114-322.[4]

93.     Section 1319(b)(1) of the WIIN Act deauthorized the NSBLD as a federal project.

_____

[4] The WIIN Act is also referred to as the ''Water Resources Development Act of 2016," per Section 1001 of the Act.

94.    Section 1319(c)(1)(A) of the WIIN Act provided for either repair or replacement of the lock and dam, as the Secretary determines to be necessary –

> (i) repair of the lock wall of the New Savannah Bluff Lock and Dam and modification of the structure such that the structure is able –
>> (I) to **maintain the pool for navigation, water supply, and recreational activities, as in existence on the date of enactment of this Act**; and
>> (II) to allow safe passage over the structure to historic spawning grounds of shortnose sturgeon, Atlantic sturgeon, and other migratory fish; or
>
> (ii)(I) construction at an appropriate location across the Savannah River of a **structure that is able to maintain the pool for water supply and recreational activities, as in existence on the date of enactment of this Act**; and
>> (II) removal of the New Savannah Bluff Lock and Dam on completion of construction of the structure….

(Emphasis added.)

95.    As a condition for repairing or removing the lock and dam (NSBLD Project), Congress explicitly required that any structure be able to maintain the pool for water supply and recreational activities as in existence on the date of enactment.

96.    "[O]n the date of enactment of [the WIIN] Act," according to United States Geological Survey data, the pool level was approximately 114.5 feet NGVD29.[5] *See* Exhibit I,

---

[5] NGVD29 is the national geodetic vertical datum for vertical control surveying in the United States based on the mean sea level datum of 1929. This dataset was formerly referred to as "mean sea level" until 1973, when the name changed to "national geodetic vertical datum."

NAVD88 is the vertical datum for orthometric heights established for vertical control surveying in the United States based upon the General Adjustment of the North American Datum of 1988.

These measurements (*i.e.*, NAVD and NGVD) differ, and a computer program is utilized for conversion between these data sets. *See* https://www.ngs.noaa.gov/PC_PROD/VERTCON/. Both measurements are commonly utilized and both are referenced with regard to the NSBLD Project, which can create some confusion when discussing elevations and levels.

In general, and to provide an order of magnitude, the proposed Alternative 2-6d would have a pool elevation of 108.2 NAVD88, which equals 109.0 NGVD29. *See* Exhibit A, SEA at ii.

Dec. 16, 2016 USGS Gage 02196999 ((Sav. River above NSBLD) daily mean height of 114.76 feet).

97.    This December 16, 2016 pool level is approximately the same level for the pool required by the flowage easements provided by the Navigation Commission to the United States as a condition for the construction of the NSBLD back in the 1930s.

98.    This pool elevation is within the normal, standard operating range for the pool. *See* Exhibit J, USGS Gage 02196999 Water-Year Summaries ((Sav. River above NSBLD) daily minimum, maximum, and mean heights for the water years 2016-2018 demonstrating a mean pool elevation of between 114 and 115 feet NGVD29, with a water year measured between October 1 and September 30).

**Supplemental Environmental Assessment**

99.    On or about October 13, 2017, the NMFS issued a second amended Biological Opinion (Second Amended Biological Opinion) for the SHEP. *See* Exhibit K, Second Amended Biological Opinion.

100.    The Second Amended Biological Opinion addressed the potential additional adverse affects that could result from the delay in implementing the NSBLD fish passage beyond the time period of the inner harbor dredging in which the primary adverse impacts to the fish habitats are incurred. *Id.*

101.    The Second Amended Biological Opinion determined that the delay caused by the Corps' identification and adoption of a revised fish passage alternative that complies with the WIIN Act would realistically cause the completion of the fish passage to occur 8 months after the completion of the inner harbor dredging. *Id.*

102.    Specifically, the Second Amended Biological Opinion looked at the effect the 8-month delay would have on the year-class strength of sturgeon, which NMFS found to be significant and a "major consequence for the late-maturing, long-lived sturgeon that spawn infrequently." *Id.* at 78. It further found that the delay would result in a prolonged period of adverse effects to an unknown number of sturgeon. *Id.*

103.    The Second Amended Biological Opinion also found that the adverse effects would occur in the same habitat area described in the Biological Opinion, but the sturgeon would be exposed to the effects for a longer period of time as a result of the delay. *Id.*

104.    Ultimately, however, the Second Amended Biological Opinion found that an 8-month delay would not change these "sublethal effects" to "lethal effects," affect a greater percentage of sturgeon in the area, or require additional or different mitigation.[6]

105.    On or about February 14, 2019, the Corps issued a Notice of Availability of a Draft Integrated Post Authorization Analysis Report (PAAR) and Supplemental Environmental Assessment for the Fish Passage at the NSBLD, and Draft Finding of No Significant Impact to evaluate proposed plans for the NSBLD Project.

106.    The draft SEA set forth the preferred plan for the NSBLD Project, which consists of constructing an in-channel fish passage consisting of a fixed crest weir with a rock ramp sloping upstream from the existing NSBLD location and removal of the existing NSBLD.

