# EXHIBIT G

## <u>COMPROMISE AND SETTLEMENT AGREEMENT</u>

This Compromise and Settlement Agreement (the "Agreement") is made and entered into by and between the Parties as defined below.

As used in this Agreement, the term "Plaintiffs" means the South Carolina Coastal Conservation League, Savannah Riverkeeper, and South Carolina Wildlife Federation, each a not-for-profit corporation (these three entities collectively, "Conservation Groups"); the Savannah River Maritime Commission ("Commission"), a South Carolina state agency; and the South Carolina Department of Health & Environmental Control ("DHEC"), a South Carolina state agency.

As used in this Agreement, the term "Defendants" means the United States Army Corps of Engineers and its Savannah District and the respective officers in their official capacities, including the Secretary of the Army, the Commanding General and Chief of Engineers, and the District Engineer for the Savannah District (these officials and entities collectively, "Corps"); and the Georgia Ports Authority ("GPA"), an authority and instrumentality of the State of Georgia.

Each of the Plaintiffs and Defendants may be referred to individually as a "Party" and collectively as "Parties."

As used in this Agreement, "Disputes" includes all issues, causes of action, and allegations raised in *Savannah Riverkeeper v. United States Army Corps of Engineers*, No. 9:12-610-RMG (D.S.C.) and the South Carolina Administrative Law Court actions identified in Section IV of this Agreement and claims seeking to stop, delay, or alter or otherwise challenge the Project.

As used in this Agreement, "Project" or "SHEP" means the Savannah Harbor Expansion Project authorized by Congress in 1999, Pub. Law 106-53, 113 Stat. 269, § 101(b)(9) and as described in the Final Environmental Impact Statement ("Final EIS") and Final General Reevaluation Report ("Final GRR"), both dated January 2012 and revised in July 2012, and approved by the Chief of Engineers Report dated August 17, 2012 ("Engineer's Report") and Record of Decision dated October 26, 2012 ("ROD").

As used in this Agreement, "Inner Harbor" shall mean the federal navigation channel of the Savannah River upstream of 0+000.

As used in this Agreement, "Outer Harbor" shall mean the federal navigation channel of the Savannah River downstream of 0+000.

As used in this Agreement, "Inner Harbor Channel Dredging" shall mean dredging for improving the federal navigation channel in the Inner Harbor and shall not include activities that may occur prior to Inner Harbor Channel Dredging including construction of any mitigation features, preparatory construction activities, and maintenance of the current 42-foot channel.

WHEREAS, the Parties have engaged in substantive settlement negotiations and exchanged information on the factual and legal positions of each Party; and

WHEREAS, the Parties wish to avoid the risk, uncertainty, and cost of litigation, and desire to compromise and settle all claims which they have against each other or may have alleged against each other with regard to the Disputes upon the terms and provisions set forth herein.

NOW, THEREFORE, the Parties agree as follows:

## I.    Commitments by the Commission and DHEC

A.    The State of South Carolina, through DHEC and the Commission, shall issue any authorizations or permits they contend are necessary for the Project ("State Approvals"). DHEC's approval shall contain only terms and conditions substantially similar to those in the attached Exhibit A and the Commission's approval shall contain only terms and conditions substantially similar to those in the attached Exhibit B, including but not limited to the following substantive conditions in addition to the commitments in Section II.

1.    The Corps shall provide a comprehensive report at: (a) the end of pre-construction; (b) the end of construction; and (c) the end of the 10-year monitoring program, as such periods are described in Appendix D of the Final EIS. Each comprehensive report shall be provided to DHEC and the Commission and made available on the Project's public website and as provided in Appendix D to the Final EIS.

2.    The Corps may construct the Project.

3.    All hopper dredging activities will only take place from December 1 through March 31.

4.    All dredging in the Inner Harbor upstream of Station 63+000 is prohibited during the striped bass spawning period of April 1 to May 15.

5.    The Corps will allow DHEC or the Commission to make periodic inspections of the project construction and mitigation implementation sites that are reasonable in scope on no less than one week's advance notice and subject to adherence to personal protective equipment requirements contained in the Corps Safety Manual (EM 385-1-1).

6.    In addition to the water quality monitoring set forth in or required by the Final EIS and other governmental approvals, the Corps will provide continuous daily water quality monitoring with two additional monitors at locations to be jointly agreed-upon by the Corps, Commission, and DHEC, to be installed simultaneously with the eight continuous water quality monitoring stations

proposed in Appendix D of the Final EIS. These two additional continuous water quality monitoring stations are intended to supplement the eight continuous water quality monitoring stations proposed in Appendix D of the Final EIS and will be subject to the same criteria for Pre-Construction Monitoring, Monitoring During Construction and Post Construction Monitoring as specified in Appendix D to the Final EIS. A copy of the monthly monitoring reports will be provided to the Conservation Groups, DHEC and the Commission and will be publicly available through the project's website within 30 days after the Corps' receipt of the monitoring report. Should adverse conditions, such as weather or vandalism, impair operations of a water quality monitor, the Corps will undertake reasonable efforts to restore operation of the monitor as soon as possible. This provision will terminate at the end of the 10-year Post Construction Monitoring Period.

7.      The Corps will refine and update the SHEP hydrodynamic (EFDC) and water quality (WASP) models specifically for DO. The updated model will take advantage of previous modeling efforts, including U.S. Environmental Protection Agency's TMDL model, and the most current information collected in the Savannah River harbor and estuary. The product will be complete DO model scenarios comparing instream DO concentrations with and without operation of the Oxygen Injection System.

        The purpose of the modeling and monitoring is to confirm that the Oxygen Injection System will mitigate for the DO impacts of the Project as shown by comparing actual DO levels in the modeled area, from Station 0+000 upstream to River Mile 27.8, to DO levels in the without-Project scenario (the "Success Criteria").

8.      Prior to commencement of any Inner Harbor Channel Dredging, the Corps will test and evaluate the downriver Oxygen Injection System that is to be located at the Hutchinson Island location to demonstrate its ability to mitigate dissolved oxygen impacts of the SHEP. Dredging of the Outer Harbor can occur prior to this testing.

        a)      The Oxygen Injection System at the downriver Hutchinson Island location must be operated and instream DO must be monitored continuously for a period of 59 days (2 lunar cycles). Continuous daily water quality monitoring must be conducted during this period at locations specified in and pursuant to the monitoring plan. This 59-day period of operation is referred to herein as the "Test Run."

        b)      Following the Test Run and analysis of the modeling results and monitoring data, the Corps will provide a report to the Conservation Groups, Commission and DHEC comparing the monitoring data collected during the Test Run to the modeling results.

c)     The Conservation Groups, Commission and DHEC will have thirty (30) days to evaluate and review the Test Run report and to provide comments and feedback to the Corps and the Adaptive Management Team.  The Corps, Conservation Groups, Commission and DHEC each will independently evaluate the Test Run report and other relevant information to assess achievement of the Success Criteria.

d)     If the Corps determines that the Oxygen Injection System test meets the Success Criteria, it will commence Inner Harbor Channel Dredging no sooner than fourteen (14) days after the 30-day comment period in subsection (c) has ended.  DHEC, the Commission, and the Conservation Groups each reserves the right to take any appropriate action if its independent determination is that the Success Criteria has not been met, including but not limited to suspension, rescission, and revocation of the State Approvals, initiation of an enforcement or other legal action, and/or termination of this Agreement.  The Corps does not waive any objection or defense to such actions, including any objection or defense based on federal preemption, sovereign immunity, or immunity from state regulation.

e)     Copies of the data, modeling inputs, modeling results, monitoring data, and reports will be provided to all Parties by the Corps as soon as available to allow the Conservation Groups, Commission and DHEC to review the information simultaneously with the Corps and Adaptive Management Team.

9.     Following the installation of the entire Oxygen Injection System, the monitoring and testing procedure will be conducted as set forth below.

a)     The entire Oxygen Injection System must be operated, and instream DO must be monitored continuously for a period of 59 days (2 lunar cycles), of which at least one 29.5 day testing (one lunar cycle) must occur in July, August, or September immediately following the installation of the Oxygen Injection System.   Continuous daily water quality monitoring must be conducted during this period at locations specified in and pursuant to the monitoring plan.  This 59-day period of operation is referred to herein as the "Start-up Run."

b)     Following the Start-up Run and analysis of the modeling results and monitoring data, the Corps will provide a report comparing the monitoring data collected during the Start-up Run to the modeling results to the Conservation Groups, Commission and DHEC.

c)     The Conservation Groups, Commission and DHEC will have sixty (60) days to evaluate and review the Start-up Run report and to provide comments and feedback to the Corps and the Adaptive Management

Team. The Corps, Conservation Groups, Commission, and DHEC each will independently evaluate the Start-up Run report and other relevant information to assess achievement of the Success Criteria.

d) If the Corps determines that the Oxygen Injection System test meets the Success Criteria, Inner Harbor Channel Dredging will continue. DHEC, the Commission, and the Conservation Groups each reserves the right to take any appropriate action if its independent determination is that the Success Criteria has not been met, including but not limited to suspension, rescission, and revocation of the State Approvals, initiation of an enforcement or other legal action, and/or termination of this Agreement. The Corps does not waive any objection or defense to such actions, including any objection or defense based on federal preemption, sovereign immunity, or immunity from state regulation.

e) Copies of the data, modeling inputs, modeling results, monitoring data, and reports will be provided to all Parties by the Corps as soon as available to allow the Conservation Groups, Commission and DHEC to review the information simultaneously with the Corps and Adaptive Management Team.

