**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA AIKEN**
**DIVISION**

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | |
| | ) | |
| SOUTH CAROLINA DEPARTMENT OF | ) | |
| HEALTH AND ENVIRONMENTAL CONTROL | ) | |
| and | ) | |
| SAVANNAH RIVER MARITIME | ) | |
| COMMISSION | ) | |
| and | ) | C/A No. <u>1:19-cv-3132-RMG</u> |
| | ) | |
| AUGUSTA, GEORGIA | ) | |
| | ) | |
| Plaintiff-Intervenor Applicant | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES ARMY CORPS OF | ) | |
| ENGINEERS; | ) | |
| | ) | |
| UNITED STATES ARMY CORPS OF | ) | |
| ENGINEERS, SAVANNAH DISTRICT; | ) | |
| | ) | |
| RYAN MCCARTHY, in his official capacity as | ) | |
| Secretary of the Army; | ) | |
| | ) | |
| LT. GENERAL TODD T. SEMONITE, in his | ) | |
| official capacity as Commanding General and | ) | |
| Chief of Engineers, U.S. Army Corps of Engineers | ) | |
| | ) | |
| MAJOR GENERAL DIANA M. HOLLAND, in | ) | |
| her official capacity as Commanding General, | ) | |
| South Atlantic Division, U.S. Army Corps of | ) | |
| Engineers; | ) | |
| | ) | |
| and | ) | |
| | ) | |
| COLONEL DANIEL H. HIBNER, in his | ) | |
| official capacity as District Engineer, U.S. | ) | |
| Army Corps of Engineers, Savannah District, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT IN INTERVENTION

1

Augusta, Georgia intervenes to bring this action under the Administrative Procedures Act, 5 U.S.C.A. §§ 701 *et seq.* (APA) and the provisions set forth below to set aside the U.S. Army Corps of Engineers final adoption of the Savannah Harbor Expansion Project Georgia and South Carolina:  Fish Passage at New Savannah Bluff Lock Integrated Post Authorization Analysis Report and Supplemental Environmental Assessment (Exhibit A, SEA), U.S. Army Corps of Eng'rs Mem., Maj. General Holland, Approval of Final Report, Savannah Harbor Expansion Project (SHEP), Georgia and South Carolina: Fish Passage at New Savannah Bluff Lock and Dam (NSBLD) Integrated Post Authorization Analysis Report and Supplemental Environmental Assessment (EA), dated Oct. 29, 2019 (Exhibit B, Approval Memo), and Finding of No Significant Impact, Savannah Harbor Expansion Project Fish Passage at New Savannah Bluff Lock and Dam Richmond County, Georgia and Aiken County, South Carolina, dated Oct. 29, 2019 (Exhibit C, FONSI), and all actions set forth in the October 31, 2019 Notice of Availability of the Final Integrated Post Authorization Analysis Report (PAAR) and Supplemental Environmental Assessment (SEA), Fish Passage at New Savannah Bluff Lock and Dam (NSBLD), and Finding of No Significant Impact (FONSI) that evaluated proposed changes to the Fish Passage feature of the Savannah Harbor Expansion Project (SHEP)**.** Augusta seeks declaratory relief and an order permanently enjoining the Federal Defendants from proceeding with construction of the plan and removal of the New Savannah Bluff Lock & Dam (NSBLD) as set forth in the FONSI and PAAR/SEA.  Augusta does not join in South Carolina's request to enjoin certain activities in the Savannah Harbor some 180 miles downstream of the NSBLD and actions set forth in the FONSI and SEA.  Intervention has been requested by Motion and is respectfully requested by way of this Complaint in Intervention which sets forth as follows:

## PARTIES

1.      Plaintiff State of South Carolina (State) is a sovereign state of the United States which borders the Savannah River. South Carolina also is the owner of property and other various property rights located in, nearby, and adjacent to the Savannah River.

2.      Plaintiff South Carolina Department of Health and Environmental Control (DHEC) is an agency and instrumentality of the State of South Carolina with general jurisdiction over, *inter alia*, the quality of and construction in the waters of the State under S.C. Code Ann. §§ 44-1-20 *et seq.*, 48-1-10 *et seq.* and 49-1-10 *et seq.*, and S.C. Code Ann. Regs. 19-450 *et seq.* and 61-101 *et seq.*

3.      Plaintiff Savannah River Maritime Commission (Commission) is an agency and instrumentality of the State of South Carolina and was created by Act No. 56 of 2007, which established the Commission to represent the State "in all matters pertaining to the navigability, depth, dredging, wastewater and sludge disposal, and related collateral issues in regard to the use of the Savannah River as a waterway for ocean-going container or commerce vessels." S.C. Code Ann. § 54-6-10. The Commission is further "empowered to negotiate on behalf of the State of South Carolina and enter into agreements with the State of Georgia [and] U.S. Army Corps of Engineers," and its responsibilities in that regard "supersede any other concurrent responsibilities of a particular state agency or department." *Id.* The State, DHEC, and Commission are referred to collectively as "South Carolina."

4.      Plaintiff-Intervenor Augusta, Georgia ("Augusta") is a municipal corporation in the State of Georgia. The City of Augusta also is the owner of property and other various property rights located in, nearby, and adjacent to the Savannah River, the owner of water and riparian rights in the Savannah River, and a public water supplier under state and federal law.

5.      Defendant United States Army Corps of Engineers (Corps) is a federal agency responsible for compliance with federal and state law for its civil works projects.

6.      Defendant United States Army Corps of Engineers, Savannah District is a unit of Defendant United States Army Corps of Engineers and is the lead federal agency responsible for compliance with federal and state law for the project at issue in this case.

7.      Defendant Ryan McCarthy is the Secretary of the Army and is sued in his official capacity. Secretary McCarthy has decision-making authority and is responsible for ensuring compliance with federal and state law related to the project at issue in this case.

8.      Defendant Lieutenant General Todd T. Semonite is the Commanding General and Chief of Engineers of the U.S. Army Corps of Engineers and is sued in his official capacity. General Semonite has decision-making authority and is responsible for ensuring compliance with federal and state law related to the project at issue in this case.

9.      Defendant Major General Diana M. Holland is the Commanding General of the South Atlantic Division of the United States Army Corps of Engineers and is sued in her official capacity. General Holland has decision-making authority and is responsible for ensuring compliance with federal and state law related to the project at issue in this case.

10.      Defendant Colonel Daniel H. Hibner is the District Commander for the U.S. Army Corps of Engineers, Savannah District and is sued in his official capacity. Colonel Hibner has decision-making authority and is responsible for ensuring compliance with federal and state law related to the project at issue in this case.

11.      Collectively, all defendants are referred to as the "Federal Defendants."   In addition to being responsible for and approving the acts and omissions of the Corps relating to this complaint, the Secretary, Assistant Secretary, Commander, Division Commander, and

District Commander are responsible for the Corps' compliance with any judgment or decree of this Court.

## JURISDICTION

12.    This Court has jurisdiction pursuant to 28 U.S.C.A. § 1331 (federal question), 28 U.S.C. § 1361 (actions to compel officers of the United States), 28 U.S.C.A. §§ 2201 and 2202 (declaratory judgment and injunction), the Federal Administrative Procedures Act, 5 U.S.C.A. §§ 701 *et seq.*, and the continuing jurisdiction of the Court under this Court's Order dated May 29, 2013, in the related case bearing C.A. No. 9:12-cv-00610-RMG, dkt.#99 (Settlement Order), as this case implicates interstate commerce, interstate waters, federal statutes, federal regulations, compliance with the Settlement Order, and the conduct of federal agencies and federal officers.

## VENUE

13.    Venue is proper in this court pursuant to 28 U.S.C.A. § 1391(b) and Local Civil Rule 3.01(A)(1), as a substantial portion of the property and land that is the subject of this action is within the boundaries of the State of South Carolina and Aiken County.

## INTERESTS OF AUGUSTA

14.    Augusta, as Plaintiff-Intervenor, has direct, substantial, and legally protectable interests in this action.

15.    The City of Augusta was incorporated on January 31, 1798.  The City and County consolidated to form the Consolidated Government of Augusta-Richmond County on January 1, 1996.  Augusta was established in 1736 by General James Edward Oglethorpe.

16.    Augusta is centrally located on and includes the Savannah River which is a central feature of this river city.

17.    On December 21, 1845 the Georgia General Assembly established the Augusta Canal Company providing for construction of a canal for manufacturing, water supply and other

purposes.  The Augusta Canal was completed in 1847.  In 1875, Augusta modified the canal to address flooding and other water use, municipal, and industrial needs.

18.     The Savannah River provides 100% of Augusta public water supply.  Water supply is dependent upon adequate flows, volumes, and water elevations. Augusta's water withdrawal facilities have been engineered and constructed using taxpayer funds and based upon current water level elevations behind and upstream of the NSBLD.  Intake structures are located in the Savannah River which include pumps that are powered by the Savannah River to serve the public water supply network.  The Federal Defendants actions will affect Augusta's water supply, water use, and cause additional expense and hardship. The Federal Defendants have not adequately considered effects to these resources.

19.     The Augusta Utilities Department service area consists of Augusta and portions of Richmond County affected by the Federal Defendants' actions.

20.     Augusta is an owner of property adjacent to and underlying the Savannah River within the area affected by the Federal Defendants' actions.  Augusta is a holder of riparian water rights to the area affected by the Federal Defendants' actions. The Federal Defendants have not adequately considered effects to these resources.

21.     Augusta includes numerous parks, recreational amenities, and historic sites including the Augusta Riverwalk along the Savannah River, the Augusta Canal National Heritage Area, river related activities and recreational opportunities.  The Federal Defendants have not adequately considered effects to these resources.

22.     Augusta's economic health and future depend upon the Savannah River and will be significantly adversely affected by the Federal Defendants actions.

23.     Augusta hosts, sponsors, organizes or contributes to numerous social and recreational events using the Savannah River which will be affected and in some cases no longer

viable following the Federal Defendants actions. The Federal Defendants have not adequately considered effects to these resources.

24.     Augusta has engaged in numerous community, citizen, and city planning activities in reliance on historical water levels in the Savannah River and levels mandated to be maintained by the WIIN Act. The Federal Defendants have not adequately considered effects to these resources.

25.     The Federal Defendants' actions will substantially affect natural resources in the Augusta jurisdictional area including effects on aquatic resources, fisheries, floodplain, and a large number of acres of wetlands. The Federal Defendants have not adequately considered effects to these resources.

26.     The Federal Defendants' actions will substantially affect historic resources including resources listed on the National Registry of Historic Places, resources associated with the historic Augusta Canal, and historic structures and other features within Augusta and in some cases owned by Augusta or other governmental or public entities. The Federal Defendants have not adequately considered effects to these resources.

27.     The Federal Defendant's actions affect Augusta financially in that under Federal Defendant's various proposals costs of its action will be borne by local governments including Augusta. The Federal Defendants in their action ask the citizens of Augusta and other local governments to fund actions necessary to correct or mitigate for the damage to the region's parks, floodplains, wetlands, socioeconomic resource, recreation, historic resources, and other resources.

28.     Augusta's consulting engineers have analyzed the Federal Defendant's action and actual field testing conducted by the Corps on February 8 to February 15, 2019 ("Federal Defendants' February 2019 Field Test"). These analysis and field conditions showed that water levels which will be in place following Federal Defendants actions reduce water levels in the

Savannah River below historical levels and levels established in the Water Infrastructure Improvements for the Nation Act (WIIN Act), Public Law 114-322, 130 Stat. 1703 (Dec. 16, 2016)(WIIN Act)(114.76 msl, see ¶ 114, 161 infra).   The preferred plan (Alternative 2-6d) is expected to lower the existing pool level by approximately 5.5 feet (from approximately 114.5 NGVD29 to 109.0 NGVD29) during low flow or critical conditions.   The Federal Defendants' modeling predicted a lowering of the existing pool level of 1.1 feet below Federal Defendants' incorrect 'existing' surface elevation, while actual water elevations during Federal Defendants' Federal Defendants' February 2019 Field Test was 3.0 feet below the Corps predicted elevation. Exhibit D, Comments of Augusta, Technical Comments, Appendix C-3 REPORT ON HYDRAULICS METHODOLOGY, Thomas Heard Robertson, PE, AICP, RLS (Apr. 15, 2019). Augusta-Richmond County has requested the model from Federal Defendants who have refused to provide the model.

