**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**AIKEN DIVISION**

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA, | ) | |
| | ) | |
| SOUTH CAROLINA DEPARTMENT OF | ) | |
| HEALTH AND ENVIRONMENTAL CONTROL, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SAVANNAH RIVER MARITIME | ) | |
| COMMISSION, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C/A No. 1:19-cv-03132-RMG |
| | ) | |
| UNITED STATES ARMY CORPS OF | ) | |
| ENGINEERS; | ) | |
| | ) | |
| UNITED STATES ARMY CORPS OF | ) | |
| ENGINEERS, SAVANNAH DISTRICT; | ) | |
| | ) | |
| RYAN MCCARTHY, in his official capacity as | ) | |
| Secretary of the Army; | ) | |
| | ) | |
| LT. GENERAL TODD T. SEMONITE, in his | ) | |
| official capacity as Commanding General and | ) | |
| Chief of Engineers, U.S. Army Corps of Engineers; | ) | |
| | ) | |
| MAJOR GENERAL DIANA M. HOLLAND, in | ) | |
| her official capacity as Commanding General, | ) | |
| South Atlantic Division, U.S. Army Corps of | ) | |
| Engineers; | ) | |
| | ) | |
| and | ) | |
| | ) | |
| COLONEL DANIEL H. HIBNER, in his | ) | |
| official capacity as District Engineer, U.S. | ) | |
| Army Corps of Engineers, Savannah District, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' COMBINED MOTION FOR PARTIAL SUMMARY JUDGMENT**
**AND MEMORANDUM OF LAW IN SUPPORT**

1

Pursuant to Rule 56(b), of the Federal Rules of Civil Procedure (FRCP), and Local Rules 7.01, 7.03, 7.04, and 7.05, The State of South Carolina, South Carolina Department of Health and Environmental Control, and the Savannah River Maritime Commission (collectively "South Carolina"), by and through their undersigned counsel, submit this combined Motion for Partial Summary Judgment and Memorandum of Law in Support in the above-captioned matter.

## BACKGROUND AND FACTS

In 1932, the South Carolina General Assembly created the Savannah River Navigation Commission (Navigation Commission) for the purpose of aiding in the construction and future maintenance of the proposed channel or channels by the United States in the Savannah River below Augusta, Georgia. 1932 S.C. Acts 1190. The Navigation Commission was, among other duties, empowered to secure the purchase of land, or rights therein, for the purpose flowage rights, easements, and/or other facilities as might be required by the United States for the construction and operation of the New Savannah Bluff Lock and Dam (NSBLD). *Id*.

The Navigation Commission exercised this power by obtaining easements upon properties adjacent to the Savannah River and the proposed project site, said easements being recorded in Aiken County, South Carolina. Dkt.#1-5, Easements. The easements obtained by the Navigation Commission conveyed the perpetual right or easement to flood as may be necessary, "by the erection and operation of a dam across the Savannah River near New Savannah Bluff, Georgia, with crest control gates so operated as to maintain a pool elevation at said dam of 114.5 feet mean sea level (11.9 feet above the point of zero on the gauge located on this date at the 5th Street Bridge leading from the State of South Carolina to the City of Augusta, Georgia), except when the natural discharge of the river exceeds that elevation at that point." *Id*. The Navigation Commission thereafter conveyed these easements to the United States via deeds recorded in Aiken County,

South Carolina. *Id.* Thus, the flowage easements obtained by the Navigation Commission and transferred to the United States for the purpose of constructing and operating the NSBLD required, as an express condition of their conveyance, that the pool be maintained at 114.5 feet mean sea level.

Consistent with the flowage easements obtained, the NSBLD was constructed along the border of South Carolina and Georgia in Aiken County, South Carolina, on the Savannah River approximately 13 miles below the City of North Augusta, South Carolina (and Augusta, Georgia) in 1937 as part of a federal project on the Savannah River below Augusta/North Augusta. The purpose of the NSBLD was to assist in commercial navigation of the Savannah River from Savannah Harbor to Augusta via steamship and commercial barge, and through a channel authorized to a depth of nine feet and 90 feet wide.[1] As presently constructed, the NSBLD creates a pool that currently serves water supply users and water-related recreation activities such as boating, fishing, and rowing events, as well as tourism activities.

As a result of non-use and lack of maintenance, the NSBLD has fallen into disrepair over the years. Dkt.#1-2, SEA at p. 14. Further, since its construction, the NSBLD has prevented fish from migrating to the Augusta Shoals located on the Savannah River near the I-20 overpass, which served as historic spawning grounds for sturgeon, American shad, striped bass, and other fish species. While the 2001 Consolidated Appropriations Act added a fish passage to a rehabilitation project for the NSBLD, it also removed the estimated cost of the rehabilitation from available

---

[1] The nine-foot authorized depth of the Savannah River channel would support only the operation of commercial freight barges, not ocean-going container ships. For a point of comparison, the typical draft for a Panamax ship carrying between 3,001 and 5,100 Twenty-foot Equivalent Unit (TEU) containers, which is on the small-end of modern oceangoing container ships, is 39.5 feet. Even smaller seagoing container vessels, like feeder ships, which carry around 300 TEU containers, have a minimum draft of approximately 20 feet.

appropriations. Due to the lack of funding, the Corps has not taken any substantive steps to rehabilitate the NSBLD.

As part of the development and approval of the Savannah Harbor Expansion Project (SHEP), on November 4, 2011, the National Oceanic and Atmospheric Administration's (NOAA) National Marine Fisheries Service (NMFS) provided a biological opinion on species listed under the Endangered Species Act (ESA). Dkt.#1-6, Biological Opinion. The Biological Opinion, which included non-discretionary terms that were required to be implemented in order for the SHEP to be exempt from the prohibitions of Section 9 of the ESA, concluded that certain mitigation measures must be fulfilled to address the potential environmental impacts of the SHEP. One such mitigation measure requires construction of a fish passage at the NSBLD, some 180 miles upstream from the SHEP, to mitigate for adverse impacts to shortnose and Atlantic sturgeon caused by inner harbor dredging of the SHEP. *Id*. at 190. The Biological Opinion included as a term and condition of NOAA/NMFS' approval of the SHEP that construction of the fish passage must commence prior to or concurrently with the initiation of inner harbor dredging in the Savannah harbor and be completed within two years. *Id*. at 190. This term and condition was designed to provide simultaneous mitigation and minimization of the adverse impacts to the sturgeon habitat caused by the inner harbor dredging.

