**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION**

| | |
|---|---|
| STATE OF SOUTH CAROLINA,<br><br>SOUTH CAROLINA DEPARTMENT OF HEALTH AND ENVIRONMENTAL CONTROL,<br><br>SAVANNAH RIVER MARITIME COMMISSION, and<br><br>AUGUSTA, GEORGIA,<br><br>                  Plaintiffs,<br><br>v.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS;<br><br>UNITED STATES ARMY CORPS OF ENGINEERS, SAVANNAH DISTRICT;<br><br>RYAN MCCARTHY, In his official capacity as Secretary of the Army;<br><br>LT. GENERAL TODD T. SEMONITE, In his official capacity as Commanding General and Chief of Engineers, U.S. Army Corps Of Engineers;<br><br>MAJOR GENERAL DIANA M. HOLLAND, In her official capacity as Commanding General, South Atlantic Division, U.S. Army Corps of Engineers;<br><br>COLONEL DANIEL H. HIBNER, In his official capacity as District Engineer, U.S. Army Corps of Engineers, Savannah District; and<br><br>GEORGIA PORTS AUTHORITY,<br><br>                  Defendants. | C/A NO.:  1:19-cv-3132-RMG<br><br>**DEFENDANT GEORGIA PORTS AUTHORITY'S RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT** |

The Georgia Ports Authority ("GPA") by and through its undersigned counsel and pursuant

to Rule 56, Fed. R. Civ. P., and Local Civil Rule 7.06, submits this Response to the Combined

Motion for Partial Summary Judgment filed by Plaintiffs State of South Carolina, South Carolina Department of Health and Environmental Control, and Savannah River Maritime Commission ("SC Plaintiffs"). SC Plaintiffs are not entitled to summary judgment.

SC Plaintiffs purport to challenge a final decision of the United States Army Corps of Engineers (the "Corps") concerning a project involving the New Savannah Bluff Lock and Dam ("NSBLD") that, in part, is being undertaken as an environmental mitigation project for the Savannah Harbor Expansion Project ("SHEP"). But the real motivation of the SC Plaintiffs appears to be to derail the SHEP. The Court should deny the motion for summary judgment for at least the following reasons.

First, the NSBLD mitigation project is part of a Settlement Agreement involving SC Plaintiffs, the Corps, GPA and others concerning the SHEP that resolved a separate lawsuit before this Court. The Settlement Agreement has its own dispute procedures and remedies. SC Plaintiffs' motion seeks to bypass those procedures and remedies under the guise of an independent challenge to the NSBLD decision. The Court should not allow a collateral attack on the Settlement Agreement. Even if it were appropriate to attack the Settlement Agreement in this case, the NSBLD decision does not violate the Settlement Agreement, which expressly provides for adaptation.

Second, SC Plaintiffs' motion is a collateral attack on the Amended Biological Opinion issued by the National Marine Fisheries Service. The Amended Biological Opinion is a final agency action reviewable under the federal Administrative Procedures Act.[1] Such judicial review requires submission of the administrative record for the Amended Biological Opinion. The SC

---

[1] 5 U.S.C. § 706(2).

Plaintiffs have not submitted that record to the Court and for that reason, the motion should be denied.

Third, SC Plaintiffs purport to request an injunction of some unspecified scope that would enjoin the SHEP. Yet their summary judgment motion neither cites nor analyzes the factors for issuing an injunction to halt a water resource development project determined by the United States Congress and the Corps to be in the public interest. The Court should therefore deny SC Plaintiffs' request for injunctive relief.

## BACKGROUND

The SHEP is the Congressionally-authorized project to deepen the federal navigation channel of the Savannah River from a depth of 42 feet to a depth of 47 feet.[2] The Corps developed the SHEP to maintain waterborne commerce by upgrading one of the most successful national ports to allow Savannah Harbor to better serve the region and the nation by efficiently accommodating larger container ships that increasingly are calling on southeastern ports.[3] The construction and mitigation plans for the SHEP are the product of more than 16 years of study, negotiation, agreement, and authorizing legislation by Congress. Nearly half of the SHEP's $1 billion estimated project costs address environmental protection and mitigation.[4]

Construction of the SHEP is well-underway. Inner harbor dredging began on September 29, 2019. Before dredging, an oxygen injection system was constructed and operational. An intensive dissolved oxygen injection study confirmed the efficacy of the system and other related

---

[2] Public Law 106-53 § 101(b) (9).
[3] Final Environmental Impact Statement (FEIS), Savannah Harbor Expansion Project, Executive Summary (January 2012). The FEIS is publicly available on the website of the COE for the SHEP: https://www.sas.usace.army.mil/Missions/Civil-Works/Savannah-Harbor-Expansion/Final-Environmental-Impact-Statement/.
[4] COE: What is SHEP: https://www.sas.usace.army.mil/Missions/Civil-Works/Savannah-Harbor-Expansion/What-is-SHEP/.

