**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION**

| | |
|---|---|
| STATE OF SOUTH CAROLINA, SOUTH CAROLINA DEPARTMENT OF HEALTH & ENVIRONMENTAL CONTROL, and SAVANNAH RIVER MARITIME COMMISSION,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS, UNITED STATES ARMY CORPS OF ENGINEERS SAVANNAH DISTRICT, RYAN McCARTHY, in his official capacity as Secretary of the Army, LT. GENERAL TODD T. SEMONITE, in his official capacity as Commanding General and Chief of Engineers, U.S. Army Corps of Engineers, MAJOR GENERAL DIANA M. HOLLAND, in her official capacity as Commanding General, South Atlantic Division, U.S. Army Corps of Engineers, and COLONEL DANIEL H. HIBNER, in his official capacity as District Engineer, U.S. Army Corps of Engineers, Savannah District,<br><br>Defendants. | Civil Action No. 1:19-cv-03132-RMG |

**FEDERAL DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 2

    A.    The New Savannah Bluff Lock and Dam .............................................. 2

    B.    The Savannah Harbor Expansion Project ............................................ 3

    C.    The WIIN Act and Subsequent NEPA Analysis .................................... 4

    D.    Present Litigation ................................................................................ 6

STANDARD OF REVIEW ................................................................................................ 6

ARGUMENT ..................................................................................................................... 8

    I.    The United States Has Not Waived Sovereign Immunity ...................................... 8

        A.    There Is No Waiver Under The Administrative Procedure Act For Claims 1-5. ............................................................................................. 10

            i.    Claim 1: Implementation Of The Fish Passage Pursuant to the WIIN Act Is Committed To Agency Discretion By Law. ............ 11

            ii.    Claims 3 and 5: The APA Does Not Provide a Waiver of Sovereign Immunity for Plaintiffs' Claim that the Corps is Not in Compliance with the Terms of the Settlement Agreement. .......... 12

            iii.    Claim 4: Plaintiffs Have An Adequate Remedy Under The Tucker Act. ................................................................................................. 14

                a.    The Court cannot order specific performance against the federal government. ................................................... 16

            iv.    Claim 2: There Is No Waiver  Under The CWA or APA. ............. 17

    II.    Plaintiffs Fail To State A Claim Upon Which Relief Could Be Granted. ............ 21

        A.    The Declaratory Judgment Act Is Not An Independent Cause Of Action. ................................................................................................... 21

        B.    Plaintiffs' Request For A Declaratory Judgment Interpreting The WIIN Act (Claim 1) Fails As A Matter Of Law. ...................................... 22

            i.    The WIIN Act does not provide a private right of action ............. 22

ii.     The WIIN Act does not require that the Corps maintain the pool at
        a precise elevation. ...................................................................... 24

        a.      The Congressional letter Plaintiffs cite is irrelevant. ........ 29

        b.      If the Court finds that the WIIN Act is ambiguous,
                the Corps' interpretation is entitled to deference. ............. 31

iii.    The Corps' selected proposal complies with the plain terms of the
        WIIN Act. .................................................................................... 32

C.      Claim 2 Fails As A Matter Of Law Because South Carolina
        Provided All Necessary Permits For SHEP Including Mitigation
        Measures. ................................................................................................ 33

D.      Claims 3 and 5 Fail As A Matter Of Law Because The Contested
        Term Is Contrary To Law And Cannot Be Enforced. ............................... 39

E.      Plaintiffs' Request For A Declaratory Judgment Interpreting The
        Flowage Easements (Claim 4) Fails As A Matter Of Law. ...................... 44

        i.      The Declaratory Judgment Act is not an independent cause of
                action. ........................................................................................... 45

        ii.     The flowage easements do not require that the Corps maintain the
                pool at 114.5 feet mean sea level. .................................................. 45

CONCLUSION ..................................................................................................... 48

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Bain,*
  697 F.2d 1213 (4th Cir. 1982) .................................................. 6

*Alexander v. Sandoval,*
  532 U.S. 275 (2001)............................................................... 22

*Am. Canoe Ass'n v. EPA,*
  30 F. Supp. 2d 908 (E.D. Va. 1998) ........................................ 21

*Am. Rivers v. NMFS,*
  126 F.3d 1118 (9th Cir. 1997) ................................................ 44

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986)................................................................. 7

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)................................................................. 7

*Atkinson v. Carolina Power & Light Co.,*
  239 S.C. 150 (1961)............................................................... 46

*Basel Action Network v. Mar. Admin.,*
  370 F. Supp. 2d 57 (D.D.C. 2005) .......................................... 19

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 554 (2007)............................................................. 6, 7

*BFP v. Resolution Tr. Corp.,*
  511 U.S. 531 (1994)............................................................... 23

*Binkley v. Rabon Creek Watershed Conservation Dist. of Fountain Inn,*
  348 S.C. 58 (Ct. App. 2001) .................................................. 46

*Blind of Del. Cty. Valley, Inc. v. Regan,*
  709 F.2d 1521 (D.C. Cir. 1983) ............................................. 13

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986)................................................................. 7

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
  467 U.S. 837 (1984)............................................................... 31

*Circuit City Stores, Inc. v. EEOC,*
  75 F. Supp. 2d 491 (E.D. Va. 1999) ......................................... 9

*City of Imperial Beach v. Int'l Boundary & Water Comm'n,*
  356 F. Supp. 3d 1006 (S.D. Cal. 2018).................................... 19

*Clear Sky Car Wash LLC v. City of Chesapeake, Va.*,
  743 F.3d 438 (4th Cir. 2014) ................................................................. 22

*Clinton v. City of New York*,
  524 U.S. 417 (1998) ............................................................................. 28

*Coggeshall Dev. Corp. v. Diamond*,
  884 F.2d 1 (1st Cir. 1989) ............................................................... 15, 16

*Colautti v. Franklin*,
  439 U.S. 379 (1979) ............................................................................. 27

*Conn. Nat'l Bank v. Germain*,
  503 U.S. 249 (1992) ............................................................................. 26

*Cont'l Can Co. v. Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.)*
  *Pension Fund*,
  916 F.2d 1154 (7th Cir. 1990) ................................................. 29, 30, 31

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) ............................................................................... 6

*Deschutes River All. v. Portland Gen. Elec. Co.*,
  249 F. Supp. 3d 1182 (D. Or. 2017) ..................................................... 18

*Discover Bank v. Vaden*,
  396 F.3d 366 (4th Cir. 2005) ......................................................... 23, 26

*Duncan v. Walker*,
  533 U.S. 167 (2001) ............................................................................. 25

*E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*,
  213 F.3d 175 (4th Cir. 2000) ................................................................. 7

*Envtl. Def. Fund v. Tidwell*,
  837 F. Supp. 1344 (E.D.N.C. 1992) ..................................................... 21

*Farmer v. United States*,
  No. 3:17-cv-956, 2018 WL 1365797 (D.S.C. Mar. 16, 2018) ..................... 9, 15, 16

*FDIC v. Meyer*,
  510 U.S. 471 (1994) .......................................................................... 8, 10

*Fla. Dep't. of State v. Treasure Salvors, Inc.*,
  458 U.S. 670 (1982) ............................................................................. 16

*Food Mktg. Inst. v. Argus Leader Media*,
  139 S. Ct. 2356 (2019) ......................................................................... 24

*Friends of DeReef Park v. Nat'l Park Serv.*,
  No. 2:13-cv-03453-DCN, 2015 WL 12807800 (D.S.C. May 27, 2015) ................................... 9

*GE Inv. Private Placement Partners II v. Parker*,
  247 F.3d 543 (4th Cir. 2001) ................................................................................................. 7

*Gillis v. U.S. Dep't of Health & Human Servs.*,
  759 F.2d 565 (6th Cir. 1985) ............................................................................................... 13

*Gonzaga Univ. v. Doe*,
  536 U.S. 273 (2002) ...................................................................................................... 22, 23

*Grand Canyon Tr. v. U.S. Bureau of Reclamation*,
  691 F.3d 1008 (9th Cir. 2012) ............................................................................................. 44

*Griffin v. Oceanic Contractors, Inc.*,
  458 U.S. 564 (1982) ............................................................................................................ 28

*Hallstrom v. Tillamook Cty.*,
  493 U.S. 20 (1989) ....................................................................................................... 18, 40

*Hammond v. United States*,
  No. CIV.A. 1:13-00139, 2014 WL 1277892 (D.S.C. Mar. 27, 2014) ................................... 10

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ..................................................................................................... 11, 12

*Hitachi Metals, Ltd. v. Quigg*,
  776 F. Supp. 3 (D.D.C. 1991) ............................................................................................. 14

*Hughes Aircraft Co. v. Jacobson*,
  525 U.S. 432 (1999) ............................................................................................................ 24

*Idaho Dep't of Fish & Game v. NMFS*,
  56 F.3d 1071 (9th Cir. 1995) ............................................................................................... 44

*In re Operation of the Mo. River Sys. Litig.*,
  418 F.3d 915 (8th Cir. 2005) ............................................................................................... 19

*Info. Sys. & Networks Corp. v. U.S. Dep't of Health & Human Servs.*,
  970 F. Supp. 1 (D.D.C. 1997) ............................................................................................. 16

*Kanemoto v. Reno*,
  41 F.3d 641 (Fed. Cir. 1994) ............................................................................................... 15

*Kell v. Oppenlander*,
  154 Or. App. 422 (1998) ...................................................................................................... 47

*Kentucky v. Graham*,
  473 U.S. 159 (1985) .............................................................................................................. 8

v

*King v. Burwell,*
    135 S. Ct. 2480 (2015) ........................................................................................ 24

*Kofa v. U.S. INS,*
    60 F.3d 1084 (4th Cir. 1995) ....................................................................... 30, 31

*Lane v. Pena,*
    518 U.S. 187 (1996) ................................................................... 8, 10, 17, 19

*Larson v. Domestic & Foreign Commerce Corp.,*
    337 U.S. 682 (1949) .......................................................................................... 16

*Lethin v. United States,*
    583 F. Supp. 863 (D. Or. 1984) ..................................................................... 47

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ............................................................................................ 6

*Madison–Hughes v. Shalala,*
    80 F.3d 1121 (6th Cir. 1996) ......................................................................... 11

*Menominee Indian Tribe of Wisconsin v. Envtl. Prot. Agency,*
    947 F.3d 1065 (7th Cir. 2020) ....................................................................... 12

*Morales v. Trans World Airlines, Inc.,*
    504 U.S. 374 (1992) .......................................................................................... 18

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
    545 U.S. 967 (2005) .......................................................................................... 31

*New Cingular Wireless PCS, LLC v. Finley,*
    674 F.3d 225 (4th Cir. 2012) ......................................................................... 29

*Newport News Shipbuilding & Dry Dock Co. v. Howard,*
    904 F.2d 206 (4th Cir. 1990) ......................................................................... 31

*North Dakota v. U.S. Army Corps of Eng'rs,*
    270 F. Supp. 2d 1115 (D.N.D. 2003) ........................................................... 19

*Nw. Res. Info. Ctr. v. NMFS,*
    56 F.3d 1060 (9th Cir. 1995) ......................................................................... 40

*Papasan v. Allain,*
    478 U.S. 265 (1986) ............................................................................................ 7

*Plott v. Justin Enterprises,*
    374 S.C. 504 (Ct. App. 2007) ....................................................................... 45

*Presidential Gardens Assocs. v. United States ex rel. Sec'y of Hous. & Urban Dev.,*
    175 F.3d 132 (2d Cir. 1999) ................................................................... 10, 17

*Pressl v. Appalachian Power Co.*,
   842 F.3d 299 (4th Cir. 2016) ................................................................... 45

*RadLax Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012) ............................................................................... 18

*Ranch at the Falls LLC v. O'Neal*,
   38 Cal. App. 5th 155 (Ct. App. 2019) ...................................................... 47

*Randall v. United States*,
   95 F.3d 339 (4th Cir. 1996) ............................................................... 9, 14

*Rhett v. Gray*,
   401 S.C. 478 (Ct. App. 2012) .................................................................. 47

*Robinson v. United States Dep't of Educ.*,
   917 F.3d 799 (4th Cir. 2019) .................................................................... 8

*Savannah Riverkeeper v. S.C. Dep't of Health & Envtl. Control*,
   400 S.C. 196 (2012) ............................................................................... 20

*Shaw v. Stroud*,
   13 F.3d 791 (4th Cir. 1994) ...................................................................... 7

*Sierra Club v. U.S. Dep't of the Interior*,
   899 F.3d 260 (4th Cir. 2018) .................................................................. 32

*Sikka v. Rumsfeld*,
   98 F. App'x 254 (4th Cir. 2004) ............................................................... 8

*Skelly Oil Co. v. Phillips Petroleum Co.*,
   339 U.S. 667 (1950) ............................................................................... 21

*Stogsdill v. Sebelius*,
   No. CA 3:12-0007-TMC, 2013 WL 521483 (D.S.C. Feb. 11, 2013) ................. 9, 10

*Story v. Marsh*,
   732 F.2d 1375 (8th Cir. 1984) ................................................................ 12