107.    The Corps' proposal for the NSBLD Project included the removal of the existing dam and the construction of a fixed crest weir with a rock ramp. This proposed action would take place in part in South Carolina waters and on South Carolina's riverbed, as the project stretches

---

[6] NMFS did not address the question of what time period of delay would cross the threshold from being "sublethal" to "lethal" in terms of the additional adverse impacts caused to sturgeon.

across the entire width of the Savannah River and South Carolina has a sovereign claim to a portion of river.

108.    Contrary to the WIIN Act's specific requirement, none of the action alternatives evaluated in the draft PAAR or the final SEA maintained the pool as in existence on or about December 16, 2016.

109.    On or about February 9, 2019, the Corps began a simulated drawdown test in order to demonstrate the effects of the preferred plan on the pool level.

110.    On or about February 15, 2019, the Corps was forced to halt the drawdown simulation after effects of the river drawdown resulted in instability of the riverbank.

111.    The drawdown simulation also resulted in numerous docks becoming useless for recreational activities, as they sat in mud rather than water, as seen below.



Source: https://www.aikenstandard.com/news/csra-officials-react-to-savannah-river-drawdown/article_af000200-3475-11e9-862f-07dbd8405628.html



Source: https://www.savannahriverkeeper.org/blue-heron-blog/lock-dam-update-public-meeting-info-petition-sign-on-and-more#/



Source: https://www.northaugustastar.com/news/several-days-of-river-

reduction/collection_7e9bc686-30c8-11e9-98b6-87b4e1857d96.html#11



*See* Exhibit L, SEA Eng'g Appx. Att. 4.

112.    Under Federal and South Carolina law, the NSBLD Project requires both a Navigable Waters Permit and a 401 Certification from DHEC. South Carolina has been proactive in its efforts to protect its sovereignty, informing the Corps that both a Navigable Waters Permit and a 401 Certification from South Carolina are required.

113.    Upon the request of the Chairman of the Commission for clarification of the demarcation of permitting jurisdiction under South Carolina law, the South Carolina Attorney General issued an opinion on April 8, 2019. *See* Exhibit M, Attorney General Opinion. The opinion found that the NSBLD Project as proposed by the Federal Defendants was not analyzed under the EIS for the SHEP and therefore constituted a new project proposal requiring a separate Navigable

Waters Permit and 401 Certification, and that DHEC rather than the Commission would be the appropriate permitting entity for South Carolina.

114.    By letter dated April 9, 2019, the Attorney General Opinion was transmitted to the Corps. *See* Exhibit N, Commission Letter. In addition to transmitting a copy of the Opinion, the Commission's letter also informed the Corps that, to the extent that the proposed removal of the NSBLD and construction of a full river rock weir under proposed Alternative 2-6d constituted a departure from the fish passage mitigation feature approved by the SHEP and thereby an entirely new proposed project, DHEC has permitting authority and jurisdiction over the NSBLD Project, and asked the Corps to coordinate with DHEC for the review and processing of the required authorizations from the State of South Carolina for the newly proposed NSBLD Project. *Id.*

115.    Also on April 9, 2019, members of the South Carolina and Georgia Congressional delegations, including all four United States Senators and the respective members of Congress whose districts include the areas impacted by the NSBLD Project, sent a joint letter to the Assistant Secretary of the Army and the Commanding General of the Corps expressing their concerns regarding the Corps' preferred Alternative 2-6d. *See* Exhibit O, Congressional Letter. The stated purpose of the letter was to "express the intent of Congress for Public Law 114-322" (WIIN Act). *Id.* The letter states that the results of the February 2019 drawdown simulation "do not reflect the intent of Congress," as "the Corps must maintain river conditions that were in place on the date of enactment [of the WIIN Act]," and "the recent drawdown test has proven [that] Alternative 2-6d does not appear to meet the requirements of the plain text of the legislation or the intent of Congress when it passed the WIIN Act." *Id.* The letter further stated that "[w]e encourage the Corps to consider the intent of Congress and to only pursue an alternative that fulfills the environmental requirements of SHEP while also protecting the investments of our riverfront communities." *Id.*

The letter also rejected the Corps' interpretation of the WIIN Act provision requiring maintenance of the pool for water supply and recreational activities as of the date of its enactment, stating that the Corps' argument about Alternative 2-6d "maintaining this functionality" is inaccurate and does not reflect Congressional intent. *Id.*

116.    Notwithstanding this Congressional rejection of its interpretation of the WIIN Act and its chosen alternative, the Corps has continued to assert its erroneous interpretation of the law and pursue Alternative 2-6d.

117.    On April 22, 2019, South Carolina Governor Henry McMaster sent a letter to the Corps reiterating the position reached by the Attorney General Opinion that the NSBLD Project requires both a Navigable Waters Permit and a 401 Certification from DHEC. Governor McMaster further emphasized that any removal of the NSBLD must be done in a manner that does not "lower the existing pool elevation and adversely impact the recreational uses, water supply, water quality, and navigability and also detrimentally impact property rights and economic development in South Carolina," as the "State of South Carolina must protect its natural resources and preserve the integrity of the Savannah River and the rights, investments, and property of its citizens." *See* Exhibit P, Governor McMaster Letter.

118.    On May 16, 2019, a Final Independent External Peer Review Report Savannah Harbor Expansion Project Georgia and South Carolina, Fish Passage at New Savannah Bluff Lock and Dam Integrated Post-Authorization Analysis Report and Environmental Assessment (Independent External Peer Review or IEPR) was released. *See* Exhibit Q, IEPR.