10. The Savannah District of the Corps will make the dissolved oxygen system a top priority for discretionary annual operations and maintenance funds appropriated and received for the Project above normal maintenance requirements.

11. Cadmium is naturally present in certain reaches of the Savannah River Harbor. Therefore, the Corps shall conduct the following monitoring:

a) During the SHEP deepening activities, cadmium concentrations in the discharge shall be monitored weekly from those Confined Disposal Facilities (CDF) receiving sediments from the four known reaches within the Savannah Harbor having elevated cadmium concentration in the sediments. U.S. Environmental Protection Agency laboratory testing methodology must have a detection limit of at least 0.7 micrograms per liter (ug/l). Monitoring shall continue at these CDF discharge points as long as discharge is present and until all dredged sediments have been dewatered, stabilized and capped as per the Final EIS. Data shall be reported to DHEC and the Commission quarterly in micrograms per liter within thirty (30) days of the end of each calendar quarter.

b) Following the installation of a stable clean cap within the CDFs that receive cadmium-bearing sediments, cadmium shall be monitored weekly for a period of one year. Data shall be reported to DHEC and the

Commission quarterly in micrograms per liter within thirty (30) days of the end of each calendar quarter.

c) Dewatering discharge from all CDFs shall be monitored by the Corps and reported to DHEC and the Commission monthly and due within thirty (30) days following the end of each reporting period. Monitoring reports shall include the location of the discharge point, sampling point, dates of discharge, total suspended solids, dissolved oxygen, pH, temperature, salinity, turbidity and conductivity. The Corps will monitor weekly when there is a discharge and provide monthly reports to DHEC and the Commission within thirty (30) days of the end of each reporting period.

d) The monitoring data will be evaluated as provided in Appendix D of the Final EIS.

12. The Corps will coordinate with the state resource agencies, including DHEC, the Commission, Georgia Department of Natural Resources ("Georgia DNR"), and the Cooperating Agencies in the implementation of the Monitoring and Adaptive Management Plan as provided in Appendix D of the Final EIS.

13. The Corps will comply with the terms and conditions of the Final Biological Opinion issued by the National Marine Fisheries Service on or about November 4, 2011.

14. The Corps will comply with the terms and conditions of the Section 401 Water Quality Certification issued by the Georgia DNR on or about February 16, 2011.

15. The Corps will comply with the Monitoring and Adaptive Management Plan provided as Appendix D of the Final EIS.

B. The State Approvals will state that they satisfy any and all South Carolina permitting requirements applicable to the Project.

## II. Commitments by GPA

A. No later than six (6) months prior to the commencement of Inner Harbor Channel Dredging, GPA will establish a letter of credit or escrow account on commercially reasonable terms agreed-upon by GPA, DHEC, and the Commission in the amount of Two Million Dollars ($2,000,000). This amount will be adjusted annually for inflation based on the U.S. Bureau of Labor Statistics CPI-U, U.S. City Average for All Items representing the annual change. Any interest that accrues in an escrow account will be applied toward the CPI-U adjustment for the following year(s). This letter of credit or escrow account is to be held as a contingent fund to be drawn upon for operation and maintenance of the Oxygen Injection System should the Corps fail to provide for an

annual appropriation for or otherwise fail to fund the operation and maintenance of the Oxygen Injection System. The letter of credit or escrow account will be maintained for a minimum of $2,000,000 (as adjusted annually for inflation) at all times for fifty (50) years after completion of the SHEP.

B.      GPA will contribute cash and land as follows:

1.      GPA will contribute Three Million Dollars ($3,000,000) to DHEC to be used solely and exclusively for water quality monitoring and other initiatives in the Lower Savannah River Basin, payable in Seven Hundred Fifty Thousand Dollar ($750,000) increments, with the first payment commencing ninety (90) days following execution of the Project Partnership Agreement and no earlier than July 1, 2013, and the remaining payments to be paid on the annual anniversary date of the initial payment for the following three (3) years.

2.      GPA will contribute Three Million Dollars ($3,000,000) to the South Carolina Department of Natural Resources ("South Carolina DNR") to be used solely and exclusively for monitoring and research of Shortnose and Atlantic Sturgeon and their habitat in the estuaries of the Savannah River payable in Seven Hundred Fifty Thousand Dollar ($750,000) increments, with the first payment commencing ninety (90) days following execution of the Project Partnership Agreement and no earlier than July 1, 2013, and the remaining payments to be paid on the annual anniversary date of the initial payment for the following three (3) years.

3.      GPA will contribute Fifteen Million Dollars ($15,000,000) for conservation efforts, as follows. GPA will pay these funds into an escrow account on commercially reasonable terms agreed-upon by GPA, DHEC, and the Commission, which will be disbursed to the relevant payees within ten (10) days of completion of the Project. Any interest that accrues in a given year will be applied toward GPA's next payment.

a)      Five Million Dollars ($5,000,000) solely and exclusively for preservation of wetlands, acquisition of conservation easements, and/or upland buffers that directly benefit the Lower Savannah watershed to be paid to The South Carolina Conservation Bank, payable in increments of One Million Dollars ($1,000,000), with the first payment commencing within sixty (60) days following initiation of Inner Harbor Channel Dredging and no earlier than July 1, 2014, and the remaining payments to be paid on the annual anniversary date of the initial payment for the following four (4) years.

b)      Five Million Dollars ($5,000,000) to South Carolina DNR, with the stipulation that South Carolina DNR must use such funds solely and exclusively for the creation, restoration, or enhancement of wetlands in the Lower Savannah watershed, payable in increments of One Million Dollars

($1,000,000), with the first payment commencing within sixty (60) days following initiation of Inner Harbor Channel Dredging and no earlier than July 1, 2014, and the remaining payments to be paid on the annual anniversary date of the initial payment for the following four (4) years.

c)      Five Million Dollars ($5,000,000) to Ducks Unlimited, Southern Region, Wetlands America Trust ("DU"), with the stipulation that DU must use such funds solely and exclusively for preservation of wetlands and/or upland buffers in the States of Georgia of South Carolina that directly benefit the Lower Savannah watershed, payable in increments of One Million Dollars ($1,000,000), with the first payment commencing within  sixty (60) days following initiation of Inner Harbor Channel Dredging and no earlier than July 1, 2014, and the remaining payments to be paid on the annual anniversary date of the initial payment for the following four (4) years.

d)      If the Project is completed before the scheduled payments set forth in II.B.3(a)-(c) have been made, GPA will pay any remaining payments due within ten (10) days of completion of the Project.

4.      GPA will contribute Twelve Million Five Hundred Thousand Dollars ($12,500,000) to be used solely and exclusively for environmental and conservation projects in the Savannah River Basin to the Savannah River Restoration Board in increments of One Million Forty-One Thousand, Six Hundred Sixty-Six Dollars and Sixty-Seven Cents ($1,041,666.67), with the first payment commencing sixty (60) days following initiation of Inner Harbor Channel Dredging and no earlier than July 1, 2014, and the remaining payments to be paid on the annual anniversary date of the initial payment for the following eleven (11) years.  Any interest that accrues in a given year will be applied toward GPA's next payment.  GPA will pay these funds into an escrow account, which will be disbursed to the Savannah River Restoration Board upon completion of the Project.  Any installment payments due after completion of the Project will be paid directly to the Savannah River Restoration Board.  The Savannah River Restoration Board will be established and operated as a bi-state board comprised of representatives of the following agencies and organizations: Georgia DNR, Georgia Environmental Protection Division, South Carolina DNR, DHEC, Commission, Savannah Riverkeeper, S.C. Coastal Conservation League, the S.C. Wildlife Federation, Georgia Wildlife Federation and GPA.  The mission of the Savannah River Restoration Board will be to fund projects in the Lower Savannah River watershed that improve the water quality and aquatic functioning of the Savannah River, with a priority on oxbow restoration projects.

5.      Recipients of GPA's Fifteen Million Dollar ($15,000,000) funding contributions set forth in Subsection 3 shall provide an annual summary to GPA regarding what projects or activities were completed with the funds within the previous year.

6.    Within ninety (90) days following execution of the Project Partnership Agreement, the GPA will cause to be transferred from the Georgia Department of Transportation, by quitclaim deed containing an automatic reversion provision, as set forth below, approximately 2,000 acres of salt marsh as generally reflected on the attached Exhibit C, exact boundaries and acreage of which to be determined by a survey to be obtained by GPA, to the Commission, assuming it has received authority to hold property (if not, the property shall be transferred to the State of South Carolina). If the Project is terminated prior to initiation of Inner Harbor Channel Dredging, the property will automatically revert to the Georgia Department of Transportation in as is condition. The deed shall contain the following reversion provision:

> **TO HAVE AND TO HOLD** the said real property unto Grantee, Grantee's successors and assigns, provided, however, if the Project is terminated at any time prior to the initiation of Inner Harbor Channel Dredging the said real property shall automatically revert back to the Grantor without the necessity of reentry and without the necessity of notice, demand, any action brought or taken by Grantor, any instrument or conveyance executed or delivered by Grantee, any liability of Grantor to make or pay any compensation therefore to Grantee or Grantee's successors and assigns, it being intended hereby to create a determinable fee in Grantee with a possibility of reverter being retained by Grantor so that when an above-stated event shall occur the title of Grantee to said real property shall automatically be at an end and by operation of law the title to said real property shall immediately revert to and revest in Grantor in the same state of title as initially conveyed to Grantee without prejudice to any other right, claim, or interest Grantee may have or had prior to the date of recordation of this deed. After such reversion, upon Grantor's written request, Grantee will execute and deliver a quitclaim deed to Grantor conveying whatever right, title, and interest was conveyed by the Grantor within thirty days from receipt of Grantor's written request. The failure of Grantee to execute and deliver such quitclaim deed shall not prevent the automatic reversion of fee simple title in said real property to Grantor.