29.    Augusta filed significant comments on the Federal Defendant's proposal on April 16, 2019 which were timely and effectively delivered to Federal Defendants.   The comments included violation of provisions of the WIIN Act, National Environmental Policy Act (NEPA), 42 U.S.C.A. §§ 4321, Water Resources Development Act, and numerous federal and state laws incorporated through these federal provisions. Federal Defendants did not address Augusta's numerous comments. Among the comments, Augusta provided justification for selection of Alternative 1-1 in which a fish passage facility would be constructed at the existing NSBLD, leaving the NSBLD in place and retaining water levels.   Although the Federal Defendant's analysis was flawed and information lacking, Augusta retained engineers which concluded that water levels could be maintained with modifications under Alternative 1-1 consistent with the historical water levels in the Augusta region since the NSBLD construction in 1937, and water

levels on the date of enactment of the WIIN Act (114.76 msl, see ¶ 114, 161, infra).   Augusta's comments are attached in Exhibit D.

30.     The Corps action will expose a training wall or jetty, which extends for about one mile down the middle of the river near the centers of the Savannah River upstream from the NSBLD ("Training Wall"). The training wall was constructed by the Corps of Engineers prior to 1915 to divert the main flow of the river to the Georgia side to keep the docks at Augusta scoured out to prevent shoaling.  The Corps has not assessed impacts on the training wall, or safety.  The Corps failed to consider the training wall as part of the SEA.

31.     Augusta has also participated to the extent possible in the proceedings involving the SHEP.  At no time during the SHEP proceedings was Augusta apprised nor was there public notice that water levels of the Savannah River in the Augusta region would be reduced by 5.5 feet.

## GOVERNING LAW

### Declaratory Judgment Act

32.     The Declaratory Judgment Act provides that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C.A. § 2201(a).

33.     The Declaratory Judgment Act further provides that "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." 28 U.S.C.A. § 2202.

**Administrative Procedure Act**

34.     The Administrative Procedures Act (APA) 5 U.S.C.A. §§ 500 *et seq.* (APA) entitles a party suffering a legal wrong because of agency action, or adversely affected by agency action, the right to judicial review. 5 U.S.C.A. § 702.

35.     The APA provides judicial review of final agency actions for which there is no other adequate remedy in court. 5 U.S.C.A. § 704.  A reviewing court shall (1) compel agency action unlawfully withheld or unreasonably delayed; and (2) hold unlawful and set aside agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, contrary to constitutional right, power, privilege, or immunity, in excess of statutory jurisdiction or authority, or without observance of procedure required by law, or unwarranted by the facts to the extent the facts are subject to trial de novo by the reviewing court.

**The National Environmental Policy Act**

36.     The National Environmental Policy Act (NEPA), 42 U.S.C.A. §§ 4321 *et seq.* directs all federal agencies to assess the environmental impact of proposed actions that significantly affect the quality of the environment. 42 U.S.C.A. § 4332(2)(C).  Each agency of the Federal Government shall include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.  Prior to making any detailed statement, the

responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by the APA and shall accompany the proposal through the existing agency review processes. 42 U.S.C.A. § 4332(2)(C). NEPA was enacted to ensure that federal agencies carefully and fully contemplate the environmental impact of their actions and to ensure that sufficient information on the environmental impact is made available to the public before actions are taken.

37.    The Council on Environmental Quality (CEQ) has promulgated uniform regulations to implement NEPA that are binding on all federal agencies. 42 U.S.C.A. § 4342; 40 C.F.R. §§ 1500-1508. The Corps has also promulgated its own NEPA regulations to supplement the uniform CEQ regulations. 33 C.F.R. §§ 230 *et seq*.

38.    NEPA requires federal agencies to prepare a review of any major federal action that may significantly affect the quality of the environment. 42 U.S.C.A. § 4332(2)(C); 40 C.F.R. § 1501.4(a)(1); 33 C.F.R. § 230.6. The purpose of NEPA review is to ensure that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts, and guarantee that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.

39.    Environmental review under NEPA can take the form of three levels of review: (1) a categorical exclusion; (2) an environmental assessment (EA) and subsequent finding of no

significant impact (FONSI); or (3) an EA and/or environmental impact statement (EIS). *E.g.* 40 C.F.R. §§ 1508.1 *et seq.*

40.     If the proposed action does not meet the criteria for a categorical exclusion, then the action is to be evaluated to determine whether an EIS is required. Typically that evaluation takes the form of an EA, which is meant to be a concise public document that looks at and provides sufficient evidence and analysis for determining whether an EIS is required. 40 C.F.R. § 1508.9. If, at the end of the EA process, the agency determines that no EIS is necessary, the agency is authorized to produce a draft EA for public review and, thereafter, issue a FONSI. 40 C.F.R. § 1508.9, -13. If, at the end of the EA process, the agency determines that an EIS is required, the agency will build upon the analysis developed in the EA process and thereafter publish a draft EIS. 40 C.F.R. § 1508.11.

41.     NEPA procedures must ensure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA. Most important, NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail.  40 C.F.R. § 1500.1.

42.     NEPA requires analysis of effects as compared to an environmental baseline. Under NEPA, environmental baseline analyzes the effects of past and ongoing human and natural factors leading to the current status of the project and impacted area. Proper baseline is existing conditions, required to identify the environmental consequences of a proposed agency action. Am. Rivers v. FERC, 201 F.3d 1186, 1195 (9th Cir. 1999). Baseline is the status quo of existing conditions with the NSBLD in place.

43.    NEPA and NEPA regulations require that during the NEPA process "[a]gencies shall not commit resources prejudicing selection of alternatives before making a final decision." 40 C.F.R. § 1502.2(f); 42 U.S.C.A. § 4332(2)(C).

44.    Section 904 of the Water Resources Development Act of 1986 (WRDA of 1986) requires the Corps to

address the following matters in the formulation and evaluation of alternative plans:

• Enhancing national economic development (including benefits to particular regions that are not transfers from other regions).

• Protecting and restoring the quality of the total environment.

• The well-being of the people of the United States.

• The prevention of loss of life.

• The preservation of cultural and historical values.

WRDA 1986; 1105-2-100 Economic and Environmental Principles for Water and Related Land Resources Implementation Studies, at 2-5 (Apr 22 2000).

45.    "Until an agency issues a record of decision …, no action concerning the proposal shall be taken which would: (1) Have an adverse environmental impact; or (2) Limit the choice of reasonable alternatives." 40 C.F.R. § 1506.1(a); *see* 33 C.F.R. § 230.22 ("Limitations on actions during the NEPA process.").  NEPA regulations require procedures including public involvement, invitation to comment and response to comments.  40 C.F.R. §§ 1500-1508.

46.    Following the publication of any draft or final environmental document under NEPA, an agency is required to supplement its analysis if the agency makes substantial changes to the proposed action that are relevant to environmental concerns, or if there are significant new

circumstances or information relevant to the environmental effects that have bearing on the proposed action or its impacts. 40 C.F.R. §§ 1500-1508.

### The National Historic Preservation Act

47.    The National Historic Preservation Act (NHPA), 54 U.S.C.A. §§ 30010 (formerly codified at 16 U.S.C. §§ 470 *et seq.)* was enacted to remedy the serious problem of "historic properties significant to the Nation's heritage … being lost or substantially altered, often inadvertently, with increasing frequency." 16 U.S.C.A. § 470(b)(3). NHPA Section 106 thus requires that federal agencies having authority to license any undertaking shall, prior to the issuance of any license, "take into account the effect of the undertaking" on any historic district or property. *Id.* § 470f. Furthermore, the agency "shall afford the Advisory Council on Historic Preservation ... a reasonable opportunity to comment with regard to such undertaking." *Id.* The goal of this consultation is "to identify historic properties potentially affected by the undertaking, assess its effects and seek ways to avoid, minimize or mitigate any adverse effects on historic properties." 36 C.F.R. § 800.1(a).

48.    The Advisory Council on Historic Preservation is charged with promulgating binding regulations that federal agencies must follow to implement NHPA Section 106. *See* 36 C.F.R. Part 800. To identify historic properties in an undertaking's Area of Potential Effects, the Corps shall "[s]eek information, as appropriate, from consulting parties, and other individuals and organizations likely to have knowledge of, or concerns with, historic properties in the area, and identify issues relating to the undertaking's potential effects on historic properties" and must consult with the State Historic Preservation Office (SHPO) as well as local governments, the public, and "other parties entitled to be consulting parties." *Id.* § 800.4. Before concluding its analysis of potential adverse effects, the Corps "shall make a reasonable and good faith effort to

carry out appropriate identification efforts, which may include background research, consultation, oral history interviews, sample field investigation, and field survey." *Id.*

49.     An undertaking's "Area of Potential Effect" is defined as the area "within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties" given the undertaking's "scale and nature." 36 C.F.R. § 800.16(d). "[A]n adverse effect is found when any undertaking may alter, directly or indirectly, any of the characteristics of a historic property in a manner that would diminish the integrity of its location, design, setting, materials, workmanship, feeling, or association," and includes indirect and cumulative effects. *Id.* § 800.5(a)(1); *see id.* § 800.5(a)(2)(iv) (adverse effects include "change of the character of the property's use or of physical features within the property's setting that contribute to its historic significance"); *id.* § 800.5(a)(2)(v) ("introduction of visual, atmospheric or audible elements that diminish the integrity of the property's significant historic features").

50.     The Corps' regulations require the agency, when authorizing work within the Corps' regulatory jurisdiction, to consider "the effects of undertakings on any known historic properties that may occur outside the permit area," 33 C.F.R. Part 325, Appendix C, ¶5(f), and direct it to "comply with the current procedures for addressing the requirements of Section 106 of the National Historic Preservation Act" in authorizing an activity. If the Corps determines an undertaking will have no effects, it must provide documentation of its determination to the SHPO, notify all consulting parties, and make the documentation available for public inspection. 36 C.F.R. §§ 800.4(d)(1), 800.5(b). Where a consulting party or the ACHP objects to the no-adverse-effect determination, the Corps must consult with the objecting parties. 36 C.F.R. § 800.5(c)(2)(i).

**The Clean Water Act**

51.     The Clean Water Act (CWA) was enacted with the objective to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C.A. § 1251(a).

52.     Further, "[i]t is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution[.]" 33 U.S.C.A. § 1251(b).

53.     Section 313 of the CWA, 33 U.S.C.A. § 1323, provides:

> (a)     Compliance with pollution control requirements of Federal entities
>
> Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any property or facility, or (2) **engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants**, and each officer, agent, or employee thereof in the performance of his official duties, **shall be subject to, and comply with, all** Federal, **State**, interstate, and local requirements, **administrative authority**, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity including the payment of reasonable service charges. The preceding sentence shall apply (A) to any requirement whether substantive or procedural (including any recordkeeping or reporting requirement, **any requirement respecting permits** and any other requirement whatsoever), (B) **to the exercise of any** Federal, **State**, or local **administrative authority**, and (C) to any process and sanction, whether enforced in Federal, State, or local courts or in any manner. This subsection shall apply **notwithstanding any immunity** of such agencies, officers, agents, or employees under any law or rule of law.

33 U.S.C.A. § 1323(a) (emphasis added).

54.     Section 401 of the CWA, 33 U.S.C.A. § 1341, "Certification", provides:

(a)(1) Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate … that any such discharge will comply with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title.

… No license or permit shall be granted until the certification required by this section has been obtained or has been waived as provided in the preceding sentence. **No license or permit shall be granted if certification has been denied by the State**, the interstate agency, or the Administrator, as the case may be.

33 U.S.C.A § 1341(a)(1) (emphasis added).  Water quality certification must be obtained from each and any State in which the applicable license or permit involving discharge into the navigable waters occurs.

## Water Quality Certification

55.    S.C. Code Ann. Regs. 61-101 *et seq.* establishes DHEC's procedures and policies for implementing the South Carolina's water quality certification requirements under 33 U.S.C.A § 1341 and consistent with Section 401 of the CWA for discharges to South Carolina waters.  The State of Georgia issues 401 water quality certifications under 33 U.S.C.A § 1341 and consistent with Section 401 of the CWA for discharges to Georgia waters.

56.    Under Regulation 61-101, DHEC is responsible for evaluating any project requiring a federal license or permit which may result in a discharge into navigable waters in order to determine whether the proposed discharge is in compliance with Section 401 of the Clean Water Act. In its analysis, DHEC is required to, among other things, assess the water quality impacts of the project and make conclusions concerning compliance with water quality standards, protection of classified uses, and related water quality impacts. Based on its evaluation, DHEC must either issue, deny, or waive certification (through inaction) for the proposed discharge and may set forth

limitations, conditions, or monitoring requirements for the project in order to assure continued compliance with South Carolina's environmental regulations.