On or about December 12, 2011 and July 22, 2012, the Commission commenced state and federal litigation, respectively, related to the SHEP. Subsequently, the Corps' issued a Final Environmental Impact Statement and Final General Reevaluation Report (FEIS), the Report of the Chief of Engineers (Chief's Report), and a Record of Decision (ROD) for the SHEP. Following extensive settlement negotiations, the Corps, DHEC, the Commission, and the Georgia Ports Authority executed an agreement settling all claims related to the permitting of the SHEP. Dkt.#1-8, Settlement Agreement. As part of the Settlement Agreement, DHEC and the Commission agreed

4

to issue the requisite 401 Certificate and Construction in Navigable Waters permit for the SHEP, conditioned on compliance with certain express terms and conditions. Specifically, the Settlement Agreement provides that "[t]he Corps will comply with the terms and conditions of the Final Biological Opinion issued by the National Marine Fisheries Service on or about November 4, 2011." *Id.* at § 1.A.13. Among the terms and conditions set forth in the Biological Opinion is the requirement that construction of the fish passage commence prior to or concurrent with the initiation of inner harbor dredging. Dkt.#1-6, Biological Opinion at p. 190. The Settlement Agreement was expressly adopted and incorporated in the order of U.S. District Judge Richard Gergel issued on May 29, 2013, which dismissed the lawsuit with prejudice but expressly retained jurisdiction to enforce the terms of the Settlement Agreement. Dkt.#1-9, Settlement Order, *Savannah River Keeper v. United States Army Corps of Engineers*, No. 9:12-610-RMG (D.S.C.), Dkt.#99.

On or about June 10, 2014, Congress enacted the Water Resources Reform and Development Act of 2014 (2014 WRDA), Public Law 113-121. Section 7002(1) of the 2014 WRDA reauthorized the SHEP "to be carried out by the Secretary substantially in compliance with the plan, and subject to the conditions" described in the Chief's Report. The plan and conditions described in the Chief's Report provide for construction of a fish passage around the NSBLD along the South Carolina side of the lock and dam. Dkt.#1-7, Chief's Report. Under the SHEP plan, the lock and dam components of the NSBLD remained in place and were not removed, thus the Corps did not analyze the complete removal of the NSBLD or the impacts related to the construction of a river-wide weir structure. Instead, the Corps determined at the initial stage that complete removal of the NSBLD was not feasible due to the concerns of water supply users.

5

On or about December 16, 2016, Congress enacted the Water Infrastructure Improvements for the Nation Act (WIIN Act), Public Law 114-322.[2] Section 1319(b)(1) of the WIIN Act deauthorized the NSBLD as a federal project. Section 1319(c)(1)(A) of the WIIN Act provided the Corps with the authority to either repair or replace the lock and dam, as the Secretary determines necessary, so long as final structure is able to maintain the pool for navigation, water supply, and recreational activities, as in existence on the date of enactment. This explicit requirement was a condition for repairing or removing the lock and dam (NSBLD Project). "[O]n the date of enactment of [the WIIN] Act," according to United States Geological Survey data, the pool level was approximately 114.5 feet NGVD29 (and specifically 114.76 feet NGVD29), approximately the same level for the pool required by the flowage easements provided to the United States as a condition for the original construction of the NSBLD. This pool elevation is within the normal, standard operating range for the pool. Dkt.#1-11, USGS Gage 02196999 Water Year Summaries ((Sav. River above NSBLD) daily minimum, maximum, and mean heights for the water years 2016-2018 demonstrating a mean pool elevation of between 114 and 115 feet NGVD29, with a water year measured between October 1 and September 30).

On or about February 14, 2019, the Corps issued a Notice of Availability of a Draft Integrated Post Authorization Analysis Report and Supplemental Environmental Assessment for the Fish (Draft SEA), and Draft Finding of No Significant Impact to evaluate proposed plans for the NSBLD Project. The Draft SEA set forth the Corps' preferred plan for the NSBLD Project, which consists of constructing an in-channel fish passage consisting of a fixed crest weir with a rock ramp sloping upstream from the existing NSBLD and removal of the existing NSBLD. The proposed action would take place in part in South Carolina waters and on South Carolina's

---

[2] The WIIN Act is also referred to as the "Water Resources Development Act of 2016" per Section 1001 of the Act.

riverbed, as the project stretches across the entire width of the Savannah River and South Carolina has a sovereign claim to a portion of the river. None of the action alternatives evaluated in the Draft SEA (or the final SEA) maintained the pool elevation as it existed on or about December 16, 2016.

Upon the request of the Chairman of the Maritime Commission for clarification of the demarcation of permitting jurisdiction under South Carolina law, the South Carolina Attorney General issued an opinion on April 8, 2019. Dkt.#1-14, Attorney General Opinion. The opinion found that the NSBLD Project as proposed by the Federal Defendants was not analyzed under the EIS for the SHEP and therefore constituted a new project proposal requiring a separate Navigable Waters Permit and 401 Certification, both of which should be obtained from DHEC. *Id*. The Attorney General Opinion was transmitted to the Corps by letter dated April 9, 2019. Dkt.#1-15, Commission Letter. The Commission's letter also informed the Corps that, to the extent that the proposed removal of the NSBLD and construction of a full river rock weir under proposed Alternative 2-6d constituted a departure from the fish passage mitigation feature approved by the SHEP and thereby an entirely new proposed project, DHEC has permitting authority and jurisdiction over the NSBLD Project. *Id.*

Also on April 9, 2019, members of the South Carolina and Georgia Congressional delegations, including all four United States Senators and the respective members of Congress whose districts include the areas impacted by the NSBLD Project, sent a joint letter to the Assistant Secretary of the Army and the Commanding General of the Corps expressing their concerns regarding the Corps' preferred Alternative 2-6d. Dkt.#1-16, Congressional Letter. The stated purpose of the letter was to "express the intent of Congress for Public Law 114-322" (WIIN Act). *Id*. The letter rejected the Corps' interpretation that the WIIN Act only requires that the current functionality of the pool must continue to allow for water supply, recreation, and navigation. *Id.*

Rather, the letter reiterated that the plain language of the statute requires the Corps to "maintain the river conditions that were in place on the date of enactment." *Id.* The Congressional Letter further encouraged the Corps "to consider the intent of Congress and to only pursue an alternative that fulfills the environmental requirements of SHEP while also protecting the investments of our riverfront communities." *Id*.