mitigation measures. A number of other environmental mitigation measures have been completed. These measures include constructing and operating flow re-routing features in and near the Savannah National Wildlife Refuge to reduce salinity impacts to freshwater and brackish wetlands; constructing a raw water impoundment to supply the City of Savannah water treatment plant with water during periods of high chloride concentrations; acquisition and preservation of 2,245 acres of freshwater wetlands; restocking of a striped bass fishery; and recovery, documentation and curation of items of historical significance of a Civil War era iron-clad ship, the CSS Georgia. [5]

The Corps' Record of Decision supporting the decision to authorize the SHEP concludes that the SHEP would result in average annual equivalent net benefits of $228 million and a benefit-to-cost ratio of 7.3 to 1.[6]

### The Settlement Agreement.

Even though the economic benefits of the SHEP are overwhelming, several groups and parties opposed the project. SHEP opponents, including SC Plaintiffs, filed challenges in various state and federal fora, including a lawsuit in this Court captioned as *Savannah Riverkeeper v. United States Army Corps of Engineers*, No. 9:12-610-RMG (D.S.C.). *Id.*, ¶¶ 81-82. That lawsuit culminated in a negotiated resolution, the Settlement Agreement, which became a final judgment

---

[5] Final Environmental Impact Statement (FEIS), Savannah Harbor Expansion Project, Appendix C (January 2012). The FEIS is publicly available on the website of the COE for the SHEP: https://www.sas.usace.army.mil/Missions/Civil-Works/Savannah-Harbor-Expansion/Final-Environmental-Impact-Statement/.

[6] Final General Re-Evaluation Report, Executive Summary (January 2012), page vi. The Final General Re-Evaluation Report and the updated financial information is publicly available on the website of the COE at. *See* https://www.sas.usace.army.mil/Missions/Civil-Works/Savannah-Harbor-Expansion/Final-General-Reevaluation/ and Savannah Harbor Expansion Project, Frequently Asked Questions (April 7, 2017): https://www.sas.usace.army.mil/Missions/Civil-Works/Savannah-Harbor-Expansion/Final-Environmental-Impact-Statement/ . The original estimate was that the SHEP would result in $174 million in net benefits and a benefit-to-cost ratio of 5.5 to 1. That number has since been updated.

of the Court.  See Dkt. No. 1, Ex. G.  As required by the Settlement Agreement, the South Carolina Department of Health and Environmental Control (the "DHEC") issued a 401 Certification, and the Savannah River Maritime Commission (the "SRMC") issued a Navigable Waters Permit for the SHEP (collectively, the "SC Authorizations").

The Settlement Agreement also addressed the need for and consequence of approvals and authorizations from sister federal agencies.  With regard to the issues raised in the motion,  the Settlement Agreement provides that "[t]he Corps will comply with the terms and conditions of the Final Biological Opinion issued by the National Marine Fisheries Service on or about November 4, 2011." Dkt. No. 1, Ex. G, § I.A.13.  Another key provision of the Settlement Agreement states that "[t]he Corps will comply with the Monitoring and Adaptive Management Plan provided as Appendix D of the Final EIS."  Dkt. No. 1, Ex. G, § I.A.15.  For purposes of the SHEP, "adaptive management is defined as evaluating the accuracy of the predicted environmental impacts, assessing the effectiveness of the mitigation features, and modifying the project as needed to ensure the levels of environmental effects predicted in the Environmental Impact Statement (EIS) are not exceeded."[7]

The Monitoring and Adaptive Management Plan is a key element of the SHEP.  It is referenced in other authorizations and permits, including DHEC's 401 Certification, which states that "[t]he Monitoring and Adaptive Management Plan will ensure the accuracy of the predicted environmental impacts, assess the effectiveness of the mitigation features and provide for modification of the Project as needed."  Dkt. No. 1, Ex. G, Ex. A, § 7.  Likewise, the Navigable Waters Permit requires that the Corps "comply with the Monitoring and Adaptive Management Plan provided as Appendix D of the Final EIS."  Dkt. No. 1, Ex. G, Ex. B, § 17.  The inclusion of a process for collecting

---

[7] FEIS, Appendix D, Monitoring and Adaptive Management Plan, p. 1.

data and information and modifying aspects of the project based on that information establishes that the SHEP always would be an evolving project.