*Strahan v. Linnon*,
   967 F. Supp. 581 (D. Mass. 1997) ........................................................... 44

*Telecare Corp. v. Leavitt*,
   409 F.3d. 1345 (Fed. Cir. 2005) ........................................................ 14, 15

*Touche Ross & Co. v. Redington*,
   442 U.S. 560 (1979) ............................................................................... 23

*Tupper v. Dorchester Cty.*,
   326 S.C. 318 (1997) ............................................................................... 45

*U.S. Dep't of Energy v. Ohio*,
    503 U.S. 607 (1992) ................................................................................. 19

*United States v. Jones*,
    131 U.S. 1 (1889) ..................................................................................... 16

*United States v. Mitchell*,
    463 U.S. 206 (1983) ............................................................................ 8, 10

*United States v. Sonmez*,
    777 F.3d 684 (4th Cir. 2015) ................................................................... 25

*United States v. Winstar Corp.*,
    518 U.S. 839 (1996) ................................................................................. 15

*Univ. Gardens Apartments Joint Venture v. Johnson*,
    419 F. Supp. 2d 733 (D. Md. 2006) ......................................................... 21

*Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*,
    833 F. Supp. 2d 524 (E.D.N.C. 2011) ...................................................... 16

*Walsh v. Brady*,
    927 F.2d 1229 (D.C. Cir. 1991) ............................................................... 30

*Wilkins v. Sessions*,
    No. 8:17-cv-403, 2018 WL 3131027 (D.S.C. June 8, 2018) ................... 17

*Williams v. Tamsberg*,
    425 S.C. 249 (Ct. App. 2018) ............................................................ 45, 46

*Women's Equity Action League v. Cavazos*,
    906 F.2d 742 (D.C. Cir. 1990) ................................................................. 13

*Young v. United Parcel Serv., Inc.*,
    575 U.S. 206 (2015) ................................................................................. 27

**Statutes**

5 U.S.C. § 701 .................................................................................................. 11

5 U.S.C. § 701(a)(2) ........................................................................................ 11

5 U.S.C. § 704 ...................................................................................... 11, 13, 14

5 U.S.C. § 706(2)(A) ........................................................................................ 31

5 U.S.C. §§ 701-706 .......................................................................................... 9

16 U.S.C. § 1536(a)(2) ..................................................................................... 39

16 U.S.C. § 1536(b) .......................................................................................... 39

28 U.S.C. § 1331 ................................................................................................. 9

28 U.S.C. § 1491(a)(1) ........................................................................................... 14

28 U.S.C. §§ 2201 .................................................................................................... 9

33 U.S.C. § 1323(a) ........................................................................................... 18, 20

33 U.S.C. § 1341 .................................................................................................... 17

33 U.S.C. § 1341(a)(1) ........................................................................................... 17

33 U.S.C. § 1365(a)(1) ........................................................................................... 18

33 U.S.C. § 1365(b)(1)(A) ...................................................................................... 18

33 U.S.C. § 1371 .................................................................................................... 19

42 U.S.C. § 300s .................................................................................................... 13

Pub. L. No. 106-53, 113 Stat. 269 (1999) ................................................................ 3

Pub. L. No. 106-53, 113 Stat. 269 (1999) .............................................................. 35

Pub. L. No. 114-322, 130 Stat. 1628 (2016) ..................................................... 4, 32

Pub. L. No. 115-270, 132 Stat. 3765 (2018) .......................................................... 32

S.C. Code Ann. § 48-1-90(a) .................................................................................. 34

**Rules**

Fed. R. Civ. P. 12(b)(6) .......................................................................................... 21

Fed. R. Civ. P. 56(a) ................................................................................................ 7

**Regulations**

33 C.F.R. § 335.2 ................................................................................................... 17

33 C.F.R. § 336.1(a) .............................................................................................. 17

33 C.F.R. § 338.2(c) .............................................................................................. 17

42 C.F.R. §§ 124.510(b)(1) .................................................................................... 13

50 C.F.R. § 402.14 ................................................................................................. 39

50 C.F.R. § 402.14(a) ............................................................................................ 39

50 C.F.R. pt. 402 ................................................................................................... 39

S.C. Code Ann. Regs. 19-450.1 ............................................................................. 19

S.C. Code Ann. Regs. 19-450.3(G) ........................................................................ 20

**Other Authorities**

28A C.J.S. Easements § 186 ................................................................................... 45

## INTRODUCTION

South Carolina brings this lawsuit in an attempt to re-litigate issues previously decided by this Court and to enjoin the U.S. Army Corps of Engineers (the "Corps") from implementing a key mitigation feature to a billion-dollar infrastructure project—the Savannah Harbor Expansion Project ("SHEP")—which will greatly expand the shipping capacity of our nation's fourth-largest port.  The Court should reject both attempts.

Over six years ago, this Court approved a global settlement agreement, reached among the Corps, South Carolina, intervenor the Georgia Ports Authority ("GPA")[1], and multiple conservation groups, that addressed all aspects of SHEP, including mitigation measures.  The agreement also resolved all permitting issues, and, under its terms, both South Carolina and Georgia agreed to provide all necessary permits to the Corps for completion of SHEP.  Despite this hard-fought global agreement, South Carolina now brings a *separate* suit challenging one of SHEP's key mitigation measures:  a fish passage that is to be constructed near Augusta, Georgia, which will mitigate for adverse impacts to endangered fish species that are presently unable to reach their historic spawning grounds north of the city.

South Carolina admits that the fish passage was a SHEP mitigation feature at the time of the prior SHEP litigation and settlement agreement.  South Carolina likewise admits that the Corps engaged in multi-year analysis pursuant to the National Environmental Policy Act ("NEPA") to evaluate alternatives for implementing the fish passage near Augusta.  It is simply dissatisfied with the alternative the Corps selected.  Its dissatisfaction, however, does not entitle it to the sweeping declaratory and injunctive relief that it seeks.  Indeed, this Court does not have

---

[1] *See* Order Granting GPA's Motion to Intervene. ECF No. 21.  The Court also granted the City of Augusta, Georgia's Motion to Intervene.  ECF No. 18.

jurisdiction to entertain five of the six claims South Carolina advances in this suit, but even if it did, those claims fail as a matter of law. For those reasons, the Court should dismiss them.

## BACKGROUND

### A. The New Savannah Bluff Lock and Dam

In the 1930s, the Corps constructed the New Savannah Bluff Lock and Dam (the "Dam" or "NSBLD") across the Savannah River to facilitate commercial navigation of steamships and commercial barges from the Savannah Harbor to the city of Augusta, Georgia. The Public Works Administration, created by the National Industrial Recovery Act of 1933 as part of the New Deal, appropriated federal funding for the Dam. A key project requirement was the acquisition, at no cost to the United States, of all necessary flowage easements along the Savannah River from Georgia and South Carolina. Each state established its own Savannah River Navigation Commission ("Commission") to acquire the necessary easements from private landowners and convey them to the United States. *See* ECF No. 1-5 (Ex. D to Compl.) (the "Easements"). The states acquired the necessary easements and the Corps completed construction of the Dam in 1937. The Dam sits 187 miles upstream from the mouth of the Savannah River and 13 miles downstream from Augusta.

An incidental result of Dam construction was the creation of an approximately 17-mile upstream pool of water abutting Augusta's riverfront. This pool, which is the subject of this litigation, was not part of the federal project. Another unintended result of construction was that fish, including the endangered Atlantic and shortnose Sturgeon, were blocked from migrating to their historic spawning areas at the upstream Augusta Shoals.

By the 1970s commercial traffic through the Dam had ceased. Given that the Dam no longer served its intended purpose and had fallen into disrepair, the Corps undertook a study to

evaluate the Dam's continued viability.  The Corps concluded that the Dam should be removed due to the prospective repair, operations, and maintenance costs.  While Congress initially directed the Corps to rehabilitate the Dam at federal expense, it never appropriated the necessary funds.  Instead, in the early 2000s, Congress's focus shifted from repairing the Dam to creating a fish passage that would allow endangered sturgeon to travel around the Dam and access their historic spawning grounds.

**B.    The Savannah Harbor Expansion Project**

SHEP is a billion-dollar federal project to deepen and lengthen the Savannah River navigation channel.  The Garden City Terminal in Savannah is the fourth largest container port in the United States and has been the fastest growing port in the country for the last ten years.  It supports hundreds of thousands of jobs and generates billions in income in Georgia and South Carolina, annually.  Once SHEP is completed, the channel will support larger and more efficient commercial container vessels as they travel upstream from the Atlantic Ocean to the Garden City Terminal.

Congress authorized SHEP in 1999, in section 101(b)(9) of the Water Resources Development Act ("WRDA"), Pub. L. No. 106-53, 113 Stat. 269, and since that time has provided additional funding and authorizations for the project through subsequent legislation. The Corps is working jointly with the Georgia Department of Transportation and GPA, the non-federal sponsors, to bring the project to completion.  In addition, the Corps has worked, and continues to work, closely with other federal agencies, including the U.S. Environmental Protection Agency, the U.S. Fish and Wildlife Service ("FWS"), and the National Marine Fisheries Service ("NMFS") to ensure that SHEP includes all appropriate environmental mitigation features.  One such mitigation feature is the fish passage that is to be constructed near

or around the Dam to allow endangered fish species to travel upstream to their historic spawning grounds.

In 2011 and 2012, South Carolina, and various conservation groups, sued the Corps in both state and federal court challenging SHEP.  A central issue in that litigation was whether the Corps had obtained the necessary permits from state authorities in South Carolina and Georgia for the project.  Following extensive settlement negotiations spanning nearly a full year, the parties, including South Carolina, GPA, the conservation groups, and the Corps, reached a comprehensive compromise and settlement agreement, which this Court approved on May 27, 2013.  ECF No. 1-8 (Ex. G to Compl.) (the "Settlement Agreement" or "SA"); ECF No. 1-9 (Ex. H to Compl.) (the "Settlement Order").  Under the Settlement Agreement, South Carolina and Georgia agreed to provide all necessary permits for SHEP.  SA § I.A.

C.      The WIIN Act and Subsequent NEPA Analysis

Congress enacted the Water Infrastructure Improvements for the Nation Act (the "WIIN Act") in 2016.  Pub. L. 114-322, § 1, 130 Stat. 1628, 1628.  Section 1319 of the WIIN Act deauthorized the Dam as a federal project and provided for modifications to the fish passage, which had been previously authorized as a SHEP mitigation feature.  While prior to the WIIN Act the Corps had planned to construct an off-channel fish passage along the South Carolina side of the River, which would allow fish to travel *around* the Dam, section 1319 foreclosed this option.  Instead, that section requires the Corps to either: (1) repair the Dam and modify it to allow safe passage for the fish *over* the Dam; or (2) remove the Dam and construct a new structure that will allow the fish to travel upstream.[2]  *Id*. § 1319(c)(1) (emphasis added).  It

_____

[2] The Second Amended Biological Opinion (dated October 13, 2017), issued after Congress enacted the WIIN Act, clarifies that under both options the Corps must provide safe passage for

4

confers complete discretion to the Corps to decide whether to pursue option 1 or 2, and how to implement its selection. *Id.*

Following passage of the WIIN Act, the Corps conducted additional NEPA analysis to evaluate fish passage alternatives that would both comply with the WIIN Act and provide the necessary mitigation for SHEP. Over the following two years, the Corps analyzed a range of alternatives and evaluated each for factors such as technical feasibility, environmental impacts, cost, and pool functionality, and considered public comments from various stakeholders, including Plaintiffs. The Corps published its final analysis in a Supplemental Environmental Assessment on August 30, 2019. ECF No. 1-2 (Ex. A to Compl.).

After evaluating the alternatives, the Corps concluded that alternative 2-6d was the best solution as it would "provide[] the highest probability of achieving fish passage objectives while maintaining the functionality of the pool for water supply and recreation." ECF No. 1-3 (Ex. B to Compl.) at 2; *see also* ECF Nos. 1-2 and 1-4 (Ex. C to Compl.). Under this selection, the Corps will remove the Dam and construct a 500-foot width in-channel rock weir—a water damming and control structure that allows water to flow over its top—which will maintain the pool at approximately 109 feet NGVD29[3] and allow fish to travel upstream to their historic spawning grounds. *Id.* The Corps signed an approval memorandum (ECF No. 1-3) and Finding of No Significant Impact ("FONSI") (ECF No. 1-4) on October 29, 2019, approving alternative 2-6d.

---

the fish to their historic spawning grounds. ECF No. 1-12 (Ex. K to Compl.) ("Second Am. BiOp") at 5-6.

[3] The National Geodetic Vertical Datum of 1929 ("NGVD29") is a unit for measuring sea level.

**D.        Present Litigation**

Plaintiffs sued the Corps on November 4, 2019 (ECF No. 1), alleging six causes of action.  Claim 1 seeks a declaration interpreting the WIIN Act; Claim 2 alleges violations of the Clean Water Act ("CWA"); Claims 3 and 5 allege breaches of the Settlement Agreement and related order; Claim 4 seeks a declaration interpreting the terms of various state law easements; and Claim 6, which is not the subject of this motion or Plaintiffs' Motion for Partial Summary Judgment, alleges violations of NEPA.