119.    The IEPR was prepared for the Corps by Battelle to provide an independent assessment of the engineering, economic, environmental, and plan formulation analyses of the project study.

120.     The IEPR found that the draft SEA does not present adequate information on (1) the likelihood that the Recommended Plan will meet the project objectives related to the fish passage, (2) the risk of injury/death during up- or downstream passage at the rock weirs, or (3) the probability of passage success overall. *See* Exhibit Q, IEPR at p. 3.

121.     In particular, the IEPR made the following findings and conclusions with respect to the Draft SEA and the Corps' proposed preferred alternative:

a.  The project does not consider a wide range of alternative fishway types and does not consider alternatives that provide a smaller fishway with low discharge capacities. *Id.* at p. 4.

b.  Several design features of the recommended plan pose risk of injury and potential lethal danger to downstream migrant sturgeons due to head-on strikes and stranding, and that information provided in the draft SEA and other supplemental documents on the design of the arch rock barriers is not adequate to ensure safe and sure passage for sturgeons under any weir alternative. *Id.* at p. 5.

c.  The draft SEA does not consider a wide range of alternative fishway types that could satisfy the first provision of the WIIN Act, "repair of the lock wall of the NSBLD an modification of the structure" to maintain the pool for navigation, water supply, and recreational activities and to allow safe fish passage. *Id.* at p. 7.

d.  The draft SEA is incomplete without a discussion of all potential types of fishways that are known to be effective at providing safe fish passage *Id.* at p. 7.

e.  Retaining the existing spillway gates "seems like the simplest way of accomplishing" the WIIN Act's objectives. *Id.* at p. 9.

f.  None of the evaluated rock weir alternatives "seem to fully satisfy" the WIIN Act's requirement that the pool be maintained. *Id.* at p. 9.

g.  Based on the conclusion that none of the evaluated rock weir alternatives fully satisfy the WIIN Act, the IEPR recommended that USACE reconsider whether the proposed alternatives meet the intent of the WIIN Act's requirement that the pool be maintained as in existence on the date of enactment of the Act. *Id.* at p. 10.

h.  The cost analysis of the alternatives cannot be determined, and that no analysis was conducted to determine the costs of mitigation of the recreation and water supply impacts under the alternatives. *Id.* at p. 11.

i.  The economic assumptions and calculations used in the alternatives analysis were not described in enough detail to evaluate the acceptability of the economic assumptions. *Id.* at p. 12.

j.  The Corps had not provided an explanation for the criteria used to evaluate navigation, water supply, recreation, and flooding impacts, making it difficult to determine whether the criteria meet the intent of the WIIN Act. *Id.* at p. 13.

k.  The alternatives analysis failed to consider the differential effectiveness of each project at meeting the project objective of providing for utilization of upstream habitat areas, which significantly impacts the cost effectiveness analysis and the alternative selectin process. *Id.* at p. 14.

l.  The draft SEA does not adequately describe how the recommended plan would meet the objectives related to upstream and downstream passage of migratory fish. *Id.* at p. 15.

m. The Corps failed to include conditions observed during the February 2019 "drawdown test" in the draft SEA, and the results were not used to verify the hydraulic modeling of post-project conditions. *Id.* at p. 19.

n. The draft SEA does not adequately convey the status of the Section 106 consultation process. *Id.* at p. 28.

o. The alternatives analysis failed to evaluate the relative impacts of the alternatives that would avoid or minimize adverse effects on the NSBLD. *Id.* at p. 30.

122.    Having received neither a response from the Corps nor an application for a Navigable Waters Permit and 401 Certification for the NSBLD Project, the Attorney General followed up with the Corps by letter dated August 12, 2019. *See* Exhibit R, Attorney General Letter. In that letter, General Wilson inquired about the status of the Corps' request for a 401 Certification from South Carolina. He also noted the fact that the NSBLD Project requires a Navigable Waters Permit, based on the fact that construction would take place in South Carolina waters and on its riverbed, and, based on the Corps' proposal, would alter the river flow and impact the pool level. *Id.* Finally, General Wilson expressed concern on behalf of South Carolina that the Corps had proposed moving forward with an alternative that "has been roundly criticized by business, industry, and other stakeholders and would not maintain the existing pool elevation—a serious concern for the State of South Carolina." *Id.*

123.    The Corps did not apply for a Navigable Waters Permit from South Carolina.

124.    The Corps did not apply for a 401 Certification from South Carolina.

125.    Instead, the Corps responded by letter dated September 20, 2019. *See* Exhibit S, Corps Response. In that letter, the Corps asserted its position that no 401 Certification was needed

for the NSBLD Project. *Id.* The Corps further asserted that the NSBLD Project is exempt from obtaining a Navigable Waters Permit. *Id.*

126.    The Corps has further asserted that the WIIN Act prohibits it from constructing a fish passage in compliance with the terms and conditions of the Settlement Agreement, Order approving the Settlement Agreement, SHEP 401 Certificate, and SHEP Navigable Waters Permit. *Id.*

127.    The Corps has not sought an amendment or modification of the Settlement Order, SHEP 401 Certification, or SHEP Navigable Waters Permit.