C.    GPA commits to work with the City of Augusta and Georgia EPD as Augusta complies with applicable responsibilities arising from Federal Energy Regulatory Commission licensing of the Augusta Canal and Diversion project, such responsibilities to include support of the fisheries by providing adequate flows.

D.    Prior to initiation of Inner Harbor Channel Dredging, GPA, at its sole expense, will retain the firm Moffatt & Nichol to evaluate the effects that cadmium disposal in confined disposal facilities 14A and 14B may have on the construction of a terminal at those sites in the future and submit such report to DHEC and the Commission.

E.      GPA's obligations under this Agreement will be suspended if (a) the Project is stayed or enjoined, (b) the State Approvals are revoked, rescinded, modified or stayed, or (c) after the initiation of Inner Harbor Channel Dredging, Inner Harbor Channel Dredging is suspended or ceased for any reason and after GPA provides written notice to the Conservation Groups, DHEC, and the Commission of such suspension or cessation which shall state the reason for such suspension or cessation and the estimated time period of the length of such suspension or cessation. GPA's suspended obligations will resume once the suspended activity resumes and after notice to the Conservation Groups, DHEC, and the Commission provided no later than ten (10) days prior to the resumption of dredging activities. If the Project is, or the dredging activities thereof are, suspended through the exercise of the rights under Section I.A.8.d or I.A.9.d by the Commission or DHEC, all of GPA's pending and future funding obligations set forth in II.B.1 through II.B.3 will be suspended, to resume once the Project resumes. If the Project is, or the dredging activities thereof are, suspended through the exercise of the rights under Section I.A.8.d or I.A.9.d by the Conservation Groups, all of GPA's pending and future funding obligations set forth in II.B.4 will be suspended, to resume once the Project resumes.

## III.    Deauthorization Study

A.      GPA and the Commission agree to make their best efforts in good faith to obtain letters from the Governors of South Carolina and Georgia requesting that the Corps conduct a section 216 study to examine the feasibility of deauthorization of the Savannah River navigation channel below Augusta project and above the Houlihan Bridge (the "Deauthorization Study").

B.      The Savannah District of the Corps will seek funding, after it receives a letter from a willing nonfederal sponsor, to conduct the Deauthorization Study.

C.      The Conservation Groups, Commission, Corps, and GPA will support in good faith the Deauthorization Study.

## IV.    Other Provisions

A.      All Parties consent to consolidation of the following pending actions in the South Carolina Administrative Law Court ("ALC"): *U.S. Army Corps of Eng'rs v. Savannah River Maritime Comm'n,* Docket No. 12-ALJ-30-0254-CC, *U.S. Army Corps of Eng'rs v. S.C. Dep't of Health and Envtl. Control, Docket No. 12-ALJ-07-0316-CC; Georgia Ports Authority v. Savannah River Maritime Comm'n, Docket No. 12-ALJ-30-0255-CC; Georgia Ports Authority v. S.C. Dep't of Health and Envtl. Control,* Docket No. 12-ALJ-07-0305-CC; *Georgia Ports Authority v. S.C. Dep't of Health and Envtl. Control,* Docket No. 12-ALJ-07-0351-CC; *U.S. Army Corps of Eng'rs v. S.C. Dep't of Health and Envtl. Control,* Docket No. 12-ALJ-07-0516-CC; and *Georgia Ports Authority v. S.C. Dep't of Health and Envtl. Control,* Docket No. 12-ALJ-07-0518-CC.

B.      Within seven (7) days of full execution of this Agreement, the Parties consent to submit a proposed order in the consolidated cases dismissing such cases with prejudice

based on entry of this Agreement and conditioning dismissal upon issuance of the State Approvals per this Agreement within ten (10) days of filing of such order ("ALC Consent Order"). The ALC Consent Order shall state that the State Approvals will be revised and modified pursuant to the terms of this Agreement.

C.      The Corps and GPA consent to dismissal of *Savannah Riverkeeper v. S.C. Dep't of Health and Envtl. Control*, 11-ALJ-07-0618-CC.

D.      Within ten (10) days of the entry of the ALC Consent Orders in Section IV.B, the State Approvals shall be issued in accordance with the terms contained herein.

E.      No later than ten (10) days after full execution of this Agreement, the Plaintiffs and Defendants agree to move for dismissal with prejudice the pending federal action, 9:12-cv-00610-RMG.

F.      The GPA commitments in Section II above are not required to be included in the ROD and are independent and separate from the Mitigation Plan included as part of the SHEP.

## V.      General Terms and Conditions

A.      <u>Release and Plaintiffs' Covenant Not to Assist Third Parties with Suit</u>.

1.      For and in consideration of the terms and conditions made in this Agreement, and for so long as this Agreement remains in effect, each Party hereby releases, acquits, and discharges all other Parties and their respective representatives, agents, employees, and officials from any and all claims arising from the construction of the SHEP, existing as of the date of this Agreement.

2.      It is understood and agreed that by entering into this Agreement the Corps does not waive any objection or defense to issuance or enforcement of the State Approvals, including any objection to or defense based on federal preemption, sovereign immunity, or immunity from state regulation.

3.      It is understood and agreed that the terms and conditions contained herein are made and given in order to compromise and settle disputed claims. The Parties further agree, among them, that this is a compromise, resolution, and settlement of any and all claims and allegations arising from the construction of the SHEP primarily to avoid the uncertainty, time, trouble and expense of litigation, and that such compromise, resolution and settlement shall not be taken as an admission of liability. No promise or inducement has been offered except as set forth herein. This Agreement is executed without reliance upon any oral, written, express or implied representations, statements, promises, warranties, or other inducement of any nature or sort made by any person or party hereto other than as is expressly set forth herein.

4.      Notwithstanding the foregoing, nothing in this Release is intended to impact or affect (1) the terms provided in the Termination provisions of this Agreement or (2) any right to enforce the State Approvals.

5.      Nothing in this Agreement shall be construed to waive, modify, release, or affect any right, interest, claim, or defense of any Party that does not arise from the construction of the SHEP.

6.      Nothing in this Agreement shall be construed to impact, affect, or waive any right, claim, defense, duty, or obligation arising from the sovereignty of the State of South Carolina, the State of Georgia, or the United States of America.

7.      Any obligations of the United States to commit or expend funds under this Settlement Agreement are subject to the availability of appropriations in accordance with the Anti-Deficiency Act, 31 U.S.C.A. § 1341.  This Settlement Agreement shall not be construed to require the United States to obligate or pay funds in contravention of the Anti-Deficiency Act.

8.      The Conservation Groups covenant that they will not assist, encourage, support, or otherwise aid a third party in pursuing any action or claim against the Defendants relating to the construction of the SHEP.

9.      The Commission agrees that it will not take formal action for the purpose of assisting, encouraging, or supporting a third-party in filing legal claims or actions against the Defendants arising from the construction of the SHEP.  For purposes of clarity, this provision applies only to official, formal action undertaken by the Commission as a state agency and shall not be construed or interpreted as applying to any individual member, public official member, or state agency member of the Commission or interfering with, impeding, affecting, or impacting the rights, responsibilities, duties, or obligations of any individual member, public official member, or state agency member of the Commission, including but not limited to statements, actions, decisions, or similar activity in furtherance of other rights, responsibilities, duties, or obligations.

B.      <u>Termination</u>.

1.      The following occurrences are "Causes for Termination" under this Agreement.

   a)      The GPA fails to tender a monetary payment or otherwise fulfill an obligation as set forth under this Agreement.

   b)      The Corps begins or continues Inner Harbor Channel Dredging after testing of the Oxygen Injection System if a Party determines that the System will not satisfy the Success Criteria.

c)      The Project activities violate the State Approvals.

d)      The State Approvals are revoked, rescinded, or modified without the prior written consent of the Corps.

e)      The Savannah District of the Corps fails to seek funding, subsequent to receiving a letter from a willing nonfederal sponsor, to conduct the Deauthorization Study.

f)      The Project, or any dredging activity, is (i) permanently enjoined; (ii) terminated; (iii) federally deauthorized; or (iv) the State Approvals are suspended for a period of ninety (90) days or more.

2.      If a "Cause for Termination" occurs, a Party exercising its termination rights will send a written "Notice of Impending Termination" that includes an explanation of the basis for each Cause of Termination to the defaulting party by certified mail or commercial carrier (such as UPS or Federal Express). If the Cause for Termination is not cured, ten (10) days after the receipt of a Notice of Impending Termination, any Party may issue a written "Notice of Termination" to all Parties by certified mail or commercial carrier (such as UPS or Federal Express).

3.      In the event of issuance of a written "Notice of Termination" by any Party, this Agreement shall automatically terminate and be null and void as of the date of receipt of the Notice of Termination between the noticing Party and the defaulting Party. For purposes of the effect of termination, if DHEC or the Commission terminate the Agreement, GPA's obligations set forth in II.B.1 through II.B.3, II.B.6 (if terminated prior to initiation of Inner Harbor Channel Dredging) and II.D shall be terminated and any of GPA's pending and future obligations will be terminated and any escrowed funds paid thereunder will be returned to GPA. If any individual Conservation Group terminates the Agreement, GPA's obligations set forth in II.B.4, II.C and III shall be terminated and any of GPA's pending and future obligations will be terminated and any escrowed funds paid thereunder will be returned to GPA.