57.    Activity, either during construction or operation, which results in any discharge to navigable waters requires certification from DHEC that such activity will not violate applicable water quality standards of the State.

58.    In assessing the water quality impacts of the project, DHEC addresses and considers the following factors:

a.  whether the activity is water dependent and the intended purpose of the activity;

b.  whether there are feasible alternatives to the activity; and

c.  all potential water quality impacts of the project, both direct and indirect, over the life of the project including:

i.   impact on existing and classified water uses;

ii.  physical, chemical, and biological impacts, including cumulative impacts;

iii. the effect on circulation patterns and water movement; and

iv.  the cumulative impacts of the proposed activity and reasonably foreseeable similar activities of the applicant and others.

S.C. Code Ann. Regs. 61-101(F)(3).

59.    Among other reasons, a 401 Certification may be denied by DHEC if, *inter alia*:

a.  the proposed activity permanently alters the aquatic ecosystem in the vicinity of the project such that its functions and values are eliminated or impaired;

b.  there is a feasible alternative to the activity, which reduces adverse consequences on water quality and classified uses;

   c. the proposed activity adversely impacts waters containing State or Federally

    recognized rare, threatened, or endangered species; or

   d. the proposed activity adversely impacts special or unique habitats, such as National

    Wild and Scenic Rivers, National Estuarine Research Reserves, or National

    Ecological Preserves, or designated State Scenic Rivers.

S.C. Code Ann. Regs. 61-101(F)(5).

  60. The Federal Defendants' NSBLD will result in discharge to waters of the State of Georgia from, inter alia, construction activity, site access and staging areas, equipment used for demolition and construction and removal, residual pollutants and material left in the Savannah River, and placement of new fill and structural material in the Savannah River.

  61. Georgia's water quality certification program requires application for 401 water quality certification be made to the Georgia Department of Natural Resources Environmental Protection Division.  Federal Defendants have not made application for 401 water quality certification to the Georgia Department of Natural Resources Environmental Protection Division

**South Carolina Construction in Navigable Waters Permit**

  62. South Carolina law provides that a permit issued by DHEC is required for any dredging, filling, or construction or alteration activity in, on, or over a navigable water; or in or on the bed under navigable waters; or in or on lands or waters subject to a public navigational servitude under Article 14 Section 4 of the South Carolina Constitution and S.C. Code Ann. §§ 49-1-10 *et seq.* S.C. Code Ann. Regs. 19-450 *et seq.* (Navigable Waters Permit).

  63. Under Regulation 19-450, DHEC is responsible for assessing the total impact of the projected activity on the navigable waters and lands subject to the jurisdiction of South

Carolina, as well as the impact on the economy and natural resources of the State. DHEC is required by regulation to evaluate the utilization and protection of important State resources and balance the extent and permanence of reasonably foreseeable benefits and detriments of the projected activity including its impact on conservation, economics, aesthetics, general environmental concerns, cultural values, fish and wildlife, navigation, erosion and accretion, recreation, water quality, water supply and conservation, and is tasked with determining whether the projected activity is consistent with the needs and welfare of the public. In particular DHEC must consider the extent to which, among other things:

    a.  the activity requires construction in, on, or over a navigable waterway, and the economic benefits to the state and public from such location;

    b.  the activity would impact fish and wildlife, water quality and other natural resource values or could affect the habitats or rare and endangered species of wildlife and irreplaceable historic and archaeological sites associated with public lands and waters;

    c.  the economic benefits to the state and public from the authorized use of lands and waters meets or exceeds the benefits from preservation of the area in its unaltered state;

    d.  there is any adverse environmental impact which cannot be avoided by reasonable safeguards;

    e.  all feasible alternatives are taken to avoid adverse environmental impact resulting from the project; and,

    f.  the long range, cumulative effects of the project, including the cumulative effects of similar projects, may affect navigable waters.

S.C. Code Ann. Regs. 19-450.

64.    In particular, any activity "that is intended to restore a water control structure involving impoundment that has not been continually maintained and is not currently serviceable and intact and is now in disrepair and disuse, shall require a permit." S.C. Code Ann. Regs. 19-450.3(H)(1).

65.    Through a Navigable Waters Permit, DHEC has the authority to ensure that "permitted activities shall not block or obstruct navigation or the flow of any waters unless specifically authorized [by the permit]; no attempt shall be made by the permittee to prevent the full and free use by the public of all navigable waters at or adjacent to the work authorized by the permits; and that no spoil, dredged material, or any other fill material be placed below the mean high water or ordinary high water elevation, unless specifically authorized [by the permit]." S.C. Code Ann. Regs. 19-450.4(A)(7).

66.    Further, Regulation 19-450.12 provides:

> Unpermitted Activity; Review of Previously Permitted Activity. A. **Any activity undertaken after the commencement of the Construction in Navigable Waters permitting program** under regulation 19-450 promulgated on December 31, 1976 **for which a permit is required but was not obtained is in violation of these regulations**. Such activity may be permitted providing that it is consistent with these regulations, and the applicant promptly complies with the permitting process. **Unless specifically authorized by the Department, an applicant may not complete any structure or continue any activity until the permit is issued**.

S.C. Code Ann. Regs. 19-450.12 (emphasis added).

67.    Federal law requires the Corps to comply with South Carolina law and obtain a 401 Certification and Navigable Waters Permit from the State of South Carolina. 33 U.S.C.A. §§ 1323(a) (all federal agencies "shall be subject to, and comply with, all Federal, State, interstate, and local requirements … respecting the control and abatement of water pollution."), 1370 (Clean

Water Act does not preclude a State from adopting or enforcing standards or limitations or

pollution control requirements or impair any rights of the States); 33 C.F.R. § 336.1(a)(1), (b)(8)

(requiring the Corps to acquire a 401 Certification); *see* Executive Order 12088, *Federal*

*Compliance With Pollution Control Standards*, dated Oct. 13, 1978 (requiring compliance of

federal activities with applicable pollution control standards in the same manner as any non-federal

entity).

      68.     Policy guiding the Corps' conduct also requires the Corps to obtain a 401

Certification and Navigable Waters Permit from the State of South Carolina.

> State water quality certification requires the District Commander to
> accomplish the following three tasks:
>> (1) Complete an evaluation of the effects of the proposed
>> discharge consistent with the Section 404(b)(1) Guidelines;
>> (2) Issue a public notice, with opportunity for public hearings
>> for the proposed discharge, including or referencing the
>> preliminary Section 404(b)(1) evaluation; and
>> **(3) Obtain certification, including any required conditions,
>> from the State or interstate water pollution control agency
>> that the proposed action is in compliance with established
>> effluent limitations and water quality standards.** If the State
>> in question has assumed responsibilities for the 404 regulatory
>> program, a State 404 permit shall be obtained, if applicable,
>> which will serve as the certification of compliance. District
>> commanders shall provide the State with necessary detailed
>> information it may need to issue the water quality certification.

U.S. Army Corps of Eng'rs, *Planning and Guidance* Appx. C, ER 1105-2-100 at C-42 (emphasis

added); U.S. Army Corps of Eng'rs, *Water Quality and Envtl. Management For Corps Civil Works*

*Projects*, ER 1110-2-8154 at 1-3 (federal activities must comply with all Federal, state, interstate,

and local requirements in the same manner and extent as other entities, and the "environment will

be addressed as equal in value and importance to other project purposes when developing or

carrying out management strategies. **The Corps will, at least, manage its projects in accordance with all applicable** Federal and **state environmental laws, criteria, and standards**.") (emphasis added).

69.     On October 29, 2019, the Corps publicly announced and released the Integrated Post Authorization Analysis Report and Supplemental Environmental Assessment, dated August 30, 2019 (SEA). *See* Exhibit A, SEA.

70.     On October 29, 2019, the Corps announced that Alternative 2-6d from the SEA, which calls for the removal of the NSBLD and the construction of a river-wide fixed weir structure and dry floodplain bench, was the preferred and approved option for the NSBLD. *See* Exhibit B, U.S. Army Corps of Eng'rs Mem., Maj. General Holland, Approval of Final Report, Savannah Harbor Expansion Project (SHEP), Georgia and South Carolina: Fish Passage at New Savannah Bluff Lock and Dam (NSBLD) Integrated Post Authorization Analysis Report and Supplemental Environmental Assessment (EA), dated Oct. 29, 2019 (Approval Memo); *See* Exhibit C, Finding of No Significant Impact, Savannah Harbor Expansion Project Fish Passage at New Savannah Bluff Lock and Dam Richmond County, Georgia and Aiken County, South Carolina, dated Oct. 29, 2019 (FONSI).

71.     The preferred plan (Alternative 2-6d) is expected to lower the existing pool level by approximately 5.5 feet (from approximately 114.5 NGVD29 to 109.0 NGVD29) during low flow or critical conditions.   The Federal Defendants' modeling predicted a lowering of the existing pool level of 1.1 feet below Federal Defendants' incorrect 'existing' surface elevation,[1] while actual water elevations during Federal Defendants' Federal Defendants' February 2019 Field Test was 3.0 feet below the Corps predicted elevation.  Exhibit D, Comments of Augusta, Technical Comments, Appendix C-3 REPORT ON HYDRAULICS

METHODOLOGY, Thomas Heard Robertson, PE, AICP, RLS (Apr. 15, 2019).  Augusta has requested the model from Federal Defendants who have refused to provide the model.

**FACTS**

**Background**

72.    The New Savannah Bluff Lock and Dam (NSBLD) is located at the New Savannah Bluff, Savannah River, along the border of South Carolina and Georgia in Richmond County, Georgia and Aiken County, South Carolina.

73.    The NSBLD was constructed on the Savannah River approximately 13 miles below the City of Augusta, Georgia and North Augusta, South Carolina in 1937 as part of a federal project on the Savannah River below Augusta/North Augusta.



Source: https://www.theoutbound.com/georgia/photography/explore-and-fish-at-the-savannah-river-lock-and-dam

74.     The purpose of the federal SHEP project was to assist in commercial navigation of the Savannah River from Savannah Harbor to Augusta via steamship and commercial barge. The project authorized maintenance of a channel through the Savannah River to a depth of nine feet and 90 feet wide. The nine-foot authorized depth of the Savannah River channel would support only the operation of commercial freight barges, not ocean-going container ships.[1]

75.     As presently constructed, the NSBLD creates a pool that currently serves water supply users including Augusta.

---

[1] In contrast, the typical draft for a Panamax ship carrying between 3,001 and 5,100 Twenty-foot Equivalent Unit (TEU) containers, which is on the small-end of modern oceangoing container ships, is 39.5 feet. Even smaller seagoing container vessels, like feeder ships, which carry around 300 TEU containers, have a minimum draft of approximately 20 feet.

76.    As presently constructed, the NSBLD creates a pool that currently serves water-related recreation activities such as boating, fishing, and rowing events, as well as tourism activities.

77.    Even at the authorized depth, this Savannah River channel did not serve its intended commercial navigational purpose even for barges. In 1978, commercial traffic ceased on the Savannah River around Augusta and the Corps of Engineers has not maintained the NSBLD or the nine-foot channel since that time.

78.    The Corps of Engineers states that commercial navigation through the lock ceased in 1979 and that the lock is no longer operated for fish passage or recreational boating. https://www.sas.usace.army.mil/Missions/Civil-Works/Savannah-Harbor-Expansion/SHEP-Fish-Passage/.

79.    The Corps has failed to provide routine maintenance and repair to the NSBLD for decades, accounting for its current state of disrepair.

80.    As a result of non-use and lack of funding for maintenance, the NSBLD has fallen into disrepair over the years. *See* Exhibit A, SEA at 14 ("According to the most recent Periodic Inspection (2014), the current condition of the project is poor. That inspection revealed substantial deterioration of the lock and dam, including numerous structural issues….").

81.    The 2001 Consolidated Appropriations Act added a fish passage to the rehabilitation project. Since its construction in 1937, the NSBLD has prevented fish from migrating to the Augusta Shoals located on the Savannah River near the I-20 overpass, which served as historic spawning grounds for sturgeon, American shad, striped bass, and other fish species. Construction of a fish passage at the NSBLD was designed for the dual purpose of allowing fish access to the Augusta Shoals while also serving as mitigation for adverse impacts to sturgeon and other fish from the construction

activities in the Savannah River. However, the 2001 Consolidated Appropriations Act removed the estimated cost of the rehabilitation from the available appropriations. As a result, no substantive steps were taken by the Corps to rehabilitate the NSBLD.