Despite a second letter from the Attorney General reiterating that under South Carolina law the NSBLD Project would require a Navigable Waters Permit and 401 Certification, the Corps has not applied for either. Instead, the Corps flat out rejected the State's conclusion as to the requirements of federal and state water quality laws. Despite having no legal authority to make such a determination, the Corps responded by letter dated September 20, 2019, asserting its conclusion that no 401 Certification was needed for the NSBLD Project and that the Project is exempt from obtaining a Navigable Waters Permit. Dkt.#1-20, Corps Response.

On October 29, 2019, the Corps publicly announced and released the Integrated Post Authorization Analysis Report and Supplemental Environmental Assessment, dated August 30, 2019 (SEA). Dkt.#1-2, SEA. It also announced that Alternative 2-6d from the SEA, which calls for the removal of the NSBLD and the construction of a river-wise fixed weir structure and dry floodplain bench, was the preferred and approved option for the NSBLD. Dkt.#1-3, U.S. Army Corps of Eng'rs Mem., Maj. General Holland, Approval of Final Report, Savannah Harbor Expansion Project (SHEP), Georgia and South Carolina: Fish Passage at the New Savannah Bluff Lock and Dam (NSBLD) Integrated Post Authorization Analysis Report and Supplemental Environmental Assessment (EA), dated Oct. 29, 2019 (Approval Memo). *See also*, Dkt.#1-4, Finding of No Significant Impact, Savannah Harbor Expansion Project Fish Passage at New Savannah Bluff Lock and Dam Richmond County Georgia and Aiken County, South Carolina dated Oct. 29, 2019 (FONSI). The preferred plan, Alternative 2-6d, is expected to lower the

existing pool elevation by more than 3.5 feet, NGVD29—from approximately 114.76 NGVD29 as of the date of the WIIN Act, to approximately 111.01 NGVD29 during normal operating conditions (if one assumes the Corps' data is accurate).[3]

## STANDARD OF REVIEW

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact" and it is therefore entitled to judgment as a matter of law. Rule 56(a), FRCP. In other words, summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party seeking summary judgment has the initial burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has made this threshold demonstration, the non-moving party must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324. Under this standard, "[c]onclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence' " in support of the non-moving party's case. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (quoting *Phillips v. CSX Transp., Inc.*, 190 F.3d 285, 287 (4th Cir. 1999)).

## ARGUMENT

South Carolina is entitled to partial summary judgment as to (1) the correct interpretation of the WIIN Act, (2) the requirement that the Corps obtain a 401 Certificate and Navigable Waters Permit from South Carolina, and (3) the Corps' breach of the Settlement Agreement. There is no

---

[3] The SEA provides that the height of the rock weir will be 109 NGVD29, *see* dkt.#1-2, SEA at p. ii.; however, the Corps has not provided the underlying modeling to verify that the pool level will exceed the weir height (and thus if one measures from the weir height, the difference is approximately 5.5 feet) using the pool level measurements provided in the SEA for Alternative 2-6d at a flow rate of 3,600cfs, *see id.*, at p. 100 (Table 27) (the pool level is estimated to be approximately 111.01 NGVD29 at a flow rate of 5,000cfs).

genuine dispute as to any material fact, and South Carolina is entitled to judgment as a matter of law.

## I.    <u>This motion for summary judgment is ripe for consideration.</u>

The general rule is that a motion for summary judgment may be premature "where the nonmoving party has not had the opportunity to discover information that is essential to his opposition." *E.g. Harrods Limited v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986)); *see also* Rule 56(d), SCRCP (providing that if a party opposing a motion for summary judgment "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.").

The general rule does not apply, however, where, as here, the issue on which summary judgment is sought is a pure question of law for which discovery would serve no useful purpose. *See*, *e.g.*, *Nader v. Blair*, 549 F.3d 953, 961-62 (4th Cir. 2008) (granting summary judgment prior to discovery was appropriate where discovery was unnecessary to resolve issue before the court); *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189 (4th Cir. 2011) (affirming grant of summary judgment prior to discovery); *Auto-Owners Ins. Co., Inc. v. Zurich US*, 377 F.Supp.2d 496 (D.S.C. 2004) (summary judgment prior to discovery is appropriate for a pure question of law).

South Carolina presents questions of statutory and quasi-contract interpretation in seeking an order requiring Defendants to comply with the law. The issues raised in the declaratory judgment causes of action which are advanced in this motion do not require discovery, but are instead requests for declarations of the law. The relevant materials facts are undisputed, none of which bear on the legal questions presented. Accordingly, this motion for summary judgment is

ripe for consideration at this stage of the litigation and appropriate for disposition by the Court based on the legal arguments of the parties.

**II.**    **South Carolina is entitled to summary judgment on the WIIN Act.**

    A.    *The WIIN Act is plain and unambiguous.*

The WIIN Act unambiguously requires the Corps to maintain the pool as it existed on the date of enactment. Nonetheless, and despite the plain language of the statute, the Corps has erroneously interpreted and superimposed a lesser standard to the WIIN Act that would allow it to construct a structure at the NSBLD that merely maintains some degree of the "functionality" of the pool on the date of enactment, but not the depth of the pool. The cardinal rule of statutory interpretation is to ascertain the clear intent of Congress. *N.L.R.B. v. Wheeling Elec. Co.*, 444 F.2d 783, 787 (4th Cir. 1971). A court must look to the plain and unambiguous meaning of the statutory language without using a forced construction. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). When Congress has spoken clearly on an issue, there is no need for further interpretation. If the statute is unambiguous, "our inquiry into Congress' intent is at an end, for if the language is plain and the statutory scheme is coherent and consistent, we need not inquire further." *Sierra Club v. U.S. Army Corps of Engineers*, 909 F.3d at 645. Courts must interpret the statutory language as written and are not permitted to add words of their own choosing. *United States v. Sonmez*, 777 F.3d 684, 688 (4th Cir. 2015).