The Settlement Agreement provides the only remedy available in the event of a specified breach. The sole remedy available to SC Plaintiffs is termination of the Settlement Agreement. Dkt. No 1, Ex. G, §V.B. Section V.B. identifies events that may constitute a "Cause for Termination" of the Settlement Agreement. Should a "Cause for Termination" occur, a party seeking termination must send written "Notice for Impending Termination" to the allegedly defaulting party.[8] The defaulting party then has a ten-day cure period. If the default is not timely cured, a written "Notice of Termination" must be sent to the defaulting party. The Settlement Agreement will then be rescinded and treated as void between the noticing party and the defaulting party. If SC Plaintiffs terminate the Agreement, the Settlement Agreement requires them to return any escrowed funds. The noticing party and defaulting party are then restored to the same legal position each occupied prior to execution of the Settlement Agreement. None of the SC Plaintiffs has issued a written "Notice for Impending Termination" or a "Notice of Termination" as is required by the Settlement Agreement.

### The Water Infrastructure and Improvements for the Nation Act

One of the environmental mitigation projects for the SHEP concerns habitat for short-nosed sturgeon, a species listed as endangered by the United States Fish and Wildlife Service. The project involves providing a means for short-nosed sturgeon to access historic spawning grounds

---

[8] Additionally, this Court stated that "any party actively considering exercising its right to terminate the Settlement Agreement for cause shall, at least fifteen (15) days before the submission of any Notice of Impending Termination, file with the Court a report setting forth in detail any problems or concerns which may lead to the termination of the Settlement Agreement." Order Approving SHEP Settlement Agreement, Civil Action No. 9:12-610-RMG, at 3 (May 29, 2013). To GPA's knowledge, none of the SC Plaintiffs has provided such notice to the Court.

upstream of the NSBLD—a water structure in the upper Savannah River subject to Congressional authorization—through a fish passage, to reach upstream habitat. The fish passage project, as originally designed, was a structure adjacent to the NSBLD to allow the sturgeon to bypass it and was evaluated as an out-of-river bypass.

In December 2016, Congress enacted the Water Infrastructure Improvements for the Nation Act ("WIIN Act").[9] Section 1319(b)(1) of the WIIN Act de-authorized the NSBLD as a federal project. Dkt. No. 1, ¶ 92. De-authorization means Congress no longer will appropriate monies to maintain the structure. In addition, the WIIN Act required the Corps to develop an in-river fish passage at the NSBLD that would be different from the fish passage project discussed in the 2011 Biological Opinion. Dkt. No. 1, ¶ 126.

### The Biological Opinion

As noted, the National Marine Fisheries Service issued a Biological Opinion on November 4, 2011. That Opinion concluded that the SHEP had to include mitigation measures to reduce environmental impacts to shortnose and Atlantic sturgeon. Dkt. No. 1, ¶ 68. The Biological Opinion recommended construction of fish passage around the NSBLD to allow the sturgeon to reach habitat upstream of the structure. Dkt. No. 1, ¶ 71. The Biological Opinion was incorporated in the Corps' Final Environmental Impact Statement and Final General Reevaluation Report ("FEIS") for the SHEP. Dkt. No. 1, ¶¶ 74-75. This Biological Opinion is the version referenced in the Settlement Agreement, which provides that "[t]he Corps will comply with the terms and conditions of the Final Biological Opinion issued by the National Marine Fisheries Service on or about November 4, 2011." Dkt. No. 1, Ex. G, § I.A.13. Likewise, the SC Authorizations require compliance with the Final Biological Opinion. DHEC's 401 Certification, states that "[t]his certification

---

[9] Public Law 114-322. Dkt. No. 1, ¶ 92.

incorporates by reference . . . the Final Biological Opinion issued by the National Marine Fisheries Service on or about November 4, 2011.  Dkt. No. 1, Ex. G, Ex. A, § 18.a  The Navigable Waters Permit requires that the Corps "will comply with the terms and conditions of the Final Biological Opinion issued by the National Marine Fisheries Service on or about November 4, 2011."  Dkt. No. 1, Ex. G, Ex. B, § 13.

The 2011 Biological Opinion has been amended twice.  None of the SC Plaintiffs has challenged the amendments to the Biological Opinion for the SHEP, which were issued on or about September 23, 2013 (the "First Amendment") and October 13, 2017 (the "Second Amendment"), respectively.  Dkt. No. 1, ¶¶ 87,[10] and 99.[11]  The First Amendment and the Second Amendment may be referred to collectively as the "Amended Biological Opinion."

A key provision of the Second Amendment recognized that the WIIN Act would delay development of a revised fish passage eight months beyond the completion of the inner harbor dredging phase of the SHEP.  Dkt. No. 1, ¶ 101.  The Second Amendment determined that this delay would not cause "lethal effects" to sturgeon or require additional or different mitigation.  Dkt. No. 1, ¶ 104.  This conclusion is the operative finding underlying the current schedule of the fish passage construction and inner harbor dredging for SHEP.