<b>STANDARD OF REVIEW</b>

The Corps moves to dismiss, in part, South Carolina's Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for lack of jurisdiction and failure to state a claim upon which relief can be granted.  Plaintiff bears the burden of establishing that the court has jurisdiction, *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), and must do so "for each claim [it] seeks to press," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).  In deciding a 12(b)(1) motion, a court need not limit itself to the complaint and may consider materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction in the case.  *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982); *Weaver v. Aegon USA, LLC*, 2015 U.S. Dist. LEXIS 130026, at *5-6 (D.S.C. Sept. 28, 2015).

To survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a complaint must contain facts sufficient "to raise a right to relief above the speculative level" and to satisfy the court that the claim is "plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555, 570 (2007).  A claim is plausible only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"—a standard that requires more than facts "that are 'merely consistent with' a

6

defendant's liability." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556-57).

The complaint must "permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. Although all well-pled allegations are presumed to be true and are viewed in the light most favorable to the plaintiff, *GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 548 (4th Cir. 2001), "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Similarly, a court need not accept as true a plaintiff's "unwarranted inferences, unreasonable conclusions, or arguments," *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000), or "a legal conclusion couched as a factual allegation[.]" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

Plaintiffs ("South Carolina") move for partial summary judgment under Federal Rule of Civil Procedure 56.[4] A party moving for summary judgment must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The party seeking summary judgment has the initial burden to show absence of evidence to support the nonmoving party's case." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). The Court "must view the factual evidence, and all justifiable inferences drawn therefrom, in the light most

---

[4] Plaintiffs' Combined Motion for Partial Summary Judgment and Memorandum of Law in Support, ECF No. 12 ("MSJ"). Plaintiffs include the State of South Carolina, the South Carolina Department of Health and Environmental Control ("DHEC"), and the Savannah River Maritime Commission, collectively "South Carolina."

favorable to the non-moving party." *Sikka v. Rumsfeld*, 98 F. App'x 254, 255 (4th Cir. 2004) (per curiam).

## ARGUMENT

For each cause of action brought against the United States, a plaintiff must establish: (1) a waiver of sovereign immunity; (2) subject matter jurisdiction; (3) standing; and (4) a legally cognizable claim. Here, Claims 1-5 do not meet these requirements and, for that reason, the Court should dismiss them. In the event the Court does not dismiss Plaintiffs' complaint, it should deny Plaintiffs' motion for summary judgment on Claims 1, 2, 3, and 5, because they have failed to meet their burden under Rule 56.

## I.    The United States Has Not Waived Sovereign Immunity

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). Plaintiffs have not identified an applicable waiver of sovereign immunity for Claims 1-5. It is axiomatic that the United States cannot be sued without its consent. *United States v. Mitchell*, 463 U.S. 206. 212 (1983). Its consent must be "unequivocally expressed in the statutory text … and will not be implied." *Lane v. Pena*, 518 U.S. 187, 192 (1996); *Robinson v. United States Dep't of Educ.*, 917 F.3d 799, 801-02 (4th Cir. 2019) ("Sovereign immunity, in short, can only be waived by statutory text that is unambiguous and unequivocal."). Waivers of sovereign immunity must be strictly construed in favor of the sovereign. *Lane*, 518 U.S. at 192. This immunity extends to federal agencies and federal officials acting in their official capacities. *Meyer*, 510 U.S. at 475; *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). Plaintiffs bear the burden of showing that the government has waived sovereign immunity at the motion to dismiss stage. *Robinson*, 917 F.3d at 802.

Here, when pleading Claims 1, 3, 4, and 5, Plaintiffs do not identify an applicable waiver of sovereign immunity.  Compl. ¶¶ 138-49, 170-97, ECF No. 1.  Plaintiffs allege in their general statement of jurisdiction that the Court has jurisdiction pursuant to "28 U.S.C. § 1331 (federal question), 28 U.S.C. §§ 2201 and 2202 (declaratory judgment and injunction), the Federal Administrative Procedures Act, 5 U.S.C. §§ 701 et seq., and the continuing jurisdiction of the Court under this Court's Order dated May 29, 2013, in the related case bearing C.A. No. 9:12-cv-00610-RMG, dkt. #99 (Settlement Order)."  *Id*. ¶ 12.  But none of these alleged bases waive sovereign immunity for these claims.

It is settled law that section 1331 is not a waiver of sovereign immunity.  *Randall v. United States*, 95 F.3d 339, 345 (4th Cir. 1996) ("[S]ection 1331 'is not a general waiver of sovereign immunity.'").  That statute "merely establishes a subject matter that is within the competence of federal courts to entertain," *id*., and is limited to cases "arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  Similarly, the Declaratory Judgment Act, and its related "Further relief" statute, is not a waiver of sovereign immunity.  *Friends of DeReef Park v. Nat'l Park Serv.*, No. 2:13-cv-03453-DCN, 2015 WL 12807800, at *9 (D.S.C. May 27, 2015); *Stogsdill v. Sebelius*, No. CA 3:12-0007-TMC, 2013 WL 521483, at *4 (D.S.C. Feb. 11, 2013), a*ff'd sub nom.*, *Stogsdill v. Azar*, 765 F. App'x 873 (4th Cir. 2019) (although the Declaratory Judgment Act "'created a remedy as to controversies of which the federal courts have jurisdiction,'. . . it is not the United States' consent to suit."); *Circuit City Stores, Inc. v. EEOC*, 75 F. Supp. 2d 491, 504 (E.D. Va. 1999), *aff'd*, 232 F.3d 887 (4th Cir. 2000) (explaining that "the Declaratory Judgement Act [does not] constitute a waiver of sovereign immunity."); *Farmer v. United States*, No. 3:17-cv-956, 2018 WL 1365797, at *2 (D.S.C. Mar. 16, 2018) ("'Absent a waiver, sovereign immunity shields the Federal Government

and its agencies from suit.'  This includes declaratory judgment actions.") (quoting *Meyer*, 510 U.S. at 475).

Nor can the settlement agreement, or the court order approving that settlement agreement, waive the federal government's sovereign immunity.  Only an act of Congress can provide such a waiver.  *Lane*, 518 U.S. at 192 (the federal government is subject to suit only when "Congress has authorized the suit"); *Mitchell*, 463 U.S. at 215-16 ("no contracting officer or other official is empowered to consent to suit against the United States"); *Presidential Gardens Assocs. v. United States ex rel. Sec'y of Hous. & Urban Dev*., 175 F.3d 132, 139 (2d Cir. 1999) ("the federal government's sovereign immunity may only be waived by Congressional enactment" (citing *Mitchell*, 463 U.S. at 215-16)).

**A.    There Is No Waiver Under The Administrative Procedure Act For Claims 1-5.**

Among the bases alleged in the Complaint, the only other conceivable source for a sovereign immunity waiver for Claims 1, 3, 4, and 5 is the Administrative Procedure Act ("APA"), but even that statute establishes no waiver for these claims.  While the APA provides a limited waiver of sovereign immunity for certain claims seeking relief other than money damages, it does not provide a blanket waiver for every nonmonetary cause of action.  *Hammond v. United States*, No. CIV.A. 1:13-00139, 2014 WL 1277892, at *4 (D.S.C. Mar. 27, 2014) ("The scope of this waiver, however, is not unlimited."); *Stogsdill*, 2013 WL 521483, at *5 ("Section 702 of the APA contains a limited waiver of sovereign immunity as to claims for declaratory or injunctive relief against government agencies and officers.").

As a threshold matter, Plaintiffs did not plead these claims as APA claims.  The only claim pled as such is Claim 6, alleging violations of NEPA.  To the extent Plaintiffs intend or attempt to rely on the APA as the applicable waiver for Claims 1-5, such reliance fails.  This is

true for two reasons.  First, the APA does not provide for review when an act or decision is committed to agency discretion by law, as it is in the WIIN Act (Claim 1), 5 U.S.C. § 701.  Second, the APA only provides for review when "there is no other adequate remedy in a court," 5 U.S.C. § 704, which there is for the section 401 water quality certification claim under the CWA (Claim 2), for enforcement of the Court' order incorporating the Settlement Agreement in the prior litigation (Claims 3 and 5), and the easement claim under the Tucker Act (Claim 4).

Because Plaintiffs fail to assert a clear and unequivocal waiver of sovereign immunity for Claims 1-5, this Court does not have jurisdiction over those claims and must dismiss them under Rule 12(b)(1).

       i.      *Claim 1: Implementation Of The Fish Passage Pursuant to the WIIN Act Is Committed To Agency Discretion By Law.*

The WIIN Act, under which Plaintiffs bring their first cause of action, provides no waiver of sovereign immunity.  Nor can the APA provide such a waiver, as that claim seeks review of an action that is "committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  The WIIN Act states that SHEP is "modified to include, as the Secretary [of the Corps] *determines to be necessary*" and describes two alternatives.  WIIN Act § 1319(c)(1) (emphasis added).  This section grants broad discretionary authority to the Secretary to determine which modification to pursue and how to implement that modification.  This is precisely the type of broad, discretionary grant that courts have found to be unreviewable under the APA.  *See Heckler v. Chaney*, 470 U.S. 821, 835 (1985) (statute that "authorized" HHS to conduct "examinations and investigations" into possible violations of food and drug standards "commit[ed] complete discretion to the Secretary to decide how and when [enforcement provisions] should be exercised"); s*ee also Madison–Hughes v. Shalala*, 80 F.3d 1121, 1127–1128 (6th Cir. 1996) (regulation requiring healthcare providers receiving HHS funds to submit "timely, complete and

accurate compliance reports" to the Department "as responsible Department officials . . . may determine to be necessary" did not provide a meaningful standard for judicial review and was left to agency discretion). In such circumstances, "the courts have little, if any, standards against which to assess the agency decision, thus rendering the substance of the agency action largely unreviewable." *Story v. Marsh*, 732 F.2d 1375, 1381 (8th Cir. 1984) (finding the Corps' action unreviewable under section 701(a)(2) where the "Congressional delegation" was "very broad in scope" and "require[d] the Corps to exercise considerable expertise in a highly technical area."). This is especially true, where, as here, there are no additional statutes or regulations instructing the agency as to how to act. *Menominee Indian Tribe of Wisconsin v. Envtl. Prot. Agency*, 947 F.3d 1065 (7th Cir. 2020) (finding that "in the absence of any regulation addressing the basis for the decision to withdraw an objection, the choice is [ ] committed to the agency's discretion" and exempt from judicial review).

Because the WIIN Act commits implementation of the fish passage to the Corps' discretion and expertise, and lacks standards that the Court could meaningfully use in evaluating its decision, it is not reviewable under the APA. *Heckler*, 470 U.S. 821. For that reason, the APA cannot serve as the basis for waiver of sovereign immunity for Claim 1.

> ii. *Claims 3 and 5: The APA Does Not Provide a Waiver of Sovereign Immunity for Plaintiffs' Claim that the Corps is Not in Compliance with the Terms of the Settlement Agreement.*

Claims 3 and 5 allege that the United States has breached its obligations under the Settlement Agreement and request a court order declaring that the Corps is in breach, and a permanent injunction. Compl. ¶¶ 170-78; 188-97. In their motion for partial summary judgment, Plaintiffs assert that settlement agreements are contracts and that summary judgment is appropriate if a contract is unambiguous. MSJ at 24-25. While it is unclear why Plaintiffs initiated a new suit and did not—as this Court directed in its order purporting to retain

jurisdiction over the Settlement Agreement[5]—move for relief in the prior the litigation, what is clear is that Plaintiffs have failed to identify a waiver of sovereign immunity for these allegations.

The APA limits judicial review to "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Plaintiffs have a judicial vehicle to vindicate their rights; therefore, they cannot use the APA to force review of the Corps' action, or inaction. As the Sixth Circuit explained in *Gillis v. United States Department of Health & Human Services*:

> Even if the Secretary has failed to "monitor" facilities by requiring periodic submission of "data and information which reasonably supports...compliance," 42 U.S.C. § 300s, and such inaction constitutes a "final agency action" for purposes of 5 U.S.C. § 704, plaintiffs cannot satisfy the second prerequisite to review under § 704 that "there is no other adequate remedy in a court." The regulations provide that the reporting and record maintenance requirements imposed on participating facilities run to the public as well as the Secretary. 42 C.F.R. §§ 124.510(b)(1) and 124.605(b)(1). Hence, they are effectively subject to enforcement by means of private suits brought directly against facilities.

759 F.2d 565, 577 (6th Cir. 1985); *Council of & for the Blind of Del. Cty. Valley, Inc. v. Regan*, 709 F.2d 1521, 1531 (D.C. Cir. 1983) (where "an adequate remedy for the wrong allegedly inflicted on appellants by the [Office of Revenue Sharing]" exists, there is no APA review); *Women's Equity Action League v. Cavazos*, 906 F.2d 742, 746 n.2 (D.C. Cir. 1990) ("We conclude instead that plaintiffs no longer have any claim under the APA because, for the injuries they continue to assert, they have another adequate remedy.").