128.    On October 29, 2019, the Corps publicly announced and released the Integrated Post Authorization Analysis Report and Supplemental Environmental Assessment, dated August 30, 2019 (SEA).  *See* Exhibit A, SEA.

129.    On October 29, 2019, the Corps announced that Alternative 2-6d from the SEA, which calls for the removal of the NSBLD and the construction of a river-wide fixed weir structure and dry floodplain bench, was the preferred and approved option for the NSBLD. *See* Exhibit B, U.S. Army Corps of Eng'rs Mem., Maj. General Holland, Approval of Final Report, Savannah Harbor Expansion Project (SHEP), Georgia and South Carolina: Fish Passage at New Savannah Bluff Lock and Dam (NSBLD) Integrated Post Authorization Analysis Report and Supplemental Environmental Assessment (EA), dated Oct. 29, 2019 (Approval Memo); *See* Exhibit C, Finding of No Significant Impact, Savannah Harbor Expansion Project Fish Passage at New Savannah Bluff Lock and Dam Richmond County, Georgia and Aiken County, South Carolina, dated Oct. 29, 2019 (FONSI).

130.    The preferred plan (Alternative 2-6d) is expected to lower the existing pool level by approximately 5.5 feet (from approximately 114.5 NGVD29 to 109.0 NGVD29) during normal operating conditions.

131.    The proposed removal of the NSBLD and construction of the fixed crest rock weir constitutes construction in navigable South Carolina waterways, and such proposed work would alter river flow, lower the pool elevation in the fixed crest weir, and include a floodplain bench.

132.    Only two percent of public comments supported the Corps' proposal. *See* Exhibit T, October 29, 2019 Corps News Release No. 19-32 at p. 2.

133.    The Corps' environmental analysis and justification for Alternative 2-6d relies heavily on the assumption that no additional real property or flowage easements will be necessary, despite the condition precedent of the existing flowage easements that the pool be maintained at approximately 114.5 feet above mean sea level. *See* Exhibit A, SEA at p. 107-8.

134.    The Corps' environmental analysis assumed the no action alternative was the original fish passage plan—a plan that the Corps asserts is a legal impossibility—rather than existing conditions. *Id.* at p. 11-12.

135.    The Corps has failed to secure a memorandum of agreement with the South Carolina State Historic Preservation Officer related to historic and cultural resources for the NSBLD Project.

136.    Any document specifically referenced but not included as an exhibit is specifically incorporated by reference.

137.    Any document specifically referenced but for which only a portion of the document is included as an exhibit is specifically incorporated by reference in its entirety.

**FOR A FIRST CAUSE OF ACTION**
**(Declaratory Judgment – Interpretation of the WIIN Act)**

138.    The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this cause of action.

139.    Section 1319(c)(1)(A) of the WIIN Act provides:

> (i) repair of the lock wall of the New Savannah Bluff Lock and Dam and modification of the structure such that the structure is able –
> (I) **to maintain the pool for navigation, water supply, and recreational activities, as in existence on the date of enactment of this Act**; and
> (II) to allow safe passage over the structure to historic spawning grounds of shortnose sturgeon, Atlantic sturgeon, and other migratory fish; or
> (ii)(I) **construction at an appropriate location across the Savannah River of a structure that is able to maintain the pool for water supply and recreational activities, as in existence on the date of enactment of this Act**; and
> (II) removal of the New Savannah Bluff Lock and Dam on completion of construction of the structure ….

(Emphasis added.)

140.    Congress has explicitly and unambiguously required that any repair or replacement of the NSBLD must maintain the pool for navigation, water supply, and recreational activities, as it existed on December 16, 2016, the date of enactment.

141.    By its plain language, the WIIN Act requires that any repair or replacement structure of the NSBLD must maintain the pool at the same elevation as it was on December 16, 2016 for navigation, water supply, and recreational activities.

142.    On December 16, 2016, the pool level was 114.76 feet NGVD29. *See* Exhibit I, Dec. 16, 2016, USGS Gage 02196999 Surface-Water Daily Statistic.

143.    Members of the Congressional delegations of South Carolina and Georgia have informed the Federal Defendants that the stated Congressional intent of the WIIN Act is that the

pool level on the date of the enactment of the WIIN Act, *i.e.* approximately 114.5 feet NGVD29, must be maintained in any effort by the Corps to modify, remove, or replace the NSBLD. *See* Exhibit O, Apr. 9, 2019 Secretary James and General Semonite ltr. from Members of the Congressional delegations of South Carolina and Georgia.

144.     The flowage easements held by and relied upon by the Corps in making its decision require a pool elevation of 114.5 feet above mean sea level.

145.     Notwithstanding the Act's plain language, the Corps interprets the WIIN Act as only requiring that any repair or replacement structure be able to maintain some degree of functionality of the pool, to be determined by the Corps in the Corps' sole discretion.

146.     Notwithstanding the Act's plain language, the Corps interprets the WIIN Act as allowing the construction of a fixed crest rock weir structure that will dramatically lower the water elevation from the conditions that existed on December 16, 2016.