4.      In the event of issuance of a written "Notice of Termination," each noticing and defaulting Party is restored to the same legal position it occupied prior to execution of this Agreement, including the right to file any and all claims arising from the construction of the SHEP, as against each other.

a)      For purposes of the effect of termination, if DHEC or the Commission is a noticing or defaulting Party, then this Agreement shall terminate as between GPA, the Corps, DHEC, and the Commission and any other obligations remain in effect.

b)      For purposes of the effect of termination, if any individual Conservation Group terminates the Agreement, then this Agreement shall terminate as between GPA, the Corps, and all Conservation Groups and any other obligations remain in effect.

c)      For purposes of the effect of termination, if GPA or the Corps is a noticing Party, then this Agreement shall terminate as between all Parties.

d)      This right includes, but is not limited to, an action in the United States District Court for the District of South Carolina alleging all claims and defenses of all Parties in the pending litigation and all Parties further retain the right to assert any and all additional claims and defenses.  These claims and defenses include, but are not limited to, claims and defenses based on the sovereignty of the State of South Carolina, the State of Georgia, or the United States or statutory interpretation.

5.      Any applicable statute of limitations or any other time limit for any claim or cause of action which the Parties may have arising from the construction of the SHEP and the Project approvals are tolled until one (1) year after termination of the Agreement.

C.      <u>Compromise and Intention of Parties</u>.

1.      It is expressly understood and agreed that the agreements, terms, conditions, covenants, and releases contained herein are made and given in order to compromise and settle disputed claims.  The Parties further agree, among them, that this is a compromise, resolution, and settlement of any and all claims, allegations, or related activities of and to the Disputes primarily to avoid the uncertainty, time, trouble and expense of litigation, and that such compromise, resolution and settlement shall not be taken as an admission of liability.  Specifically, neither the Corps nor the GPA admits that the SHEP as described in the Engineers' Report, the ROD, Final EIS and Final GRR was or is not in compliance with the requirements of law, including, but not limited to, all laws referenced herein.  No promise or inducement has been offered except as set forth herein.  This Agreement is executed without reliance upon any oral, written, express or implied representations, statements, promises, warranties, or other inducement of any nature or sort made by any person or party hereto other than as is expressly set forth herein.

2.      Each Party shall bear its own costs and fees.

3.      Except as specifically set forth in this Agreement, nothing in this Agreement shall be construed to (a) waive, modify, or affect any other right or interest of any Party under any other statute, regulation, or law or (b) release or affect any claim that may arise or exist after the date of this Agreement.  Nothing

in this agreement shall be construed to impact, affect or waive the United States' sovereign immunity or immunity from state regulation.

D. <u>Public Statements</u>. Each of the Parties stipulates and agrees that the terms of this Agreement constitute public information and may be provided to third parties with or without a request under the federal or state freedom of information acts.

E. <u>Binding Effect</u>. This Agreement shall inure to the benefit of and shall be binding upon the undersigned Parties and their respective officials, employees, agents, representatives, affiliates, and successors.

F. <u>Voluntary Agreement</u>. Each of the Parties acknowledges that this Agreement has been executed freely and voluntarily, without compulsion and with full knowledge of its legal significance and consequences.

G. <u>Authority</u>. Each of the undersigned warrants and covenants that he or she has the authority and authorization to execute this Agreement on behalf of their respective Party and that each Party has taken any and all necessary steps to ratify, approve, and consent to the terms and conditions contained herein.

H. <u>Counterparts</u>. This Agreement may be executed in counterparts or with detachable signature pages and shall constitute one agreement, binding upon all the Parties as if all the Parties signed the same document.

I. <u>Headings</u>. The headings used in this Agreement are intended solely for the convenience of reference and should not in any manner amplify, limit, modify or otherwise be used in the interpretation of any of the provisions of the Agreement.

J. <u>Entire Agreement</u>. This Agreement embodies, merges, and integrates all prior and current agreements and understandings of the Parties and may not be clarified, modified, changed, or amended except in writing signed by each signatory hereto or their other authorized representatives.

K. <u>Not Operational Unless Authorized by All Parties</u>. The Agreement is not operational absent the signatures of all Parties.

L. <u>Survival</u>. All representations, covenants, and warranties contained herein shall survive the execution and delivery of this Agreement and the execution and delivery of any other document or instrument referred to herein.

M. <u>Counsel</u>. The Parties, together with their respective legal counsel, actively and equally participated in the negotiation and review of this Agreement, with the Parties having the opportunity to make changes. Therefore, in the event of any ambiguity in this Agreement, such ambiguity shall not be presumptively construed in favor of or against either Party solely because that Party or its legal representation drafted the provision.

This Agreement is executed as of the date of last signature.

**SAVANNAH RIVER MARITIME COMMISSION**


By:     William D. Moss, Jr.
Its:    Chairman
Date:   April 17, 2013


**SOUTH CAROLINA DEPARTMENT OF
HEALTH & ENVIRONMENTAL CONTROL**


By:     Catherine B. Templeton
Its:    Director
Date:   April 19, 2013

**SAVANNAH RIVERKEEPER**

By:   Tonya Bonitatibus
Its:   Executive Director
Date:   4|7|13

**SOUTH CAROLINA COASTAL CONSERVATION LEAGUE**

By:   Dana Beach
Its:   Executive Director
Date:   4/22/13

**SOUTH CAROLINA WILDLIFE FEDERATION**

By:   Ben Gregg
Its:   Executive Director
Date:   4/18/13

**JOHN McHUGH, In His Official Capacity As Secretary of the Army**
**U.S. ARMY CORPS OF ENGINEERS**
**LT. GENERAL THOMAS P. BOSTICK, In His Official Capacity As Chief Of Engineers**
**U.S. ARMY CORPS OF ENGINEERS, SAVANNAH DISTRICT**
**COL. JEFFREY HALL, In His Official Capacity As District Engineer, Savannah District**

IGNACIA S. MORENO
Assistant Attorney General
By: NORMAN L. RAVE, JR.
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
Their: Counsel of Record
Date: 5/17/2013

**GEORGIA PORTS AUTHORITY**


By:    Curtis J. Foltz
Its:    Executive Director
Date:    April 24, 2013

# EXHIBIT A

The South Carolina Department of Health & Environmental Control (DHEC) certifies pursuant to Section 401 of the Clean Water Act, 33 U.S.C.A. § 1341, and S.C. Code Regulation 61-101 that: (1) there is a reasonable assurance that the Savannah Harbor Expansion Project authorized by Congress in 1999, Pub. Law 106-53, 113 Stat. 269, § 101(b)(9) and as described in the Final Environmental Impact Statement ("Final EIS") and Final General Reevaluation Report ("Final GRR"), both dated January 2012 and revised in July 2012, and approved by the Chief of Engineers Report dated August 17, 2012 ("Engineer's Report") and Record of Decision dated October 26, 2012 ("ROD") ("SHEP" or "the Project"), including proposed mitigation measures, and subject to the conditions contained in this certification, will be conducted in a manner which will not violate applicable water quality standards regulations; (2) any discharges into navigable waters from the Project, as described in the final EIS and subject to the conditions contained in this certification, will comply with applicable provisions of Section 303 of the Clean Water Act; and (3) there are no applicable effluent limitations under Sections 301(b) and 302 of the Act and there are no applicable standards under Sections 306 and 307.

This certification serves as a state permit under the South Carolina Pollution Control Act, S.C. Code Ann. § 48-1-90(a) and is enforceable as a permit under the Pollution Control Act.

This certification authorizes the Project as described in the Final EIS, ROD, Chief of Engineer's Report, and approvals of other federal agencies including the USEPA approval of July 11, 2012 and the USFWS approval of July 9, 2012, subject to the additional requirements of this certification. Actions inconsistent with the Final EIS and other federal approvals are not authorized except where permitted or required by this certification.

This certification is subject to the following conditions, which include certain obligations of the Georgia Ports Authority (GPA). GPA's compliance with its obligations is an essential component of this authorization. This certification does not require that the GPA commitments be included in the ROD.


1.      The U.S. Army Corps of Engineers (Corps) may construct the Project consistent with the Final EIS dated January 2012 and revised in July 2012 and approved by the Chief of Engineers Report dated August 17, 2012.

2.      Any hopper dredging activities for the Outer Harbor must take place between December 1 and March 31.

3.      All dredging in the Inner Harbor upstream of Station 63+000 is prohibited during the striped bass spawning period of April 1 to May 15.

4.      The Corps will make reasonable efforts to perform the authorized work in a manner to minimize adverse impact on fish, wildlife, and water quality. The Corps must construct the Project in a manner that will not violate applicable law.

5.      DHEC may make periodic inspections of the Project construction and mitigation implementation sites that are reasonable in scope on no less than one week's advance notice and subject to adherence to personal protective equipment requirements contained in the Corps Safety Manual (EM 385-1-1).