82.     As part of the development and approval of the Savannah Harbor Expansion Project (SHEP), on November 4, 2011, the National Oceanic and Atmospheric Administration's (NOAA) National Marine Fisheries Service (NMFS) provided a biological opinion (2011 Biological Opinion) on species listed under the Endangered Species Act (ESA) of 1973. *See* Exhibit E, Biological Opinion.

83.     The 2011 Biological Opinion included non-discretionary terms and conditions that were required to be implemented in order for the SHEP to be exempt from the prohibitions of Section 9 of the ESA.

84.     The Biological Opinion concluded that certain mitigation measures must be fulfilled to address the potential environmental impacts of the SHEP.

85.     One such mitigation measure requires construction of a fish passage around the NSBLD, some 180 miles upstream from the SHEP, to mitigate for adverse impacts to shortnose and Atlantic sturgeon caused by the inner harbor dredging of the SHEP.

86.     However, on August 17, 2017 NMFS and USFWS designated critical habitat for the Atlantic sturgeon pursuant to the Endangered Species Act (ESA). 82 Fed. Reg. 39160 (Aug. 17, 2017).  In designating critical habitat for distinct population segments of the Atlantic Sturgeon, NMFS and USFWS limited to the designation the main stem Savannah River from the New Savannah Bluff Lock and Dam downstream to rkm 0 (South Atlantic Unit 3). Thus, the area above NSBLD is not critical habitat and was excluded by NMFS and USFWS as species recovery priority habitat under the ESA.

87.     The 2011 Biological Opinion included as a term and condition of NOAA/NMFS' approval of the SHEP that construction of the fish passage must commence prior to or concurrently with initiation of inner harbor dredging in the Savannah harbor and be completed within two years.

88.     This term and condition was designed to provide simultaneous mitigation and minimization of the adverse impacts to the sturgeon habitat caused by the inner harbor dredging.

89.     On or about April 11, 2012, the Corps issued a Final Environmental Impact Statement and Final General Reevaluation Report (FEIS) for the SHEP.

90.     The FEIS adopted the mitigation measures and conditions set forth in the Biological Opinion, incorporating the 2011 Biological Opinion as Appendix Z.

91.     The FEIS recognized that compliance with the relevant environmental laws, as required by Water Resources Development Act (WRDA), obligated the Corps to adopt the mitigation measures set forth in the 2011 Biological Opinion, including timely construction of the fish bypass, for any alternative selected.

92.     Thereafter, DHEC and the Commission filed suits challenging the adequacy of the FEIS, as well as the Corps' failure to obtain a 401 Certification and a Construction in Navigable Waters permit.

93.     On or about August 17, 2012, the Corps provided the Report of the Chief of Engineers (Chief's Report) for the SHEP. *See* Exhibit F, 2012 Chief's Report.

94.     The Chief's Report provided that the mitigation plan for the SHEP included construction of the fish bypass around the NSBLD to compensate for the adverse impacts to short-nose and Atlantic sturgeon attributable to the inner harbor dredging of the SHEP.

95.     On or about October 26, 2012, the Corps issued a Record of Decision providing that compensatory mitigation for the SHEP includes timely construction of a fish bypass around the NSBLD.

96.     On or about December 12, 2011, state litigation was commenced by the Commission related to the SHEP.

97.     On or about July 11, 2012, federal litigation was commenced by the Commission related to the SHEP.

98.     On or about May 17, 2013, the Corps, DHEC, the Commission, and the Georgia Ports Authority executed a Settlement Agreement of all claims related to the permitting of the SHEP. *See* Exhibit G, Settlement Agreement.

99.     As part of the Settlement Agreement, DHEC and the Commission agreed to issue the requisite 401 Certificate and the Construction in Navigable Waters permit for the SHEP, conditioned on compliance with certain express terms and conditions.

100.    Specifically, the Settlement Agreement provides that "[t]he Corps will comply with the terms and conditions of the Final Biological Opinion issued by the National Marine Fisheries Service on or about November 4, 2011" identified as the 2011 Biological Opinion herein. Exhibit G, Settlement Agreement, § I.A.13. Among the terms and conditions set forth in the 2011 Biological Opinion is a requirement that construction of the fish passage commence prior to or concurrent with inner harbor dredging.

101.    The Settlement Agreement was expressly adopted and incorporated into the order of U.S. District Judge Richard Gergel issued on May 29, 2013, which dismissed the lawsuit with prejudice but expressly retained jurisdiction to enforce the terms of the Settlement Agreement. *See*

*Exhibit H,* Settlement Order, Savannah River Keeper v. United States Army Corps of Engineers, No. 9:12-610-RMG (D.S.C.), Dkt.#99.

102.    On or about September 23, 2013, the NMFS issued an Amended Biological Opinion (First Amended Biological Opinion) for the SHEP.[2]

103.    On or about June 10, 2014, Congress enacted the Water Resources Reform and Development Act of 2014 (2014 WRDA), Public Law 113-121.

104.    Section 7002(1) of the 2014 WRDA reauthorized the SHEP "to be carried out by the Secretary substantially in accordance with the plan, and subject to the conditions" described in the Chief's Report.

105.    The plan and conditions described in the Chief's Report provide for construction of a fish passage around the NSBLD. *See* Exhibit F, Chief's Report.

106.    The fish passage proposed and approved as a part of the mitigation plan for the SHEP was limited to the construction of a passageway structure around the South Carolina side of the lock and dam that would allow migrating fish to pass and thereby provide access to historic upriver spawning areas at the Augusta Shoals. Under the SHEP plan, lock and dam components of the NSBLD remained in place and were not removed. While the off-channel fish passage recommended by the SHEP Environmental Impact Statement and Record of Decision (October 26, 2012) (2012 SHEP EIS)[3] included deposition of rock required to construct the structure, and other alternatives looked at variations of such a structure, the Corps did not analyze the complete removal of the NSBLD or the impacts related to the construction of a river-wide weir structure.

---

[2] The First Amended Biological Opinion did not involve sturgeon or the fish passage mitigation feature of the SHEP; therefore, it is not directly relevant to the issues involved in the instant complaint.

[3] The SHEP EIS was a tiered EIS including iterations and supplementations. However, at no time was the removal of the NSBLD contemplated or put out for public notice and comment.

Instead, the Corps determined at the initial stage that complete removal of the NSBLD was not feasible due to the concerns of water supply users.   In short, the current proposal advanced by the Corps was neither evaluated as a part of the SHEP mitigation nor received consideration or approval from Augusta, South Carolina, or the public through the public notice and comment procedures required by the APA and Corps regulations.

107.    The Final EIS for the SHEP stated that removal of the New Savannah Bluff Lock and Dam was infeasible.  2012 SHEP EIS, App. C Mitigation, at 65.

108.    The Federal Defendant's 2012 Record of Decision specifies that fish passage will be 'around the New Savannah Bluff Lock and Dam' clearly indicating the dam will be left in place. Record of Decision, at Compensatory Mitigation, item a (Page 2)(Oct. 26, 2012).

### 2016 WIIN Act

109.    On or about December 16, 2016, Congress enacted the Water Infrastructure Improvements for the Nation Act (WIIN Act), Public Law 114-322, 130 Stat. 1703 (Dec. 16, 2016.[4]

110.    Section 1319(b)(1) of the WIIN Act deauthorized the NSBLD as a federal project.

111.    Section 1319(c)(1)(A) of the WIIN Act provided for either repair or replacement of the lock and dam, as the Secretary determines to be necessary –

> (i) repair of the lock wall of the New Savannah Bluff Lock and Dam and modification of the structure such that the structure is able –
> (I) to **maintain the pool for navigation, water supply, and recreational activities, as in existence on the date of enactment of this Act**; and
> (II) to allow safe passage over the structure to historic spawning grounds of short-nose sturgeon, Atlantic sturgeon, and other migratory fish; or
> (ii)(I) construction at an appropriate location across the Savannah River of a **structure that is able to maintain the pool for water**

---

[4] The WIIN Act is also referred to as the ''Water Resources Development Act of 2016,'' per Section 1001 of the Act.

**supply and recreational activities, as in existence on the date of enactment of this Act**; and

    (II) removal of the New Savannah Bluff Lock and Dam on completion of construction of the structure….

WIIN Act, 114 P.L. 322, 130 Stat. 1703 (Dec. 16, 2016), § 1319(C). (Emphasis added).

112.    The WIIN Act does not include a requirement for passage of short-nose sturgeon, Atlantic sturgeon, or other migratory fish under the replacement provision at WIIN Act, 114 P.L. 322, 130 Stat. 1703 (Dec. 16, 2016), § 1319(C)(1)(A)(ii).

113.    As a condition for repairing or removing the lock and dam (NSBLD Project), Congress explicitly required that any structure be able to maintain the pool for water supply and recreational activities as in existence on the date of enactment.

114.    "[O]n the date of enactment of [the WIIN] Act," according to United States Geological Survey data, the pool level was approximately 114.5 feet NGVD29.[5]  *See* Exhibit I,

Dec. 16, 2016 USGS Gage 02196999 ((Sav. River above NSBLD) daily mean height of 114.76 feet).

115.    In the 2012 SHEP Environmental Assessment the Corps states "The District maintains stable pool elevations **(near EL 115 feet) during most river flows** and raises the

---

[5] NGVD29 is the national geodetic vertical datum for vertical control surveying in the United States based on the mean sea level datum of 1929. This dataset was formerly referred to as "mean sea level" until 1973, when the name changed to "national geodetic vertical datum."

    NAVD88 is the vertical datum for orthometric heights established for vertical control surveying in the United States based upon the General Adjustment of the North American Datum of 1988.

    These measurements (*i.e.*, NAVD and NGVD) differ, and a computer program is utilized for conversion between these data sets. *See* https://www.ngs.noaa.gov/PC_PROD/VERTCON/. Both measurements are commonly utilized and both are referenced with regard to the NSBLD Project, which can create some confusion when discussing elevations and levels.

    In general, and to provide an order of magnitude, the proposed Alternative 2-6d would have a pool elevation of 108.2 NAVD88, which equals 109.0 NGVD29. *See* Exhibit A, SEA at ii.

gates at the dam during high flows to reduce the backwater effects of the dam on the upstream pool and its adjacent development."  2012 SHEP EA, App. C Mitigation Plan, at 71.

116.    This December 16, 2016 pool level is approximately the same level for the pool required by the flowage easements provided by the Navigation Commission to the United States as a condition for the construction of the NSBLD back in the 1930s.

117.    This pool elevation is within the normal, standard operating range for the pool. S*ee* Exhibit J, USGS Gage 02196999 Water-Year Summaries ((Sav. River above NSBLD) daily minimum, maximum, and mean heights for the water years 2016-2018 demonstrating a mean pool elevation of between 114 and 115 feet NGVD29, with a water year measured between October 1 and September 30).

### Supplemental Environmental Assessment

118.    On or about October 13, 2017, the NMFS issued a Second Amended Biological Opinion (2017 Second Amended Biological Opinion) for the SHEP. *See* Exhibit K, 2017 Second Amended Biological Opinion.

119.    The 2017 Second Amended Biological Opinion addressed the potential additional adverse effects that could result from the delay in implementing the NSBLD fish passage beyond the time period of the inner harbor dredging in which the primary adverse impacts to the fish habitats are incurred. *Id.*

120.    The 2017 Second Amended Biological Opinion determined that the delay caused by the Corps' identification and adoption of a revised fish passage alternative that complies with the WIIN Act would realistically cause the completion of the fish passage to occur 8 months after the completion of the inner harbor dredging. *Id.*

121.    Specifically, the 2017 Second Amended Biological Opinion looked at the effect the 8-month delay would have on the year-class strength of sturgeon, which NMFS found to be significant and a "major consequence for the late-maturing, long-lived sturgeon that spawn infrequently." *Id.* at 78. It further found that the delay would result in a prolonged period of adverse effects to an unknown number of sturgeon. *Id.*

122.    The 2017 Second Amended Biological Opinion also found that the adverse effects would occur in the same habitat area described in the Biological Opinion, but the sturgeon would be exposed to the effects for a longer period of time as a result of the delay. *Id.*

123.    Ultimately, however, the 2017 Second Amended Biological Opinion found that an 8-month delay would not change these "sublethal effects" to "lethal effects," affect a greater percentage of sturgeon in the area or require additional or different mitigation. [6]

124.    On or about February 14, 2019, the Corps issued a Notice of Availability of a Draft Integrated Post Authorization Analysis Report (PAAR) and Supplemental Environmental Assessment for the Fish Passage at the NSBLD, and Draft Finding of No Significant Impact to evaluate proposed plans for the NSBLD Project.