Section 1319(c)(1)(A) of the WIIN Act provides:

(i) repair of the lock wall of the New Savannah Bluff Lock and Dam and modification of the structure such that the structure is able –
        (I) **to maintain the pool for navigation, water supply, and recreational activities, as in existence on the date of enactment of this Act**; and
        (II) to allow safe passage over the structure to historic spawning grounds of shortnose sturgeon, Atlantic sturgeon, and other migratory fish; or
(ii)(I)  construction at an appropriate location across the Savannah River of a structure that is **able to maintain the pool for water supply and recreational activities, as in existence on the date of enactment of this Act**; and

(II) removal of the New Savannah Bluff Lock and Dam on completion of construction of the structure ….

(Emphasis added).

Thus, both applicable sections of the WIIN Act require that any structure must be "able to maintain the pool … as in existence on the date of enactment of this Act". WIIN Act, § 1319(c)(1). While the Secretary may determine between repairing the lock wall and modifying the NSBLD structure or constructing a new structure and removing the NSBLD, there is no discretion as to what effect either option may have on the elevation of the pool – it must be maintained as in existence on the date of enactment. *Id*. As the impacted Congressional representatives informed the Corps prior to its selection of Alternative 2-6d, "[t]he WIIN Act of 2016 allows for the modification or removal of the NSBL&D to allow for the passage of shortnose sturgeon, Atlantic sturgeon, and other migratory fish in order to mitigate the environmental impacts of the Savannah Harbor Expansion Project (SHEP) while also taking into consideration that the Corps **must maintain the river conditions that were in place** on the date of enactment." Dkt.#1-16, Congressional Letter (emphasis added).

The language of the WIIN Act is unambiguous. It is a clear declaration – maintain the pool as in existence on the date of enactment. To maintain something is to keep it as in existence. Merriam Webster, https://www.merriam-webster.com/dictionary/maintain (last visited November 8, 2019). Maintain is a transitive verb, with pool as its object. Further, this directive is attached to both of the options that Congress has left for the Secretary to choose between. Thus, Congress left no discretion for the Corps to alter the statutory mandate by requiring only that the structure maintain the "functionality" of the pool, a word that does not appear in the applicable provisions of the WIIN Act. Just as this court is prohibited from adding words of its own choosing to the statute, so too is the Corps. The statute does not require the Corps to only ensure that the pool

remains usable for navigation, water supply, and recreational purposes. Nor does it require that the pool remain functionable. Rather, it clearly requires that the pool itself be maintained as in existence on the date of the enactment. This means the pool level itself must be "maintain[ed]." The plain and unambiguous language of the WIIN Act requires that the pool be maintained as it existed on the date of enactment, and South Carolina is entitled to judgment declaring as much.

      B.     *The Corps' interpretation of the WIIN Act is not entitled to deference.*

The Corps' argument with respect to the WIIN Act requires the Court to look beyond the plain language of the statute and infer Congressional intent from words that do not appear therein. Even if the Court were inclined to look beyond the plain language of the WIIN Act, however, South Carolina is entitled to summary judgment on its request for declaratory judgment because the Corps' construction of the WIIN Act contradicts both the clear and unambiguous language of the Act, and the expressed intent of Congress that the Act requires the Corps to maintain the pool as it existed on the date of enactment. This court should review the WIIN Act *de novo* without affording deference to the Corps' erroneous interpretation that is contrary to the publicly expressed intent of Congress. Not only has Congress directly spoken to the precise question at issue, but the Corps has not acted with the force of law that would entitle its interpretation to deference. Where Congress has spoken to the precise question at issue and the intent of Congress is clear, the court as well as the agency must give effect to Congress' unambiguously expressed intent. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). Only an agency interpretation that carries the force of law is eligible for *Chevron* review. *Sierra Club v. U.S. Dep't of Interior*, 899 F.3d 260, 286 (4th Cir. 2018) (citing *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001)). "[W]hen an agency does not act with the 'force of law,' the agency action is not entitled to *Chevron* deference." *Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 643 (4th Cir. 2018) (quoting *Sierra Club v. U.S. Dep't of Interior*, 899 F.3d at 286).

An agency interpretation carries the force of law when, first, Congress has "delegated authority to the agency generally to make rules" and, second, the "agency interpretation claiming deference was promulgated in the exercise of that authority." *Sierra Club v. U.S. Dep't of Interior*, 899 F.3d at 286 (quoting *Chevron*, 533 U.S. at 226-27). Here, in addition to the fact that Congress has clearly spoken on this issue, there has been no delegation of authority to the Corps to promulgate regulations on this matter, this is not a regulation that was preceded by the notice-and-comment process, and there are no legislative hallmarks that would otherwise indicate that the Corps was speaking with the force of law. As such, the Corps' interpretation of the WIIN Act is not entitled to *Chevron* deference.

Furthermore, the interpretation is not entitled to *Skidmore* respect. An agency interpretation may be entitled to *Skidmore* respect, depending "upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). The Corps has not attempted to provide any reasoning for its erroneous interpretation of the WIIN Act or its decision to alter Congress' plain language by adding the word "functionality" to the statute. The interpretation is devoid of any statutory analysis, and is nothing more than a one-off decision that has little explanatory or persuasive power. Because the Corps' interpretation of the WIIN Act is not entitled to *Chevron* deference or *Skidmore* respect, the Court must review the statute *de novo*. *Sierra Club v. U.S. Dep't of Interior*, 899 F.3d at 288 (quoting *William v. Gonzales*, 499 F.3d 329, 333 (4th Cir. 2007)).