### The Integrated Post Authorization Analysis Report

On or about February 14, 2019, in response to the WIIN Act and the amended Biological Opinion, the Corps issued a Notice of Availability of a Draft Integrated Post Authorization Analysis Report (PAAR) and Supplemental Environmental Assessment for the Fish Passage at the

---

[10] The First Amendment analyzed project effects on green sea turtles and leatherback sea turtles.
[11] Along with reviewing the impacts of the NSBLD fish passage project, the Second Amendment also addresses increased takes of green sea turtles and Atlantic sturgeon and revised the Incidental Take Statement for green sea turtles, Atlantic sturgeon, and shortnose sturgeon, providing revised Reasonable and Prudent Measures and associated Terms and Conditions.

NSBLD. Dkt. No. 1, ¶ 105. The Notice provided information on alternative projects for fish passage consistent with all of the Corps' obligations. On October 29, 2019, the Corps released the Integrated Post Authorization Analysis Report and Supplemental Environmental Assessment, selecting Alternative 2-6d as the approved option for the NSBLD project. Dkt. No. 1, ¶¶ 109-110, 128-129.

## STANDARD OF REVIEW

The standard of review for a summary judgment motion places the burden on the moving party to establish conclusively there is no material fact in dispute **and** it is entitled to judgment as a matter of law. Only then, does the non-moving party have any burden to refute the movant's contentions.

> Summary judgment is appropriate if a party "shows that there is no genuine dispute as to any material fact" and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In other words, summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). "In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities in favor of the nonmoving party." *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1008 (4th Cir. 1996). The party seeking summary judgment has the initial burden of demonstrating to the Court that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. *Id.* at 324. Rather, the non-moving party must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* Under this standard, "[c]onclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence' " in support of the non-moving party's case. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (quoting *Phillips v. CSX Transp., Inc.*, 190 F.3d 285, 287 (4th Cir. 1999)).

*Butler v. Bessinger,* Civil Action No. 4:16-3662-RMG, 2019 WL 181530, at *1 (D.S.C. Jan. 14, 2019) (denying summary judgment based on disputed material facts regarding whether the

plaintiff exhausted administrative remedies); *see also Vaughn v. SCDC*, Civil Action No. 4:09-cv-03286-RMG, 2011 WL 2896016, at*1 (D.S.C. July 20, 2011) (applying the same standard).

As shown below, SC Plaintiffs have failed to satisfy this standard. They neither establish that all material facts are undisputed nor that they are entitled to a judgment as a matter of law. The Court should therefore deny their summary judgment motion.

## ARGUMENT

SC Plaintiffs' reliance on the Settlement Agreement and the 2011 Biological Opinion to support their claims for injunctive relief must fail. First, SC Plaintiffs are limited to the remedies in the Settlement Agreement. Here, SC Plaintiffs are attempting to preserve the benefits of the Settlement Agreement without invoking the limited remedy of termination provided for in the Settlement Agreement. Even if SC Plaintiffs could properly present an alleged breach of the Settlement Agreement to this Court, they could have no reasonable expectation that the features of the NSBLD project and fish passage alternatives would not be revised from time to time. The NSBLD, including the fish passage, is a water development project, dependent on authorizations from the United States Congress. Once Congress acted to revise the project through the WIIN Act, the Corps was obligated to revise the NSBLD project. Even without the WIIN Act, it is clear that the Settlement Agreement recognized that mitigation projects and the Biological Opinion could be revised from time to time based on monitoring and new information.

Second, SC Plaintiffs' Motion for Summary Judgment constitutes an improper challenge of the Amended Biological Opinion, a final, valid and enforceable action of the National Marine Fisheries Service ("NMFS"), which is entitled to deference. SC Plaintiffs' challenge of the Amended Biological Opinion is an improper collateral attack on a final agency action.

Third, SC Plaintiffs purport to request an injunction of some unspecified scope that would enjoin the SHEP, but they have not cited or analyzed the relevant factors. The Court should therefore deny SC Plaintiffs' request for injunctive relief.

## I.     SC Plaintiffs are limited to the remedies set forth in the Settlement Agreement.

The Settlement Agreement provides the only remedies available in the event of a breach. SC Plaintiffs' request for an injunction of the SHEP violates the remedies provisions of the Settlement Agreement and is thus improper. "When parties themselves stipulate in the contract what shall be the consequences of a breach of the agreement, such stipulation, if reasonable, is controlling, and excludes other consequences." *Ancrum v. Water*, 82 S.C. 284, 64 S.E. 151 (S.C. 1909).