Here, there is an adequate remedy in South Carolina's previous action in which the Court retained jurisdiction for enforcement—making this action unnecessary and precluding the action

---

[5] Order purporting to retain "continuing jurisdiction over the matter to enforce compliance with the Settlement Agreement and Order." Order at 2-3, *Savannah River Keeper v. U.S. Army Corps of Eng'rs* ("*SHEP I*"), No. 9:12-cv-00610-RMG (D.S.C. May 29, 2013), ECF No. 99.

from overcoming the adequate remedy hurdle of the APA.  *See Hitachi Metals, Ltd. v. Quigg*, 776 F. Supp. 3, 10 (D.D.C. 1991).  In *Hitachi*, the action was not subject to judicial review under the APA as a "final agency action for which there is no other adequate remedy in a court," in light of the fact that remedies capable of redressing Hitachi's potentially substantive injuries included raising an allegation of patent invalidity as a defense to an infringement action.  *Id.*

Because Plaintiffs could request relief from this Court in the prior litigation regarding the alleged failure to comply with the Settlement Agreement, Plaintiffs have "an adequate remedy in a court" and therefore, can not avail themselves of the APA waiver of sovereign immunity for these claims in a separate suit.  Because the APA does not waive sovereign immunity for Claims 3 and 5, the Court must dismiss them.

iii.        *Claim 4: Plaintiffs Have An Adequate Remedy Under The Tucker Act.*

Claim 4, wherein Plaintiffs complain that Federal Defendants have or will violate the terms of numerous flowage easements, created under state law, is—at its core—a breach of contract claim for which there is an adequate remedy under the Tucker Act.  Compl. ¶ 185 (seeking a declaratory judgment interpreting the easements so as to "terminate this uncertainty and breach of contractual duties by the Federal Defendants.").

As previously noted, review under the APA is available only for "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  This limitation has been held "to preclude review under the APA when a plaintiff has an adequate remedy by suit under the Tucker Act."  *Randall*, 95 F.3d at 346.  The Tucker Act confers exclusive jurisdiction on the United States Court of Federal Claims to hear cases involving express or implied contracts with the United States, which exceed $10,000.  28 U.S.C. § 1491(a)(1).  "The availability of an action for money damages under the Tucker Act or Little Tucker Act is presumptively an 'adequate remedy' for 704 purposes."  *Telecare Corp. v. Leavitt*, 409 F.3d. 1345, 1349 (Fed. Cir. 2005).

Because Claim 4 sounds in contract, Plaintiffs have an available and adequate remedy under the Tucker Act, and it is not cognizable under the APA. *Id.*

Plaintiffs allege that the flowage easements require the United States to maintain the pool at a precise elevation—114.5 feet mean sea level—and that the United States will breach this requirement when it removes the Dam and implements the fish passage, which will lower the elevation of the pool and, in turn, impair their use and enjoyment of the pool. Compl. ¶¶ 179-87. This is an economic injury that can be quantified and compensated by money damages, presuming, of course, that Plaintiffs can sustain their claims in any suit they choose to file in the Court of Federal Claims. *United States v. Winstar Corp.*, 518 U.S. 839, 885 (1996) ("damages are always the default remedy for breach of contract."). Thus, the appropriate and adequate remedy for such a claim, when it is ripe, is an action under the Tucker Act.

This is true even where a plaintiff styles its claim as one seeking declaratory relief. Such styling does not change the nature of the underlying claim. *Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 4 (1st Cir. 1989) (explaining that a claim seeking to enforce easement rights granted by the United States in a deed was an action for breach of contract "irrespective of how it is packaged"); *Farmer*, 2018 WL 1365797, at *6 ("the Court must regard substance over form. It looks beyond the packaging of a litigants claims to determine what it is the party is actually seeking"); *Kanemoto v. Reno*, 41 F.3d 641, 646 (Fed. Cir. 1994) (concluding that monetary relief was "adequate" and explaining that a plaintiff "cannot escape this conclusion merely by framing her claim for relief in declaratory or injunctive terms"). Here, payment of damages could adequately compensate Plaintiffs for any alleged breach and losses incurred as a result of the lowered pool level.

        *a.*     *The Court cannot order specific performance against the federal government.*

Plaintiffs are likewise limited to monetary damages because the Court cannot order specific performance by the federal government. *United States v. Jones*, 131 U.S. 1, 18–19 (1889); *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 703 (1949) ("It was, therefore, inescapably the action of the United States and the effort to enjoin it must fail as an effort to enjoin the United States."); *Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs,* 833 F. Supp. 2d 524, 534 (E.D.N.C. 2011), *aff'd*, 714 F.3d 186 (4th Cir. 2013) (explaining that the Tucker Act and the Little Tucker "'impliedly forbid' federal courts from ordering declaratory or injunctive relief, at least in the form of specific performance" in this context); *Coggeshall*, 884 F.2d at 3 ("Federal courts do not have the power to order specific performance by the United States of its alleged contractual obligations.") (citing *Fla. Dep't. of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 689 (1982)); *Farmer*, 2018 WL 1365797, at *6 (concluding that the APA did not waive sovereign immunity for claim seeking specific performance of a loan agreement with the United States).

The only available remedy against the United States for a breach of the alleged terms of an easement is money damages. *Coggeshall*, 884 F.2d at 4. And while Plaintiffs may contest that such a remedy is "inadequate," that changes nothing. "Congress deliberately intended that contract disputes with the federal government be heard in the Court of Federal Claims, and deliberately intended that only certain relief be available." *Info. Sys. & Networks Corp. v. U.S. Dep't of Health & Human Servs.*, 970 F. Supp. 1, 6–7 (D.D.C. 1997). That a plaintiff "would rather have specific performance is of no concern in the scheme of federal jurisdiction." *Id.*

Because an adequate remedy exists elsewhere, the APA does not provide for review or waive the government's sovereign immunity for Claim 4.

iv.     *Claim 2: There Is No Waiver Under The CWA or APA.*

As to Claim 2, South Carolina cites section 313 of the CWA as the basis of its claim that the Corps must, but has not, obtained a water quality certification pursuant to CWA section 401.[6] Such a claim must be brought under the CWA's citizen suit provision, which requires notice as a jurisdictional prerequisite to suit. Plaintiffs have not provided notice and thus there is no waiver of sovereign immunity.

CWA section 401, 33 U.S.C. § 1341, requires the Corps to seek state water quality certification for activities that may result in any discharge into navigable waters unless the discharges would be excluded under CWA section 404(r), *id*. § 1344(r) (exempting discharge from certain specifically authorized construction projects). Specifically, section 401 requires that:

> Any applicant for a Federal license or permit to conduct *any activity* including, but not limited to, the construction or operation of facilities, *which may result in any discharge into the navigable waters*, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate . . . that any such discharge will comply with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title.

33 U.S.C. § 1341(a)(1) (emphasis added); *see also* 33 C.F.R. § 338.2(c).[7]

---

[6] Plaintiffs also refer to Executive Order 12088 (1978) and a Corps' policy and guidance document, Engineer Regulation ("ER") 1110-2-8154, *Water Quality Management* (May 31, 2018). Neither is a basis either for the Court's jurisdiction or a waiver of sovereign immunity. *Lane*, 518 U.S. at 192; *Presidential Gardens Assocs.*, 175 F.3d at 139; *Wilkins v. Sessions*, No. 8:17-cv-403, 2018 WL 3131027, *6 (D.S.C. June 8, 2018), *report & recommendation adopted*, No. 8:17-CV-803-TMC, 2018 WL 3127323 (D.S.C. June 26, 2018) (recognizing that an executive order could not waive sovereign immunity).

[7] Although the Corps does not issue itself permits for its activities, it authorizes its own discharges of dredged or fill material by applying all applicable substantive legal requirements, including public notice, opportunity for public hearing, and application of the CWA 404(b)(1) Guidelines. 33 C.F.R. § 336.1(a); 33 C.F.R. § 335.2. The Corps' NEPA documentation and its CWA section 404(b)(1) evaluation constitute the functional equivalent of a permit. *See* ER 1105-2-100, *Planning Guidance Notebook* (Apr. 22, 2000),

Plaintiffs suggest that CWA section 313, 33 U.S.C. § 1323(a), the federal facilities provision, provides jurisdiction over their claim that the Corps must obtain a separate section 401 certification for the SHEP mitigation measures.  That is incorrect.  Because the CWA provides a specific basis for jurisdiction and a waiver of sovereign immunity for such a claim, South Carolina cannot rely on the general federal facilities provision.  *RadLax Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645-46 (2012) (stating that it is "[a] well established canon of statutory interpretation . . . the specific governs the general") (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)).

CWA section 505(a)(1) provides that any citizen may bring a civil action against any person, including the United States, who is alleged to be in violation of "an effluent standard or limitation under this chapter."  33 U.S.C. § 1365(a)(1).  An "effluent standard or limitation under this chapter" means, inter alia, "a certification under section 1341," a section 401 water quality certification.  CWA section 505(a)(1), 33 U.S.C. § 1365(a)(1), provides for exclusive jurisdiction in the district courts over suits "both to require a facility to obtain certification and to enforce conditions in an existing certificate."  *Deschutes River All. v. Portland Gen. Elec. Co.*, 249 F. Supp. 3d 1182, 1194 (D. Or. 2017).

But no citizen suit may be commenced prior to 60 days after the plaintiff gives notice to the alleged violator, here, the Corps.  33 U.S.C. § 1365(b)(1)(A).  Notice is a jurisdictional pre-requisite to a citizens' suit against the United States.  *See Hallstrom v. Tillamook Cty.*, 493 U.S. 20, 31 (1989).  "Particularly when the United States is the defendant, such mandatory provisions

---

https://www.publications.usace.army.mil/USACE-Publications/Engineer-Regulations/u43546q/313130352D322D313030/.

must be strictly construed because they waive sovereign immunity." *Basel Action Network v. Mar. Admin.*, 370 F. Supp. 2d 57, 76 (D.D.C. 2005) (citing *Lane*, 518 U.S. at 192).

Additionally, although the federal facilities provision in CWA section 313 constitutes a limited waiver of sovereign immunity, *see U.S. Dep't of Energy v. Ohio*, 503 U.S. 607, 615 (1992), CWA section 511(a)(2) unambiguously limits that partial waiver. 33 U.S.C. § 1371. Section 511(a)(2) provides sovereign immunity protection for the Corps when compliance may "affect or impair" its authority to "maintain navigation." *Id.*; *In re Operation of the Mo. River Sys. Litig.*, 418 F.3d 915 (8th Cir. 2005); *see also City of Imperial Beach v. Int'l Boundary & Water Comm'n*, 356 F. Supp. 3d 1006, 1015-16 (S.D. Cal. 2018); *North Dakota v. U.S. Army Corps of Eng'rs*, 270 F. Supp. 2d 1115, 1123 (D.N.D. 2003). SHEP clearly falls within the Corps' responsibility to maintain navigation and thus precludes a waiver of sovereign immunity under CWA section 313.

To the extent Plaintiffs may argue that their allegation that the SHEP mitigation measures require a South Carolina Navigable Waters Permit is not defeated by lack of jurisdiction because CWA section 313(a) makes federal entities subject to certain state requirements, that argument fails as a matter of law. Plaintiffs cannot simultaneously maintain that SHEP mitigation measures require both a CWA section 401 water quality certification and a Navigable Waters Permit under South Carolina law. Under S.C. Code Ann. Regs. 19-450.1:

> *[u]nless expressly exempted*, [a Construction in Navigable Waters Permit issued by DHEC] is required for any dredging, filling or construction or alteration activity in, on, or over a navigable water, or in, or on the bed under navigable waters, or in, or on lands or waters subject to a public navigational servitude under Article 14 Section 14 of the South Carolina Constitution and 49-1-10 of the 1976 S.C. Code of Law including submerged lands under the navigable waters of the state, or for any activity significantly affecting the flow of any navigable water.

S.C. Code Ann. Regs. 19-450.1(A) (emphasis added).

South Carolina references this provision, MSJ at 21, but fails to address the prefatory phrase: "[u]nless expressly exempted." Pursuant to S.C. Code Ann. Regs. 19-450.3(G), "[n]o permit is required for any activity which requires another Department permit or certification, including but not limited to 401 Water Quality Certifications." Activities which require a section 401 water quality certification are therefore expressly exempt from the requirement to obtain a Navigable Waters Permit. The Supreme Court of South Carolina has made this abundantly clear, ruling that:

> When a § 401 Certification is issued, no separate permit for construction in navigable waters is required. Instead, the 401 Certification serves as the construction permit. Before DHEC may issue the permit, however, the staff reviewing the certification application is 'required to coordinate with the Construction in Navigable Waters Permitting staff to insure' that the regulatory requirements for the construction permit are met.