147.     In February 2019, the Corps performed a drawdown simulation to show the effects of Alternative 2-6d on the pool. The drawdown simulation did not maintain the pool for navigation, water supply, and recreational activities, as in existence on December 16, 2016. Instead, the drawdown simulation demonstrated that Alternative 2-6d lowered the elevation of the pool from the level in existence on December 16, 2016 and resulted in instability to the riverbank of the Savannah River. The drawdown simulation also resulted in the beaching of recreational docks along the Savannah River. The drawdown simulation also created significant concern among water supply users that the Corps' proposals and analysis were woefully deficient, inadequate, and could not be relied upon.

148.     Accordingly, South Carolina is entitled to a declaratory judgment pursuant to 28 U.S.C.A. §§ 2201 and 2202 against the Federal Defendants. There exists an actual dispute and

controversy between the parties which cannot be resolved absent declaratory relief by this Court. Declaratory judgment in the manner sought would terminate this uncertainty and breach of statutory duties by the Federal Defendants. South Carolina is therefore entitled to a declaratory judgment, declaring the rights and legal relations of the parties as follows:

    a. The Federal Defendants' interpretation of the WIIN Act is contrary to its plain language and the expression of Congressional intent.

    b. The WIIN Act requires maintenance of the pool level of approximately 114.5 feet NGVD29.

    c. Alternative 2-6d does not comply with the WIIN Act.

149.    South Carolina is entitled to (1) a declaratory judgment, (2) a permanent injunction, and (3) such other relief as is just, equitable, and proper.

**FOR A SECOND CAUSE OF ACTION**
**(Declaratory Judgment – The Federal Defendants**
**Must Comply with and Abide by South Carolina Law)**

150.    The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this cause of action.

151.    South Carolina holds title to the land underlying a portion of the Savannah River.

152.    The Savannah River lies within South Carolina's jurisdiction.

153.    The NSBLD Project involves the discharge of pollutants into South Carolina waters through dredging, involves the discharge of fill material into the waters of the State, and re-routes water flow in South Carolina (changing the chemical and physical composition of waters of the State).

154.    Congress has explicitly and unambiguously waived the Federal Defendants'

sovereign immunity for its actions which constitute a discharge of pollutants under State pollution

control regulations under the CWA. 33 U.S.C.A. § 1323(a).

155.    Section 313, 33 U.S.C.A. § 1323, states in pertinent part:

> (a) Compliance with pollution control requirements by Federal
> entities
> **Each department**, agency, or instrumentality of the executive,
> legislative, and judicial branches of the Federal Government
> > (1) having jurisdiction over any property or facility, or
> > (2) **engaged in any activity resulting, or which may
> > result, in the discharge or runoff of pollutants**, and
> > each officer, agent, or employee thereof in the
> > performance of his federal duties, **shall be subject to
> > and comply with, all** Federal, **State**, interstate, and local
> > requirements, **administrative authority, and process
> > and sanctions respecting the control and abatement
> > of water pollution in the same manner, and to the
> > same extent as any nongovernmental entity** including
> > the payment of reasonable service charges. The
> > preceding sentence shall apply
> > > (A) **to any requirement whether substantive or
> > > procedural** (including any recordkeeping or
> > > reporting requirement, any requirement
> > > respecting permits and any other requirement,
> > > whatsoever),
> > > (B) **to the exercise of any** Federal, **State**, or local
> > > **administrative authority**, and
> > > (C) **to any process and sanction**, whether enforced
> > > in Federal, State, or local courts or in any manner.
> > > This subsection shall apply notwithstanding any
> > > immunity of such agencies, officers, agents, or
> > > employees under any law or rule of law….

(Emphasis added.)

156.    Section 510, 33 U.S.C.A. § 1370, states:

> Except as expressly provided in this chapter, **nothing in this
> chapter shall (1) preclude or deny the right of any State** or
> political subdivision thereof or interstate agency **to adopt or
> enforce (A) any standard or limitation respecting discharges of
> pollutants, or (B) any requirement respecting control or
> abatement of pollution**; … or (2) be construed as impairing or in

42

any manner affecting any right or jurisdiction of the States with
respect to the waters (including boundary waters) of such States.

(Emphasis added.); *see also* 33 U.S.C.A. § 1251(b) (It is Congressional policy to "recognize,
preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and
eliminate pollution.").

157.    The CWA requires the State in which a proposed discharge is to take place to
evaluate and issue a Water Quality Certification assuring that a project complies with Section 401
of the Act. 33 U.S.C.A. § 1341.

158.    The proposed NSBLD Project will result in a discharge and impact on waters of the
United States and waters of the State of South Carolina.

159.    Federal and state law and Corps' policy requires the Corps to obtain a 401
Certification from South Carolina (or a waiver thereof).

160.    In South Carolina, DHEC is the agency that assesses and determines water quality
certifications under Section 401 of the CWA. S.C. Code Ann. Regs. 61-101 *et seq*.

161.    The Federal Defendants have neither sought nor received a 401 Certification from
DHEC for the NSBLD Project, despite being informed that one is required.

162.    Under South Carolina law, neither construction nor operation activities shall "block
or obstruct navigation or the flow of any waters unless specifically authorized [by the permit]; no
attempt shall be made by [a person] to prevent the full and free use by the public of all navigable
waters at or adjacent to the work authorized by the permits; and that no spoil, dredged material, or
any other fill material be placed below the mean high water or ordinary high water elevation,
unless specifically authorized [by the permit]."  S.C. Code Ann. Regs. 19-450.4(A)(7).