6.      In addition to the water quality monitoring set forth in or required by the Project Final EIS and other governmental approvals, the Corps will provide continuous daily water quality monitoring with two additional monitors at locations to be jointly agreed-upon by the Corps, Savannah River Maritime Commission, and DHEC, to be installed simultaneously with the eight continuous water quality monitoring stations proposed in Appendix D of the Final EIS. These additional continuous water quality monitoring stations are intended to supplement the eight continuous water quality monitoring stations proposed in Appendix D of the Final EIS and will be subject to the same criteria for Pre-Construction Monitoring, Monitoring During Construction and Post Construction Monitoring as specified in Appendix D to the Final EIS. A copy of the monthly monitoring reports will be provided to DHEC and the Commission and will be publicly available through the project's website within 30 days after the Corps' receipt of the monitoring report. Should adverse conditions, such as weather or vandalism, impair operations of a water quality monitor, the Corps will undertake reasonable efforts to restore operation of the monitor as soon as possible. This provision will terminate at the end of the 10-year Post Construction Monitoring Period.

7.      The Corps will mitigate the impacts of the Project consistent with the Final EIS and ROD. The Corps will comply with the Monitoring and Adaptive Management Plan in Appendix D of the final EIS, incorporated by reference. The Monitoring and Adaptive Management Plan will ensure the accuracy of the predicted environmental impacts, assess the effectiveness of the mitigation features, and provide for modification of the Project as needed.

8.      The Corps will coordinate with the state resource agencies, including DHEC, the Commission, Georgia Department of Natural Resources ("Georgia DNR"), and the federal Cooperating Agencies in the implementation of the Project's Monitoring and Adaptive Management Plan as provided in Appendix D of the Final EIS.

9.      Prior to initiation of Inner Harbor Channel Dredging, GPA, at its sole expense, will evaluate the effects that cadmium disposal in confined disposal facilities 14A and 14B may have on the construction of a terminal at those sites in the future and submit such report to DHEC and the Commission.

10.     Cadmium is naturally present in certain reaches of the Savannah River Harbor. Therefore, the Corps shall conduct the following monitoring:

    a. During the SHEP deepening activities, cadmium concentrations in the discharge shall be monitored weekly from those Confined Disposal Facilities (CDF) receiving sediments from the four known reaches within the Savannah Harbor having elevated cadmium concentration in the sediments. U.S. Environmental Protection Agency laboratory testing methodology must have a detection limit of at least 0.7 micrograms per liter (ug/l). Monitoring shall continue at these CDF discharge points as long as discharge is present and until all dredged sediments have been dewatered, stabilized and capped as per the Final EIS. Data shall be reported to DHEC quarterly in micrograms per liter within thirty (30) days of the end of each calendar quarter.

    b. Following the installation of a stable clean cap within the CDFs that receive cadmium-bearing sediments, cadmium shall be monitored weekly for a period of one year. Data shall be reported to DHEC quarterly in micrograms per liter within thirty (30) days of the end of each calendar quarter.

c. The Corps shall monitor dewatering discharges from all CDFs weekly and shall provide monthly reports to DHEC within thirty (30) days of the end of each reporting period. Monitoring reports shall include the location of the discharge point, sampling point, dates of discharge, total suspended solids, dissolved oxygen, pH, temperature, salinity, turbidity and conductivity.

d. The monitoring data will be evaluated as provided in Appendix D of the Final EIS.

11.    Prior to commencement of any Inner Harbor Channel Dredging, the Corps will test and evaluate the Oxygen Injection System to demonstrate its effectiveness consistent with the Final EIS to mitigate for the dissolved oxygen ("DO") impacts caused by the Project. Dredging of the Outer Harbor can occur prior to this testing.

a. The Corps will refine and update the SHEP hydrodynamic (EFDC) and water quality (WASP) models specifically for DO. The updated model will take advantage of previous modeling efforts, including U.S. Environmental Protection Agency's TMDL model, and the most current information collected in the Savannah River harbor and estuary, and will use the most current and representative data. The product will be complete DO predictive model scenarios comparing instream DO concentrations with and without operation of the Oxygen Injection System.

b. The purpose of the modeling and monitoring is to confirm that the Oxygen Injection System will mitigate for the DO impacts of the Project, as shown by comparing actual DO levels in the modeled area, from Station 0+000 upstream to River Mile 27.8, to DO levels in the without-Project scenario (the "Success Criteria").

c. The Oxygen Injection System at the downriver Hutchinson Island location of the Oxygen Injection System must be operated and instream DO must be monitored continuously for a period of 59 days (2 lunar cycles). Continuous daily water quality monitoring must be conducted during this period at locations specified in and pursuant to the monitoring plan provided in the Adaptive Management Plan and as modified herein. This 59-day period of operation is referred to herein as the "Test Run."

d. Following the Test Run and analysis of the modeling results and monitoring data, the Corps will provide a report to DHEC comparing the monitoring data collected during the Test Run to the modeling results.

e. Copies of the data, modeling inputs, modeling results, monitoring data, and reports will be provided to DHEC as soon as available to allow DHEC to review the information simultaneously with the Corps and Adaptive Management Team.

f. DHEC will have thirty (30) days to evaluate and review the Test Run report and to provide comments and feedback to the Corps and Adaptive Management Team (as described in Appendix D of the Final EIS). The Corps, Conservation Groups (defined as the South Carolina Coastal Conservation League, Savannah Riverkeeper, and South Carolina Wildlife Federation), Commission and DHEC each will independently evaluate the Test Run report and other relevant information to assess achievement of the Success Criteria.

g. If the Corps determines that the Oxygen Injection System test meets the Success Criteria, it will commence Inner Harbor Channel Dredging no sooner than fourteen

(14) days after the 30-day comment period in subsection (c) has ended. DHEC reserves the right to take any appropriate action if its independent determination is that the Success Criteria has not been met, including but not limited to suspension, rescission, and revocation of this certification, initiation of an enforcement or other legal action. The Corps does not waive any objection or defense to such actions, including any objection or defense based on federal preemption, sovereign immunity, or immunity from state regulation.

12.    Following the installation of the entire Oxygen Injection System, the entire Oxygen Injection System must be operated and instream DO must be monitored continuously for a period of 59 days (2 lunar cycles), of which at least one 29.5 day testing (one lunar cycle) must occur in July, August, or September immediately following the installation of the Oxygen Injection System. Continuous daily water quality monitoring must be conducted during this period at locations specified in and pursuant to the monitoring plan. This 59-day period of operation is referred to herein as the "Start-up Run."

   a.  Following the Start-up Run and analysis of the modeling results and monitoring data, the Corps will create a report comparing the monitoring data collected during the Start-up Run to the predictive modeling results.

   b.  Copies of the data, modeling inputs, modeling results, monitoring data, and reports will be provided to DHEC as soon as available to the Corps.

   c.  DHEC will have sixty (60) days to evaluate and review the Start-up Run report and to provide comments and feedback to the Corps and Adaptive Management Team (as described in Appendix D of the Final EIS). The Corps, Conservation Groups, Commission, and DHEC each will independently evaluate the Start-up Run report and other relevant information to assess achievement of the Success Criteria.

   d.  If the Corps determines that the Oxygen Injection System test meets the Success Criteria, Inner Harbor Channel Dredging will continue. DHEC reserves the right to take any appropriate action if its independent determination is that the Success Criteria has not been met, including but not limited to suspension, rescission, and revocation of this certification, initiation of an enforcement or other legal action. The Corps does not waive any objection or defense to such actions, including any objection or defense based on federal preemption, sovereign immunity, or immunity from state regulation.

13.    Following successful completion of the Test Run and Start-up Run, the Corps will operate and maintain the Oxygen Injection System during the life of the Project in a manner that will mitigate for DO impacts of the Project on water quality consistent with the Final EIS. Copies of all data and reports will be provided to DHEC.

14.    The Savannah District of the Corps will make the Oxygen Injection System a top priority for discretionary annual operations and maintenance funds appropriated and received for the Project above normal maintenance requirements.

15.    No later than six (6) months prior to the commencement of Inner Harbor Channel Dredging, GPA will establish a letter of credit or escrow fund on commercially reasonable terms agreed-upon by GPA, DHEC, and the Commission in the amount of Two Million Dollars ($2,000,000). This amount will be adjusted annually for inflation based on the U.S. Bureau of

Labor Statistics CPI-U, U.S. City Average for All Items representing the annual change and any adjustments shall be made within thirty (30) days of the anniversary date of the initial deposit into the escrow fund on which the annual adjustment is based. Any interest that accrues in an escrow account will be applied toward the CPI-U adjustment for the following year(s). This letter of credit or escrow fund is to be held as a contingent fund to be drawn upon for operation and maintenance of the Oxygen Injection System should the Corps fail to provide for an annual appropriation for or otherwise fail to fund the operation and maintenance of the Oxygen Injection System. The letter of credit or escrow account will be maintained for a minimum of $2,000,000 (as adjusted annually for inflation) at all times for fifty (50) years after completion of the SHEP.