125.    The draft SEA set forth the preferred plan for the NSBLD Project, which consists of constructing an in-channel fish passage consisting of a fixed crest weir with a rock ramp sloping upstream from the existing NSBLD location and removal of the existing NSBLD.

126.    The Corps' proposal for the NSBLD Project included the removal of the existing dam and the construction of a fixed crest weir with a rock ramp. This proposed action would take place in part within Augusta and on Augusta's riparian areas, riverbed, and river and/or will affect

---

[6] NMFS did not address the question of what time period of delay would cross the threshold from being "sublethal" to "lethal" in terms of the additional adverse impacts caused to sturgeon

areas where Augusta holds riparian and water rights and has developed infrastructure in reliance on the river and water level elevations.

127.    Contrary to the WIIN Act's specific requirement, none of the action alternatives evaluated in the draft PAAR or the final SEA maintained the pool as in existence on or about December 16, 2016.

128.    On or about February 9, 2019, the Corps began a simulated drawdown test in order to demonstrate the effects of the preferred plan on the pool level, the "Federal Defendants February 2019 Field Test."  The Federal Defendants February 2019 Field Test was identified by the Federal Defendants as a test of the action, alternative 2-6D.

129.    On or about February 15, 2019, the Corps was forced to halt the drawdown simulation and Federal Defendants February 2019 Field Test after effects of the river drawdown resulted in instability of the riverbank.

130.    The drawdown simulation and Federal Defendants February 2019 Field Test also resulted in numerous docks becoming useless for recreational activities, as they sat in mud rather than water, as seen below.



Source: https://www.aikenstandard.com/news/csra-officials-react-to-savannah-river-drawdown/article_af000200-3475-11e9-862f-07dbd8405628.html



Source: https://www.savannahriverkeeper.org/blue-heron-blog/lock-dam-update-public-meeting-info-petition-sign-on-and-more#/



Source: https://www.northaugustastar.com/news/several-days-of-river-reduction/collection_7e9bc686-30c8-11e9-98b6-87b4e1857d96.html#11



*See* Exhibit L, SEA Eng'g Appx. Att. 4.

     131.    The drawdown simulation and Federal Defendants February 2019 Field Test also caused damage to riparian areas, lands and property adjacent to the Savannah River including causing failure of structural features and walls and subsidence as shown in the photographs below, taken February 15, 2019.  Federal Defendants ceased the Federal Defendants February 2019 Field Test in part due to the subsidence and failure:







132.    Under Federal, South Carolina and Georgia law, the NSBLD Project requires both a Navigable Waters Permit and a 401 Certification from DHEC and the State of Georgia Department of Natural Resources.

133.    Upon the request of the Chairman of the Commission for clarification of the demarcation of permitting jurisdiction under South Carolina law, the South Carolina Attorney General issued an opinion on April 8, 2019. *See* Exhibit M, Attorney General Opinion. The opinion found that the NSBLD Project as proposed by the Federal Defendants was not analyzed under the EIS for the SHEP and therefore constituted a new project proposal requiring a separate Navigable

Waters Permit and 401 Certification, and that DHEC rather than the Commission would be the appropriate permitting entity for South Carolina.

134.    By letter dated April 9, 2019, the Attorney General Opinion was transmitted to the Corps. *See* Exhibit N, Commission Letter. In addition to transmitting a copy of the Opinion, the Commission's letter also informed the Corps that, to the extent that the proposed removal of the NSBLD and construction of a full river rock weir under proposed Alternative 2-6d constituted a departure from the fish passage mitigation feature approved by the SHEP and thereby an entirely new proposed project, DHEC has permitting authority and jurisdiction over the NSBLD Project, and asked the Corps to coordinate with DHEC for the review and processing of the required authorizations from the State of South Carolina for the newly proposed NSBLD Project. *Id.*

135.    On April 9, 2019, members of the South Carolina and Georgia Congressional delegations, including all four United States Senators and the respective members of Congress whose districts include the areas impacted by the NSBLD Project, sent a joint letter to the Assistant Secretary of the Army and the Commanding General of the Corps expressing their concerns regarding the Corps' preferred Alternative 2-6d. *See* Exhibit O, Congressional Letter. The stated purpose of the letter was to "express the intent of Congress for Public Law 114-322" (WIIN Act). *Id.* The letter states that the results of the February 2019 drawdown simulation "do not reflect the intent of Congress," as "the Corps must maintain river conditions that were in place on the date of enactment [of the WIIN Act]," and "the recent drawdown test has proven [that] Alternative 2-6d does not appear to meet the requirements of the plain text of the legislation or the intent of Congress when it passed the WIIN Act." *Id.* The letter further stated that "[w]e encourage the Corps to consider the intent of Congress and to only pursue an alternative that fulfills the environmental requirements of SHEP while also protecting the investments of our riverfront communities." *Id.*

The letter also rejected the Corps' interpretation of the WIIN Act provision requiring maintenance of the pool for water supply and recreational activities as of the date of its enactment, stating that the Corps' argument about Alternative 2-6d "maintaining this functionality" is inaccurate and does not reflect Congressional intent. *Id.*

136.    The Federal Defendants responded to the South Carolina and Georgia Congressional delegations, including all four United States Senators and the respective members of Congress whose districts include the areas impacted by the NSBLD Project, who acted on the WIIN Act and were part of its passage, stating the comments 'do not meet the specifications of the 2016 WIIN Act.' Exhibit R, Corps Response, at 241.

137.    On March 31, 2019 during a public meeting held by the Federal Defendants, Congressmen Joe Wilson and Rick Allen testified regarding the Corps proposal and the WIIN 2016 Act, explaining the congressional intent was to maintain the pool upstream of the NSBLD and expressing concern that the Corps had misinterpreted the statute. Exhibit P, Transcript of City of Augusta Public Meeting, Lock and Dam Meeting, March 31, 2019.

138.    Notwithstanding this Congressional rejection of its interpretation of the WIIN Act and its chosen alternative, the Corps has continued to assert its erroneous interpretation of the law and pursue Alternative 2-6d.

139.    On May 16, 2019, a Final Independent External Peer Review Report Savannah Harbor Expansion Project Georgia and South Carolina, Fish Passage at New Savannah Bluff Lock and Dam Integrated Post-Authorization Analysis Report and Environmental Assessment (Independent External Peer Review or IEPR) was released. *See* Exhibit Q, IEPR.

140.    The IEPR was prepared for the Corps by Battelle to provide an independent assessment of the engineering, economic, environmental, and plan formulation analyses of the project study.

141.    The IEPR found that the draft SEA does not present adequate information on (1) the likelihood that the Recommended Plan will meet the project objectives related to the fish passage, (2) the risk of injury/death during up- or downstream passage at the rock weirs, or (3) the probability of passage success overall. *See* Exhibit Q, IEPR at p. 3.

142.    In particular, the IEPR made the following findings and conclusions with respect to the Draft SEA and the Corps' proposed preferred alternative:

a.  The project does not consider a wide range of alternative fishway types and does not consider alternatives that provide a smaller fishway with low discharge capacities. *Id.* at p. 4.

b.  Several design features of the recommended plan pose risk of injury and potential lethal danger to downstream migrant sturgeons due to head-on strikes and stranding, and that information provided in the draft SEA and other supplemental documents on the design of the arch rock barriers is not adequate to ensure safe and sure passage for sturgeons under any weir alternative. *Id.* at p. 5.

c.  The draft SEA does not consider a wide range of alternative fishway types that could satisfy the first provision of the WIIN Act, "repair of the lock wall of the NSBLD an modification of the structure" to maintain the pool for navigation, water supply, and recreational activities and to allow safe fish passage. *Id.* at p. 7.

d.  The draft SEA is incomplete without a discussion of all potential types of fishways that are known to be effective at providing safe fish passage *Id.* at p. 7.

e.  Retaining the existing spillway gates "seems like the simplest way of accomplishing" the WIIN Act's objectives. *Id.* at p. 9.

f.  None of the evaluated rock weir alternatives "seem to fully satisfy" the WIIN Act's requirement that the pool be maintained. *Id.* at p. 9.

g.  Based on the conclusion that none of the evaluated rock weir alternatives fully satisfy the WIIN Act, the IEPR recommended that USACE reconsider whether the proposed alternatives meet the intent of the WIIN Act's requirement that the pool be maintained as in existence on the date of enactment of the Act. *Id.* at p. 10.

h.  The cost analysis of the alternatives cannot be determined, and that no analysis was conducted to determine the costs of mitigation of the recreation and water supply impacts under the alternatives. *Id.* at p. 11.

i.  The economic assumptions and calculations used in the alternatives analysis were not described in enough detail to evaluate the acceptability of the economic assumptions. *Id.* at p. 12.

j.  The Corps had not provided an explanation for the criteria used to evaluate navigation, water supply, recreation, and flooding impacts, making it difficult to determine whether the criteria meet the intent of the WIIN Act. *Id.* at p. 13.

k.  The alternatives analysis failed to consider the differential effectiveness of each project at meeting the project objective of providing for utilization of upstream habitat areas, which significantly impacts the cost effectiveness analysis and the alternative selection process. *Id.* at p. 14.

l.   The draft SEA does not adequately describe how the recommended plan would meet the objectives related to upstream and downstream passage of migratory fish. *Id.* at p. 15.

m.  The Corps failed to include conditions observed during the February 2019 "drawdown test" in the draft SEA, and the results were not used to verify the hydraulic modeling of post-project conditions. *Id.* at p. 19.

n.   The draft SEA does not adequately convey the status of the Section 106 consultation process. *Id.* at p. 28.

o.   The alternatives analysis failed to evaluate the relative impacts of the alternatives that would avoid or minimize adverse effects on the NSBLD. *Id.* at p. 30.

142.   The Corps did not apply for a Navigable Waters Permit from South Carolina.

143.   The Corps did not apply for a 401 Certification from South Carolina. The Corps did not apply for a 401 Certification from Georgia.

144.   The Corps responded by letter dated September 20, 2019. *See* Exhibit R, Corps Response. In that letter, the Corps asserted its position that no 401 Certification was needed from South Carolina for the NSBLD Project. *Id.* The Corps further asserted that the NSBLD Project is exempt from obtaining a South Carolina Navigable Waters Permit. *Id.*

145.   The Corps has further asserted that the WIIN Act prohibits it from constructing a fish passage in compliance with the terms and conditions of the Settlement Agreement, Order approving the Settlement Agreement, SHEP 401 Certificate, and SHEP Navigable Waters Permit.

146.   The Corps has not sought an amendment or modification of the Settlement Order, SHEP 401 Certification, or SHEP Navigable Waters Permit.

147.    On October 29, 2019, the Corps publicly announced and released the Integrated Post Authorization Analysis Report and Supplemental Environmental Assessment, dated August 30, 2019 (SEA). *See* Exhibit A, SEA.

148.    On October 29, 2019, the Corps announced that Alternative 2-6d from the SEA, which calls for the removal of the NSBLD and the construction of a river-wide fixed weir structure and dry floodplain bench, was the preferred and approved option for the NSBLD. *See* Exhibit B, U.S. Army Corps of Eng'rs Mem., Maj. General Holland, Approval of Final Report, Savannah Harbor Expansion Project (SHEP), Georgia and South Carolina: Fish Passage at New Savannah Bluff Lock and Dam (NSBLD) Integrated Post Authorization Analysis Report and Supplemental Environmental Assessment (EA), dated Oct. 29, 2019 (Approval Memo); *See* Exhibit C, Finding of No Significant Impact, Savannah Harbor Expansion Project Fish Passage at New Savannah Bluff Lock and Dam Richmond County, Georgia and Aiken County, South Carolina, dated Oct. 29, 2019 (FONSI).

149.    The preferred plan (Alternative 2-6d) is expected to lower the existing pool level by approximately 5.5 feet (from approximately 114.5 NGVD29 to 109.0 NGVD29) during normal operating conditions.

150.    The proposed removal of the NSBLD and construction of the fixed crest rock weir constitutes construction in navigable South Carolina waterways, and such proposed work would alter river flow, lower the pool elevation in the fixed crest weir, and include a floodplain bench.

151.    Only two percent of public comments supported the Corps' proposal. *See* Exhibit S, October 29, 2019 Corps News Release No. 19-32 at p. 2.