C.     *The WIIN Act requires the Corps to select an alternative that maintains the pool elevation.*

Because the WIIN Act requires the Corps to maintain the pool as it existed on the date of enactment, the Corps must select an alternative that maintains the pool elevation as it existed on that date. Congress did not direct the Corps to maintain only some aspects of the pool, and as discussed above, did not direct the Corps to only maintain the pool's functionality. Rather, Congress directed the Corps to maintain the pool level as it existed, including the elevation that existed on the specified date. Dkt.#1-16, Congressional Letter. To the extent that there is even a slight ambiguity to the language used by Congress, the affected Congressional representatives provided the Corps with a clear explanation of Congress' intent – maintain the pool, and the relevant river conditions, as they were on the date of enactment. As the pool elevation is a "river condition," it must be maintained. Further, Congress and the Corps are charged with knowledge of the restrictions in the flowage easements associated with the NSBLD, which require that the pool elevation remain at approximately 114.5 feet. Dkt.#1-5, Easements.

D.     *Neither Alternative 2-6d nor any other alternative reviewed by the Corps complies with the WIIN Act.*

The alternative selected by the Corps for the NSBLD Project, Alternative 2-6d, does not comply with the WIIN Act because it will lower the pool elevation substantially below 114.5 feet NGVD29. Dkt.#1-2, SEA at p. ii, 77, 100. In fact, none of the alternatives evaluated in the SEA comply with the plain language of the conditions imposed by the WIIN Act, as each of them will result in lowering the elevation of the pool. *Id*. As determined by the Independent External Peer Review (IEPR), none of the evaluated rock weir alternatives "seem to fully satisfy" the WIIN Act's requirement that the pool be maintained. Dkt.#1-18, IEPR at p. 9. Based on the conclusion that none of the evaluated rock weir alternatives fully satisfy the WIIN Act, the IEPR recommended

that the Corps reconsider whether the proposed alternatives meet the intent of the WIIN Act's requirement that the pool be maintained as in existence on the date of enactment. *Id*. at 10.

And, to make it even clearer, the affected Congressional representatives plainly told the Corps prior to it making a final selection that Alternative 2-6d did not meet the express language or intent of the WIIN Act. Dkt.#1-16, Congressional Letter. Because the WIIN Act clearly and unambiguously requires the Corps to maintain the pool elevation as it existed on the date of enactment, and because neither Alternative 2-6d nor any of the other alternatives do this, South Carolina is entitled to judgment as a matter of law that Alternative 2-6d does not comply with the WIIN Act. It is further entitled to an injunction preventing the Corps with proceeding with either the selected alternative or any other alternative that does not maintain the pool elevation as it existed on the date of enactment.

### III.    South Carolina is entitled to summary judgment on its Clean Water Act claims.

A. *The Clean Water Act waives the Federal Defendants' sovereign immunity.*

South Carolina is also entitled to summary judgment on its claim that the Clean Water Act (CWA) requires the Corps to obtain both a 401 Certification and a Navigable Waters Permit from South Carolina prior to commencing any work on the NSBLD Project. The CWA recognizes the important role states play in controlling and abating water pollution, and reflects Congress' intent for states to have the primary responsibility on issues of environmental protection. "It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter." 33 U.S.C.A. § 1251(b). The Corps seeks to undertake a project that has significant adverse environmental impacts without regard to the State's

permitting authority. However, the CWA's clear, unequivocal, and unambiguous waiver of sovereign immunity acts as a check on the Corps' ambitions.

Congress has explicitly and unambiguously waived the Corps' sovereign immunity and mandated that it comply with state water regulations. 33 U.S.C.A. §§ 1251 *et seq*. Section 313, 33 U.S.C.A. § 1323, states in pertinent part:

> (a) **Each department**, agency, or instrumentality of the executive, legislative, and judicial branches **of the Federal Government**
> (1)  having jurisdiction over any property or facility, or
> (2)  **engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants**, and each officer, agent, or employee thereof in the performance of his official duties, **shall be subject to, and comply with, all** Federal, **State**, interstate, and local requirements, **administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity** including the payment of reasonable service charges. The preceding sentence shall apply
> (A) **to any requirement whether substantive or procedural** (including any recordkeeping or reporting requirement, any requirement respecting permits and any other requirement, whatsoever),
> (B) **to the exercise of any** Federal, **State**, or local **administrative authority**, and
> (C) **to any process and sanction**, whether enforced in Federal, State, or local courts or in any other manner. This subsection shall apply notwithstanding any immunity of such agencies, officers, agents, or employees under any law or rule of law….

(Emphasis added). Section 1323 is "an unambiguous mandate applicable to the Corps and its actions" and "strips the Corps of any discretion to refuse to abide by State requirements aimed at controlling and eliminating water pollution." *Ohio v. U.S. Army Corps of Engineers*, 259 F.Supp.3d 732, 751 (N.D. Oh. 2017).

Similarly, and specific to the "discharge of dredge and fill material," Section 404(t), 33 U.S.C.A. § 1344(t), states:

> **Nothing in this section shall preclude or deny the right of any State or interstate agency to control the discharge of dredged or fill material in any portion of the navigable waters within the jurisdiction of such State**, including any activity of any Federal agency, and **each such agency shall comply with such State** or interstate **requirements both substantive and procedural** to control the discharge of dredged or fill material to the same extent that any person is subject to such requirements. This section shall not be construed as affecting or impairing the authority of the Secretary to maintain navigation.

(Emphasis added).

Further, per 33 U.S.C.A. § 1370:

> Except as expressly provided in this chapter, **nothing in this chapter shall (1) preclude or deny the right of any State** or political subdivision thereof or interstate agency **to adopt or enforce (A) any standard or limitation respecting discharges of pollutants, or (B) any requirement respecting control or abatement of pollution**; except that if an effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance is in effect under this chapter, such State or political subdivision or interstate agency may not adopt or enforce any effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance which is less stringent than the effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance under this chapter; or **(2) be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States**.

(Emphasis added).

An Executive Order in 1978 further requires the Corps to comply with South Carolina pollution abatement laws to protect the environment of the State. Executive Order 12088, *Federal Compliance With Pollution Control Standards*, dated 13 Oct. 1978 (requiring compliance of federal activities with applicable pollution control standards in the same manner as any non-federal entity). And the Corps' own policy document requires compliance with state water pollution control requirements. Exhibit A, U.S. Army Corps of Eng'rs, *Water Quality and Environmental*

*Management For Corps Civil Works Projects*, ER 1110-2-8154 at 2 ("The Corps will, at least, manage its projects in accordance with all applicable Federal and state environmental laws, criteria, and standards."). Nonetheless, the Corps bristles at any attempt by South Carolina to take action to protect its environment.