To resolve the SHEP Litigation, the parties entered the Settlement Agreement, stating that they "desire[d] to compromise and settle all claims which they have against each other or may have alleged against each other with regard to the Disputes upon the terms and provisions set forth herein." Dkt. No. 1, Ex. G, p. 2. Understanding that disputes over enforcement of the Settlement Agreement might occur, the parties agreed to comprehensive and specific remedies in the Agreement. Specifically, the Settlement Agreement sets forth various "Causes for Termination." Dkt. No. 1, Ex. G, Section V.B.1. Should one of these "Causes for Termination" occur, the party seeking termination must send a written "Notice of Impending Termination" that includes an explanation of the reason for the termination. Dkt. No. 1, Ex. G, Section V.B.2. If the Cause for Termination is not cured within 10 days, any party may issue a written "Notice of Termination." Dkt. No. 1 Ex. G, Section V.B.2. Any Notice of Termination would terminate the Agreement and provide a right to pursue "an action in the United States District Court for the District of South Carolina alleging all claims and defenses of all Parties in the pending litigation

and…the right to assert any and all additional claims and defenses," including "the right to file any and all claims arising from the construction of the SHEP." Dkt. No. 1 Ex. G, Sections V.B.3-V.B.5. This right is not available until the Settlement Agreement is terminated. If the SC Plaintiffs terminate the Agreement, any escrowed funds paid under the Settlement Agreement are to be returned to GPA. Dkt. No. 1 Ex. G, Sections V.B.3-V.B.5.

No party to the Settlement Agreement, including any of SC Plaintiffs, has sent a Notice of Impending Termination or Notice of Termination, and the Settlement Agreement thus remains in effect. SC Plaintiffs' request for an injunction, which seeks to stop "construction of the SHEP," is plainly barred by the remedies available in the Settlement Agreement, revealing that this litigation is an improper vehicle SC Plaintiffs' have employed to keep the benefits of the Settlement Agreement without honoring their obligations.

## II. Compliance with the Amended Biological Opinion does not constitute a breach of the Settlement Agreement, and SC Plaintiffs have no reasonable expectation that features of the NSBLD would not be revised based on new information.

SC Plaintiffs mistakenly contend they have a legally enforceable expectation that the fish passage features of the NSBLD mitigation project discussed in 2011 would not change. Any such expectation is not reasonable under the circumstances, does not support SC Plaintiffs' claims for breach of the Settlement Agreement and, more importantly, is not legally enforceable.

First, the parties to the Settlement Agreement understood the fish passage project described in the 2011 Biological Opinion constituted a water resource development project that required authorization from the United States Congress in order to be constructed. Here, Congress enacted the WIIN Act in 2016, which authorized a different remediation for the NSBLD fish passage than the project described in the 2011 Biological Opinion referenced in the Settlement Agreement. As a result, it was necessary to amend the features of the fish passage to meet the requirements established by Congress.

Neither the Settlement Agreement parties nor the Court may prohibit a subsequent session of the United States Congress from authorizing a different NSBLD fish passage mitigation project as part of managing the navigable waters of the upper Savannah River. The United States Supreme Court has held that a subsequent act of Congress authorizing a water resource project in navigable waters supersedes prior statutes and a prior judicial decrees regarding the project. *See Pennsylvania v. Wheeling & Belmont Bridge Co.*, 59 U.S. 421 (1855) (allowing Congress's subsequent authorization for a water resource project that had previously been enjoined as a nuisance to proceed). Even if SC Plaintiffs are correct that the Settlement Agreement required a different mitigation project from the project authorized by the WIIN Act, the Court must enforce the statutorily authorized project. To the extent the NSBLD project is inconsistent with the Settlement Agreement, the legislation supersedes the Settlement Agreement and corresponding final order of the district court in *Savannah Riverkeeper v. U.S. Army Corps of Engineers*, Civ. Action No. 9:12:610-RMG (D.S.C. May 29, 2013) under the holding of *Pennsylvania v. Wheeling & Belmont Bridge Co.* and is a lawful and valid project.

Additionally, the WIIN Act required changes to the original fish passage plan, making it impossible for the original plan to be implemented, thereby discharging the Corps' obligation to implement the original fish passage plan. Where a party's contractual obligation, such as an obligation in a settlement agreement, becomes impractical or impossible in light of a change in law, the party's performance of that obligation is discharged. *See Kansas City, Missouri v. Kansas City, Kansas*, 393 F. Supp. 1, 7 (W.D. Mo. 1975) (holding that a party's contractual obligation was discharged by a subsequent federal statute making the obligation impossible to perform without facing significant burden); Restatement of the Law – Contracts § 264; 30 Williston on Contracts § 77:57 (4th ed.).