*Savannah Riverkeeper v. S.C. Dep't of Health & Envtl. Control*, 400 S.C. 196, 200, 733 (2012) (citing S.C. Code Ann. Regs. 19-450.3(G)). Thus, to the extent Claim 2 alleges that the Corps must obtain a Navigable Waters Permit to implement the mitigation measures, that allegation fails as a matter of law.[8]

Lastly, because there is an adequate remedy under the CWA for Plaintiffs' allegations, the APA cannot provide a sovereign immunity waiver or basis for jurisdiction for Claim 2. *See*,

---

[8] The omission of any reference to the exemption for projects that require a CWA section 401 water quality certification is also made in the South Carolina Attorney General's Opinion Letter, ECF No. 1-14. If the import of that omission is that the Corps is subject to different (and unwritten) requirements than any other applicant, then that treatment also dooms South Carolina's claim as to the alleged requirement for the Corps to obtain such a permit. The limited waiver of sovereign immunity in CWA section 313(a) only requires federal entities to "be subject to, and comply with . . . state . . . requirements . . . respecting the control and abatement of water pollution in the same manner and to the same extent as nongovernmental entity." 33 U.S.C. § 1323(a). To the extent that South Carolina is suggesting that the Corps' activities are not exempt in the same manner as nongovernmental entities would be, then that requirement is not within the limited waiver of sovereign immunity.

*e.g.*, *Am. Canoe Ass'n v. EPA*, 30 F. Supp. 2d 908, 915 (E.D. Va. 1998) (holding that "duplicative causes of action cannot lie under both the Clean Water Act and the Administrative Procedure Act"); *Envtl. Def. Fund v. Tidwell*, 837 F. Supp. 1344, 1356 (E.D.N.C. 1992) ("if a plaintiff can bring suit against the responsible federal agencies under the CWA, this action precludes an additional suit under the APA.  However, where a plaintiff's claims are not covered by the citizen suit provision of the CWA, the plaintiff can maintain an action against the responsible federal agencies under the APA.").

Because neither the CWA nor the APA provide a waiver for Claim 2, the Court does not have jurisdiction and must dismiss that claim.

## II.    Plaintiffs Fail To State A Claim Upon Which Relief Could Be Granted.

Even if the Court were to find that Congress waived sovereign immunity, Claims 1-5 must be dismissed under Rule 12(b)(6) for failure to state a claim.  *See* Fed. R. Civ. P. 12(b)(6).

### A.    The Declaratory Judgment Act Is Not An Independent Cause Of Action.

Plaintiffs bring all six claims pursuant to the Declaratory Judgment Act.  But this statute does not create an independent cause of action.  *Poly-Med, Inc. v. Novus Sci. Pte. Ltd.*, Civ. A. No. 8:15-CV-01964-JMC, 2018 WL 4223443, at *3 (D.S.C. Aug. 27, 2018), *appeal dismissed and remanded*, 773 F. App'x 727 (4th Cir. 2019) (explaining that the Declaratory Judgment Act is "a remedy, not an independent [cause of action]" and, "[t]herefore, a prayer for declaratory relief must accompany a valid cause of action"); *Univ. Gardens Apartments Joint Venture v. Johnson*, 419 F. Supp. 2d 733, 742 (D. Md. 2006) (explaining that the Declaratory Judgment Act does not "provide a basis for an independent claim" but is instead an "available form[ ] of relief, should the court otherwise have a valid cause of action before it.").  It is simply a procedural statute that expands the "range of remedies available in the federal courts."  *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950).  Thus, for each claim, Plaintiffs must identify

21

an underlying cognizable cause of action to avoid dismissal.  They fail to do so for Claim 1

(alleging violations of the WIIN Act) and Claim 4 (alleging violations of various easements).

For that reason alone, those claims fail as a matter of law and must be dismissed.

   **B.    Plaintiffs' Request For A Declaratory Judgment Interpreting The WIIN Act (Claim 1) Fails As A Matter Of Law.**

   Claim 1 seeks a declaratory judgment interpreting the WIIN Act.  This claim fails for

several reasons.  First, the Declaratory Judgment Act is not an independent cause of action and

the WIIN Act, which underpins Claim 1, does not provide a private right of action.  Second, the

WIIN Act by its plain terms does not require what Plaintiffs allege that it requires.  And, third,

the Corps has complied with the requirements of the WIIN Act.

   *i.    The WIIN Act does not provide a private right of action.*

   As explained above, the Declaratory Judgment Act is not an independent cause of action.

Thus, the Court must look to the statute under which Plaintiffs purport to bring this claim: the

WIIN Act.  But this statute does not create a private right of action or a private remedy.  For that

reason, Plaintiffs cannot bring suit under this statutory provision.

   "[P]rivate rights of action to enforce federal law must be created by Congress."

*Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).  To determine whether a private right of action

exists under a particular statute, the Court must determine whether Congress intended to create

both a private right and a private remedy.  *Id.*  And the Supreme Court has made clear that to

create such a private right of action, Congress must "speak[ ] with a clear voice," and

"unambiguously" express that intent.  *Gonzaga Univ. v. Doe*, 536 U.S. 273, 274 (2002) (quoting

*Sandoval*, 532 U.S. at 286)). Courts will "not recognize an implied right of action under a statute

'where the text and structure of [the] statute provide no indication that Congress intend[ed] to

create new individual rights.'"  *Clear Sky Car Wash LLC v. City of Chesapeake, Va.*, 743 F.3d

22

438, 443–44 (4th Cir. 2014) (quoting *Gonzaga Univ.*, 536 U.S. at 286)).  That a federal statute

may have been violated and some person harmed "does not automatically give rise to a private

cause of action in favor of that person."  *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568

(1979) (citation omitted).

      Section 1319 of the WIIN Act does not create individually enforceable rights.  For that

reason, Plaintiffs lack any basis for a private action to remedy supposed violations of that

provision.  There is nothing in the statutory language that expressly grants a private right of

action and Plaintiffs have not identified any basis for a private right of action or remedy in either

the statute itself or its legislative history.  *See generally* Compl.; MSJ.  Had it been Congress's

intent to create a private right of action to enforce this section, it would have said so.  *Discover*

*Bank v. Vaden*, 396 F.3d 366, 370 (4th Cir. 2005) (stating that "where Congress knows how to

say something but chooses not to, its silence is controlling." (citation omitted)).  For example,

another section of the WIIN Act expressly authorizes a private right of action to enforce

statutorily-created obligations.  WIIN Act § 3608(j)(1)(A)(ii) ("The Choctaw Nation, the

Chickasaw Nation, the State, the City, the Trust, and the United States *shall each have the right*

*to bring an action* pursuant to this section.") (emphasis added).[9]  The clear absence of similar

rights-conferring language in section 1319 of the WIIN Act evidences that Congress did not

intend to create a private right to enforce that section.  *BFP v. Resolution Tr. Corp.*, 511 U.S.

531, 537 (1994) ("[I]t is generally presumed that Congress acts intentionally and purposely when

---

[9] This section provides those tribes with the right to seek enforcement or interpretation of that section of the WIIN Act: "The United States District Court for the Western District of Oklahoma shall have exclusive jurisdiction for all purposes and for all causes of action relating to the interpretation and enforcement of the Settlement Agreement, the amended storage contract, or *interpretation or enforcement of this section*, including all actions filed by an allottee pursuant to subsection (e)(6)(B)."  WIIN Act § 3608(j)(1)(A)(i) (emphasis added).

it includes particular language in one section of a statute but omits it in another[.]" (internal

citation omitted)).  Because this section does not confer a private right of action, the Court must

dismiss Claim 1 for failure to state a claim.

ii.     *The WIIN Act does not require that the Corps maintain the pool at a precise elevation.*

Claim 1 also fails because the WIIN Act does not require what Plaintiffs allege that it

requires.  Plaintiffs allege, and request a declaration from the Court, that the WIIN Act "requires

maintenance of the pool level of approximately 114.5 feet NGVD29."  Compl. ¶ 148; *see also*

MSJ at 16 (alleging that the WIIN Act "clearly and unambiguously requires the Corps to

maintain the pool elevation as it existed on the date of the enactment").  But the WIIN Act, by its

plain terms, requires no such thing.  For that reason, as a matter of law, the Court could not enter

a declaratory judgment interpreting the WIIN Act in Plaintiffs' favor.

To interpret the WIIN Act, the Court should first look to the plain language of the statute.

*Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019) ("In statutory

interpretation disputes, a court's proper starting point lies in a careful examination of the

ordinary meaning and structure of the law itself.").  Where, as here, that language is clear and

unambiguous, the Court's inquiry is at an end.  *Food Mktg.*, 139 S. Ct. 2356; s*ee also Hughes

Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) ("As in any case of statutory construction,

our analysis begins with 'the language of the statute.' . . . And where the statutory language

provides a clear answer, it ends there as well.") (citations omitted).  In such a case, the Court

need only give effect to the statute's plain language.  *King v. Burwell*, 135 S. Ct. 2480, 2489

(2015) ("If the statutory language is plain, we must enforce it according to its terms.").

Plaintiffs' flawed interpretation of the WIIN Act would require the Court to either add

language that does not appear in the statutory text or disregard language that does.  Neither is

permissible. *United States v. Sonmez*, 777 F.3d 684, 688 (4th Cir. 2015) ("we are required to interpret statutory language as written and are not permitted to add words of our own choosing"); *Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("It is our duty 'to give effect, if possible, to every clause and word of a statute.'" (citation omitted)).

The WIIN Act states, in relevant part:

> (1) In general.–-Notwithstanding any other provision of law, the Project is modified to include, as the Secretary determines to be necessary —
> (A)(i) repair of the lock wall of the New Savannah Bluff Lock and Dam and modification of the structure such that the structure is able –
> > (I) to maintain the pool for navigation, water supply, and recreational activities, as in existence on the date of enactment of this Act; and
> > (II) to allow safe passage over the structure to historic spawning grounds of short-nose sturgeon, Atlantic sturgeon, and other migratory fish; or
> (ii)(I) construction at an appropriate location across the Savannah River of a structure that is able to maintain the pool for water supply and recreational activities, as in existence on the date of enactment of this Act; and
> (II) removal of the New Savannah Bluff Lock and Dam on completion of construction of the structure[.]

WIIN Act § 1319 (c)(1)(A).

The WIIN Act provides the Corps with two options: (1) repair the Dam and modify it to allow safe passage for the fish; or (2) remove the Dam and construct a new structure that will allow the fish to travel upstream. Plaintiffs agree that the WIIN Act confers complete discretion to the Corps to decide whether to pursue option 1 or 2. MSJ at 12. After an exhaustive analysis of the alternatives, the Corps has elected to pursue option 2: it will remove the Dam and construct a new structure across the Savannah River—a 500 foot width rock weir that will allow fish to travel to their historic spawning grounds. ECF No. 1-4, FONSI at 2. The WIIN Act by its plain terms, requires only that that new structure be "able to maintain the pool *for water supply and recreational activities*, as in existence on the date of the enactment." WIIN Act § 1319(c)(1)(A)(ii)(I) (emphasis added). It does not require that the structure maintain the pool at an exact or even approximate elevation. Had it been Congress's intention to require that the

Corps maintain the pool at an exact or approximate elevation, it would have said so. But Congress said no such thing. And this Court must give effect to what Congress said. *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."); *Discover Bank*, 396 F.3d at 370 ("where Congress knows how to say something but chooses not to, its silence is controlling." (citation omitted)).

The WIIN Act could have stated, for example, that the structure must be "able to maintain the pool at the level (or depth or elevation) as in existence on the date of the enactment" or that it must be "able to maintain the pool at approximately 114.5 feet NGVD29." There are countless variations as to how Congress might have expressed the requirement that the Dam or new structure would have to maintain the elevation of the pool at a precise or approximate level. But the WIIN Act contains none of them. Instead, the statutory text requires only that the structure be "able to maintain a pool for water supply and recreational activities." WIIN Act § 1319(c)(1)(A)(ii)(I). The statutory language focuses on the purposes for which the pool has historically been used—water supply and recreation—and expresses Congress's intent that the pool continue to hold sufficient water for those purposes in the future. Congress's language, and the ordering of that language, makes clear that it was the *purposes* served by the pool, as of the date of the statute's enactment, rather than the precise elevation of the pool, that it intended to preserve.

Moreover, to adopt Plaintiffs' flawed reading, the Court would have to disregard statutory language. Plaintiffs agree that the Court should look to and enforce the plain language of the statute. MSJ at 11. Plaintiffs further agree that the statute is plain and unambiguous. *Id*. Yet, when asking this Court to enforce that plain language, Plaintiffs selectively quote from it,

purposefully disregarding a crucial modifying phrase: "for water supply and recreational activities[.]" *Id.* at 11 ; Compl. ¶ 141.  Just as courts are not permitted to add words of their own choosing when interpreting a statute, they likewise are not permitted to disregard words of their own choosing.  *Colautti v. Franklin*, 439 U.S. 379, 392 (1979) ("Appellants' argument . . . would make either the first or the second condition redundant or largely superfluous, in violation of the elementary canon of construction that a statute should be interpreted so as not to render one part inoperative."); *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 226 (2015) ("We have long held that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause' is rendered 'superfluous, void, or insignificant.'" (citation omitted)).  Here, the words following "for" in the statutory text are essential as they define the purposes for which the pool is to be maintained.  And the Court must give effect to those words.