163.    South Carolina law further provides that "any activity" involving construction in
navigable waterways requires a Navigable Waters Permit from DHEC, and a person in violation

of that requirement can be enjoined from further activity until a permit is obtained. S.C. Code Ann. Regs. 19-450.12.

164.    Federal and state law and Corps' policy requires the Corps to obtain a Navigable Waters Permit from South Carolina.

165.    The activities proposed by the Federal Defendants on the NSBLD Project require a Navigable Waters Permit. S.C. Code Ann. Regs. 19-450 *et seq.*

166.    Congress has explicitly and unambiguously waived the Federal Defendants' sovereign immunity for any state regulation related to the CWA, including but not limited to the 401 Certification and Navigable Waters Permit.

167.    Notwithstanding, the Federal Defendants have refused to seek either a Navigable Waters Permit or a 401 Certification from South Carolina for the NSBLD Project, and despite being informed that one is rquired for the NSBLD Project.

168.    Accordingly, South Carolina is entitled to a declaratory judgment pursuant to 28 U.S.C.A. §§ 2201 and 2202 against the Federal Defendants. There exists an actual dispute and controversy between the parties which cannot be resolved absent declaratory relief by this Court. Declaratory judgment in the manner sought would terminate this uncertainty and breach of statutory duties by the Federal Defendants. South Carolina is therefore entitled to a declaratory judgment, declaring the rights and legal relations of the parties as follows:

a.    The Federal Defendants are required to seek a Navigable Waters Permit for the NSBLD Project from South Carolina.

b.    The Federal Defendants are required to seek a 401 Certification for the NSBLD Project from South Carolina.

c.  The Federal Defendants are permanently enjoined from proceeding with the NSBLD Project absent receipt of and compliance with a Navigable Waters Permit and 401 Certification from South Carolina.

d.  Without the ability to proceed with the NSBLD Project, which has been proposed as concurrent mitigation for the impacts caused to the habitat of sturgeon resulting from inner harbor dredging of the SHEP, the Federal Defendants are permanently enjoined from proceeding with inner harbor dredging of the SHEP until they have proposed an alternative for the NSBLD Project that receives a Navigable Waters Permit and 401 Certification from South Carolina.

169.   South Carolina is entitled to (1) a declaratory judgment, (2) a permanent injunction, and (3) such other relief as is just, equitable, and proper.

## FOR A THIRD CAUSE OF ACTION
### (Declaratory Judgment – The Federal Defendants Must Comply with and Abide by the Settlement Agreement and Order)

170.   The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this cause of action.

171.   The Settlement Agreement between DHEC and the Corps requires that the Corps' actions related to the SHEP must comply with the terms and conditions set forth in the SHEP 401 Certification and SHEP Navigable Waters Permit.

172.   The Order approving the Settlement Agreement requires compliance with the terms and conditions of the SHEP 401 Certification and SHEP Navigable Waters Permit.

173.   The SHEP 401 Certification and SHEP Navigable Waters Permit require that the Corps comply with the terms and conditions set forth in the Biological Opinion.

174.    The Biological Opinion requires that construction of the approved fish passage, which is necessarily compliant with, *inter alia*, the WIIN Act, commence prior to or concurrent with inner harbor dredging.

175.    Inner harbor dredging has commenced prior to construction of an approved fish passage that complies with, *inter alia*, the WIIN Act.

176.    Because the Corps should hereby be required to comply with the WIIN Act, which compliance will necessarily delay implementation of the fish passage, the Corps will therefore not be in compliance with the terms of the Biological Opinion and the SHEP 401 Certification and SHEP Navigable Waters Permit.

177.    Accordingly, South Carolina is entitled to a declaratory judgment pursuant to 28 U.S.C.A. §§ 2201 and 2202 against the Federal Defendants. There exists an actual dispute and controversy between the parties which cannot be resolved absent declaratory relief by this Court. Declaratory judgment in the manner sought would terminate this uncertainty and breach of statutory duties by the Federal Defendants. South Carolina is therefore entitled to a declaratory judgment, declaring the rights and legal relations of the parties as follows:

   a.   The Federal Defendants are required to begin construction of an approved fish passage that complies with the WIIN Act prior to or concurrent with inner harbor dredging.

   b.   The Federal Defendants are permanently enjoined from proceeding with inner harbor dredging until the Corps is ready to begin construction of the fish passage.

178.    South Carolina is entitled to (1) a declaratory judgment, (2) a permanent injunction, and (3) such other relief as is just, equitable, and proper.

## FOR A FOURTH CAUSE OF ACTION
### (Declaratory Judgment – The Federal Defendants
### Must Comply with the Flowage Easements)

179.    The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this cause of action.

180.    The flowage easements obtained by the Navigation Commission granted it the perpetual right or easement to flood as may be necessary, "by the erection and operation of a dam across the Savannah River near New Savannah Bluff, Georgia, with crest control gates so operated as to maintain a pool elevation at said dam of 114.5 feet mean sea level (11.9 feet above the point of zero on the gauge located on this date at the 5th Street Bridge leading from the State of South Carolina to the City of Augusta, Georgia), except when the natural discharge of the river exceeds that elevation at that point."