16.     GPA will contribute cash and land to address DHEC concerns about the sufficiency of mitigation for the Project's potential impacts on salt marsh and other environmental impacts as follows:

a.  GPA will contribute Three Million Dollars ($3,000,000) to DHEC to be used for water quality monitoring and other initiatives in the Lower Savannah River Basin payable in Seven Hundred Fifty Thousand Dollar ($750,000) increments, with the first payment commencing ninety (90) days following execution of the Project Partnership Agreement and no earlier than July 1, 2013, and the remaining payments to be paid on the annual anniversary date of the initial payment for the following three (3) years.

b.  GPA will contribute Three Million Dollars ($3,000,000) to the South Carolina Department of Natural Resources to be used for monitoring and research of Shortnose and Atlantic Sturgeon and their habitat in the estuaries of the Savannah River, payable in Seven Hundred Fifty Thousand Dollar ($750,000) increments, with the first payment commencing ninety (90) days following execution of the Project Partnership Agreement and no earlier than July 1, 2013, and the remaining payments to be paid on the annual anniversary date of the initial payment for the following three (3) years.

c.  GPA will contribute Fifteen Million Dollars ($15,000,000) for conservation efforts, as follows. GPA will pay these funds into an escrow account on commercially reasonable terms agreed-upon by GPA, DHEC, and the Commission, which will be disbursed to the relevant payees within ten (10) days of completion of the Project. Any interest that accrues in a given year will be applied toward GPA's next payment.

i.  Five Million Dollars ($5,000,000) solely and exclusively for preservation of wetlands, acquisition of conservation easements, and/or upland buffers that directly benefit the Lower Savannah watershed to be paid to The South Carolina Conservation Bank, payable in increments of One Million Dollars ($1,000,000), with the first payment commencing within sixty (60) days following initiation of Inner Harbor Channel Dredging and no earlier than July 1, 2014, and the remaining payments to be paid on the annual anniversary date of the initial payment for the following four (4) years.

ii.  Five Million Dollars ($5,000,000) to South Carolina DNR, with the stipulation that South Carolina DNR must use such funds solely and exclusively for the creation, restoration, or enhancement of wetlands in the Lower Savannah watershed, payable in increments of One Million Dollars ($1,000,000), with the

first payment commencing within sixty (60) days following initiation of Inner Harbor Channel Dredging and no earlier than July 1, 2014, and the remaining payments to be paid on the annual anniversary date of the initial payment for the following four (4) years.

   iii. Five Million Dollars ($5,000,000) to Ducks Unlimited, Southern Region, Wetlands America Trust ("DU"), with the stipulation that DU must use such funds solely and exclusively for preservation of wetlands and/or upland buffers in either state that directly benefit the Lower Savannah watershed, payable in increments of One Million Dollars ($1,000,000), with the first payment commencing within sixty (60) days following initiation of Inner Harbor Channel Dredging and no earlier than July 1, 2014, and the remaining payments to be paid on the annual anniversary date of the initial payment for the following four (4) years.

   iv. If the Project is completed before the scheduled payments set forth in II.B.3(a)-(c) have been made, GPA will pay any remaining payments due within ten (10) days of completion of the Project.

d. GPA will contribute Twelve Million Five Hundred Thousand Dollars ($12,500,000) to be used solely and exclusively for environmental and conservation projects in the Savannah River Basin to the Savannah River Restoration Board in increments of One Million Forty-One Thousand, Six Hundred Sixty-Six Dollars and Sixty-Seven Cents ($1,041,666.67), with the first payment commencing sixty (60) days following initiation of Inner Harbor Channel Dredging and no earlier than July 1, 2014, and the remaining payments to be paid on the annual anniversary date of the initial payment for the following eleven years. Any interest that accrues in a given year will be applied toward GPA's next payment. GPA will pay these funds into an escrow account, which will be disbursed to the Savannah River Restoration Board upon completion of the Project. Any installment payments due after completion of the Project will be paid directly to the Savannah River Restoration Board. The Savannah River Restoration Board will be established and operated as a bi-state board comprised of representatives of the following agencies and organizations: Georgia DNR, Georgia Environmental Protection Division, South Carolina DNR, DHEC, Commission, Savannah Riverkeeper, S.C. Coastal Conservation League, the S.C. Wildlife Federation, Georgia Wildlife Federation and GPA. The mission of the Savannah River Restoration Board will be to fund projects in the Lower Savannah River watershed that improve the water quality and aquatic functioning of the Savannah River, with a priority on oxbow restoration projects.

e. Recipients of GPA's Fifteen Million Dollar ($15,000,000) funding contributions set forth in Subsection (c) shall provide an annual summary to GPA regarding what projects or activities were completed with the funds within the previous year.

f. Within ninety (90) days following execution of the Project Partnership Agreement for the SHEP, the GPA will cause to be transferred from the Georgia Department of Transportation, by quitclaim deed containing an automatic reversion provision, as set forth below, approximately 2,000 acres of salt marsh as generally reflected on the attached Exhibit A, exact boundaries and acreage of which to be determined by a

survey to be obtained by GPA, to the Commission, assuming it has received authority to hold property (if not, the property shall be transferred to the State of South Carolina). If the Project is terminated prior to initiation of Inner Harbor Channel Dredging, the property will automatically revert to the Georgia Department of Transportation in as is condition. The deed shall contain the following reversion provision:

> **TO HAVE AND TO HOLD** the said real property unto Grantee, Grantee's successors and assigns, provided, however, if the Project is terminated at any time prior to the initiation of Inner Harbor Channel Dredging the said real property shall automatically revert back to the Grantor without the necessity of reentry and without the necessity of notice, demand, any action brought or taken by Grantor, any instrument or conveyance executed or delivered by Grantee, any liability of Grantor to make or pay any compensation therefore to Grantee or Grantee's successors and assigns, it being intended hereby to create a determinable fee in Grantee with a possibility of reverter being retained by Grantor so that when an above-stated event shall occur the title of Grantee to said real property shall automatically be at an end and by operation of law the title to said real property shall immediately revert to and revest in Grantor in the same state of title as initially conveyed to Grantee without prejudice to any other right, claim, or interest Grantee may have or had prior to the date of recordation of this deed. After such reversion, upon Grantor's written request, Grantee will execute and deliver a quitclaim deed to Grantor conveying whatever right, title, and interest was conveyed by the Grantor within thirty days from receipt of Grantor's written request. The failure of Grantee to execute and deliver such quitclaim deed shall not prevent the automatic reversion of fee simple title in said real property to Grantor.

17. GPA's obligations under this certification will be suspended if (a) the Project is stayed or enjoined, (b) the State Approvals (this certification and the Commission's permit for the Project) are revoked, rescinded, modified or stayed, or (c) after the initiation of Inner Harbor Channel Dredging, Inner Harbor Channel Dredging is suspended or ceased for any reason and after GPA provides written notice to the Conservation Groups, DHEC, and the Commission of such suspension or cessation which shall state the reason for such suspension or cessation and the estimated time period of the length of such suspension or cessation. GPA's suspended obligations will resume once the suspended activity resumes and after notice to the Conservation Groups, DHEC, and the Commission provided no later than ten (10) days prior to the resumption of dredging activities. If the Project is, or the dredging activities thereof are, suspended through the exercise of the rights under Section 11.g or 12.d by the Commission or DHEC, all of GPA's pending and future funding obligations set forth in 16.a through 16.c will be suspended, to resume once the Project resumes. If the Project is, or the dredging activities thereof are, suspended through the exercise of the rights under Section 11.g or 12.d by the Conservation Groups, all of GPA's pending and future funding obligations set forth in 16.d will be suspended, to resume once the Project resumes.

18. This certification incorporates by reference all terms and conditions of:

    a. the Final Biological Opinion issued by the National Marine Fisheries Service on or about November 4, 2011;

    b. the Section 401 Water Quality Certification issued by the Georgia Department of Natural Resources on or about February 16, 2011;

    c. the Programmatic Agreement for Cultural Resources with the South Carolina Historic Preservation Office, Appendix G of the final EIS.

19.    To the extent any conflict may arise or exist between the specific terms and conditions set forth herein and the terms and conditions of other governmental approvals incorporated into this certification, the terms and conditions specifically set forth herein shall govern.

20.    The Corps shall provide a comprehensive report at: (a) the end of pre-construction; (b) the end of construction; and (c) the end of the 10-year monitoring program, as such periods are described in Appendix D of the Final EIS. Each comprehensive report shall be provided to DHEC and the Commission and made available on the Project's public website and as provided in Appendix D to the Final EIS.

21.    This certification does not convey and will not be interpreted as conveying, expressly or implicitly, any property interest.

22.    DHEC reserves the right to impose additional conditions on this certification to respond to unforeseen, specific problems that may arise and to take any enforcement action within its statutory authority, in its discretion, as necessary to ensure compliance with South Carolina water quality standards and the conditions of this certification. This certification and DHEC's Coastal Zone Consistency Determination satisfy existing DHEC permitting requirements applicable to the Project as described in the Final EIS. DHEC reserves the right to require additional certifications or permits for future changes to the project and activities outside the scope of the project as described in the EIS, or as required by changes to applicable law.

# EXHIBIT B

Terms and Conditions

The Commission must balance economic development with the protection of the environment to ensure the responsible implementation of the SHEP.  The Commission represents the State of South Carolina "in all matters pertaining to the navigability, depth, dredging, wastewater and sludge disposal, and related collateral issues in regard to the use of the Savannah River as a waterway for ocean-going container or commerce vessels," which includes the SHEP.  S.C. Code Ann. § 54-6-10(A).  The DHEC and Commission approvals and authorizations satisfy any and all South Carolina permitting requirements applicable to the Project.  Based upon and to implement and achieve the goal of fully mitigating for the impacts from the SHEP and in furtherance of the analysis and evaluation undertaken by the Commission, and in satisfaction of all authority and jurisdiction conferred upon the Commission to permit, regulate, authorize, and approve construction of the SHEP on behalf of the State of Carolina, including but not limited to compliance with the S.C. Pollution Control Act, S.C. Code Ann. § 48-1-10 et seq., the Maritime Commission Act, S.C. Code Ann. § 54-6-10, and the Navigable Waters Permit requirements, S.C. Code Ann. Regs. 19-450, the Commission imposes the following terms and conditions to protect the environment and natural resources of the State of South Carolina, mitigate for all of the environmental impacts of the SHEP, and provide reasonable assurance that the SHEP will not cause a violation of water quality or other applicable environmental standards, which are incorporated herein by reference.