152.    The Corps' environmental analysis and justification for Alternative 2-6d relies heavily on the assumption that no additional real property or flowage easements will be necessary,

despite the condition precedent of the existing flowage easements that the pool be maintained at approximately 114.5 feet above mean sea level. *See* Exhibit A, SEA at p. 107-8.

153.    The Corps' environmental analysis improperly assumed the no action alternative was the original fish passage plan—a plan that the Corps asserts is a legal impossibility—rather than existing conditions. *Id.* at p. 11-12.

154.    The Corps has failed to comply with the NHPA through the South Carolina State Historic Preservation Officer and Georgia Department of Natural Resources related to historic and cultural resources for the NSBLD Project or otherwise comply with the NHPA

155.    Any document specifically referenced but not included as an exhibit is specifically incorporated by reference.

156.    Any document specifically referenced but for which only a portion of the document is included as an exhibit is specifically incorporated by reference in its entirety.

**FOR A FIRST CAUSE OF ACTION**
**(Declaratory Judgment – Interpretation of the WIIN Act)**

157.    The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this cause of action.

158.    Section 1319(c)(1)(A) of the WIIN Act provides:

(i) repair of the lock wall of the New Savannah Bluff Lock and Dam and modification of the structure such that the structure is able –
        (I) **to maintain the pool for navigation, water supply, and recreational activities, as in existence on the date of enactment of this Act**; and
        (II) to allow safe passage over the structure to historic spawning grounds of shortnose sturgeon, Atlantic sturgeon, and other migratory fish; or
(ii)(I) **construction at an appropriate location across the**

**Savannah River of a structure that is able to maintain the pool for water supply and recreational activities, as in existence on the date of enactment of this Act**; and

    (II) removal of the New Savannah Bluff Lock and Dam on completion of construction of the structure ….

(Emphasis added.)

159.    Congress has explicitly and unambiguously required that any repair of the NSBLD must maintain the pool for navigation, water supply, and recreational activities, as it existed on December 16, 2016, the date of enactment.  In the event Federal Defendants choose to replace the NSBLD, Congress has explicitly and unambiguously required that replacement of the NSBLD must maintain the pool for water supply and recreational activities, and does not require passage for shortnose sturgeon, Atlantic sturgeon, and/or other migratory fish.

160.    By its plain language, the WIIN Act requires that any repair or replacement structure of the NSBLD must maintain the pool at the same elevation as it was on December 16, 2016 for navigation, water supply, and recreational activities.  Federal Defendants may also determine that repair or replacement of the NSBLD is not necessary, in which case the pool would remain unchanged.

161.    On December 16, 2016, the pool level was 114.76 feet NGVD29. *See* Exhibit I, Dec. 16, 2016, USGS Gage 02196999 Surface-Water Daily Statistic.

162.    Members of the Congressional delegations of South Carolina and Georgia have informed the Federal Defendants that the stated Congressional intent of the WIIN Act is that the pool level on the date of the enactment of the WIIN Act, *i.e.* approximately 114.5 feet NGVD29 as set forth in ¶¶ 96, 142, must be maintained in any effort by the Corps to modify, remove, or replace the NSBLD. *See* Exhibit O, Apr. 9, 2019 Secretary James and General Semonite ltr. from Members of the Congressional delegations of South Carolina and Georgia.

163.     The flowage easements held by and relied upon by the Corps in making its decision require a pool elevation of 114.5 feet above mean sea level.

164.     Notwithstanding the Act's plain language, the Corps interprets the WIIN Act as only requiring that any repair or replacement structure be able to maintain some degree of functionality of the pool, to be determined by the Corps in the Corps' sole discretion.

165.     The IEPR Report, which was commissioned by Federal Defendants, criticized Federal Defendants interpretation of applicable water level and stated "None of the alternatives seem to fully satisfy this requirement [of the WIIN Act] since they all appear to have a direct impact by lowering the normal pool elevation below the existing conditions."  Exhibit Q, Final Panel Comment 3, at p. 9.

166.     Notwithstanding the Act's plain language, the Corps interprets the WIIN Act as allowing the construction of a fixed crest rock weir structure that will dramatically lower the water elevation from the conditions that existed on December 16, 2016.

167.     In February 2019, the Corps performed a drawdown simulation to show the effects of Alternative 2-6d on the pool. The drawdown simulation did not maintain the pool for navigation, water supply, and recreational activities, as in existence on December 16, 2016. Instead, the drawdown simulation demonstrated that Alternative 2-6d lowered the elevation of the pool from the level in existence on December 16, 2016 and resulted in instability to the riverbank of the Savannah River. The drawdown simulation also resulted in the beaching of recreational docks along the Savannah River. The drawdown simulation also created significant concern among water supply users that the Corps' proposals and analysis were woefully deficient, inadequate, and could not be relied upon.

168.    Accordingly, Augusta is entitled to a declaratory judgment pursuant to 28 U.S.C.A. §§ 2201 and 2202 against the Federal Defendants. There exists an actual dispute and controversy between the parties which cannot be resolved absent declaratory relief by this Court. Declaratory judgment in the manner sought would terminate this uncertainty and breach of statutory duties by the Federal Defendants. Augusta is therefore entitled to a declaratory judgment, declaring the rights and legal relations of the parties as follows:

    a.    The Federal Defendants' interpretation of the WIIN Act is contrary to its plain language and the expression of Congressional intent.

    b.    The WIIN Act requires maintenance of the pool level as in existence on the date of enactment of the WIIN Act December 16, 2016) of approximately 114.76 feet NGVD29.

    c.    The Federal Defendants' selected Alternative 2-6d does not comply with the WIIN Act.

    d.    That Federal Defendants must determined that repair or replacement of the NSBLD is not necessary in accordance with the WIIN Act, or be limited to action which maintains of the pool level as in existence on the date of enactment of the WIIN Act December 16, 2016) of approximately 114.76 feet NGVD29.

169.    Augusta is entitled to (1) a declaratory judgment, (2) a permanent injunction, and (3) such other relief as is just, equitable, and proper.

**FOR A SECOND CAUSE OF ACTION**
**(Declaratory Judgment – The Federal Defendants**
**Must Comply with and Abide by the Laws of Georgia and South Carolina Regarding**
**Section 401 Water Quality Certification and State Navigable Waters Laws)**

170.    The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this cause of action.

171.    Title to certain land underlying a portion of the Savannah River is held by various entities including the States of Georgia, South Carolina, Augusta, and various landowners. Such landowners possess land and water rights consistent with Federal, state and common law.

172.    The Savannah River lies within both Georgia and South Carolina's jurisdiction, as well as within the jurisdiction of Augusta.

173.    The NSBLD Project involves the discharge of pollutants into Georgia and South Carolina waters through dredging, involves the discharge of fill material into the waters of the State, discharge of pollutants from construction and demolition activities including discharge of pollutants, stormwater containing pollutants, flows containing pollutants, and the NSBLD Project will permanently change and re-routes water flow in Georgia and South Carolina (changing the chemical and physical composition of waters).

174.    Congress has explicitly and unambiguously waived the Federal Defendants' sovereign immunity for its actions which constitute a discharge of pollutants under State pollution control regulations under the CWA. 33 U.S.C.A. § 1323(a).

175.    Section 313, 33 U.S.C.A. § 1323, states in pertinent part:

(a) Compliance with pollution control requirements by Federal entities
**Each department**, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government
(1) having jurisdiction over any property or facility, or

(2) **engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants**, and each officer, agent, or employee thereof in the performance of his federal duties, **shall be subject to and comply with, all** Federal, **State**, interstate, and local requirements, **administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity** including the payment of reasonable service charges. The preceding sentence shall apply

(A) **to any requirement whether substantive or procedural** (including any recordkeeping or reporting requirement, any requirement respecting permits and any other requirement, whatsoever),

(B) **to the exercise of any** Federal, **State**, or local **administrative authority**, and

(C) **to any process and sanction**, whether enforced in Federal, State, or local courts or in any manner. This subsection shall apply notwithstanding any immunity of such agencies, officers, agents, or employees under any law or rule of law….

(Emphasis added.)

176.    Section 510, 33 U.S.C.A. § 1370, states:

Except as expressly provided in this chapter, **nothing in this chapter shall (1) preclude or deny the right of any State** or political subdivision thereof or interstate agency **to adopt or enforce (A) any standard or limitation respecting discharges of pollutants, or (B) any requirement respecting control or abatement of pollution**; … or (2) be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States.

(Emphasis added.); *see also* 33 U.S.C.A. § 1251(b) (It is Congressional policy to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution.").

177.    The CWA requires the Federal Defendants to obtain a Water Quality Certification assuring that a project complies with Section 401 of the Act. 33 U.S.C.A. § 1341.

178.    The proposed NSBLD Project will result in a discharge and impact on waters of the United States and waters of the States of Georgia and South Carolina.

179.    Federal and state law and Corps' policy requires the Corps to obtain a 401 Certification from Georgia and South Carolina (or a waiver thereof).

180.    In South Carolina, DHEC is the agency that assesses and determines water quality certifications under Section 401 of the CWA for discharge to South Carolina waters. S.C. Code Ann. Regs. 61-101 *et seq*.  Georgia Department of Natural Resources Environmental Protection Division is the agency that assesses and determines water quality certifications under Section 401 of the CWA for discharge to Georgia waters.

181.    The Federal Defendants have neither sought nor received a 401 Certification from DHEC for the NSBLD Project, despite being informed that one is required and despite the requirements of Section 401 of the CWA.

182.    Under South Carolina law, neither construction nor operation activities shall "block or obstruct navigation or the flow of any waters unless specifically authorized [by the permit]; no attempt shall be made by [a person] to prevent the full and free use by the public of all navigable waters at or adjacent to the work authorized by the permits; and that no spoil, dredged material, or any other fill material be placed below the mean high water or ordinary high water elevation, unless specifically authorized [by the permit]." S.C. Code Ann. Regs. 19-450.4(A)(7).

183.    South Carolina law further provides that "any activity" involving construction in navigable waterways requires a Navigable Waters Permit from DHEC, and a person in violation of that requirement can be enjoined from further activity until a permit is obtained. S.C. Code Ann. Regs. 19-450.12.

184.    Federal and state law and Corps' policy requires the Corps to obtain a Navigable Waters Permit from South Carolina.

185.    The activities proposed by the Federal Defendants on the NSBLD Project require a Navigable Waters Permit. S.C. Code Ann. Regs. 19-450 *et seq.*

186.    Congress has explicitly and unambiguously waived the Federal Defendants' sovereign immunity for any state regulation related to the CWA, including but not limited to the 401 Certification and Navigable Waters Permit.

187.    Notwithstanding, the Federal Defendants have refused to seek either a Navigable Waters Permit or a 401 Certification from South Carolina for the NSBLD Project, and despite being informed that one is required for the NSBLD Project.

188.    Accordingly, Augusta is entitled to a declaratory judgment pursuant to 28 U.S.C.A. §§ 2201 and 2202 against the Federal Defendants. There exists an actual dispute and controversy between the parties which cannot be resolved absent declaratory relief by this Court. Declaratory judgment in the manner sought would terminate this uncertainty and breach of statutory duties by the Federal Defendants. Augusta is therefore entitled to a declaratory judgment, declaring the rights and legal relations of the parties as follows:

   a.   The Federal Defendants are required to seek and obtain a Navigable Waters Permit for the NSBLD Project from South Carolina.

   b.   The Federal Defendants are required to seek a 401 Certification for the NSBLD Project from South Carolina and Georgia.

   c.   The Federal Defendants are permanently enjoined from proceeding with the NSBLD Project absent receipt of and compliance with a Navigable Waters Permit and 401 Certification from South Carolina and Georgia.

189.     Augusta is entitled to (1) a declaratory judgment, (2) a permanent injunction, and (3) such other relief as is just, equitable, and proper.

## FOR A THIRD CAUSE OF ACTION
### (Declaratory Judgment – The Federal Defendants Must Comply with and Abide by the Settlement Agreement and Order)

190.     The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this cause of action.

191.     The Settlement Agreement between DHEC and the Corps requires that the Corps' actions related to the SHEP must comply with the terms and conditions set forth in the SHEP 401 Certification and SHEP Navigable Waters Permit.

192.     The Order approving the Settlement Agreement requires compliance with the terms and conditions of the SHEP 401 Certification and SHEP Navigable Waters Permit.

193.     The SHEP 401 Certification and SHEP Navigable Waters Permit require that the Corps comply with the terms and conditions set forth in the 2011 Biological Opinion.

194.     The 2011 Biological Opinion constitutes a wholesale change from the approved SHEP mitigation and differs from Federal Defendants NSBLD actions set forth in the SEA and FONSI.