 B. *The CWA requires the Corps to obtain a 401 Certificate and Navigable Waters Permit.*

Section 404(b)(1) requires compliance with state water quality standards, and the CWA requires any applicant for a federal license or permit to conduct an activity which may result in any discharge into navigable waters, to provide to the licensing agency a certification from the state in which the discharge will originate. *Ohio v. U.S. Army Corps of Engineers*, 259 F.Supp.3d at 749 (citing 33 U.S.C.A. § 1341). The CWA requires states to make a Section 401 determination to assure compliance with water quality standards. Section 401, 33 U.S.C.A. § 1341, provides that a Federal license or permit may not be granted until the state makes such a determination:

> Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into the navigable waters, **shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate** … No license or permit shall be granted until the certification required by this section has been obtained or has been waived as provided by the preceding sentence. **No license or permit shall be granted if certification has been denied by the State**, interstate agency, or the Administrator, as the case may be.

(Emphasis added). Through this certification process, state water quality requirements take on the force of federal law, and become conditions which must be followed by federal permitting agencies. *Ohio v. U.S. Army Corps of Engineers*, 259 F.Supp.3d at 749. The Corps is thus "bound to comply with state environmental laws and certification decisions that are given federal force through the CWA and other federal environmental statutes." *Id*. at 747.

"The legislative purpose of the certification mechanism … is to assure that Federal licensing or permitting agencies cannot override State water quality requirements." *City of Olmstead Falls v. U.S. Envtl. Prot. Agency*, 266 F.Supp.2d 718, 726 (N.D. Oh. 2003). In fact, the Corps' own regulations promulgated in furtherance of the CWA recognize the importance and necessity of complying with state water quality laws. The Corps' regulations acknowledge that a state's certification decision "will be considered conclusive with respect to water quality considerations." 33 C.F.R. § 320.4(d). "Although the Corps does not process and issue permits for its own activities, the Corps authorizes its own discharges of dredged or fill material by applying all applicable substantive legal requirements." 33 C.F.R. § 336.1(a). The regulations also require the Corps to seek a state water quality certification for dredged material disposal into waters of the U.S. 33 C.F.R. §§ 336(a)(1), (b)(8). As such, there can be no question that the Corps is required by the CWA, and its own regulations, to comply with South Carolina's environmental laws.

C.    *South Carolina law requires both a 401 Certificate and Construction in Navigable Waters Permit.*

The CWA and South Carolina law are clear—federal agencies, including the Corps, are required to comply with state environmental laws. Because the CWA mandates that the Corps comply with South Carolina's water quality requirements, it must obtain a 401 Certification and a Navigable Waters Permit prior to commencing work on the NSBLD Project. As South Carolina's Attorney General opined in an opinion the Maritime Commission provided to the Corps, South Carolina law requires both a 401 Certification and a Navigable Waters Permit for this Project. Dkt.#s 1-14, 1-15. South Carolina regulations specify that "[a]ny applicant for a Federal license or permit to conduct any activity which during construction or operation may result in any discharge to navigable waters is required by Federal law to first obtain a certificate from the Department."

S.C. Code Ann. Regs. 61-101.A.2. "Certification" is defined as the certification required under

Section 401 of the CWA, 33 U.S.C.A. § 1341. S.C. Code Ann. Regs. 61-101.B.2.

Further,

> [u]nless expressly exempted, **a permit issued by the Department of Health and Environmental Control is required for any dredging, filling or construction or alteration activity in, on, or over a navigable water, or in, or in the bed under navigable waters**, or in, or on lands or waters subject to a public navigational servitude under Article 14 Section 4 of the South Carolina Constitution and 49-1-10 of the 1976 S.C. Code of Laws including submerged lands under the navigable waters of the state, **or for any activity significantly affecting the flow of any navigable water**.

S.C. Code Ann. Regs. 19-450.1.A (emphasis added). If an activity requires both a 401 Certification

and a Navigable Waters Permit, the review for the water quality certification will consider issues

of that permit and the certification will serve as the permit. S.C. Code Ann. Regs. 61-101.A.9.

Although the Federal Defendants have issued a FONSI on the NSBLD Project and

indicated that they are prepared to move forward with construction activities, they have neither

sought nor acquired the requisite state permits. The State has not waived its right to require the

permits. And, as discussed above, the CWA mandates that the Corps comply with the state's

requirements. Thus, the CWA prohibits the Corps from commencing work on the NSBLD Project

unless and until the Corps obtains them. South Carolina is entitled to judgment as a matter of law

that the CWA requires the Federal Defendants to comply with state water quality laws, including

a 401 certification and a Navigable Waters Permit, and an order prohibiting them from beginning

construction of the NSBLD Project unless and until they obtain the requisite permits.

> D.    *The 401 Certification obtained by the Corps for the SHEP and the original fish passage designed as a mitigation feature for the impacts caused by the SHEP does not apply to the NSBLD Project due to the substantial alterations made thereto.*

Because Federal and South Carolina law are clear that the NSBLD Project requires both a

Navigable Waters Permit and a 401 Certification from DHEC, South Carolina has been proactive

in its efforts to protect its sovereignty, informing the Corps that both are required. Upon the request of the Chairman of the Commission for clarification of the demarcation of permitting jurisdiction under South Carolina law, the South Carolina Attorney General issued an opinion on April 8, 2019. Dkt.#1-14, Attorney General Opinion. The opinion found that the NSBLD Project as proposed by the Federal Defendants was not analyzed under the EIS for the SHEP and therefore constituted a new project proposal requiring a separate Navigable Waters Permit and 401 Certification, and that DHEC rather than the Commission would be the appropriate permitting entity for South Carolina.