13

Second, even without the WIIN Act project, the Court should reject SC Plaintiffs' argument that the Settlement Agreement established a fixed fish passage project and that a failure to implement that former project results in a breach of the Settlement Agreement. That fish passage project was subject to the general requirements of SHEP, which includes the active Monitoring and Adaptive Management Plan. Further, compliance with the Monitoring and Adaptive Management Plan is a substantive requirement of the Settlement Agreement. A Monitoring and Adaptive Management Plan, by its essential nature, assumes mitigation projects will be revised from time to time based on monitoring data and other new information. SC Plaintiffs have not established as a matter of law, as they must, that the features of the proposed fish passage at the time of the Settlement Agreement were exempt from the Monitoring and Adaptive Management Plan, or that modifying the mitigation project based on such information violates the letter or spirit of the Settlement Agreement.

The Biological Opinion has been amended two times, including to address the WIIN Act. Neither amendment was unexpected, and the Settlement Agreement parties and other stakeholders never challenged either amendment because both were part of the expected evolution of the project under the Monitoring and Adaptive Management Plan. This ongoing review and modification defeats SC Plaintiffs' claim that it had a legally enforceable expectation of a specific mitigation project.

Third, the Corps' final decision on the features of the fish passage project must meet the requirements established by the WIIN Act as well as the Amended Biological Opinion. Following passage of the WIIN Act, the NMFS again reopened its consultation process which culminated in a second Amended Biological Opinion. The current Amended Biological Opinion sets forth the terms and conditions of a remediation project for the NSBLD fish passage project that will comply

and implement all applicable laws while achieving the key objective of protecting short-nosed sturgeon. The Corps has an affirmative legal obligation to implement the recommended project that complies with the Amended Biological Opinion that implements the WIIN Act.

Fourth, a requirement to comply with an outdated Biological Opinion produces nonsensical results. The Biological Opinion has been amended twice and the revised fish passage is only one part of the revised and enhanced mitigation measures. If the terms of the Settlement Agreement limited the Corps to only implementing the mitigation measures in the 2011 Biological Opinion, the Corps would not only be limited in complying with the requirements of the WIIN Act, but the Corps also would be prevented from implementing other biological enhancements to mitigation projects that have nothing to do with the fish passage. Under SC Plaintiffs' reasoning, the Corps would be in violation of the Settlement Agreement for any revision to any mitigation feature, even if that mitigation feature is more protective, revealing the flaw in that reasoning.

Further, the Settlement Agreement does not require the Corps to seek an amendment to the Settlement Agreement every time a mitigation measure is revised or improved. Rather, the requirement to implement the Monitoring and Adaptive Management Plan anticipates that such changes will be made as a matter of course as the plans and programs are implemented.

III.    **SC Plaintiffs' Motion for Summary Judgment constitutes an improper challenge of the Amended Biological Opinion, a final, valid and enforceable agency action.**

This lawsuit is an impermissible collateral attack on the Amended Biological Opinion, which specifically authorizes the final NSBLD project selected by the Corps. The Amended Biological Opinion is a final agency action of the NMFS. The Opinion is binding and impacts the

scope of the NSBLD remediation project and fish passage.[12]  The undisputed fact that the Amended Biological Opinion is a final agency action raises several legal issues fatal to SC Plaintiffs' motion.

First, as a final agency action, the Amended Biological Opinion is entitled to deference and should be overturned only if found to be arbitrary and capricious or an abuse of discretion as a challenge under the federal Administrative Procedures Act.[13]  In determining whether the final agency action should be upheld, a reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."[14]  The reviewing court's inquiry must be "thorough," but "the standard of review is highly deferential; the agency's decision is entitled to a presumption of regularity, and [the court] may not substitute [its] judgment for that of the agency."[15]  Although a court's review is deferential, the court "must engage in a careful, searching review to ensure that the agency has made a rational analysis and decision on the record before it."[16]  SC Plaintiffs have not alleged such facts, much less demonstrated those facts are undisputed.  Nor could they based on the current record.  SC Plaintiffs make no reference to the administrative record supporting the Amended Biological Opinion.

Second, the need for deference to the final decision of the NMFS and the need to identify specific aspects of the administrative record that establish the final decision is arbitrary and capricious is particularly important here.  A biological opinion requires a "high degree of technical expertise," which is why courts are deferential to "the informed discretion of the responsible

---

[12]  *Bennett v. Spear*, 520 U.S. at 173-74.

[13]  5 U.S.C. § 706(2); *Bennett v. Spear*, 520 U.S. at 173-74; *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205-06 (9th Cir. 2004).

[14]  *Id.* (quotation marks and citation omitted)

[15]  *Id.* (quotation marks and citation omitted).

[16]  *Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 927 (9th Cir. 2007).

federal agencies."[17]    Moreover, review is limited to the administrative record.[18]    Under these circumstances, unsubstantiated allegations are not sufficient to overturn the Amended Biological Opinion.