Notably, the words following "for" in options 1 and 2 differ, further illustrating that it was the purposes for which the structure was to maintain the pool, rather than the precise elevation of the pool, which guided Congress in crafting this section of the WIIN Act.  Option 1 states that the modified dam must be able to "maintain the pool for navigation, water supply, and recreational activities."  WIIN Act § 1319(c)(1)(A)(i)(I).  In contrast, option 2, which involves removal of the dam, eliminates the navigational purpose and only requires that the structure be able to maintain the pool "for water supply and recreational activities."  § 1319(c)(1)(A)(ii)(I).  Had it been Congress's intent that under either or both options, the Corps was required simply to maintain the pool at the precise or approximate elevation as it existed on the date of the law's enactment, Congress would not have included those additional modifying words (navigation, water supply, recreational activities).  Under Plaintiffs' reading, those words are rendered superfluous, as the only meaningful metric, according to Plaintiffs, is whether the pool is

maintained at a specific elevation—114.5 feet NGVD.  This interpretation fails to give meaning and effect to all of the words in the statute and the Court should reject it.

Plaintiffs' singular focus on the phrase "as in existence on the date of enactment of this Act" is likewise misguided.  Compl. ¶¶ 140-43; MSJ at 11-12.  That clause—which is separated from "maintain the pool" by the additional modifying language discussed above and a comma—simply clarifies that the Corps should look to how the pool was being utilized at the time of the law's enactment to determine what pool level would be sufficient for those purposes moving forward.  Without this additional clarifying language, the Corps would have no guidance as to at what point in time it should account for the water supply and recreation activities, as such uses have varied historically.  Plaintiff is wrong to read this clarifying phrase as requiring that the pool be maintained at the precise elevation it was at on December 16, 2016.

Not only does Plaintiffs' reading of this statute flout accepted statutory construction canons, it would also lead to an absurd result.  And courts should not interpret statutes in ways that lead to absurd results.  *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[Interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."); *Clinton v. City of New York*, 524 U.S. 417, 429 (1998) (rejecting an interpretation that "would produce an absurd and unjust result which Congress could not have intended.").

Under Plaintiffs' reading, the WIIN Act requires the Corps to maintain, for all eternity, the elevation of an upstream pool, which is connected to a river—a naturally flowing, variable waterway—at the exact level that pool so happened to be at on December 16, 2016.[10]  That

---

[10] A date which could not have been known to Congress when it drafted the bill, as the date the President would sign the bill into law could not have been known.

simply cannot be what Congress intended.  This is especially true given that the level of the pool

has always fluctuated, a fact which Plaintiffs concede.[11]  Compl. ¶ 98.  To presume that in

enacting the WIIN Act, Congress intended to prohibit any such naturally-occurring fluctuation,

require the Corps to permanently maintain the level of an upstream river pool with exactitude at

an elevation determined by an arbitrary future date—despite naturally-changing conditions in

river flow and rainfall—and create a private right of action for parties to sue the United States

and complain whenever the elevation of that pool dropped so much as one millimeter below

114.5 feet NGVD29 is absurd.  And this Court should reject that interpretation.

<em>a.     The Congressional letter Plaintiffs cite is irrelevant.</em>

Plaintiffs rest their statutory interpretation argument principally on a letter from the

Georgia and South Carolina Congressional delegations.  ECF No. 1-16 (Ex. O to Compl.).  But

that letter is irrelevant and unavailing for several reasons.

First, the Court should consider legislative history only when a statute is ambiguous.

*New Cingular Wireless PCS, LLC v. Finley*, 674 F.3d 225, 249 (4th Cir. 2012) ("If the language

is ambiguous . . .  we then turn to other evidence to interpret the meaning of the provision, such

as . . .  the legislative history." (citations omitted)).  Since both parties agree that the WIIN Act is

not ambiguous, MSJ at 11-12, the Court need look no further than the plain text.  *See Cont'l Can

Co. v. Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund*, 916

F.2d 1154, 1157-58 (7th Cir. 1990) ("The text of the statute, and not the private intent of the

---

[11] And given that Congress had no way of knowing the "date of enactment" when it drafted the WIIN Act, or the water level on that future unknown date, it is possible that, on that day, the water level could have been either extremely high, due to flooding, or extremely low, due to drought or other factors.  Under Plaintiffs' interpretation, the Corps would be required to thus either maintain flood or drought conditions in perpetuity.  This cannot be what Congress intended.  The far more reasonable reading of the statute is that Congress intended for the Corps to maintain the functionality of the pool as it existed at the time of enactment.

legislators, is the law . . . So the text is law and legislative intent a clue to the meaning of the text, rather than the text being a clue to legislative intent.").

Second, this letter does not constitute legislative history. The delegations drafted this letter (dated April 9, 2019) over two years after Congress enacted the WIIN Act (December 16, 2016). Post-enactment legislative statements such as this have no bearing on the proper interpretation of a statute and are, quite simply, irrelevant. *Kofa v. U.S. INS*, 60 F.3d 1084, 1089-90 (4th Cir. 1995) (explaining that reliance on post-enactment "legislative history," including letters from various senators drafted months after the law's enactment, was unavailing and a "process that had been soundly criticized"); *Walsh v. Brady*, 927 F.2d 1229, 1233 n.2 (D.C. Cir. 1991) (noting that a post-enactment letter from the amendment's sponsor to a government official was "oxymoronic 'subsequent legislative history'" that added "nothing" to the court's interpretation of the statute); *Cont'l Can Co.*, 916 F.2d at 1157(explaining that legislative "statements after enactment do not count; the legislative history of a bill is valuable only to the extent it shows genesis and evolution, making 'subsequent legislative history' an oxymoron." (citations omitted)). Plaintiffs cite no documented legislative history that supports their position and the Corps is not aware of any published committee reports, floor statements, debates, or other legislative history materials discussing section 1319.

Finally, this letter does not support South Carolina's reading of the statute. It does not state that the delegation believes the WIIN Act requires the Corps to maintain the pool at a precise or approximate elevation, and nowhere does it reference 114.5 or 114.76 feet NVDG. *See generally* ECF No. 1-16. Rather, the letter explains that it is the delegation's belief that under the WIIN Act, the Corps "must maintain the river conditions that were in place on the date of the enactment." *Id.* Moreover, the letter does not dispute the Corps' interpretation of the

WIIN Act, as requiring that it implement a structure able to maintain the "current functionality" of the pool. *Id.* Instead, it appears to question, as a factual matter, whether this has been accomplished—a wholly different inquiry. In short, the letter offers little more than a perfunctory summation of the law itself and does not support Plaintiffs' flawed reading of the text.

> b.     If the Court finds that the WIIN Act is ambiguous, the Corps'
>        interpretation is entitled to deference.

If the Court finds that the WIIN Act is ambiguous, the Corps' interpretation is entitled to deference because it is reasonable. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984)*; Kofa*, 60 F.3d at 1087-88. And because it is reasonable, the Court may not substitute its own construction of the statute for that of the agency. *Newport News Shipbuilding & Dry Dock Co. v. Howard*, 904 F.2d 206, 209 (4th Cir. 1990). As the Supreme Court explained, "*Chevron* established a 'presumption that Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion that ambiguity allows.'" *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) (explaining that "the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency" (citations omitted)). Thus, it falls to the Corps to interpret any ambiguity in the WIIN Act, and, under the APA's deferential standard of review, the Court should uphold that interpretation unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

The Corps' interpretation of the WIIN Act is reasonable. The Corps, through implementation guidance issued by Headquarters and the South Atlantic Division, has

interpreted the statute to require that, in constructing the fish passage, it must maintain the pool

level so that certain specified activities (water supply and recreation) can continue to occur, as

they occurred at the time of enactment —in other words, it must maintain the pool's

"functionality."  *See* WIIN Act Implementation Guidance (attached hereto as Exhibits 1 and 2).

This is a reasonable reading of the statutory text.  And because it is reasonable, it is entitled to

deference.  The case law cited by Plaintiffs does not support a contrary result.[12]

Because the WIIN Act does not require that the Corps maintain the pool at a specific

elevation, Plaintiffs' request for a declaratory judgment interpreting the WIIN Act in this manner

fails as a matter of law and must be dismissed.

> iii.    *The Corps' selected proposal complies with the plain terms of the WIIN Act.*

Finally, it is clear on the face of the Complaint, and its attached exhibits, that the Corps'

selected proposal complies with the WIIN Act.[13]  ECF No. 1-2 at 62-63, 106-08.  Based on the

---

[12] The case upon which Plaintiffs principally rely, *Sierra Club*, is distinguishable.  There, the federal agency—the National Park Service—had issued only a two-sentence conclusion in a permitting decision, without any accompanying explanation or rationale.  *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 287 (4th Cir. 2018).  The Fourth Circuit concluded this decision lacked "virtually all of the procedural hallmarks of a legislative-type determination." *Id.* at 288.  In contrast, here, the implementation guidance issued by the Corps was the result of a deliberative process.  Moreover, Congress delegates the authority to implement water resources legislation, such as the WIIN Act, to the Corps.  *See, e.g.,* WRDA of 2016, Pub. L. No. 114-322, § 1112, 130 Stat. 1632, 1637 (directing the Secretary to publish implementation guidance on the Corps' website); WRDA of 2018, Pub. L. No. 115-270, § 1105(a), 132 Stat. 3765, 3772 (directing the Secretary to "expeditiously issue guidance to implement each covered provision of law in accordance with this section.").  The Corps issued the WIIN Act implementation guidance in furtherance of similar authority.

[13] South Carolina's citation to a cherry-picked statement in the Independent External Peer Review Report on the project (the "IEPR") that the Corps' considered proposals do not "seem to fully satisfy" the WIIN Act is unavailing.  MSJ at 15-16 (citing ECF No. 1-18).  The IEPR was prepared by a five-person panel with expertise in engineering, biology, and fisheries.  ECF No. 1-18 at 24.  None of the members has a law degree and the report does not purport to provide legal analysis or guidance.  *Id.* at 70-75.  Any statements within that report which purport to opine on the legality of the Corps' actions are unsupported and, in any case, irrelevant.

Corps' analysis, the rock weir will maintain the pool at approximately 109 feet NGVD29.  *Id*. at ii.  The structure will not affect water supply for any water users.  *Id*. at 100.  And the pool will continue to provide sufficient water for recreational activities, including, boating, fishing, rowing, etc.  *Id*. at 97-99.  Thus, the pool will continue to support both the water supply and recreational activities that existed at the time of enactment.  *Id*. at ii, 62-63, 97-100 106-08.  This is all that the WIIN Act requires.

Since the Corps has fully complied with this requirement of the WIIN Act, the Court must dismiss Claim 1 under Rule 12(b)(6), or, in the alternative deny Plaintiffs' request for summary judgment.

### C.    Claim 2 Fails As A Matter Of Law Because South Carolina Provided All Necessary Permits For SHEP Including Mitigation Measures.

As part of the Settlement Agreement, Plaintiffs agreed to and provided all necessary permits including a section 401 water quality certification.  A fact that Plaintiffs admit in their own motion for summary judgment: "Following extensive settlement negotiations, [the parties] executed an agreement settling all claims related to the permitting of the SHEP."  MSJ at 4.  That Settlement Agreement resolved all challenges to SHEP, including mitigation measures, between South Carolina, the Corps, GPA and several conservation groups.  Resolved "[d]isputes" is defined to include all issues, causes of action, and allegations raised in *SHEP I* and certain South Carolina Administrative Law Court actions and "claims seeking to stop, delay, or alter or otherwise challenge the Project."  SA at 1.

The Settlement Agreement requires that:

The State of South Carolina, through DHEC and the Commission, shall issue any authorizations or permits they contend are necessary for the Project ("State Approvals").  DHEC's approval shall contain only terms and conditions substantially similar to those in the attached Exhibit A and the Commission's approval shall contain only terms and conditions substantially similar to those in the attached Exhibit B, including but not limited to the following substantive

conditions in addition to the commitments in Section II [of the SA].

*Id*. ¶ I.A.  South Carolina, through DHEC and the Commission, was required to "issue any

authorizations or permits they contend are necessary for the Project" and their approvals are

required to "contain *only* terms and conditions substantially similar to those in the attached"

Exhibits A and B, respectively.  *Id*. (emphasis added).  Further the Settlement Agreement

provides that "[t]he State Approvals will state that they satisfy any and all South Carolina

permitting requirements applicable to the Project."  *Id*. ¶ I.B.  Exhibit A provides:

> The [DHEC] certifies pursuant to Section 401 of the [CWA], and S.C. Code
> Regulation 61-101 that: (1) there is a reasonable assurance that [the Project] . . .
> ***including proposed mitigation measures***, and subject to the conditions contained
> in this certification, will be conducted in a manner which will not violate
> applicable water quality standards regulations; (2) any discharges into navigable
> waters from the Project, as described in the final EIS and subject to the conditions
> contained in this certification, will comply with applicable provisions of Section
> 303 of the [CWA]; and (3) there are no applicable effluent limitations under
> Sections 301(b) and 302 of the Act and there are no applicable standards under
> Sections 306 and 307.
>
> This certification serves as a state permit under the South Carolina Pollution
> Control Act, S.C. Code Ann. § 48-1-90(a) and is enforceable as a permit under the
> Pollution Control Act.
>
> This certification authorizes the Project as described in the Final EIS, ROD, Chief
> of Engineer's Report, and approvals of other federal agencies including the
> USEPA approval of July 11, 2012 and the USFWS approval of July 9, 2012,
> subject to the additional requirements of this certification.