181.    The flowage easements conveyed by the Navigation Commission to the United States likewise granted the United States the perpetual right or easement to flood as may be necessary, "by the erection and operation of a dam across the Savannah River near New Savannah Bluff, Georgia, with crest control gates so operated as to maintain a pool elevation at said dam of 114.5 feet mean sea level (11.9 feet above the point of zero on the gauge located on this date at the 5th Street Bridge leading from the State of South Carolina to the City of Augusta, Georgia), except when the natural discharge of the river exceeds that elevation at that point."

182.    The Federal Defendants now propose to use their flowage easements to maintain a pool elevation below 114.5 feet mean sea level.

183.    The Federal Defendants expressly rely upon the existing flowage easements obtained from the Navigation Commission in selecting Alternative 2-6d, stating that "[t]he existing NSBLD project has Perpetual Flowage Easements over 682.39 acres of which 178.75 acres are

47

located in Georgia and 503.64 acres in South Carolina. No additional easements or right-of-ways will be required for this project."

184.    However, the proposed use of the flowage easements under Alternative 2-6d does not comply with express terms of those easement rights, as it is undisputed that Alternative 2-6d would lower the level of the pool below 114.5 feet, and, therefore, the Federal Defendants may not rely upon the existing flowage easements in support of the NSBLD Project.

185.    Accordingly, South Carolina is entitled to a declaratory judgment pursuant to 28 U.S.C.A. §§ 2201 and 2202 against the Federal Defendants. There exists an actual dispute and controversy between the parties which cannot be resolved absent declaratory relief by this Court. Declaratory judgment in the manner sought would terminate this uncertainty and breach of contractual duties by the Federal Defendants. South Carolina is therefore entitled to a declaratory judgment, declaring the rights and legal relations of the parties as follows:

   a.  The flowage easements granted to the Federal Defendants for the NSBLD require the maintainence of the pool elevation at 114.5 feet mean sea level.

   b.  The Federal Defendants are required to comply with the elevation restriction contained in the flowage easements in evaluating and adopting any alternative for the NSBLD Project and associated fish passage mitigation feature of the SHEP.

   c.  The Federal Defendants are permanently enjoined from choosing an alternative for the NSBLD Project that violates the express condition of the flowage easements granted to them for the NSBLD that the pool elevation of 114.5 feet mean sea level must be maintained.

186.    The Federal Defendants are permanently enjoined from lowering the pool elevation below 114.5 feet mean sea level until they obtain flowage easements authorizing a lower pool elevation.

187.    South Carolina is entitled to (1) a declaratory judgment, (2) a permanent injunction, and (3) such other relief as is just, equitable, and proper.

### FOR A FIFTH CAUSE OF ACTION
### (Declaratory Judgment - Breach of Settlement Agreement)[7]

188.    The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this cause of action.

189.    The Settlement Agreement between DHEC, the Commission, and the Corps, as well as the SHEP 401 Certification and SHEP Navigable Waters Permit issued to the Corps by DHEC and the Commission, respectively, require that the Corps comply with the terms and conditions of the Biological Opinion, which was incorporated into the 401 Certification and Navigable Waters Permit and such terms and conditions of the Biological Opinion became terms and conditions of the 401 Certification and Navigable Waters Permit.

190.    The terms and conditions of the SHEP 401 Certification and SHEP Navigable Waters Permit require that construction of the fish passage begin prior to or concurrent with the SHEP inner harbor dredging.

191.    The terms and conditions of the SHEP 401 and SHEP Navigable Water Permit were incorporated into the Settlement Order.

192.    The Corps has begun inner harbor dredging.

---

[7] South Carolina reserves the right to file a Rule to Show Cause for why the Federal Defendants should not be held in contempt of this Court's Settlement Order.

193.    Construction of the fish passage did not occur prior to inner harbor dredging, nor did it begin concurrent with the beginning of inner harbor dredging.

194.    Moreover, because the Alternative 2-6d does not comply with the WIIN Act and does not have the requisite flowage easements, as described herein, it is unlikely that a legally viable alternative to 2-6d will be proposed and approved in sufficient time to complete same prior to the completion of inner harbor dredging.

195.    The Corps is therefore in breach of the Settlement Agreement, the SHEP 401 Certification, the SHEP Navigable Waters Permit, and the Settlement Order by failing to commence construction of the fish passage prior to or concurrent with inner harbor dredging.

196.    Accordingly, South Carolina is entitled to a declaratory judgment pursuant to 28 U.S.C.A. §§ 2201 and 2202 against the Federal Defendants. There exists an actual dispute and controversy between the parties which cannot be resolved absent declaratory relief by this Court. Declaratory judgment in the manner sought would terminate this uncertainty and breach of contractual duties by the Federal Defendants. South Carolina is therefore entitled to a declaratory judgment, declaring the rights and legal relations of the parties as follows:

    a.    The Federal Defendants are required to comply with the terms and conditions of the Settlement Agreement, including its requirement that construction of an approved fish passage that complies with the WIIN Act and any subsequently issued 401 Certification and Navigable Waters Permit begin prior to or concurrent with, and finish prior to completion of, inner harbor dredging.

    b.    The Federal Defendants breached the Settlement Agreement by beginning inner harbor dredging prior to and not concurrent with construction of an approved fish

passage that complies with the WIIN Act and any subsequently issued 401 Certification and Navigable Waters Permit.

    c.   The Federal Defendants are permanently enjoined from conducting inner harbor dredging until they begin construction of an approved fish passage, as herein determined.