These specific terms and conditions are in addition to those general terms and conditions set forth in South Carolina law pursuant to S.C. Code Ann. Regs. 19-450.4, which are incorporated herein by reference.

1.    The Corps may construct the Project as described in the Final EIS dated January 2012 and revised in July 2012 and approved by the Chief of Engineers Report dated August 17, 2012, and Record of Decision dated October 26, 2012.

2.     All hopper dredging activities will only take place from December 1 through March 31.

3.     All dredging in the Inner Harbor upstream of Station 63+000 is prohibited during the striped bass spawning period of April 1 to May 15.

4.     The Commission may make periodic inspections of the Project construction and mitigation implementation sites that are reasonable in scope on no less than one week's advance notice and subject to adherence to personal protective equipment requirements contained in the Corps Safety Manual (EM 385-1-1).

5.     In addition to the water quality monitoring set forth in or required by the Final EIS and other governmental approvals, the Corps will provide continuous daily water quality monitoring with two additional monitors at locations to be jointly agreed-upon by the Corps, Commission, and DHEC, to be installed simultaneously with the eight continuous water quality monitoring stations proposed in Appendix D of the Final EIS. These two additional continuous water quality monitoring stations are intended to supplement the eight continuous water quality monitoring stations proposed in Appendix D of the Final EIS and will be subject to the same criteria for Pre-Construction Monitoring, Monitoring During Construction and Post Construction Monitoring as specified in Appendix D to the Final EIS. A copy of the monthly monitoring reports will be provided to the Commission and will be publicly available through the project's website within 30 days after the Corps' receipt of the monitoring report. Should adverse conditions, such as weather or vandalism, impair operations of a water quality monitor, the Corps will undertake reasonable efforts to restore operation of the monitor as soon as possible. This provision will terminate at the end of the 10-year Post Construction Monitoring Period.

6.     The Corps shall provide a comprehensive report at: (a) the end of pre-construction; (b) the end of construction; and (c) the end of the 10-year monitoring program, as such periods are described in Appendix D of the Final EIS. Each comprehensive report shall be provided to DHEC and the Commission and made available on the Project's public website and as provided in Appendix D to the Final EIS.

7.     The Corps will refine and update the SHEP hydrodynamic (EFDC) and water quality (WASP) models specifically for DO. The updated model will take advantage of previous modeling efforts, including U.S. Environmental Protection Agency's TMDL model, and the most current information collected in the Savannah River harbor and estuary. The product will be complete DO model scenarios comparing instream DO concentrations with and without operation of the Oxygen Injection System.

The purpose of the modeling and monitoring is to confirm that the Oxygen Injection System will mitigate for the DO impacts of the Project as shown by comparing actual DO levels in the modeled area, from Station 0+000 upstream to River Mile 27.8, to DO levels in the without-Project scenario (the "Success Criteria").

8.     Prior to commencement of any Inner Harbor Channel Dredging, the Corps will test and evaluate the downriver Oxygen Injection System that is to be located at the

Hutchinson Island location to demonstrate its ability to mitigate dissolved oxygen impacts of the SHEP. Dredging of the Outer Harbor can occur prior to this testing.

a) The Oxygen Injection System at the downriver Hutchinson Island location must be operated and instream DO must be monitored continuously for a period of 59 days (2 lunar cycles). Continuous daily water quality monitoring must be conducted during this period at locations specified in and pursuant to the monitoring plan. This 59-day period of operation is referred to herein as the "Test Run."

b) Following the Test Run and analysis of the modeling results and monitoring data, the Corps will provide a report to the Conservation Groups, Commission and DHEC comparing the monitoring data collected during the Test Run to the modeling results.

c) The Conservation Groups, Commission and DHEC will have thirty (30) days to evaluate and review the Test Run report and to provide comments and feedback to the Corps and the Adaptive Management Team. The Corps, Conservation Groups, Commission and DHEC each will independently evaluate the Test Run report and other relevant information to assess achievement of the Success Criteria.

d) If the Corps determines that the Oxygen Injection System test meets the Success Criteria, it will commence Inner Harbor Channel Dredging no sooner than fourteen (14) days after the 30-day comment period in subsection (c) has ended. DHEC, the Commission, and the Conservation Groups each reserves the right to take any appropriate action if its independent determination is that the Success Criteria has not been met, including but not limited to suspension, rescission, and revocation of this permit, initiation of an enforcement or other legal action, and/or termination of this Agreement. The Corps does not waive any objection or defense to such actions, including any objection or defense based on federal preemption, sovereign immunity, or immunity from state regulation.

e) Copies of the data, modeling inputs, modeling results, monitoring data, and reports will be provided to all Parties by the Corps as soon as available to allow the Conservation Groups, Commission and DHEC to review the information simultaneously with the Corps and Adaptive Management Team.

9. Following the installation of the entire Oxygen Injection System, the monitoring and testing procedure will be conducted as set forth below.

a) The entire Oxygen Injection System must be operated, and instream DO must be monitored continuously for a period of 59 days (2 lunar cycles), of which at least one 29.5 day testing (one lunar cycle) must occur in July, August, or September immediately following the installation of the Oxygen Injection System. Continuous daily water quality monitoring must be conducted during this period at locations specified in and pursuant to the monitoring plan. This 59-day period of operation is referred to herein as the "Start-up Run."

b) Following the Start-up Run and analysis of the modeling results and monitoring data, the Corps will provide a report comparing the monitoring data collected during the Start-up Run to the modeling results to the Conservation Groups, Commission and DHEC.

c) The Conservation Groups, Commission and DHEC will have sixty (60) days to evaluate and review the Start-up Run report and to provide comments and feedback to the Corps and the Adaptive Management Team. The Corps, Conservation Groups, Commission, and DHEC each will independently evaluate the Start-up Run report and other relevant information to assess achievement of the Success Criteria.

d) If the Corps determines that the Oxygen Injection System test meets the Success Criteria, Inner Harbor Channel Dredging will continue. DHEC, the Commission, and the Conservation Groups each reserves the right to take any appropriate action if its independent determination is that the Success Criteria has not been met, including but not limited to suspension, rescission, and revocation of this permit, initiation of an enforcement or other legal action, and/or termination of this Agreement. The Corps does not waive any objection or defense to such actions, including any objection or defense based on federal preemption, sovereign immunity, or immunity from state regulation.

e) Copies of the data, modeling inputs, modeling results, monitoring data, and reports will be provided to all Parties by the Corps as soon as available to allow the Conservation Groups, Commission and DHEC to review the information simultaneously with the Corps and Adaptive Management Team.

10. The Savannah District of the Corps will make the dissolved oxygen system a top priority for discretionary annual operations and maintenance funds appropriated and received for the Project above normal maintenance requirements.

11. The Corps shall conduct the following monitoring:

a) During the SHEP deepening activities, cadmium concentrations in the discharge shall be monitored weekly from those Confined Disposal Facilities (CDF) receiving sediments from the four known reaches within the Savannah Harbor having elevated cadmium concentration in the sediments. U.S. Environmental Protection Agency laboratory testing methodology must have a detection limit of at least 0.7 micrograms per liter (ug/l). Monitoring shall continue at these CDF discharge points as long as discharge is present and until all dredged sediments have been dewatered, stabilized and capped as per the Final EIS. Data shall be reported to DHEC and the Commission quarterly in micrograms per liter within thirty (30) days of the end of each calendar quarter.

b) Following the installation of a stable clean cap within the CDFs that receive cadmium-bearing sediments, cadmium shall be monitored weekly for a period of one year. Data shall be reported to DHEC and the Commission quarterly in micrograms per liter within thirty (30) days of the end of each calendar quarter.

    c)      Dewatering discharge from all CDFs shall be monitored by the Corps and reported to DHEC and the Commission monthly and due within thirty (30) days following the end of each reporting period. Monitoring reports shall include the location of the discharge point, sampling point, dates of discharge, total suspended solids, dissolved oxygen, pH, temperature, salinity, turbidity and conductivity. The Corps will monitor weekly when there is a discharge and provide monthly reports to DHEC and the Commission within thirty (30) days of the end of each reporting period.

    d)      The monitoring data will be evaluated as provided in Appendix D of the Final EIS.

12.    The Corps will coordinate with the state resource agencies, including the Commission, in the implementation of the Monitoring and Adaptive Management Plan as provided in Appendix D of the Final EIS.

13.    The Corps will comply with the terms and conditions of the Final Biological Opinion issued by the National Marine Fisheries Service on or about November 4, 2011, which are incorporated herein by reference.

14.    The Corps will comply with the terms and conditions of the Section 401 Water Quality Certification issued by the Georgia Department of Natural Resources ("Georgia DNR") on or about February 16, 2011, which are incorporated herein by reference.

15.    The Corps will comply with the terms and conditions of the Programmatic Agreement for Cultural Resources with the South Carolina State Historic Preservation Office on or about November 30, 2011, which are incorporated herein by reference.

16.    To the extent any conflict may arise or exist between the South Carolina-specific terms and conditions set forth herein and the terms and conditions of other governmental approvals incorporated by reference, the terms and conditions specifically set forth herein shall govern.