195.     Accordingly, Augusta is entitled to a declaratory judgment pursuant to 28 U.S.C.A. §§ 2201 and 2202 against the Federal Defendants. There exists an actual dispute and controversy between the parties which cannot be resolved absent declaratory relief by this Court. Declaratory judgment in the manner sought would terminate this uncertainty and breach of statutory duties by the Federal Defendants. South Carolina is therefore entitled to a declaratory judgment, declaring the rights and legal relations of the parties as follows:

a.   The Federal Defendants must comply with the Settlement Agreement.

b.   The Federal Defendants must comply with the WIIN Act.

196.    Augusta is entitled to (1) a declaratory judgment, (2) a permanent injunction, and (3) such other relief as is just, equitable, and proper.

### FOR A FOURTH CAUSE OF ACTION
### (Violation of NEPA and the APA– Failure to Prepare an Adequate Environmental Analysis for a New Agency Action)

197.    The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this cause of action.

198.    NEPA requires federal agencies to fully consider and disclose the environmental consequences of an agency action before proceeding with that action. NEPA also requires the preparation of an appropriate analysis when a major federal action is proposed that may significantly affect the quality of the environment. 42 U.S.C.A. § 4332(C); 40 C.F.R. § 1501.4(a)(1); 33 C.F.R. § 230.6.

199.    The Federal Defendants' authorization of the NSBLD Project is a federal action.

200.    The NSBLD Project will significantly affect the quality of the environment by, among other things, removing an historic structure requiring analysis under Section 106, facilitating construction and placement of material within navigable waters of the U.S., altering the characteristics of the river and the water quality.

201.  Federal Defendants did not prepare or undertake a sufficient or adequate analysis of the NSBLD Project under and as required by NEPA, and is in violation of NEPA.

202.    Under NEPA, an agency may not "define [a] project so narrowly that it forecloses[s] a reasonable consideration of alternatives." Davis v. Mineta, 302 F.3d 1104, 1119 (10th Cir. 2002).

203.    Federal Defendants defined the project as a project "to mitigate for impacts to two endangered sturgeon species. The SHEP includes a mitigation feature to provide fish passage at the NSBLD to address adverse impacts to shortnose and Atlantic sturgeon. The plan, described in the 2012 SHEP GRR and Final EIS, was for the construction and operation of a fish bypass around the NSBLD on the South Carolina side of the Savannah River. This feature would ensure USACE and NFS compliance with the Endangered Species Act."  SEA at Section 1.3, p. 10.

204.    WIIN 2016 specifically provides for 'construction at an appropriate location across the Savannah River of a structure that is able to maintain the pool for water supply and recreational activities as in existence on the date of enactment'.  WIIN Act, 114 P.L. 322, 130 Stat. 1703 (Dec. 16, 2016), § 1319(C)(1)(A)(ii).

205.    WIIN Act, Public Law 114-322, 130 Stat. 1703 (Dec. 16, 2016)(WIIN Act) § 1319(C)(1)(A)(ii) does not include fish passage or authorize fish passage by its explicit and plain language and terms.

206.    As WIIN Act, Public Law 114-322, 130 Stat. 1703 (Dec. 16, 2016)(WIIN Act) at (c)(1)(A)(ii), Federal Defendants have defined the project, by including fish passage, so narrowly as to foreclose reasonable consideration of alternatives as required by NEPA.  By failing to consider alternatives which do not include fish passage, the Federal Defendants have improperly and illegally narrowed the NEPA analysis in contravention of NEPA and the WIIN Act.

207.    Removal of the NSBLD and implementation of the WIIN Act and its deauthorization of the NSBLD is a separate federal action from the SHEP project requiring its own separate NEPA full and complete NEPA analysis.

208.    The Federal Defendants state that the purpose of the NSBLD Project is "to mitigate for impacts to two endangered sturgeon species."  SEA, at 1.3.  In referring to impacts, Federal Defendants are referring to impacts from another project, the SHEP Project. The purpose of the SHEP project was federal SHEP project was to assist in commercial navigation of the Savannah River.

209.    To the extent a supplemental environmental assessment is an appropriate process to undertake, the SEA in this case is inadequate, fails to adequately address all issues, and is wholly deficient.

210. The SEA, FONSI and Federal Defendants' action described herein does not comply with NEPA.

211.    The SEA fails to adequately assess alternatives to the action including the no action alternative and a reasonable range of alternatives.

212.    The NEPA regulations require the Federal Defendants "rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated  range of reasonable alternatives are to be selected by reference to the project implemented."  Alternatives including the proposed action are "the heart of the environmental impact statement."  40 C.F.R. § 1502.14. Alternatives must include "reasonable alternatives not within the jurisdiction of the lead agency."

213.    Federal Defendants are required to consider the no action alternative.  "There are two distinct interpretations of 'no action' that must be considered, depending on the nature of the

proposal being evaluated. The first situation might involve an action such as updating a land management plan where ongoing programs initiated under existing legislation and regulations will continue, even as new plans are developed. In these cases 'no action' is 'no change' from current management direction or level of management intensity. To construct an alternative that is based on no management at all would be a useless academic exercise. Therefore, the 'no action' alternative may be thought of in terms of continuing with the present course of action until that action is changed. Consequently, projected impacts of alternative management schemes would be compared in the EIS to those impacts projected for the existing plan. In this case, alternatives would include management plans of both greater and lesser intensity, especially greater and lesser levels of resource development.  The second interpretation of 'no action' is illustrated in instances involving federal decisions on proposals for projects. 'No action' in such cases would mean the proposed activity would not take place, and the resulting environmental effects from taking no action would be compared with the effects of permitting the proposed activity or an alternative activity to go forward." Council on Environmental Quality, Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026 (Mar. 23, 1981).

214.    Here, the no action alternative is the existing NSBLD in place, with no change from the operations, maintenance and configuration of the NSBLD.

215.    Federal Defendants identified the no action alternative as "the original 2012 SHEP design" which has never been implemented, is not existing, and does not represent the current or historical operations, maintenance and configuration of the NSBLD.  In applying the original 2012 SHEP design as the no action alternative, Federal Defendants are in violation of NEPA.

216.    The NEPA regulations also require the Federal Defendants "rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated  range of reasonable alternatives are to be selected by reference to the project implemented."  Alternatives including the proposed action are "the heart of the environmental impact statement. Alternatives must include "reasonable alternatives not within the jurisdiction of the lead agency."  40 C.F.R. § 1502.14. Federal Defendants are required to use the "NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment."   40 C.F.R. § 1500.2.  NEPA and regulations at 40 C.F.R. Parts 1500 through 1508 are "applicable to and binding on all Federal agencies" including Federal Defendants. "These regulations . . . are not confined to Section 102(2)(C)(environmental impact statements)."  40 C.F.R. § 1500.3.

217.    The Federal Defendants have not complied with NEPA alternatives analysis requirements.

218.    Federal Defendants have not assessed alternatives including:

a.      Habitat enhancement. Because NOAA-NMFS and the Corps used habitat as a surrogate for species impact to mitigate for potential take for the SHEP and Biological Opinion, habitat alternatives should have been assessed. The Corps failed to consider potential enhancement for sturgeon in other areas of the Savannah River.  Assessment and enhancement in areas known to be currently utilized by sturgeon provide greater potential benefits to the species than opening a new area above the NSBLD where it is not known whether the species would use the habitat area. Habitat enhancement, opening of other habitat, removal of other obstructions, and other habitat options were

available and not considered.

b.    Fish passage alternatives.  The Federal Defendants have not assessed other passage methods that would not involve lowering the pool surface water elevation and would otherwise meet WIIN 2016.  The Federal Defendants' IEPR Report, Exhibit Q, admits and concurs that other fish passage alternatives are available but were not assessed by the Federal Defendants. The IEPR Report states "The IPAAR/SEA focuses on a rock arch rapids fishway design and does not consider a wide range of alternative fishway types that could satisfy the first provision in the 2016 WIIN Act "repair of the lock wall of the NSBLD and modification of the structure" to maintain the pool for navigation, water supply, and recreational activities and to allow safe fish passage." IEPR, Table ES-1. Additionally, the IEPR states, "The IPAAR/SEA does not consider alternatives that provide a smaller fishway with a discharge capacity less than the low end of the normal flow range, while retaining the operation of the spillway gates to maintain the upstream pool level and provide adequate discharge capacity for higher flows."  IEPR, Table ES-1. Federal Defendants admit in response to comments that there is limited data on the sturgeon and uncertainty regarding effectiveness of the Federal Defendants' proposed NSBLD Project in meeting the purpose of passing sturgeon.  See Exhibit R, Corps Response, at Response 238; *in passim.*  The IEPR report noted that many commenters had requested Federal Defendants to consider other types of fishways (aside from the rock arch rapids fishway) and that such requests were reasonable and appropriate and could be "equally or more effective."  Exhibit Q, IEPR, at Final Panel Comment 2, p. 7.

c.    Dam operational alternatives.  Federal Defendants did not assess changes in dam operations that would meet the purpose and the WIIN Act.

d.      Retaining gates.  As the IEPR report states, "one way to maintain the existing pool level would be to retain the spillway gates and provide a smaller fishway that does not convey more flow than the low end of the normal flow range (3,600 cubic feet per second [cfs])"  Exhibit Q, IEPR Report, Final Panel Comment 3, at p. 9.  Federal Defendants did not assess alternatives that would retain the NSBLD spillway gates.

e.      Additional dissolved oxygen enhancement.  Federal Defendants did not assess dissolved oxygen enhancement as a means of mitigation for the impacts of the SHEP project.

f.      Cost-effectiveness/Incremental cost analysis:  The SEA does not include a cost-effectiveness/incremental cost analysis that compares the cost of each alternative to resulting changes in habitat availability.

g.      Critical conditions:  Federal Defendants have failed to assess critical conditions impacts for each alternative, thereby underestimating effects and precluding comparison of alternative effects.

h.      Habitat:  The Federal Defendants have failed to assess effect on upstream and downstream habitat for each alternative, wetted area, depth, potential stranding areas, water quality impacts.  The IEPR report agrees stating "the alternatives analysis does not consider the differential effectiveness of each alternative at meeting the project objective of providing for utilization of upstream habitat areas."  IEPR at Table ES-1.

i.      Historic resources: The Federal Defendants have failed to assess historic resource impacts of alternatives including effects on the NSBLD itself, which is a historic resource, and numerous historic resources within the Savannah River, adjacent to the river constituting effects on those resourced, and on historical features.

j.    Economic effects.  The Federal Defendants have failed to assess economic effects of each alternative.  The IEPR states "The economic assumptions and calculation of the AACs used in the alternatives analysis **are not described in enough detail to evaluate the acceptability of the economic assumptions."**  Exhibit Q, IEPR, at Table ES-1.

k.    Augusta adopts and incorporates by reference the IEPR report assessment of deficiencies of the SEA alternatives analysis.  Exhibit Q, IEPR.

219.    In accordance with NEPA a federal entity may not predetermine outcome prior to public notice and comment and full consideration of alternatives, or applying resources to the outcome. Davis v. Mineta, 302 F.3d 1104 (10th Cir. 2002). The Federal Defendants improperly eliminated alternative 1-1 prior to close of the comment period, and other reasonable and feasible alternatives, and pre-decided it would pursue alternative 2-6D, in violation of NEPA requirements.

220.    NEPA requires analysis of effects as compared to an environmental baseline. Under NEPA, environmental baseline analyzes the effects of past and ongoing human and natural factors leading to the current status of the project and impacted area. Proper baseline is existing conditions, required to identify the environmental consequences of a proposed agency action. Am. Rivers v. FERC, 201 F.3d 1186, 1195 (9th Cir. 1999). Baseline is the status quo of existing conditions with the NSBLD in place.

221.    NEPA requires the Federal Defendants take a 'hard look' at environmental consequences and effects of the action before concluding that those impacts are insignificant or rending a decision on the action.