By letter dated April 9, 2019, the Attorney General Opinion was transmitted to the Corps. Dkt.#1-15, Commission Letter. In addition to transmitting a copy of the Opinion, the Commission's letter also informed the Corps that, to the extent that the proposed removal of the NSBLD and construction of a full river rock weir under proposed Alternative 2-6d constituted a departure from the fish passage mitigation feature approved by the SHEP and thereby an entirely new proposed project, DHEC has permitting authority and jurisdiction over the NSBLD Project, and asked the Corps to coordinate with DHEC for the review and processing of the required authorizations from the State of South Carolina for the newly proposed NSBLD Project. *Id.*

On April 22, 2019, South Carolina Governor Henry McMaster sent a letter to the Corps reiterating the position reached by the Attorney General Opinion that the NSBLD Project requires both a Navigable Waters Permit and a 401 Certification from DHEC. Dkt.#1-17, Governor McMaster Letter. Governor McMaster further emphasized that any removal of the NSBLD must be done in a manner that does not "lower the existing pool elevation and adversely impact the recreational uses, water supply, water quality, and navigability and also detrimentally impact property rights and economic development in South Carolina," as the "State of South Carolina must protect its natural resources and preserve the integrity of the Savannah River and the rights, investments, and property of its citizens." *Id.*

With South Carolina having received neither a response from the Corps nor an application for a Navigable Waters Permit and 401 Certification for the NSBLD Project, the Attorney General followed up with the Corps by letter dated August 12, 2019.  Dkt.#1-19, Attorney General Letter. In that letter, General Wilson inquired about the status of the Corps' request for a 401 Certification from South Carolina. He also noted the fact that the NSBLD Project requires a Navigable Waters Permit, based on the fact that construction would take place in South Carolina waters and on its riverbed, and, based on the Corps' proposal, would alter the river flow and impact the pool level. *Id.*

Notwithstanding, the Corps sought neither a Navigable Waters Permit nor a 401 Certification for the NSBLD Project from South Carolina. Instead, the Corps finally responded by letter dated September 20, 2019. Dkt.#1-20, Corps Response.  In that letter, the Corps purports to unilaterally override Federal law, as well as the expression of South Carolina law by its chief legal officer, the Attorney General, by opining that no Navigable Waters Permit or separate 401 Certification was needed for the NSBLD Project. *Id.* The Corps further asserted that the WIIN Act prohibits it from constructing a fish passage in compliance with the terms and conditions of the Settlement Agreement, this Court's Order approving the Settlement Agreement, the SHEP 401 Certification, and the SHEP Navigable Waters Permit. *Id.* Yet, the Corps has not sought an amendment or modification of the Settlement Order, the SHEP 401 Certification, or the SHEP Navigable Waters Permit.

Because the impacts of a full-river rock weir and removal of the NSBLD were not evaluated in the SHEP EIS, or by DHEC and the Maritime Commission in issuing the 401 Certification and Navigable Waters Permit for the SHEP, the Corps' purported reliance on those documents in the face of South Carolina's express directions to the contrary, is patently insufficient under the law. Accordingly, South Carolina is entitled to judgment as a matter of law that the Corps

may not rely upon the certification and permit issued to the SHEP, and instead must obtain a new

401 Certification and Navigable Waters Permit for the NSBLD.

IV.    **South Carolina is entitled to summary judgment on its claims seeking a declaration that the Corps is in violation of the Settlement Agreement.**

    A.    *The Settlement Agreement unambiguously requires compliance with the Biological Opinion.*

South Carolina is entitled to summary judgment on its claims seeking declarations that the

Corps has breached the terms of the Settlement Agreement, which Agreement and resulting Order

of this Court require the Corps to begin construction of the fish passage mitigation feature of the

SHEP prior to or concurrent with the initiation of inner harbor dredging. Settlement agreements

are binding contracts, and judicial relief may be sought to remedy the breach of one. A settlement

agreement is considered to be a contract. *Sadighi v. Daghighfekr*, 66 F. Supp. 2d 752, 759 (D.S.C.

1999) (citing *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 238, 95 S.Ct. 926 (1975)).

While this Court must apply federal common law to resolve a dispute concerning a settlement of

federal claims, it should look to the law of the forum state for well-established contract principles.[4]

*Id.* at 759, n.2.  In South Carolina jurisprudence, settlement agreements are viewed as contracts.

*Pee Dee Stores, Inc. v. Doyle*, 672 S.E.2d 799, 802 (Ct. App. 2009); *see also, Pruitt v. South*

*Carolina Med. Malpractice Liab. Joint Underwriting Ass'n*, 540 S.E.2d 843, 845 (S.C. 2001)

(enforcement of the terms of a settlement agreement is a matter of contract law).

South Carolina is entitled to summary judgment because the Settlement Agreement

between DHEC, the Commission, and the Corps unambiguously requires compliance with the

terms and conditions of the Biological Opinion, and the Corps is out of compliance with a clear

term and condition of the Biological Opinion. Summary judgment is appropriate if a contract is

---

[4] Further, the Settlement Agreement resolved both federal and state law claims.

unambiguous, and a question of law for the court. *Id.* at 803. As an initial matter, the Settlement Agreement clearly and unambiguously requires the Corps to comply with the terms and conditions of the Biological Opinion. Dkt.#1-8, Settlement Agreement § 1.A.13. In turn, the Biological Opinion clearly and unambiguously requires the Corps to begin construction of the fish passage prior to or concurrent with the initiation of inner harbor dredging and finish construction of the passage within two years (*i.e.*, prior to the completion of inner harbor dredging), in order to adequately and timely mitigate for the adverse impacts to shortnose and Atlantic sturgeon caused by the inner harbor dredging of the SHEP. Dkt.#1-6, Biological Opinion at p. 190. Thus, under the Settlement Agreement, the Corps was required to begin construction of the fish passage prior to or concurrent with the initiation of inner harbor dredging in order to be finished with same by the end of inner harbor dredging: the Corps has not complied, and, based on the inadequacies of its environmental analyses and failures to obtain the necessary certifications, permits, and flowage easements, the Corps will not be able to comply.

B.     *The Corps has breached the Settlement Agreement.*

Despite the binding requirement that it begin construction of the fish passage prior to or concurrent with the initiation of inner harbor dredging, the Corps initiated inner harbor dredging on or about September 30, 2019, several years prior to the date they propose to begin construction of the fish passage. Exhibit B, September 30, 2019 Press Release. In fact, the Corps will apparently never begin construction of the fish passage as it was envisioned by the SHEP, and does not believe it will be ready to begin construction of the NSBLD Project until January of 2021. Dkt.#1-21, October 29, 2019 Press Release; Dkt.#1-4, FONSI. Inner harbor dredging is expected to be completed by January of 2022, while construction of the NSBLD Project is expected to take approximately three years. Dkt.#1-4, FONSI. Thus, the Corps may not begin construction of the

NSBLD Project until inner harbor dredging is almost completed, and will not finish construction of the Project until approximately three years later.