Third, NMFS is the federal agency issuing the Amended Biological Opinion and it is thus a proper and indispensable party in this litigation.  The nub of SC Plaintiffs' lawsuit is that NMFS has allowed a remediation project and schedule that the SC Plaintiffs now contest.  A lawsuit against only the Corps, and not NMFS, is a collateral attack on the final Biological Opinion, which is not permissible.  Federal district courts should not allow collateral attacks on final agency action.[19]    Federal courts have not allowed citizen groups to use their citizen suit rights to initiate collateral attacks on permitting decisions by the United States Environmental Protection Agency.[20]    The Amended Biological Opinion is the equivalent of the permitting decision in these cited cases in that it is an independent agency action subject to review by courts under an independent statute and review procedure.    The Court should not bypass that long-standing procedure for administrative review to permit the SC Plaintiffs' improper collateral attack here.

Fourth, the Corps does not have discretion to approve a project that deviates from the final Amended Biological Opinion.   The Corps must conform its actions to then final Biological

---

[17] *March v. Or. Nat. Res. Council,* 490 U.S. 360, 377 (1989) *quoting Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976).

[18]  *Karuk Tribe v. U.S. Forest Serv. ̦* 681 F.3d 1006, 1012 (9th Cir. 2012)(en banc).

[19] *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 48-50 (1938) (NLRB order not subject to collateral attack); *Davis v. Horry County Council*, Case No. 4:17-cv-391-DCC, 2019 WL 3407121, *5 (D.S.C. July 25, 2019) (FAA decision not subject to collateral attack); *Grand Canyon Trust v. Public Service Co. of New Mexico*, 283 F. Supp.2d 1249, 1253 (D. N. Mex. 2003) (EPA decision that an air emission permit was not required not subject to collateral attack through a citizen suit).

[20] *Grand Canyon Trust*, 283 F. Supp.2d at 1253 *citing Chemical Weapons Working Group, Inc. v. United States Dep't of the Army*, 111 F.3d 1485, 1492 (10th Cir. 1997); *Greenpeace Inc. v. Waste Tech. Indus.*, 9 F.3d 1174 (6th Cir. 1993).

Opinion. A failure to comply with the final Amended Biological Opinion may subject the Corps to a Section 9 "take" claim under the Endangered Species Act.[21] For purposes of the Corps' decision-making, the Amended Biological Opinion is a valid and enforceable final agency action that the approved project must satisfy.

SC Plaintiffs' collateral attack on the Amended Biological Opinion must fail. The Corps' implementation of the valid Amended Biological Opinion is not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law. In fact, the Court should determine the opposite and uphold the Corps' decision as valid and lawful. NMFS appropriately amended the Biological Opinion to conform to intervening legislation, the WIIN Act. SC Plaintiffs never challenged the Amended Biological Opinion. That failure means the Amended Biological Opinion is a valid, enforceable final agency action, which the Corps properly implemented. Thus, the actions by the Corps regarding the Integrated Post Authorization Analysis Report (PAAR) and Supplemental Environmental Assessment for the fish passage project at the NSBLD also are lawful and valid agency actions.

## IV.    SC Plaintiffs' claims are premature as the administrative record has not been entered before the Court.

Federal courts' review of agency action is based on the record before the agency. 5 U.S.C.A. § 706 (instructing courts, when reviewing agency action, to "review the whole record"); *Nat'l Wildlife Fed. v. U.S. Army Corps of Engineers*, 384 F.3d 1163, 1170 (9th Cir. 2004) ("A reviewing court must review the administrative record before the agency at the time the agency made its decision."); *Gyorgy v. C.I.R.*, 779 F.3d 466, 473 (7th Cir. 2015) ("Judicial review of an administrative    decision    is    ordinarily    confined    to    the    record    that    was    before    the

---

[21] 16 U.S.C. §§ 1536, 1538; 50 C.F.R. § 402.15; *see also Bennett v. Spear*, 520 US 154, 169 (1997) (a Biological Opinion has a "powerful, coercive effect" on federal agencies).

agency.")  "Summary judgment is the mechanism for deciding whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the [Administrative Procedure Act] standard of review."  *Kingman Park Civic Assoc. v. Gray*, 27 F. Supp. 3d 171 (D.D.C. 2014).

As discussed above, this litigation is a challenge to the Biological Opinion, albeit a procedurally improper one.  Any challenge to the Biological Opinion must be based on the administrative record created as part of NMFS's decision-making.  The administrative record before NMFS, however, has not yet been assembled in this litigation, making it impossible for the Court to evaluate the Biological Opinion.  Because SC Plaintiffs do not address the Biological Opinion's administrative record and are not seeking a determination under the Administrative Procedures Act, the court should deny SC Plaintiffs' motion.