SA Ex. A at 1 (emphasis added).  South Carolina's section 401 water quality certification clearly

includes not just the aspects of the Project in and around Savannah Harbor, but the proposed

mitigation measures that include, among other things, creating a fish passage near Augusta,

Georgia.

The Settlement Agreement defines the Project as "the Savannah Harbor Expansion

Project authorized by Congress in 1999, Pub. Law 106-53, 113 Stat. 269, § 101(b)(9) and as

described in the Final Environmental Impact Statement ('Final EIS' [or "FEIS"]) and Final

General Re-evaluation Report ('Final GRR'), both dated January 2012 and revised in July 2012,

and approved by the Chief of Engineers Report dated August 17, 2012 ('Engineer's Report') and

Record of Decision dated October 26, 2012 ('ROD')." SA at 1.  Excerpts of the Final EIS and

Final GRR are attached hereto as Exhibits 3 and 4, respectively, and the complete ROD is

attached hereto as Exhibit 5.

The "proposed mitigation measures" described in the FEIS, Final GRR, the Engineer's

Report, and the ROD each document, in detail, the requirement for a fish passage near the Dam.

The FEIS and Final GRR both identify providing for fish passage at the Dam as required

mitigation to address adverse impacts to sturgeon.  The Final GRR emphasizes that the Project,

as originally authorized under the WRDA of 1999, Pub. L. No. 106-53, § 102(b)(9), specified the

Project could only be carried out after consultation with, among others, the State of South

Carolina, and that the required mitigation be implemented before or concurrently with

construction.  Final GRR at 138.  The GRR notes that it is based upon several March 2011

studies of the impacts on adult and juvenile short nosed sturgeon "with Proposed Mitigation" *Id.*

at 150.  "The mitigation planning process began early in the General Re-evaluation process, and

it became one of the main focus areas as the General Re-Evaluation study progressed. The

process included working with the SEG to identify and evaluate potential mitigation measures.

A list of conceptual mitigation measures was collaboratively developed in 2002, with input from

the natural resource agencies" including DHEC.  *Id.* at 157-58.

"One potential measure is to provide Shortnose sturgeon access to traditional foraging

and spawning habitat above the lowest dam [NSBLD] on the river.  The Corps acknowledged

that removal of the lowest dam on the river, the [Dam] at Augusta, Georgia, which is operated by

35

the Corps, would be the preferred method to allow sturgeon and other anadromous fish to access upstream habitat." *Id.* at 175.[14]  Because of varying opinions about how to ensure effective passage, "the Corps convened an interagency workshop on April 25-27, 2011 to discuss and evaluate mitigation options available. Numerous options were evaluated in regards to fish passage at the NSBL&D.  Using the input from the agencies at the workshop, the Corps screened the potential fish passage options and prepared preliminary designs for three fish passage alternatives."  *Id.* at 175-76; FEIS at 5-119.  DHEC participated in that interagency workshop.  FEIS, App. N.  DHEC, and by extension South Carolina, cannot now claim any lack of understanding about either the need for or the potential details of the SHEP mitigation measures, specifically the removal of the Dam.  At that stage, however, prior to the WIIN Act's passage, an off-channel rock ramp fish passage was selected as the preferred design because it was the most cost effective.  Final GRR at 176.

The FEIS emphasizes that "[t]he Corps coordinated its evaluation of potential environmental effects from the Savannah Harbor Expansion Project with various experts within the Federal and State natural resource agencies through a series of Interagency Coordination Teams."  FEIS at 5-1.  "This includes, for example, such agencies as [DHEC] because of the Project's need to obtain a South Carolina water quality certification . . . ."  *Id.*  The purpose of that coordination was to ensure that the Corps:

(1) conducted the necessary evaluations,
(2) used evaluation tools that are acceptable to the agencies,
(3) *evaluated the alternatives under conditions determined by the agencies to be appropriate*, and

---

[14] At the time the GRR was prepared, the Corps acknowledged that it lacked authority to remove the Dam because it was federally authorized and the Corps was required to maintain it, WRDA of 2000, as amended, called for rehabilitation of the structure and construction of a fish passage, and removal of the Dam was expected to "adversely impact the freshwater supply of eight major users."  Final GRR at 175; FEIS at 5-115.

> (4) *developed the type of information the agencies would need to reach their decision about the project.*

*Id.* (emphasis added).[15]  During the interagency workshop, numerous options were evaluated for a fish passage.  *Id.* at 5-119.  "[T]he Corps screened the potential fish passage options and prepared preliminary designs for three new fish passage alternatives: a full river rock ramp, an off-channel rock ramp, and a hybrid rock ramp."  *Id.*  A full river rock ramp, similar to alternative 2-6d, was clearly identified as a potential design and evaluated in the FEIS.  *Id.*  However, the off-channel rock ramp design was "selected as the preferred design because it is the most cost effective."  *Id.*  The off-channel rock ramp design would have left the existing Dam in place.

Similarly, the Chief of Engineer's Report transmitted to the Secretary of the Army on August 17, 2012 (ECF No. 1-7) (Ex. F to Compl.) ("Ch.'s Rep.") states that the Project's mitigation plan includes construction of a fish bypass around the Dam to compensate for loss of sturgeon habitat by allowing the endangered sturgeon access to historic spawning grounds at the Augusta Shoals that are currently inaccessible.  *Id.* at 2.  The Chief's Report further explains that "[a]s a condition of issuance of the Section 401 Water Quality Certification by [DHEC], the potential non-Federal sponsor, the [GPA], agreed to provide financial assurance, in a manner acceptable to DHEC, that it will fund operation and maintenance of the Dissolved Oxygen system in any year that sufficient federal funds for the operation and maintenance of the system are not made available. This obligation extends for the life of the project."  *Id.* at 4.  There can be no question that South Carolina offered the section 401 water quality certification in exchange for, among other things, GPA's commitments in the Settlement Agreement.  South Carolina

---

[15] "Copies of meeting records and decision documents are found in Appendix N" of the FEIS. FEIS at 5-1.

cannot now claim that it was unaware that it had provided a section 401 water quality certification for SHEP including proposed mitigation measures.

The ROD then approved the Project, finding it to be "technically feasible, economically justified, cost effective, in accordance with applicable environmental statutes, and in the public interest." ROD at 1. The ROD emphasized the required compensatory mitigation features that constituted parts of the Project including "[c]onstruction of a fish bypass around the [Dam] in Augusta, Georgia." *Id*.

In sum, there can be no dispute that construction of a fish passage at the Dam was part of SHEP and that Plaintiffs agreed to provide all necessary permits for the fish passage as part of the Settlement Agreement. It is also clear that a wide variety of alternatives were under consideration when each of the documents discussed above was created. Plaintiffs were aware that there was no final design for the fish passage when they entered into the Settlement Agreement. While Plaintiffs might now wish that they had not agreed to provide the section 401 water quality certification (and any other permits that they believed were necessary) or that they had anticipated the implications of the bargain they struck, they cannot renege on their obligations without themselves breaching the Settlement Agreement.

While the Corps does not dispute that passage of the WIIN Act modified the Project, limiting the Corps' options to those that included either repairing the Dam and building a fish passage around the Dam or building a new fish passage and removing the Dam, *see* WIIN Act § 1319(c), that statutory change, made by Congress, does not provide a basis for South Carolina to breach the Settlement Agreement.

**D.     Claims 3 and 5 Fail As A Matter Of Law Because The Contested Term Is Contrary To Law And Cannot Be Enforced.**

Plaintiffs allege that the Corps has breached a provision of the Settlement Agreement unrelated to the claims at issue in *SHEP I*.  The Settlement Agreement provides that South Carolina approvals for the Project will contain only terms and conditions "substantially similar to those in the attached Exhibit A"[16] and conditions listed in Section I.A. include a requirement that "[t]he Corps will comply with the terms and conditions of the Final Biological Opinion issued by the National Marine Fisheries Service on or about November 4, 2011."  SA ¶ I.A.13.  This is the basis of Plaintiffs' breach of contract allegations.

Compliance with the Biological Opinion is not a CWA requirement.  Rather, section 7(a)(2) of the Endangered Species Act ("ESA") provides that federal agencies must ensure that any action authorized, funded, or carried out by the agency is not likely to "jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical . . . ."  16 U.S.C. § 1536(a)(2).  To achieve this objective, the ESA requires agencies to consult with the FWS whenever a federal action "may affect" an endangered or threatened species.  50 C.F.R. § 402.14(a).  Section 7 and its implementing regulations set out detailed consultation procedures designed to provide agencies with expert advice to determine the biological impacts of their proposed activities.  16 U.S.C. § 1536(b); 50 C.F.R. pt. 402.  The "formal consultation" process is described at length at 50 C.F.R. § 402.14.  Formal consultation culminates in the issuance of a "biological opinion" or "BiOp" by FWS or the NMFS, which advises the action agency whether jeopardy is likely to occur for any listed species and, if so,

---

[16] Exhibit A to the Settlement Agreement, the South Carolina certification under CWA section 401, does not expressly require compliance with the Final Biological Opinion.

whether "reasonable and prudent alternatives" exist to avoid a jeopardy situation.  *Id.* §

402.14(h)(2).  In general, the FWS has authority over terrestrial and freshwater species and the

NMFS has authority over marine species.  *See*, *e.g.*, *Nw. Res. Info. Ctr. v. NMFS*, 56 F.3d 1060,

1065 (9th Cir. 1995) (discussing the division of responsibility for listed species).

For SHEP, after extensive consultation, the NMFS issued a Biological Opinion on

November 4, 2011.  ECF No. 1-6 (Ex. E to Compl.) ("Initial BiOp").  The NMFS concluded, at

the time, "that the proposed action is not likely to jeopardize species listed or proposed for listing

under the ESA under NMFS purview and provides reasonable and prudent measures, along with

their implementing terms and conditions."  *Id.* at 1.  The no jeopardy conclusion of the

Biological Opinion was made contingent upon an agreement to implement and maintain all of

the mitigation measures, including:

> (1) [f]inalization of the proposed off-channel rock ramp fish passage design in
> coordination with NMFS and the other federal and state resource agencies; [and]
>
> (2) [c]onstruction of the fish passage facility at the [Dam] to provide access to
> historical spawning habitat for sturgeon . . .

*Id.* at 4-5.  The Biological Opinion concludes that construction of a fish bypass at the Dam (the

lowest dam on the river) would open up an additional twenty miles of sturgeon habitat upstream

of the dam to provide access to historical spawning habitat.  Although the first design proposed

by the Corps was a horseshoe-shaped rock ramp, NMFS advised the Corps during the

consultation process that dam removal was the "preferred choice because there would be no risk

of it failing to pass sturgeon, and that the proposed fish bypass design was probably not likely to

successfully pass sturgeon."  *Id.* at 21.  Subsequently, at the interagency workshop described

above, regulatory agencies including NMFS and DHEC discussed and evaluated various fish

passage alternatives including three viable alternatives and five others that presented design

40

challenges that would need to be overcome.  The Biological Opinion describes three viable

alternatives:

> The results indicated that dam removal would be the best option as it had the
> highest expected passage effectiveness associated with it, but it would also result
> in loss of the pool, which had been identified as a concern by local governments
> upstream.
>
> The second best alternative proposed would be a full rock ramp built across the
> existing sill of the dam.  The lock would remain operational and the pool would
> be maintained. The in-channel, full-river rock ramp would be the most natural
> pathway, as it would not involve a diversion to a side channel.  Using the theory
> that percent of flow through a fish passage facility is roughly equal to the
> percentage of fish that would pass through, they felt this option would be 90
> percent effective in upstream passage and 100 percent in downstream passage
> efficiency. A separate floodway would be constructed to assist in flood control.
>
> The third choice consisted of a hybrid design that would include partial removal
> of two of the dam's gates and construction of a rock ramp on the upland side of
> the dam.

*Id*. at 22.  As noted above, at that point in time, the Corps lacked authority to proceed with Dam

removal and, and as described in the FEIS and ROD, the Corps selected the off-channel rock

ramp because it had significantly lower estimated construction costs and the predicted passage

efficiency would be almost as high as with the more expensive designs.  *Id.*

NMFS imposed various additional non-discretionary terms and conditions on the Corps.

Relevant to the present dispute was a now-superseded timing requirement that "[f]ish passage

construction shall commence prior to or concurrently with initiation of inner harbor dredging and

be completed with two years."  *Id*. at 191.  This timeline was based on the status of the Project at

the time and the presumption that the Corps would be proceeding with the proposed off-channel

rock ramp design that was anticipated in late 2011.

Subsequently, Congress passed the WIIN Act (discussed above), which limited the

Corps' options with regard to the proposed fish passage.  As a result, the Corps reinitiated

section 7 consultation with the NMFS for SHEP.  The NMFS amended the Biological Opinion to

address "changes resulting from passage of the [WIIN] Act of 2016 which includes specific

provisions regarding implementation of fish passage at the [Dam]."  ECF No. 1-12, Second Am.