197.    South Carolina is entitled to (1) a declaratory judgment, (2) a permanent injunction, and (3) such other relief as is just, equitable, and proper.

**FOR AN SIXTH CAUSE OF ACTION**
**(Violation of NEPA and the APA– Failure to Prepare an**
**Adequate Environmental Analysis for a New Agency Action)**

198.    The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this cause of action.

199.    NEPA requires federal agencies to fully consider and disclose the environmental consequences of an agency action before proceeding with that action. NEPA also requires the preparation of an appropriate analysis when a major federal action is proposed that may significantly affect the quality of the environment. 42 U.S.C.A. § 4332(C); 40 C.F.R. § 1501.4(a)(1); 33 C.F.R. § 230.6.

200.    The Federal Defendants' authorization of the NSBLD Project is a federal action.

201.    The NSBLD Project will significantly affect the quality of the environment by, among other things, removing an historic structure requiring analysis under Section 106, facilitating construction and placement of material within navigable waters of the U.S., altering the characteristics of the river and the water quality.

202.    The Corps did not prepare or undertake a sufficient or adequate analysis of the NSBLD Project under NEPA.

203. To the extent a supplemental environmental assessment is an appropriate process to undertake, the SEA in this case is inadequate, fails to adequately address all issues, and is wholly deficient.

204. The SEA does not comply with NEPA.

205. Authorizing the NSBLD Project without NEPA compliance was arbitrary and capricious and otherwise not in accordance with law.

206. For the foregoing reasons, Plaintiffs are entitled to a declaration and order enjoining and requiring the Federal Defendants to analyze in accordance with NEPA and the APA the environmental impact of removing the NSBLD Project and replacing it with the proposed rock weir.

207. South Carolina is entitled to (1) a declaratory judgment, (2) a permanent injunction, and (3) such other relief as is just, equitable, and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, the State of South Carolina and DHEC prays that the Court grant the following relief:

A. A declaration and order that the WIIN Act requires the Federal Defendants to maintain the pool level at the same depth as it existed on the date of enactment.

B. A declaration and order that the Corps' interpretation of the WIIN Act is inconsistent with the plain language of the Act.

C. A declaration and order that the preferred Alternative 2-6d does not comply with the WIIN Act's requirement to maintain the pool level at the same depth as it existed on the date of enactment.

D.    A declaration and order permanently enjoining the Federal Defendants from proceeding with construction of the preferred plan.

E.    A declaration and order permanently enjoining the Federal Defendants from selecting a proposed plan that does not maintain the pool level at the same depth as it existed on the date of enactment, as required by the plain language of the Act.

F.    A declaration and order that the Federal Defendants and the NSBLD Project must comply with South Carolina law, including statutes, regulations, orders, rulings, and decisions of its agencies.

G.    A declaration and order that the Federal Defendants and the NSBLD Project are barred from proceeding with construction because no 401 Certification or Navigable Waters Permit have been issued by South Carolina.

H.    A declaration and order that the Federal Defendants' decision to proceed with the NSBLD Project violates NEPA.

I.    A declaration and order permanently enjoining the Federal Defendants from proceeding with the NSBLD Project prior to conducting a proper NEPA review.

J.    A declaration and order that the Federal Defendants are required to begin constructon of the fish passage prior to or concurrent with the inititation inner harbor dredging.

K.    A declaration and order permanently enjoining the Federal Defendants from conducting or continuing inner harbor dredging or any maintenance dredging on the inner harbor until all legal obligations, including but not limited to the Settlement Agreement, Settlement Order, a South Carolina-issued 401 Certification, and a South Carolina-issued Navigable Waters Permit, have been fully and completely satisfied and complied with.

L.    An order granting such other relief as the Court may deem just and proper.

Respectfully submitted,

Alan Wilson, Fed. Bar No. 10457
Robert D. Cook, Fed. Bar No. 285
T. Parkin Hunter, Fed. Bar No. 2018
**ATTORNEY GENERAL FOR**
**THE STATE OF SOUTH CAROLINA**
Post Office Box 11549
Columbia, South Carolina 29211-1549
agwilson@scag.gov
agrcook@scag.gov
phunter@scag.gov
(803) 734-3970

s/Chad N. Johnston
Randolph R. Lowell, Fed. Bar No. 9203
Chad N. Johnston, Fed. Bar No. 10813
**WILLOUGHBY & HOEFER, PA**
133 River Landing Drive, Suite 200
Charleston, South Carolina 29492
rlowell@willoughbyhoefer.com
cjohnston@willoughbyhoefer.com
(843) 619-4426

*Attorneys for the State of South Carolina, Savannah*
*River Maritime Commission, and South Carolina*
*Department of Health and Environmental Control*

Stephen P. Hightower, Fed. Bar No. 9591
**SOUTH CAROLINA DEPARTMENT OF**
**HEALTH AND ENVIRONMENTAL**
**CONTROL**
2600 Bull Street
Columbia, South Carolina 29201
hightosp@dhec.sc.gov
(803) 898-3350

*Attorney for South Carolina Department of Health*
*and Environmental Control*

November 4, 2019
Columbia, South Carolina