17.    The Corps will comply with the Monitoring and Adaptive Management Plan provided as Appendix D of the Final EIS.

18.    No later than six (6) months prior to the commencement of Inner Harbor Channel Dredging, GPA will establish a letter of credit or escrow account on commercially reasonable terms agreed-upon by GPA, DHEC and the Commission in the amount of Two Million Dollars ($2,000,000). This amount will be adjusted annually for inflation based on the U.S. Bureau of Labor Statistics CPI-U, U.S. City Average for All Items representing the annual change. Any interest that accrues in an escrow account will be applied toward the CPI-U adjustment for the following year(s). This letter of credit or escrow account is to be held as a contingent fund to be drawn upon for operation and maintenance of the Oxygen Injection System should the Corps fail to provide for an annual appropriation for or otherwise fail to fund the operation and maintenance of the Oxygen Injection System. The letter of credit or escrow account will be maintained for a minimum of $2,000,000 (as adjusted annually for inflation) at all times for fifty (50) years after completion of the Project.

19.  GPA will contribute cash and land to address the Commission's concerns about the sufficiency of mitigation for the Project's potential environmental impacts as follows:

a)  GPA will contribute Three Million Dollars ($3,000,000) to DHEC to be used solely and exclusively for water quality monitoring and other initiatives in the Lower Savannah River Basin, payable in Seven Hundred Fifty Thousand Dollar ($750,000) increments, with the first payment commencing ninety (90) days following execution of the Project Partnership Agreement and no earlier than July 1, 2013, and the remaining payments to be paid on the annual anniversary date of the initial payment for the following three (3) years.

b)  GPA will contribute Three Million Dollars ($3,000,000) to the South Carolina Department of Natural Resources ("South Carolina DNR") to be used solely and exclusively for monitoring and research of Shortnose and Atlantic Sturgeon and their habitat in the estuaries of the Savannah River payable in Seven Hundred Fifty Thousand Dollar ($750,000) increments, with the first payment commencing ninety (90) days following execution of the Project Partnership Agreement and no earlier than July 1, 2013, and the remaining payments to be paid on the annual anniversary date of the initial payment for the following three (3) years.

c)  GPA will contribute Fifteen Million Dollars ($15,000,000) for conservation efforts, as follows.  GPA will pay these funds into an escrow account on commercially reasonable terms agreed-upon by GPA, DHEC, and the Commission, which will be disbursed to the relevant payees within ten (10) days of completion of the Project.  Any interest that accrues in a given year will be applied toward GPA's next payment.

(1)  Five Million Dollars ($5,000,000) solely and exclusively for preservation of wetlands, acquisition of conservation easements, and/or upland buffers that directly benefit the Lower Savannah watershed to be paid to The South Carolina Conservation Bank, payable in increments of One Million Dollars ($1,000,000), with the first payment commencing within sixty (60) days following initiation of Inner Harbor Channel Dredging and no earlier than July 1, 2014, and the remaining payments to be paid on the annual anniversary date of the initial payment for the following four (4) years.

(2)  Five Million Dollars ($5,000,000) to South Carolina DNR, with the stipulation that South Carolina DNR must use such funds solely and exclusively for the creation, restoration, or enhancement of wetlands in the Lower Savannah watershed, payable in increments of One Million Dollars ($1,000,000), with the first payment commencing within sixty (60) days following initiation of Inner Harbor Channel Dredging and no earlier than July 1, 2014, and the remaining payments to be paid on the annual anniversary date of the initial payment for the following four (4) years.

(3)  Five Million Dollars ($5,000,000) to Ducks Unlimited, Southern Region, Wetlands America Trust ("DU"), with the stipulation that DU must use such funds solely and exclusively for preservation of

wetlands and/or upland buffers in either state that directly benefit the Lower Savannah watershed, payable in increments of One Million Dollars ($1,000,000), with the first payment commencing within sixty (60) days following initiation of Inner Harbor Channel Dredging and no earlier than July 1, 2014, and the remaining payments to be paid on the annual anniversary date of the initial payment for the following four (4) years.

(4)    If the Project is completed before the scheduled payments set forth in this Section (1)-(3) have been made, GPA will pay any remaining payments due within ten (10) days of completion of the Project.

(5)    Recipients of GPA's Fifteen Million Dollar ($15,000,000) funding contributions set forth in this Subsection (c) shall provide an annual summary to GPA regarding what projects or activities were completed with the funds within the previous year.

d)    GPA will contribute Twelve Million Five Hundred Thousand Dollars ($12,500,000) to be used solely and exclusively for environmental and conservation projects in the Savannah River Basin to the Savannah River Restoration Board in increments of One Million Forty-One Thousand, Six Hundred Sixty-Six Dollars and Sixty-Seven Cents ($1,041,666.67), with the first payment commencing sixty (60) days following initiation of Inner Harbor Channel Dredging and no earlier than July 1, 2014, and the remaining payments to be paid on the annual anniversary date of the initial payment for the following eleven years.  Any interest that accrues in a given year will be applied toward GPA's next payment.  GPA will pay these funds into an escrow account, which will be disbursed to the Savannah River Restoration Board upon completion of the Project.  Any installment payments due after completion of the Project will be paid directly to the Savannah River Restoration Board.  The Savannah River Restoration Board will be established and operated as a bi-state board comprised of representatives of the following agencies and organizations: Georgia DNR, Georgia Environmental Protection Division, South Carolina DNR, DHEC, Commission, Savannah Riverkeeper, S.C. Coastal Conservation League, the S.C. Wildlife Federation, Georgia Wildlife Federation and GPA.  The mission of the Savannah River Restoration Board will be to fund projects in the Lower Savannah River watershed that improve the water quality and aquatic functioning of the Savannah River, with a priority on oxbow restoration projects.

20.    GPA will contribute cash and land to address the Commission's concerns about the sufficiency of mitigation for the Project's potential environmental impacts as follows.  Within ninety (90) days following execution of the Project Partnership Agreement, the GPA will cause to be transferred from the Georgia Department of Transportation, by quitclaim deed containing an automatic reversion provision, as set forth below, approximately 2,000 acres of salt marsh as generally reflected on the attached Exhibit A, exact boundaries and acreage of which to be determined by a survey to be obtained by GPA, to the Commission.  If the Project is terminated prior

to initiation of Inner Harbor Channel Dredging, the property will automatically revert to the Georgia Department of Transportation in as is condition. The deed shall contain the following reversion provision:

> **TO HAVE AND TO HOLD** the said real property unto Grantee, Grantee's successors and assigns, provided, however, if the Project is terminated at any time prior to the initiation of Inner Harbor Channel Dredging the said real property shall automatically revert back to the Grantor without the necessity of reentry and without the necessity of notice, demand, any action brought or taken by Grantor, any instrument or conveyance executed or delivered by Grantee, any liability of Grantor to make or pay any compensation therefore to Grantee or Grantee's successors and assigns, it being intended hereby to create a determinable fee in Grantee with a possibility of reverter being retained by Grantor so that when an above-stated event shall occur the title of Grantee to said real property shall automatically be at an end and by operation of law the title to said real property shall immediately revert to and revest in Grantor in the same state of title as initially conveyed to Grantee without prejudice to any other right, claim, or interest Grantee may have or had prior to the date of recordation of this deed. After such reversion, upon Grantor's written request, Grantee will execute and delivery a quitclaim deed to Grantor conveying whatever right, title, and interest was conveyed by the Grantor within thirty days from receipt of Grantor's written request. The failure of Grantee to execute and deliver such quitclaim deed shall not prevent the automatic reversion of fee simple title in said real property to Grantor.

21. GPA commits to work with the City of Augusta and Georgia EPD as Augusta complies with applicable responsibilities arising from Federal Energy Regulatory Commission licensing of the Augusta Canal and Diversion project, such responsibilities to include support of the fisheries by providing adequate flows.

22. Prior to initiation of Inner Harbor Channel Dredging, GPA, at its sole expense, will retain the firm Moffatt & Nichol to evaluate the effects that cadmium disposal in confined disposal facilities 14A and 14B may have on the construction of a terminal at those sites in the future and submit such report to DHEC and the Commission.

23. GPA's obligations in Terms and Conditions 19-22 will be suspended if (a) the Project is stayed or enjoined, (b) the State Approvals are revoked, rescinded, modified or stayed, or (c) after the initiation of Inner Harbor Channel Dredging, Inner Harbor Channel Dredging is suspended or ceased for any reason and after GPA provides written notice to the Commission of such suspension or cessation which shall state the reason for such suspension or cessation and the estimated time period of the length of such suspension or cessation. GPA's suspended obligations will resume once the suspended activity resumes and after notice to the Commission provided no later than ten (10) days prior to the resumption of dredging activities. If the Project is, or the dredging activities thereof are, suspended through the exercise of the rights under Terms and Conditions 8(d) or 9(d) by the Commission or DHEC, all of GPA's pending and future funding obligations set forth in Term and Condition 19(a)-(c) will be suspended, to resume once the Project resumes. If the

Project is, or the dredging activities thereof are, suspended through the exercise of the rights under Terms and Conditions 8(d) or 9(d) by the Conservation Groups, all of GPA's pending and future funding obligations set forth in Term and Condition 19(d) will be suspended, to resume once the Project resumes.

24.     The Corps must construct the Project in a manner that will not violate applicable law.

25.     This authorization may be suspended, rescinded, revoked, modified, amended, or revised by further action of the Commission in its sole discretion after review of a request for such action by the applicant and the evaluation of appropriate supporting documentation or *sua sponte* on the Commission's own initiative based on a change of circumstances or conditions, including changes to the Project.

# EXHIBIT C