222.    Federal Defendants failed to take a hard look at environmental consequences and effects of the action, including:

a. Socioeconomic impacts.  The Federal Defendants did not assess impacts of removal of the NSBLD on the local and regional economy, individual landowners and businesses, and the citizenry of Augusta or on Augusta itself.  During the Federal Defendants February 2019 Field Testing damage to property was evidence, docks were affected, recreational navigability was affected and in some cases precluded. Federal Defendants have not assessed the socioeconomic impact of these effects, and effects on commercial and recreational navigation which will be curtailed or precluded altogether.   Federal Defendants did not assess impacts on water related special events in the Augusta region which will be affected and in some cases will no longer be able to be conducted.   Included in socioeconomic effects are environmental justice effects on.  Federal Defendants have no assessment of effects for the seventeen mile area upstream of the NSBLD.

b. Water supply.  The Federal Defendants did not assess impact of removal of the NSBLD on water supply, and did not adequately assess the effects and costs on existing water intakes for water supply including Augusta water intakes.

c. Recreation.  The Federal Defendants did not fully assess impact of removal of the NSBLD on recreation, including Recreational activities that Augustans currently enjoy on and along the banks of the river include: viewing, fishing, skiing, wake boarding and wake surfing, motor boating, rowing, kayaking, whitewater rafting at the shoals, long-term docking of house boats, and hosting of various water dependent events.  The variability of water levels will impact and in many cases preclude these activities, and the Federal Defendants have not assessed changes in Savannah River flow which is likely to increase following removal of the NSBLD creating additional restrictions and

safety issues.  Federal Defendants did not assess impacts on parks and recreation including the NSBLD Park which will no longer be useable following NSBLD removal, connected pathways and recreational infrastructure, the Butler Creek Trail.

d.  Fish Passage: Federal Defendants have not assessed impacts on sturgeon by the proposed design.  The IEPR study states, "Several design features of the rock structures in the arch ramp and top weir alternatives, including the Recommended Plan, pose risk of injury and a **potential lethal danger to downstream migrant sturgeons due to head-on strikes and stranding**." Exhibit Q, IEPR.  Injury and potential lethal danger to sturgeon, a species protected under the ESA, constitutes a violation of Section 9 and potential criminal act.

e.  Sturgeon characteristics and behavior.  The NSBLD project will create a "rapids style of fish passage" (SEA at 4.4.1) which is inconsistent with sturgeon behavior and life cycle information. The Federal Defendants have not assessed the efficacy of a rapid style of fish passage and likelihood of success or failure.   The IEPR Report states that the SEA does not fully assess whether upstream migrant sturgeons, particularly shortnose sturgeons, would be able to swim upstream past the selected configuration, and whether post-spawned shortnose and Atlantic sturgeons would be able to safely swim downstream between the rock arch structures in the top weir.  Exhibit Q, IEPR Report, at Final Panel Comment 8, p. 15.

f.  Water Elevations:  Modeling failed to include low flow conditions, which are the conditions that are most likely to result in reduced water level elevations.  Federal Defendants would not provide Augusta with the model, but states the flow used to evaluate the project impacts, with the exception of impacts to water supply intakes, is

5,000 cfs, the low average of the normal flow.  SEA, at 3.1.1, p. 52.  Flows lower than 5,000 cfs occur 25% of the time and are the critical condition flows, and were not assessed by Federal Defendants.

g.  Fluctuations:  Federal Defendants failed to assess effects of water fluctuations within the seventeen mile reach above the NSBLD which will experience reduced water elevations and changes in hydrology.

h.  Flooding: Federal Defendants did not assess the change and increase in flooding caused by the installation of the rock structure proposed by the NSBLD project.

i.  Habitat:  The Federal Defendants did not assess impacts on lost aquatic habitat, riparian habitat, wetland habitat, and fringe habitat which will occur as an effect of its actions.   Federal Defendants admit that they have not identified locations where spawning of sturgeon is occurring or would occur if the NSLBD Project is constructed.  Exhibit R, Corps Response, Response 238.  The Federal Defendants also did not assess habitat for the species of sturgeon it wishes to pass upstream of the NSBLD.  Modeling using the Incremental Flow Instream Methodology or an equivalent method is necessary to determined effects on wetted area, depths, potential habitat alteration, areas where circulation patterns may be affected with resultant water quality impacts, and general effect of the change presented by the NSBLD Project. Federal Defendants have not assessed effects using the USGS Physical Habitat Simulation System (PHABSIM) which is a recommended method to assess relationship between streamflow and physical habitat for various life stages of a species of fish or a recreational activity.

j.   Fisheries Impact:  The SEA contains little to no assessment of fisheries habitat and fisheries impacts following removal of the NSBLD.

k.   Sediment: Federal Defendants have not conducted analysis of sediment quality and the effects of release of sediment once the NSBLD is removed, as well as sediment transport and fate of environmental contaminants in sediment as a result of the NSLBD project.  Federal Defendants have not adequately assess sediment exposure resulting from the NSBLD project. Federal Defendants have not assessed sediment impacts and scour from the NSBLD project.

l.   Water Quality:  Federal Defendants have not assessed impacts of the NSBLD project on water quality, where the current NSBLD structure and operations provide aeration effects beneficial to water quality, as well as collection of sediment and any associated pollutants.

m.   Wetland, Fringe Wetland and sensitive riparian areas. Federal Defendants have not assessed direct, indirect and cumulative effects to wetland, fringe wetland, and sensitive riparian habitat.

n.   Groundwater elevations.  The Federal Defendants have not assessed the effect of lowered water levels in the Savannah River, loss of riparian and wetland area, and reduced flows to recharge areas as they affect groundwater and groundwater elevation and utilization.

o.   Historic resources.  The Federal Defendants have failed to fully assess effects to historic resources as required pursuant to 36 CFR Part 800 and the National Historic Protection Act (NHPA) Archaeological and Historic Preservation Act of 1974, the American Indian Religious Freedom Act of 1978, the Archaeological Resources

Protection Act of 1979, the Abandoned Shipwreck Act of 1987, and the Native American Graves Protection and Repatriation Act of 1990 ("Historic Resource Protection Laws").

p. Endangered Species. Federal Defendants omitted protected and endangered species effects in the seventeen mile area upstream of the NSBLD resulting from the lowering of water levels, change in hydrology and speed, and loss of riparian, wetlands and fringe habitat. Federal Defendants limited their assessment geographically to only those species in the immediate vicinity of the NSBLD.

q. Construction effects. Federal Defendants have not adequately assessed effects of construction, demolition, removal, in water and riparian buffer effects of construction.

r. Training Wall. The NSBLD Project would dewater the Training Wall. The Federal Defendants have not assessed the effects of dewatering and reducing water elevations around the Training Wall including effects on recreation, safety, aesthetics, habitat, water flow and supply, and other effects.

223. The Federal Defendants SEA is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law, and unwarranted by the facts to the extent the facts as follows:

a. The Federal Defendants February 2019 Field Test demonstrated that Federal Defendants modeling and assessment of effects of the action on water levels was significantly in error.

b. The Federal Defendants applied an erroneous baseline or existing water surface elevation in modeling and assessment of effects resulting in flawed and erroneous, and understated, impact analysis.

67

    c.   The IEPR documents errors in models and in elevations.  Exhibit Q, IEPR Report.

    d.   Licensed professional engineers have identified errors in water surface elevation modeling (HECRAS) which were evident during Federal Defendants' February 2019 Field Test and drawdown.  Corps modeling underestimated pool lowering by several feet in some instances, so that the observed water levels were much lower than predicted.  See Exhibit D, Comments of Augusta, Appendix C, Report on Hydraulics Methodology.  The professional engineers concluded that the hydraulic models used by the Federal Defendants "are obviously flawed and do not accurately represent the actual water surface profiles on the Savannah River, bringing into question all of the conclusions of the entire Corps Draft Report based on the flawed water surface profiles.that the hydraulic models used in the Draft Report are all flawed and do not accurately represent the actual water surface profiles on the Savannah River."    Exhibit D, Comments of Augusta, Appendix C, Report on Hydraulics Methodology, at C-9.  Engineer Richard E. McLaughlin concluded that the Federal Defendants were in error by "over 200% in the modeling accuracy."  See Exhibit D, Comments of Augusta, Appendix D-12.

    e.   Errors in water surface elevations result in errors in the analysis of the direct, indirect, and cumulative effects of the NSBLD Project.

224.   Federal Defendants failed to fully assess the effects, data and information established by Federal Defendants' February 2019 Field Test and drawdown.  Federal Defendants issued its draft report and document for public comment within two days of the completion of the Federal Defendants' February 2019 Field Test and the draft report did not

include calibration or other information from the Federal Defendants' February 2019 Field Test which demonstrated errors in the Corps modeling and assessment.

225.    The Federal Defendants failed to consider and respond to comments as required under NEPA.

226.    Federal Defendant have improperly limited the scope of effects to the geographic area surrounding the NSBLD and failed to assess direct, indirect, and cumulative effects including effects in the seventeen mile area upstream and surrounding areas.

227.    The 2017 BO similarly fails to comply with NEPA and fails to consider direct, indirect, cumulative effects, or assess a reasonable range of alternatives, and take a hard look at effects of the action.

228.    The effects of the project are significant and require Federal Defendants to prepare and issue an Environmental Impact Statement (EIS) and follow NEPA EIS procedures.

229.    Federal Defendants have not considered, proposed, or implement mitigation for the above-referenced effects, or considered avoidance and minimization of effects of the NSBLD Project.

230.    Authorizing the NSBLD Project without NEPA compliance was arbitrary and capricious and otherwise not in accordance with law.

a.    For the foregoing reasons, Plaintiffs are entitled to a declaration and order enjoining and requiring the Federal Defendants to analyze in accordance with NEPA and the APA the environmental impact of removing the NSBLD Project and replacing it with the proposed rock weir, taking a hard look at the entirety of applicable effects, avoid and minimize adverse effects, and propose and implement mitigation for effects.

    b.  Augusta is entitled to (1) a declaratory judgment, (2) a permanent injunction enjoining the Federal Defendants from proceeding with construction of the plan and removal of the New Savannah Bluff Lock & Dam (NSBLD) as set forth in the FONSI and PAAR/SEA and all actions set forth in the October 31, 2019 Notice of Availability of the Final Integrated Post Authorization Analysis Report (PAAR) and Supplemental Environmental Assessment (SEA), Fish Passage at New Savannah Bluff Lock and Dam (NSBLD), and Finding of No Significant Impact (FONSI) that evaluated proposed changes to the Fish Passage feature of the Savannah Harbor Expansion Project (SHEP) and (3) such other relief as is just, equitable, and proper.

**PRAYER FOR RELIEF**

**WHEREFORE**, Augusta prays that the Court grant the following relief:

A.    A declaration and order that the WIIN Act requires the Federal Defendants to maintain the pool level at the same depth as it existed on the date of enactment.

B.    A declaration and order that the Corps' interpretation of the WIIN Act is inconsistent with the plain language of the Act.

C.    A declaration and order that the preferred Alternative 2-6d does not comply with the WIIN Act's requirement to maintain the pool level at the same depth as it existed on the date of enactment.

D.    A declaration and order permanently enjoining the Federal Defendants from proceeding with construction of the preferred plan.

E.    A declaration and order permanently enjoining the Federal Defendants from selecting a proposed plan that does not maintain the pool level at the same depth as it existed on the date of enactment, as required by the plain language of the Act.

F.      A declaration and order that the Federal Defendants and the NSBLD Project are barred from proceeding with construction because no 401 Certification or Navigable Waters Permit have been issued by Georgia and South Carolina.

G.      A declaration and order that the Federal Defendants' decision to proceed with the NSBLD Project violates NEPA.

H.      A declaration and order permanently enjoining the Federal Defendants from proceeding with the NSBLD Project prior to conducting a proper NEPA review.

I.      An order granting such other relief as the Court may deem just and proper.

[THIS SPACE INTENTIONALLY BLANK]

Respectfully submitted this 6th day of December, 2019

BARNWELL, WHALEY, PATTERSON, AND HELMS, LLC

By: s/ John W. Fletcher
M. Dawes Cooke, Jr., Esq.  (Fed. I.D. # 288)
John W. Fletcher, Esq. (Fed I.D. # 9378)
P.O. Drawer H (29402)
288 Meeting Street, Suite 200
Charleston, SC  29401
(843) 577-7700

David M. Moore, Esq. (Ga. Bar No. 518830)
*Pro Hac Vice* Motion to be Filed
Mary Ellen Ternes, Esq. (S.C. Bar No. 0070237)
*Pro Hac Vice* Motion to be Filed
Earth & Water Law, LLC
Promenade, Suite 1900
1230 Peachtree Street, N.E.
Atlanta, Georgia 30309-3592
(404) 245-5421

Wayne Brown, Esq. (Ga. Bar No. 089655)
General Counsel, Augusta Law Department
Kayla Cooper
Ga Bar No. 846280
Augusta Law Department
520 Greene Street
Augusta, GA 30901

*Attorneys for Plaintiff/Intervenor Applicant*
*Augusta, Georgia*