As the Corps has initiated inner harbor dredging prior to and not concurrent with construction of the fish passage, it is in breach of the Settlement Agreement. The plain language of the Settlement Agreement requires it to comply with the terms and conditions of the Biological Opinion, including its requirement that construction of the fish passage begin prior to or concurrent with the initiation of inner harbor dredging. The Corps has not sought to amend the Settlement Agreement, but rather has chosen to simply ignore its obligations and commitments to the parties and this Court. However, settlement agreements are binding contracts, and the Corps may not ignore this one. The Settlement Agreement does not require that construction of the fish passage begin at some point during inner harbor dredging, or prior to the conclusion of inner harbor dredging, but rather requires the Corps to begin construction prior to or concurrent with the **initiation** of inner harbor dredging. Because the Corps has refused to comply with a clear term and condition of the Settlement Agreement, South Carolina is entitled to judgment as a matter of law that the Corps is in breach of the agreement and must comply with same. To remedy this breach, the Corps must be enjoined from conducting any inner harbor dredging until it is ready to begin construction of a properly permitted and legally compliant NSBLD Project.

### V.    The Corps must comply with the Settlement Order.

Finally, South Carolina is entitled to summary judgment on its claim that the Corps must comply with the terms of the Settlement Order issued by Judge Richard Gergel on May 29, 2013, which dismissed the lawsuit with prejudice but expressly retained jurisdiction to enforce its terms. Dkt.#1-9, Settlement Order, *Savannah River Keeper v. United States Army Corps of Engineers*, No. 9:12-610-RMG (D.S.C.), Dkt.#99. A district court has the discretion to condition the dismissal of a case upon compliance with terms and conditions as it deems proper. *Bailey v. Potter*, 498

F.Supp.2d 320 (D.D.C. 2007). Judge Gergel's Settlement Order expressly incorporated the terms of the Settlement Agreement, which requires compliance with the Biological Opinion. The Settlement Order also requires compliance with the terms and conditions of the SHEP 401 Certification and the SHEP Navigable Waters Permit, both of which require the Corps to comply with the express terms and conditions set forth in the Biological Opinion. As discussed in Section II.b, *supra*, the Biological Opinion, and thus both the Settlement Agreement and Settlement Order, clearly and unambiguously require the Corps to begin construction of the fish passage prior to or concurrent with the initiation of inner harbor dredging. Because the Corps began inner harbor dredging prior to and not concurrent with the construction of the fish passage, it has violated the Settlement Order. South Carolina is therefore entitled to a declaration requiring the Federal Defendants to comply with the Settlement Order and enjoining them from conducting any further inner harbor dredging until such time as they are ready to begin construction of the fish passage.

## <u>CONCLUSION</u>

For the reasons set forth above, South Carolina respectfully requests that its motion for partial summary judgment be granted because, based on the undisputed facts, the Corps has failed to comply with the plain language of the WIIN Act, by choosing an alternative that lowers the elevation of the pool. Moreover, the Corps has not only failed to obtain the requisite 401 Certification and Navigable Waters Permit from South Carolina, but it has openly and publicly expressed its disdain for Federal and South Carolina law and the State's permitting authority. In addition, based on the undisputed facts, the Corps has breached both the Settlement Agreement and the Settlement Order by initiating inner harbor dredging prior to and not concurrent with the construction of the fish passage.

Based on these irrefutable breaches, South Carolina respectfully requests that this Court enter an order that: (1) declares as a matter of law that the WIIN Act requires the Corps to maintain

the pool elevation at the height as of the date of its enactment, (approximately 114.5 NVGD29); (2) declares as a matter of law that Alternative 2-6d does not comply with the WIIN Act and enjoins the Corps from proceeding with either the selected alternative or any other alternative that does not maintain the pool elevation as it existed on the date of enactment; (3) declares as a matter of law that the CWA requires the Federal Defendants to comply with state water quality laws, including obtaining a 401 Certification and Navigable Waters Permit from South Carolina, and enjoins them from beginning construction of the NSBLD Project unless and until they obtain the requisite approvals; (4) declares as a matter of law that the Federal Defendants have breached the Settlement Agreement and enjoins them from performing any further inner harbor dredging until such time as they are ready to begin construction of the fish passage; and (5) declares as a matter of law that the Federal Defendants are in violation of the Settlement Order, and enjoin them from performing any further inner harbor dredging until such time as they are in compliance with same, as determined by this Court.

[SIGNATURE PAGE FOLLOWS]

Respectfully submitted,

Alan Wilson, Fed. Bar No. 10457
Robert D. Cook, Fed. Bar No. 285
T. Parkin Hunter, Fed. Bar No. 2018
**ATTORNEY GENERAL FOR
THE STATE OF SOUTH CAROLINA**
Post Office Box 11549
Columbia, South Carolina 29211-1549
agwilson@scag.gov
agrcook@scag.gov
phunter@scag.gov
(803) 734-3970

_s/Chad N. Johnston_
Randolph R. Lowell, Fed. Bar No. 9203
Chad N. Johnston, Fed. Bar No. 10813
**WILLOUGHBY & HOEFER, PA**
133 River Landing Drive, Suite 200
Charleston, South Carolina 29492
rlowell@willoughbyhoefer.com
cjohnston@willoughbyhoefer.com
(843) 619-4426

_Attorneys for the State of South Carolina, Savannah
River Maritime Commission, and the South
Carolina Department of Health and Environmental
Control_

Stephen P. Hightower, Fed. Bar No. 9591
**SOUTH CAROLINA DEPARTMENT OF
HEALTH AND ENVIRONMENTAL
CONTROL**
2600 Bull Street
Columbia, South Carolina 29201
hightosp@dhec.sc.gov
(803) 898-3350

_Attorney for the South Carolina Department of
Health and Environmental Control_

December 20, 2019
Columbia, South Carolina