**V.  SC Plaintiffs have not established that inner harbor dredging should be enjoined.**

In their Motion for Partial Summary Judgment, SC Plaintiffs state vaguely that they are "entitled to a declaration requiring the Federal Defendants to comply with the Settlement Order and enjoining them from conducting any further inner harbor dredging until such time as they are ready to begin construction of the fish passage."  Dkt. No. 12 at 27.  Yet the SC Plaintiffs have failed to establish that they are entitled to summary judgment on the issue of an injunction.

General equitable principles govern the grant of an injunction.  *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  Assuming that SC Plaintiffs seek a permanent injunction, because they are seeking an injunction as part of a summary judgment motion, they must satisfy a four-factor test to obtain such relief.  A movant must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the parties, a remedy in equity is warranted; and (4)

that the public interest would not be disserved by a permanent injunction. *Id.* Injunctive relief is "an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." *Holland America Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985).

SC Plaintiffs have neither cited the relevant factors nor presented any arguments related to these factors. It follows that they have failed to carry their burden to show clearly that they are entitled to injunctive relief.

But even if SC Plaintiffs had included a discussion of the relevant factors, they could not demonstrate that they are entitled to an injunction. This is because their primary reason for requesting an injunction of inner harbor dredging is that SC Plaintiffs allege that the construction of the fish passage will not occur according to the timeline they believe the Settlement Agreement requires. While GPA contends that the Settlement Agreement has not been violated (except by SC Plaintiffs' failure to invoke the Settlement Agreement's remedies provisions), even if it had been, SC Plaintiffs cannot seek the extreme relief of an injunction because of a construction timing issue. An injunction "is not a remedy which issues as of course," or "to restrain an act the injurious consequences of which are merely trifling." *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982). Rather, "[a]n injunction should issue only where the intervention of a court of equity 'is essential in order effectually to protect property rights against injuries otherwise irremediable.'" *Id.*

SHEP is a comprehensive public infrastructure project that has been carefully vetted and for which significant funds have been invested. There is no question that there will be a fish passage at the NSBLD; the only question is what the final NSBLD structure will be. The SC Plaintiffs cannot be entitled to injunction of the SHEP, a wholly separate project, because of a dispute over the NSBLD, a dispute which they in part created.

**VI.**      **No injunction should issue without a multi-million dollar bond.**

To the extent Plaintiffs are seeking a preliminary injunction, they must issue a bond sufficient to cover costs in the event the injunction is determined to have been improper.  Rule 65(c) provides that "[t]he court may issue a preliminary injunction…order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoyed or restrained.  Fed. R. Civ. P. 65(c).  If SC Plaintiffs could satisfy their burden to show that they are entitled to injunctive relief, they would need to post a multi-million dollar bond because dredging equipment was deployed and inner harbor dredging began in September.  To halt the progress of the inner harbor dredging would create significant costs for each day that dredging is stopped or delayed.

## CONCLUSION

SC Plaintiffs are not entitled to summary judgment, because they are limited to the remedies set forth in the Settlement Agreement; the Settlement Agreement has not been breached; their motion is an improper collateral attack on the Amended Biological Opinion; the administrative record is not before this Court, making review impossible; and they have not established the required elements for an injunction.

|  | *s/ Rita Bolt Barker*       |
|---|---|
|  | Rita Bolt Barker (USDC FED ID No. 10566) |
|  | Gregory J. English (USDC FED ID No. 5737) |
|  | **WYCHE, P.A.** |
|  | 200 East Camperdown Way |
|  | Greenville, SC  29601 |
|  | Email: rbarker@wyche.com |
|  | gengish@wyche.com |
|  | Telephone: (864) 242-8200 |
|  | Facsimile: (864) 235-8900 |
|  |  |
|  | *Attorneys for Intervenor-Defendant Georgia Ports Authority* |

|  | Of Counsel:<br><br>Susan H. Richardson (Admitted **Pro Hac Vice**)<br>Ronald L. Raider (Admitted **Pro Hac Vice**)<br>**KILPATRICK TOWNSEND &**<br>**STOCKTON, LLP**<br>1100 Peachtree Street,<br>Suite 2800<br>Atlanta, GA 30309<br>Telephone: (404) 815-6500<br>Facsimile: (404) 815-6555<br>srichardson@kilpatricktownsend.com<br>rraider@kilpatricktownsend.com<br><br>Paul H. Threlkeld (Admitted **Pro Hac Vice**)<br>Special Assistant Attorney General<br>**OLIVER MANER LLP**<br>Post Office Box 10186<br>Savannah, Georgia 31412<br>(912) 236-3311<br>pht@olivermaner.com |
|---|---|
| February 13, 2020 |  |