BiOp at 6.  NMFS explained:

> The original Opinion evaluated fish passage at the NSBLD for Atlantic and
> shortnose sturgeon as one of several measures to avoid and minimize effects
> resulting from deepening and expansion of the navigation channel.  This fish
> passage was intended to provide improved access to upstream spawning habitat
> by constructing an 'out of river' passage adjacent to the NSBLD.  This design
> would require construction of an entirely new artificial channel adjacent to the
> Savannah River to provide a bypass around the dam structure.  Section 1319 of
> the WIIN Act of 2016 deauthorized the federal interest in the NSBLD project, and
> directed USACE to re-consider fish passage alternatives for SHEP. Specifically,
> Section 1319 directs USACE to evaluate an 'in-river' fish passage design that
> would result in removal of the NSBLD structure entirely.  Upon completion of the
> re-evaluation, WIIN 2016 authorizes USACE to implement one of two variations
> of an in-river alternative. The mandate provided in the WIIN Act results in a
> delay in the beginning of construction and also completion of fish passage at
> NSBLD; the original Opinion required that construction of fish passage
> commence prior to or concurrently with initiation of inner harbor dredging and be
> completed within two years.

*Id*.  NMFS summarized the timing of the Corps' efforts to comply with the WIIN Act and the

likely delay in construction of a fish passage:

> To implement the provisions of WIIN 2016, USACE will first evaluate and
> choose between the two identified alternatives for fish passage at NSBLD (i.e.,
> previous out of river alternative and new in-river alternative).  The evaluation will
> include extensive hydraulic modeling to ascertain effects of removal of the dam
> and replacement with a different structure, including the potential for increased
> flooding in upstream communities, impacts to numerous industrial and water
> supply intakes, and impacts to recreational use of the upstream pool.  USACE will
> use these analyses and input from the public to identify the best in-river design
> alternative.  Once the conceptual plan is identified and approved, the USACE
> must then complete full detailed design, complete required environmental
> compliance clearances, acquire any necessary lands, easements, or rights-of-way,
> prepare a solicitation, advertise, and award a construction contract for fish
> passage.

*Id*. at 8-9.  The Corps estimated that the alternative would take approximately forty months and that the construction could take up to three years—one year longer than the earlier construction estimate because an "in-river design" would "require more complex 'in the wet' construction methods."  *Id*. at 9.

Under the Final Biological Opinion, which had required fish passage construction to start prior to or concurrently with initiation of inner harbor dredging and be completed within two years, construction of the fish passage was estimated to be completed in January 2022 (concurrent with the completion of inner harbor dredging).  *Id*.  As a result of the WIIN Act, however—which delayed initiation of construction and would require an additional year for construction—completion was not expected to be completed until October 2022, an eight month delay.  Accordingly, NMFS analyzed the impact of an eight-month delay.  NMFS concluded that the WIIN Act delay would result "in additional adverse effects beyond those anticipated in the original Opinion, including adverse effects to the year-class strength of both Atlantic and shortnose sturgeon over multiple years resulting from habitat changes."  *Id*. at 115.  As a result, NMFS imposed additional conditions.  NMFS also imposed superseding timing requirements for construction of the fish passage, requiring construction to "commence prior to January 2021 and be completed within 3 years."  *Id*. at 124; *see also id*. at 116.

Thus, the requirement that construction of the fish passage "commence prior to or concurrently with initiation of inner harbor dredging and be completed within two years" is no longer part of the NMFS Biological Opinion and the Corps is no longer required to comply with this superseded requirement.  Instead, the Corps must now commence construction prior to January 2021 and complete construction within three years.  Indeed, if South Carolina were to seek to challenge the Final Biological Opinion as a final agency action, the court would lack

jurisdiction because challenges to a superseded biological opinion are moot. *Grand Canyon Tr. v. U.S. Bureau of Reclamation*, 691 F.3d 1008, 1017, 1024 (9th Cir. 2012), *as amended*, (Sept. 17, 2012) (holding that "issuance of a superseding BiOp [biological opinion] moots issues on appeal relating to the preceding BiOp" and explaining that "[a]ny inquiry into whether [challenged agency action] violated the APA would require [the court] to delve into the merits of the 2009 BiOp, a document that is no longer operative"); *Am. Rivers v. NMFS*, 126 F.3d 1118, 1123 (9th Cir. 1997) (holding claims against a prior opinion mooted by new, superseding opinion); *Strahan v. Linnon*, 967 F. Supp. 581, 590 (D. Mass. 1997), *aff'd*, 187 F.3d 623 (1st Cir. 1998) (holding that a "claim against the 1995 [BiOp] is now moot because the 1995 [BiOp] is no longer in effect and 'the challenged actions are now water over the spillway, as it were.'" (quoting *Idaho Dep't of Fish & Game v. NMFS*, 56 F.3d 1071, 1074 (9th Cir. 1995)). Although here, NMFS characterized the subsequent documents as amendments to the Final Biological Opinion, the provisions at issue here—timing of implementation of the fish passage mitigation measures—were superseded, not amended. Thus, notwithstanding the Settlement Agreement's reference to the outdated Biological Opinion, the Corps is no longer obligated to comply with this superseded requirement. And Plaintiffs' claims alleging breach of that term fail as a matter of law and should be dismissed.

### E.    Plaintiffs' Request For A Declaratory Judgment Interpreting The Flowage Easements (Claim 4) Fails As A Matter Of Law.

Claim 4 seeks a declaration that the Corps must comply with alleged "elevation restriction[s]" contained in numerous flowage easements. Compl. ¶ 185. This claim fails for two reasons. One, the Declaratory Judgment Act is not an independent cause of action. And two, the flowage easements, by their plain terms, do not require that the United States maintain the pool's elevation at 114.5 feet mean sea level. For that reason, the Court could not enter a

44

declaratory judgment interpreting the flowage easements in Plaintiffs' favor.  The claim, therefore, fails as a matter of law and must be dismissed.

<em>i.    The Declaratory Judgment Act is not an independent cause of action.</em>

As discussed above, the Declaratory Judgment Act is not an independent cause of action. It is a remedy.  Therefore, the Court must determine whether there is a cognizable claim underlying the request for declaratory judgment.  Plaintiffs do not identify an independent cause of action underpinning Claim 4 and, for that reason alone, it fails as a matter of law.

<em>ii.    The flowage easements do not require that the Corps maintain the pool at 114.5 feet mean sea level.</em>

Claim 4 also fails because the flowage easements, by their plain terms, do not require that the United States maintain the pool at 114.5 feet mean sea level.  Because the easements do not require this, the Court could not issue a declaratory judgment interpreting the easements in Plaintiffs' favor.

Flowage easements are instruments governed by state law.  *Pressl v. Appalachian Power Co.*, 842 F.3d 299, 305 (4th Cir. 2016).  Under South Carolina law, courts interpret express easements, such as flowage easements, in accordance with the rules applied to contracts, deeds, and other written instruments.  *Williams v. Tamsberg*, 425 S.C. 249, 259 (Ct. App. 2018), *reh'g denied* (Dec. 13, 2018), *cert. denied* (June 28, 2019).  The proper interpretation presents a question of law to be resolved by the court.  28A C.J.S. Easements § 186 ("the interpretation of an easement that does not depend on conflicting extrinsic evidence is a question of law"); *Tupper v. Dorchester Cty.*, 326 S.C. 318, 323 (1997).  The primary consideration in construing the scope of an express easement is the language of the grant.  *Plott v. Justin Enterprises*, 374 S.C. 504, 513–14 (Ct. App. 2007) ("The language of an easement determines its extent.").  Courts must

"construe unambiguous language in the grant of an easement according to the terms the parties have used." *Williams*, 425 S.C. at 259.

Under South Carolina law, "flowage rights" have been defined as "the 'private right to operate a dam and flood [flow] the property of upstream waterfront landowners'" and the right to set "water back against the up stream river banks and over them to *at least the level* that the surface of the water is maintained at the dam." *Binkley v. Rabon Creek Watershed Conservation Dist. of Fountain Inn*, 348 S.C. 58, 68 (Ct. App. 2001) (emphasis added).  Flowage easements are "customarily described in terms of elevation, contour lines, and/or acreage." *Id.*  Hence, as a threshold matter, flowage easements generally operate to allow one party to flood the property of another up to a certain level.  *Id.*  (explaining that an easement allowing "for the *flowage* of any waters in, *over, upon* or through such [dam] structure" conveyed the right to flood land "surrounding the lake up to the . . . top of the dam"); *Atkinson v. Carolina Power & Light Co.*, 239 S.C. 150, 156 (1961) (describing a flowage easement that allowed a party to "impound water up to the 220 foot elevation contour line").

Plaintiffs' reading of the flowage easements is flawed because those easements, by their plain terms, permit—but do not require—the United States to maintain the water level up to 114.5 feet mean sea level.  The easements, which all contain identical terms, convey to the United States:

> the perpetual right or easement to flood as may be necessary, by the erection and operation of a dam across the Savannah River near the New Savannah Bluff, Georgia, with crest control gates so operated as to maintain a pool elevation at said dam of 114.5 feet mean sea level … except when the natural discharge of the rivers exceeds that elevation at that point

ECF No. 1-5, Easements.  The core terms of the flowage easements include: the description of the property over which the easement runs (the servient estate), the parties to the easement (the private landholder and the United States), and the duration of the conveyance (perpetual).  The

46

reference in the flowage easements to "114.5 feet mean sea level" is merely a description of the upper boundary at which flooding of the property may occur, as a result of the dam's operation. That reference does not create, as Plaintiffs argue, an "express condition" or requirement that the United States forever maintain the pool at 114.5 feet mean sea level.  Compl. ¶ 185.  Moreover, the exception which immediately follows the reference to 114.5 feet—"except when the natural discharge of the rivers exceeds that elevation at that point"—evidences that, at the time of conveyance, the parties recognized that the pool level would fluctuate due to the natural variance of the flowing river.  In sum, the flowage easements by their plain terms do not require the United States to maintain the pool at 114.5 feet mean sea level.

Plaintiffs' reading of the easement is likewise flawed because descriptive language in an easement, such as the reference to 114.5 feet mean sea level, does not generally create an enforceable condition or term of the easement.  *See, e.g., Ranch at the Falls LLC v. O'Neal*, 38 Cal. App. 5th 155, 177 (Ct. App. 2019), *reh'g denied* (Aug. 21, 2019), *review denied* (Nov. 13, 2019) ("a descriptive term in a recital does not change the clear language of the easement grant."); *Lethin v. United States*, 583 F. Supp. 863, 871–72 (D. Or. 1984) (concluding that descriptive language in an easement did not limit its scope); *Kell v. Oppenlander*, 154 Or. App. 422, 427 (1998) (concluding that an easement's reference to a "garage"—the encroaching structure—was a term of description rather than limitation).  The same is true here.

Finally, using less than all of an easement is not a breach of that easement.  An easement entitles the holder to "use the servient estate in any manner that is reasonably necessary for the convenient enjoyment of the servitude."  Restatement (Third) of Property (Servitudes) § 4.10 (2000).  While the easement holder "cannot materially increase the burden of the servient estate or impose thereon a new and additional burden," *Rhett v. Gray*, 401 S.C. 478, 493 (Ct. App.

2012), there is nothing to prevent a dominant estate holder from decreasing the burden on the servient estate.

Here, the Corps does not propose to exceed 114.5 feet mean sea level, or increase the burden on the servient estates; rather, it proposes to flood less than all of its easement, and thereby decrease the burden on the servient estates. The servient estates will not in any way be burdened beyond what is authorized in the easement. The effect, if any, on the servient estates is that their landholdings may be flooded less than is permissible under the flowage easements. Because using less than all of an easement is not a cognizable cause of action, the Court must dismiss Claim 4.

## CONCLUSION

The Court should dismiss Claims 1-5, under either Rule 12(b)(1) or 12(b)(6). The Court does not have jurisdiction to entertain these claims because Plaintiffs have not identified an applicable waiver of sovereign immunity. Even if there were jurisdiction for the Court to hear them, these claims fail as a matter of law for the reasons discussed above. And in the event the Court considers the merits of Plaintiffs' motion for summary judgment, the Court should deny the motion.

Respectfully submitted this 13th day of February, 2020.

PRERAK SHAH

Acting Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

*/s/ Sally J. Sullivan*
SALLY J. SULLIVAN (DC Bar No. 1021930)
Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
4 Constitution Square
150 M Street NE
Suite 3.142
Washington, DC  20002
Tel: (202) 514-9269
Fax: (202) 305-0506
Email: sally.sullivan@usdoj.gov

LESLIE M. HILL (D.C. Bar No. 476008)
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
4 Constitution Square
150 M St. NE
Suite 4.149
Washington, DC  20002
Tel: (202) 514-0375
Fax: (202) 514-8865
Email: leslie.hill@usdoj.gov

BETH DRAKE (#5598)
Assistant United States Attorney
1441 Main Street, Suite 500
Columbia, SC  29201
Tel: (803) 929-3061
Email: beth.drake@usdoj.gov

*Attorneys for Federal Defendants*